08 CV 0013⁵

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT ASSOCIATION OF COLORADO; TENNESSEE CONSOLIDATED RETIREMENT SYSTEM; SJUNDE AP-FONDEN; FJÄRDE AP-FONDEN; and PENSIONSKASSERNES ADMINISTRATION A/S, Individaully and Behalf of All Others Similarly Situated, | Civil Action No. <br><br> **CLASS ACTION** <br><br> **JURY TRIAL DEMANDED** <br> "ECF CASE" |
| Plaintiffs, |  |
| v. |  |
| CITIGROUP INC., CHARLES O. PRINCE, SALLIE L. KRAWCHECK, GARY L. CRITTENDEN, TODD S. THOMSON, ROBERT DRUSKIN, THOMAS G. MAHERAS, MICHAEL STUART KLEIN, DAVID C. BUSHNELL, JOHN C. GERSPACH, STEPHEN R. VOLK, GEORGE DAVID, and KPMG LLP, |  |
| Defendants. |  |



## CLASS ACTION COMPLAINT FOR
## VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**TABLE OF CONTENTS**

I.    SUMMARY OF THE ACTION..............................................................................2

    A.    Citigroup's Use of Liquidity Puts In Connection with VIEs.....................3

    B.    Citigroup's Improper Accounting for Its SIVs.........................................5

    C.    Defendants Begin to Admit the Truth Concerning Citigroup's Liquidity
        Puts and SIVs..........................................................................................7

II.   JURISDICTION AND VENUE ......................................................................13

III.  PARTIES ......................................................................................................14

    A.    Plaintiff, the Public Employees' Retirement Association of Colorado ................14

    B.    Plaintiff, the Tennessee Consolidated Retirement System .....................15

    C.    Plaintiff, Sjunde AP-Fonden..................................................................15

    D.    Plaintiff, Fjärde AP-Fonden ..................................................................16

    E.    Plaintiff, Pensionskassernes Administration A/S ...................................16

    F.    Citigroup Inc............................................................................................16

    G.    The Individual Defendants .....................................................................17

        1.    Charles O. Prince......................................................................18

        2.    Sallie L. Krawcheck .................................................................20

        3.    Gary L. Crittenden....................................................................21

        4.    Todd S. Thomson ......................................................................22

        5.    Robert Druskin .........................................................................23

        6.    Thomas G. Maheras...................................................................25

        7.    Michael Stuart Klein.................................................................26

        8.    David C. Bushnell......................................................................27

        9.    John C. Gerspach.......................................................................29

        10.   Stephen R. Volk.........................................................................30

        11.   George David.............................................................................31

    H.    KPMG LLP..............................................................................................32

IV.   BACKGROUND AND SUMMARY OF DEFENDANTS' FRAUD ...............33

    A.    Citigroup's Subprime and Off-balance-sheet Background ....................33

    B.    Defendants' Failure to Disclose Citigroup's Use of Liquidity Puts.....................36

    C.    Citigroup's Improper Accounting for Its SIVs.......................................39

V.    CLASS PERIOD EVENTS AND FALSE AND MISLEADING STATEMENTS.........42

|       | A. | 2004 Events and False and Misleading Statements | 44 |
|       | B. | 2005 Events and False and Misleading Statements | 58 |
|       | C. | 2006 Events and False and Misleading Statements | 71 |
|       | D. | January 2007 - September 2007 Events and False and Misleading Statements | 84 |
| VI.   | THE DEFENDANTS BEGIN TO DISCLOSE THE TRUTH | | 101 |
| VII.  | POST CLASS PERIOD EVENTS | | 114 |
| VIII. | DEFENDANTS VIOLATED GENERALLY ACCEPTED ACCOUNTING PRINCIPLES AND OTHER REPORTING REGULATIONS | | 116 |
|       | A. | Defendants' Omission of Material Facts Concerning the Liquidity Puts Violated U.S. GAAP | 117 |
|       | B. | Defendants' Omission of Material Facts Concerning the Liquidity Puts Violated Item 303, Regulation S-K – Management's Discussion and Analysis of Financial Condition and Results of Operations | 120 |
|       | C. | Defendants Failed to Consolidate Citigroup's SIVs As Required | 123 |
| IX.   | KPMG VIOLATED AUDITING STANDARDS AND REQUIREMENTS OF THE PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD | | 125 |
| X.    | THE INDIVIDUAL DEFENDANTS' INSIDER SELLING | | 131 |
| XI.   | LOSS CAUSATION | | 137 |
| XII.  | GROUP PLEADING | | 138 |
| XIII. | FRAUD ON THE MARKET PRESUMPTION | | 139 |
| XIV.  | THE SAFE HARBOR PROVISION OF THE PSLRA IS INAPPLICABLE | | 140 |
| XV.   | CLASS ACTION ALLEGATIONS | | 142 |
| XVI.  | CAUSES OF ACTION | | 145 |
|       | COUNT I: Violation of § 10(b) of The Exchange Act And Rule 10b-5 Promulgated Thereunder | | 145 |
|       | COUNT II: Violation of § 20(a) of The Exchange Act | | 148 |
|       | COUNT III: Violation of § 20A of The Exchange Act | | 149 |
| XVII. | PRAYER FOR RELIEF | | 161 |
| XVIII.| JURY DEMAND | | 161 |

Plaintiffs, the Public Employees' Retirement Association of Colorado ("Colorado PERA"), the Tennessee Consolidated Retirement System ("TCRS"), Sjunde AP-Fonden ("AP7"), Fjärde AP-Fonden ("AP4"), and Pensionskassernes Administration A/S ("PKA") (collectively, "Plaintiffs"), on behalf of themselves and a class of investors (the "Class") consisting of all persons and entities that purchased Citigroup Inc. ("Citigroup" or the "Company") common stock during the period from January 2, 2004 through and including November 21, 2007 (the "Class Period"), by and through their undersigned attorneys, allege the following for their Class Action Complaint ("Complaint") for violations of the Securities Exchange Act of 1934 (the "Exchange Act"). The allegations in this Complaint are based upon personal knowledge as to Plaintiffs' own acts, and are based upon information and belief as to all other matters alleged herein.

Plaintiffs' information and belief is based upon, among other things, a continuing investigation, directed and supervised by Plaintiffs and conducted by and through their undersigned counsel, into the facts and circumstances alleged herein including, without limitation, review and analysis of: (i) the filings that Citigroup made with the United States Securities and Exchange Commission ("SEC") and the London Stock Exchange ("LSE"); (ii) press releases, public statements, news articles, and other publications disseminated by or concerning Citigroup, the other defendants named herein (together with Citigroup, the "Defendants") and related parties; (iii) Citigroup's press conferences, analyst conference calls and conferences, and corresponding transcripts thereof; (iv) the corporate websites of Citigroup, the other Defendants and related parties; (v) securities analyst reports concerning Citigroup and its operations; (vi) other public and non-public information concerning Citigroup and the other Defendants; and (vii) consultation with banking, auditing, and accounting experts. Many

1

additional facts supporting the allegations herein are known only to the Defendants and/or are within their exclusive custody or control. Plaintiffs believe that additional evidentiary support for the allegations herein will emerge after a reasonable opportunity to conduct discovery.

## I.     SUMMARY OF THE ACTION

1.     During the Class Period, the Defendants named herein knowingly and/or recklessly made a series of materially false and misleading statements and omissions of material fact concerning Citigroup's exposure to losses based upon the Company's creation and/or sponsorship of numerous off-balance-sheet Variable Interest Entities ("VIE"). Citigroup's VIEs included collateralized debt obligations ("CDO"), structured investment vehicles ("SIV"), asset-backed commercial paper ("ABCP") conduits, and other "structured finance" vehicles. Despite Citigroup's implicit and explicit obligations to provide liquidity, credit enhancement, and other support to its VIEs, the Defendants failed to disclose such obligations to investors, and further failed to account properly for the VIEs.

2.     As Defendants began to disclose the truth regarding Citigroup's exposure to risks associated with its VIEs, the price of Citigroup common stock declined in a series of material steps from $47.10 per share on October 1, 2007 to $30.73 per share on November 21, 2007 as the market processed each set of previously undisclosed facts. Each such disclosure removed a portion of the artificial inflation in the price of Citigroup's common stock and directly caused Plaintiffs and the other members of the Class to suffer damages. At the end of the Class Period, Citigroup's common stock had declined by $25.68 (46%) per share from its Class Period high of $56.41 -- erasing $122 billion in shareholder value and giving Citigroup common stock the distinction of being the worst performing stock in the Dow Jones Industrial Average for 2007.

**A.    Citigroup's Use of Liquidity Puts In Connection with VIEs**

3.     The hundreds of billions of dollars of off-balance-sheet VIEs that Citigroup created and/or sponsored during the Class Period typically issued commercial paper, or other short term debt, to investors and used the proceeds to purchase assets. Included among the assets that Citigroup's VIEs purchased were billions of dollars worth of subprime mortgage-backed securities, many of which were originally issued by Citigroup itself. Citigroup received huge fees for arranging and managing its VIEs, which were little more than vehicles to allow Citigroup to move its own risky subprime debt off Citigroup's balance sheet.

4.     Citigroup arranged for its VIEs to fund themselves by issuing short-term debt. At the date of maturity, the holder of the VIE debt had the option of requiring repayment of the amounts advanced, refinancing, or "rolling over," the VIE-issued debt instrument.

5.     Defendants knew that the tightening market would make it difficult for holders of VIE debt to roll over VIE issued commercial paper. Nevertheless, Citigroup took the dramatic step of issuing "Liquidity Puts" during the Class Period to sweeten the deal for purchasers of VIE debt, and to ensure a source of funding for the VIEs, thereby providing a vehicle by which Citigroup could drive its own risky subprime and other non-performing debt off its own balance sheet. Citigroup's Liquidity Puts guaranteed a market for VIE debt purchasers by obligating Citigroup to buy back VIE-issued commercial paper -- ***at the original purchase price*** -- from a holder if the holder could not find a ready market into which to sell such paper.

6.     Citigroup's Liquidity Puts guaranteed that it would bear the enormous risk associated with the VIE commercial paper in a market that Citigroup itself knew was both volatile and full of enormous risk. In so doing, Citigroup and the other Defendants exposed the Company to catastrophic and undisclosed losses. The fact that the commercial paper issued by Citigroup's VIEs was collateralized by subprime asset-backed securities, underwritten to the

3

lowest standards in history, virtually ensured that Citigroup shareholders would ultimately bear the risk of a significant decline in -- a risk of which Citigroup was admittedly aware in 2004. Defendants never disclosed this multibillion dollar exposure to the Liquidity Puts and the related credit enhancement devices, all of which directly resulted in: (i) the destruction of more than $122 billion in shareholder value; (ii) Citigroup's own liquidity crisis; (iii) the write off of billions in assets; and (iv) the eventual need for Citigroup to further decrease shareholder with billions of dollars of outside financing. Simply stated, Citigroup's "money machine" ran amok while the Defendants concealed the true nature of a material portion of Citigroup's revenues and the risks associated therewith from Citigroup's investors.

### Citi's Subprime Money Machine



7.     Citigroup also extended its use of Liquidity Puts beyond VIEs that the Company sponsored. For example, beginning in 2004, Citigroup provided Liquidity Puts to investors in CDOs arranged by Bear Stearns & Co., Inc. and its affiliates ("Bear Stearns"). These CDOs, known as Klio Funding entities ("Klio") were structured and managed by Ralph Cioffi, a Bear Stearns asset manager. In connection with the Klios, Citigroup provided Liquidity Puts to Klio investors, guaranteeing that Klio investors would receive a refund of their initial investment together with interest if the market soured. In return for this arrangement, Citigroup was able to sell its own mortgage-backed securities and other debt to the Klio entities -- effectively creating a market to assets that Defendants knew were too risky to remain on Citigroup's books. Of course, because Citigroup "sold" these assets to the Klios pursuant to Liquidity Puts, Citigroup knew that it had continued to bear the entire risk of loss in connection with these "sold" assets.

8.     As alleged in detail herein, United States Generally Accepted Accounting Principles ("U.S. GAAP") and SEC regulations *required* Citigroup to disclose the terms of the Liquidity Puts and related liquidity devices, as well as the specifics of the risks that the Company assumed pursuant to the Liquidity Puts, including identifying the subprime assets that served as dubious collateral. Citigroup never disclosed any of these material facts and known risks, thereby depriving Class members of information that they required to make fully informed decisions in connection with their purchases of Citigroup common stock during the Class Period.

### B.     Citigroup's Improper Accounting for Its SIVs

9.     In addition to Defendants' materially false and misleading statements and omissions of material fact concerning Citigroup's use of Liquidity Puts, Defendants failed to disclose or to properly account for the Company's risk exposure based upon its responsibility for numerous SIVs, which Citigroup used to purchase mortgage-backed securities during the Class Period.

10.    Even though Citigroup, as a practical matter, bore the responsibility for its SIVs'
losses during the Class Period, the Company did not consolidate the SIVs on its own balance
sheet, as required under U.S. GAAP.  Citigroup also failed to disclose the massive exposure
presented by the subprime mortgage-backed securities which comprised a material portion of the
assets of Citigroup's SIVs.  As the losses in Citigroup's SIVs escalated, Citigroup was forced to
reveal and belatedly account for its previously undisclosed exposure to the losses of its SIVs, a
portion of which exposure is depicted below:

### Citigroup's Massive Exposure to VIE Risk



**C.      Defendants Begin to Admit the Truth Concerning Citigroup's Liquidity
Puts and SIVs**

11.      On October 1, 2007, Citigroup issued a press release in which Citigroup estimated
a *60% decline* in net income from the prior-year quarter as a result of "dislocations in the
mortgage-backed securities and credit markets."  In the foregoing press release, Defendant
Prince falsely stated that "the decline in income was driven primarily by weak performance in
fixed income credit market alternatives, write-downs in leveraged loan commitments, and
increases in consumer credit costs."  The truth was that the decline in income was driven, among
other things, by the redemption of more than $25 billion in undisclosed Liquidity Puts.

12.      On October 15, 2007, Citigroup issued a press release in which the Company
announced its third quarter 2007 results and reported a decline in net income of 57% from the
prior year.  In this release, Citigroup claimed, among other things, that the decline in net income
resulted from the *"correction of the valuation on the Company's $43 billion in Asset-Backed
Securities Collateralized Debt Obligations (ABS CDOs) super senior exposures.  The impact of
this correction is a $270 million reduction in Principal Transactions Revenue, a $166 million
reduction in Net Income and a $0.03 reduction in Diluted Earnings per Share."*[1]  Again,
Citigroup failed to disclose the fact that $25 billion of this amount was from the redemption of
undisclosed Liquidity Puts.  Citigroup also failed to disclose the existence (and draw-down) of VIE
stand-by credit facilities of more than $7 billion.  Citigroup also announced a write-down of
"$1.35 billion pre-tax, net of underwriting fees, on funded and unfunded highly leveraged
finance commitments" and "losses of $1.83 billion pre-tax, net of hedges, on the value of sub-
prime mortgage-backed securities warehoused for future collateralized debt obligation ("CDO")
securitizations, CDO positions, and leveraged loans warehoused for future collateralized loan

---

[1]   Unless otherwise indicated, emphasis is added to quoted language.

obligation ("CLO") securitizations" (subprime loans that Citigroup had previously intended to "dump" off balance sheet into its SIVs).

13.     Despite announcing the foregoing poor financial results, Citigroup continued to conceal its massive exposure to $55 billion in subprime securities, $25 billion of which Citigroup would soon announce it was taking directly onto its books because of Citigroup's redemption of VIE commercial paper backed by Liquidity Puts.  Instead, Citigroup issued a second press release on the same day which disclosed a plan to bail-out Citigroup's ailing SIVs though a proposed "Master Liquidity Enhancement Conduit" ("M-LEC"), into which Citigroup and several other financial institutions would provide liquidity by purchasing assets at supposedly market values from the flailing SIVs.  The plan was widely criticized by, among many others, Warren Buffet and Alan Greenspan, and became moot with Citigroup's December 13, 2007 announcement that it would take its SIVs onto the Company's balance sheet.

14.     On October 19, 2007, Citigroup disclosed that the Company sponsored seven SIVs with a total of *$80 billion* in assets.  In Citigroup's press release, entitled "Fact Sheet – Citigroup-Advised Structured Investment Vehicles (SIVs)," the Company stated that third-party investors provide the equity capital to the SIVs, which are "advised" by Citi Alternative Investments.  This release was designed to make investors believe that Citigroup, contrary to the true facts, was not responsible for providing liquidity to its SIVs.  In this regard, the press release stated, "*[w]hile Citigroup will not consolidate the assets of the SIVs, Citigroup has and will, from time to time, continue to provide liquidity to the SIVs on an* arm's length basis on commercial terms consistent with those provided by unaffiliated third parties."

15.     Despite the false picture presented by Citigroup, the facts disclosed were enough to cause Citigroup's stock price to decline $5.44 per share from a closing price of $47.25 per

share on October 12, 2007 to $41.81 per share on October 19, 2007 -- the loss of another $25 billion in market capitalization.

16.     Citigroup provided additional details of the magnitude of its subprime and VIE-related losses on November 4, 2007, when Citigroup issued a press release, entitled "Citigroup's Sub-Prime Related Exposure in Securities and Banking."  In this press release, the Company announced that severe declines in the fair value of approximately *$55 billion* in U.S. subprime related direct exposures would result in an estimated *massive $8 to $11 billion write-down of revenue, which Citigroup stated represented a decline of approximately $5 billion to $7 billion in net income on an after tax basis*.  Of the $55 billion in impaired direct subprime exposure, Citigroup indicated that $43 billion represented exposures in the most senior tranches (super senior tranches) of CDOs which are collateralized by asset-backed securities.  Unbelievably, Citigroup had yet to disclose that $25 billion of the $55 billion in US subprime exposures was related to Liquidity Puts redemption.

17.     Also on November 4, 2007, Citigroup announced that Defendant Prince would immediately resign from his positions as Chairman and CEO of Citigroup.  In connection with the announcement of his resignation, Prince stated:  "it is my judgment that given the size of the recent losses in our mortgage-backed securities business, the only honorable course for me to take as Chief Executive Officer is to step down."  For his role in this fraud, Prince walked away with almost $95 million, including $28 million in stock awards, an incentive award of approximately $12 million, and $53 million in Citigroup stock he already holds.

18.     On November 5, 2007, Citigroup held a conference call with analysts to discuss the massive anticipated write-down that the Company announced the prior day (the "November 5, 2007 Call").  *During the November 5, 2007 Call, Defendant Crittenden disclosed*

9

***Citigroup's use of Liquidity Puts and their previously hidden risks and ultimate impact upon the Company's financial exposure for the first time.*** When questioned regarding the $25 billion of commercial paper exposure with underlying subprime exposures disclosed above in the November 4, 2007 Press Release, Crittenden responded, in relevant part, as follows:

> ***So this was, this was essentially <u>a funding mechanism that was used as we structured CDOs up until I believe the end of 2005</u>, so we would sell a structured CDO to a customer. We would provide a liquidity put essentially to that*** customer during the course of the summer. And this was all backed by subprime collateral, I might add, as you know. But essentially looks like a super senior CDO for all intents and purposes that those – ***we decided actually to buy the commercial paper associated with that during the course of the summer and as result that came back on our books and obviously we had the exposure to the underlying security there. And so that's what the $25 billion is made up of.*** Once it's back on our books for all intents and purposes, it operates and looks like a super senior CDO position. That's what it is because in essence this was a financing mechanism.

* * *

> ***So the 25 billion is a kind of 2006 and older liquidity put*** that has come back to us that feels and has all of the characteristics of a super senior CDO.

19.    Citigroup's use of Liquidity Puts, which Defendants failed to disclose until November 5, 2007, meant that billions of dollars in purported issuance of CDO commercial paper was illusory and that approximately $25 billion of such debt actually contained guarantees from Citigroup to buy back the commercial paper if the investor could not sell the paper on its own or if the debtholder chose not to refinance. In other words, the risk was not transferred to the purchasers and these "sales" were nothing more than parking transactions for risky Citigroup assets. Of course, this is precisely what happened, and Citigroup never disclosed the tremendous loss contingency relating to the Liquidity Puts and other credit enhancement devices. Instead, investors were only informed of the Company's use of Liquidity Puts ***after*** the damage was done.

20.    Citigroup's Class Period admissions demonstrate that the Defendants knew of the exact risks that the Liquidity Puts entailed and consciously elected to take those risks and gamble with the value of the Company and Class members' investments therein in order to enable Citigroup and certain of the Individual Defendants (defined herein at ¶ 76) to earn fees from arranging and managing VIEs.

21.    For example, in a submission to the LSE made during the summer of 2007, Citigroup admitted that ***Defendants knew since 2004 that continued investment in Residential Mortgage Backed Securities ("RMBS") and Asset Backed Securities ("ABS") CDOs presented too much risk***.  In its August 2007 "Portfolio Commentary for Beta Finance Corporation", ***Citigroup stated that "[w]e stopped buying ABS CDO deals for any of the SIV portfolios in 2004, due to concerns about the correlation of the underlying products."***

22.    In the foregoing submission pertaining to the Beta SIV, Citigroup further stated:

> ***Over recent years, the tight credit spread environment drove us to reduce risk by pursuing the following strategies in return for a minimal give up in yield:***
>
> - ***Protecting the more volatile sectors (USRMBS, CMBS and arbitrage CDOs) well beyond the rating agency's requirements for AAA***
> - ***Avoiding what we perceived as the unduly risky areas of sub prime and CDOs of ABS***

23.    Citigroup's 2004 admissions concerning its deliberate election to avoid investing in securities backed by subprime mortgages on behalf of its SIVs because of the volatility and unacceptable risks inherent in such investments, demonstrates that Citigroup knowingly incurred the risks inherent in the Liquidity Puts and other VIE related credit enhancement in order to dump subprime debt of its balance sheet into hidden off-balance-sheet transactions and to earn lucrative fees based upon its arrangement and management of its VIEs.  Citigroup's shareholders were the ultimate loser in this gamble to the tune of at least $122 billion in shareholder value.

24.     Further contradicting Citigroup's repeated contentions that it was not obligated to provide liquidity to its SIVs, the Company also disclosed for the first time in its Form 10-Q for the quarter ended September 30, 2007 (the "Third Quarter 2007 10-Q") that the Company had provided its SIVs with a ***$10 billion** line of credit, **$7.6 billion** of which had been drawn as of **October 31, 2007.*** The Third Quarter 2007 10-Q also summarized the seven Citigroup-advised SIVs as follows:

| *(In billions of dollars)* | | | |
|---|---|---|---|
| **SIV** | **Assets** | **CP Funding** | **Medium Term Notes** |
| Beta | $19.3 | $2.6 | $15.7 |
| Centauri | 20.1 | 2.9 | 16.1 |
| Dorada | 11.0 | 2.2 | 8.1 |
| Five | 13.2 | 5.5 | 7.1 |
| Sedna | 13.4 | 5.6 | 7.0 |
| Zela | 4.1 | 2.7 | 1.2 |
| Vetra | 2.0 | 1.4 | 0.5 |
| **Total** | **$83.1** | **$22.9** | **$55.7** |

25.     Citigroup's November 4 and November 5, 2007 disclosures caused investors to lose more confidence and suffer additional losses. Just a few short weeks earlier, Citigroup stated that its third quarter 2007 losses attributable to the Company's subprime exposure would be $1.56 billion. The disclosure of mounting losses, which Citigroup was still unable to quantify with any real degree of precision, cast grim shadows upon the Company's ability to value its assets or quantify its losses. As a result of Citigroup's disclosure of its massive write-down, its use of Liquidity Puts, and the Company's provision of $10 billion in liquidity to its struggling off-balance-sheet SIV's, Citigroup's common stock price declined an additional $4.83 per share from a closing price of $37.73 per share on November 2, 2007 to $32.90 per share on November

8, 2007, with a huge trading volume of over 1 billion shares each day. During this period, Citigroup lost another $22.9 billion in market capitalization.

26.    On November 19, 2007, several analysts downgraded the Company based upon such analysts' predictions that Citigroup had not yet fully disclosed its subprime-related losses. As a result of these downgrades, Citigroup's common stock price declined $1.27 per share, from $32.00 per share on November 19, 2007 to close at $30.73 per share at the end of the Class Period on November 21, 2007.

27.    The Defendants capitalized on their materially false and misleading statements and omissions of material fact concerning Citigroup's exposure to: (i) commercial paper issued by Citigroup-sponsored CDOs, including the staggering amount of such debt that Citigroup guaranteed through undisclosed Liquidity Puts; (ii) the debt of Citigroup's own SIVs, for which Citigroup was financially responsible; and (iii) its own portfolio of risk intensive subprime mortgage-backed securities. In addition to having actual knowledge of the falsity of these Class Period misrepresentations and omissions, as depicted in the tables in Section III, the Individual Defendants named herein sold approximately 2,169,405 shares of Citigroup common stock while in possession of undisclosed material information generating $110,951,714 in proceeds during the Class Period.

## II.    JURISDICTION AND VENUE

28.    This action arises under Sections 10(b), 20(a) and 20A of the Exchange Act, as amended, 15 U.S.C. §§ 78j(b), 78(n) and 78t(a), 78(t)-1(a), and SEC Rule l0b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

29.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

30.    Venue is proper in this District pursuant to § 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Citigroup maintains its corporate headquarters in this District and many of the acts and omissions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

31.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, internet communications and the facilities of the New York Stock Exchange.

### III.    PARTIES

### A.    Plaintiff, the Public Employees' Retirement Association of Colorado

32.    Plaintiff, Colorado PERA, as set forth in the accompanying certification, incorporated by reference herein, purchased Citigroup common stock at artificially inflated prices during the Class Period and has been damaged thereby.

33.    Colorado PERA, which was established in 1931, operates by authority of the Colorado General Assembly. Colorado PERA provides retirement and other benefits to the employees of more than 400 government agencies and public entities in the State of Colorado. Colorado PERA's membership includes employees of the Colorado state government, most teachers in the State of Colorado, many university and college employees, judges, many employees of Colorado cities and towns, Colorado State Troopers, and the employees of a number of other public entities within the State of Colorado. With approximately $42 billion in assets and more than 230 employees, Colorado PERA is the 25th largest public pension plan in the United States.

14

**B.    Plaintiff, the Tennessee Consolidated Retirement System**

34.    Plaintiff, TCRS, as set forth in the accompanying certification, incorporated by reference herein, purchased Citigroup common stock at artificially inflated prices during the Class Period and has been damaged thereby.

35.    TCRS was established in 1972 with the consolidation of seven separate retirement systems for state employees, public higher education institution employees, public school teachers, and employees of political subdivisions electing to participate in TCRS.  The state of Tennessee is responsible for the pension benefits of state employees and higher education employees, and funds a significant portion of the retirement liability for teachers through the Basic Education Program.  Each of the 457 participating political subdivisions is responsible for the pension benefits of its employees.

36.    TCRS provides a variety of services to its members including:  investing assets; counseling of rights and benefits; publishing newsletters, booklets, pamphlets, and financial statements; processing deductions for retiree insurance programs and federal income tax; calculating death, disability, and retirement benefits; and processing refund and prior service requests.  TCRS currently manages approximately $32 billion in assets.

**C.    Plaintiff, Sjunde AP-Fonden**

37.    Plaintiff, Sjunde AP-Fonden ("AP7"), or the Seventh Swedish National Pension Fund, is based in Stockholm, Sweden and was founded in 1998.  As set forth in the accompanying certification, incorporated by reference herein, AP7 purchased Citigroup common stock at artificially inflated prices during the Class Period and has been damaged thereby.  AP7 is part of the Swedish National Pension Fund (AP Fund) system and manages a portion of the pension assets of the citizens of Sweden.  With assets under management of approximately $11

billion and over 2 million members, AP7 is one of the largest institutional investors in Sweden and one of its most prominent pension funds.

**D.    Plaintiff, Fjärde AP-Fonden**

38.    Plaintiff, Fjärde AP-Fonden ("AP4), or the Fourth Swedish National Pension Fund, is based in Stockholm, Sweden and manages a portion of the pension assets of the citizens of Sweden.  As set forth in the accompanying certification, incorporated by reference herein, AP4 purchased Citigroup common stock at artificially inflated prices during the Class Period and has been damaged thereby.  AP4 is part of the Swedish National Pension Fund (AP Fund) system and was founded in 1998.  With assets under management of approximately $32 billion and over four million members, AP4 is one of the largest institutional investors in Scandinavia and one of its most prominent pension funds.

**E.    Plaintiff, Pensionskassernes Administration A/S**

39.    Plaintiff, Pensionskassernes Administration A/S ("PKA"), is one of Denmark's largest pension funds and represents occupational pension funds for those individuals in the public social and health sectors.  As set forth in the accompanying certification, incorporated by reference herein, PKA purchased Citigroup common stock at artificially inflated prices during the Class Period and has been damaged thereby.  PKA was founded in 1954 and has approximately 210,000 members.  With assets under management of approximately $23 billion PKA is one of the leading pension funds in Denmark.

**F.    Citigroup Inc.**

40.    Defendant Citigroup, incorporated in 1988 under the laws of Delaware, is traded on the NYSE under the symbol "C."  Citigroup's principal executive offices are located at 399 Park Avenue, New York, New York.  The Company is a multibank holding company that

provides various financial services to customers in the United States and internationally.

Citigroup is organized into three major business groups, as detailed below:



**G.    The Individual Defendants**

41.    Each of the Individual Defendants (defined below) had the duty to make full, candid and timely disclosures of all material facts relating to the business, operations, performance and prospects of Citigroup.  Among other things, Individual Defendants were required to:

- conduct and supervise the business of Citigroup in accordance with all applicable laws and regulations;

- supervise the preparation of the Company's SEC filings and approve any reports concerning the financial reporting and results of Citigroup;

17

- ensure that Citigroup established and followed adequate internal controls; and

- refrain from obtaining personal benefit, at the expense of the public purchasers of Citigroup common stock, by misusing proprietary non-public information.

42.     As senior officers and controlling persons of a publicly-held Company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's performance, operations, business, and prospects, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.

43.     As a result of Individual Defendants' failure to fulfill the foregoing obligations, Citigroup's common stock was artificially inflated during the Class Period.  In response to the gradual emergence of the truth, Citigroup's common stock fell in precipitous steps.  As a direct and proximate result of Individual Defendants' wrongdoing, Plaintiffs and other Class members were damaged.

### 1.     Charles O. Prince

44.     Defendant Charles O. Prince ("Prince") was Chairman of Citigroup's Board of Directors ("BOD") from 2006, and CEO of Citigroup from 2003, until his resignation from the Company on November 4, 2007.  Defendant Prince made materially false and misleading public statements during the Class Period, including in the following Company press releases:  the January 20, 2004 Press Release;[2] the April 15, 2004 Press Release; the July 15, 2004 Press

---

[2]  Such terms are defined in Section V below, entitled "Class Period Events and False and Misleading Statements."

Release; the October 14, 2004 Press Release; the January 20, 2005 Press Release; the April 15, 2005 Press Release; the July 18, 2005 Press Release; the October 17, 2005 Press Release; the January 20, 2006 Press Release; the April 17, 2006 Press Release; the July 17, 2006 Press Release; the October 19, 2006 Press Release; the January 19, 2007 Press Release; the February 23, 2007 Press Release; the April 16, 2007 Press Release; the July 20, 2007 Press Release; the October 1, 2007 Press Release; and the October 15, 2007 Press Release.

45.    Defendant Prince signed the following documents that the Company filed with the SEC during the Class Period, which contained materially false and misleading statements and/or omissions of material facts:  the First Quarter 2004 10-Q; the Second Quarter 2004 10-Q; the Third Quarter 2004 10-Q; the First Quarter 2005 10-Q; the Second Quarter 2005 10-Q; the Third Quarter 2005 10-Q; the First Quarter 2006 10-Q; the Second Quarter 2006 10-Q; the Third Quarter 2006 10-Q; the First Quarter 2007 10-Q; the Second Quarter 2007 10-Q; the Third Quarter 2007 10-Q; the 2003 10-K; the 2004 10-K; the 2005 10-K; and the 2006 10-K.

46.    During the Class Period, Defendant Prince sold approximately 518,059 shares of Citigroup common stock for proceeds of approximately $26,476,119.09, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiffs and Class members who purchased Citigroup common stock contemporaneously with the sales by Defendant Prince.

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|------|------|------|------|
| 1/12/2004 | 3,564 | $49.69 | $177,095.16 |
| 1/16/2004 | 9,023 | $49.40 | $445,736.20 |
| 1/22/2004 | 15,172 | $50.36 | $764,061.92 |
| 1/23/2004 | 38,492 | $50.69 | $1,951,159.48 |
| 3/31/2004 | 54,330 | $51.94 | $2,821,900.20 |
| 7/12/2004 | 3,495 | $45.04 | $157,414.80 |
| 1/12/2005 | 3,558 | $47.95 | $170,606.10 |

| 2/14/2005 | 13,944 | $49.25 | $686,742.00 |
|---|---|---|---|
| 7/12/2005 | 4,381 | $46.06 | $201,788.86 |
| 11/30/2005 | 68,510 | $49.09 | $3,363,155.90 |
| 1/12/2006 | 3,412 | $48.99 | $167,153.88 |
| 1/20/2006 | 18,866 | $46.52 | $877,646.32 |
| 2/13/2006 | 18,145 | $45.74 | $829,952.30 |
| 10/5/2006 | 116,924 | $51.03 | $5,966,631.72 |
| 1/22/2007 | 81,087 | $54.55 | $4,423,295.85 |
| 4/17/2007 | 13,419 | $52.93 | $710,267.67 |
| 5/17/2007 | 13,395 | $54.91 | $735,519.45 |
| 7/13/2007 | 38,342 | $52.84 | $2,025,991.28 |
| **Total** | **518,059** | | **$26,476,119.09** |

47.    Defendant Prince's sales were well-timed to take advantage of his knowledge of key events. In particular, on July 13, 2007, Prince sold over 38,000 shares of Citigroup stock in at $52.84 per share for proceeds of over $2 million while billions of dollars of commercial paper was being returned to Citigroup as a result of the undisclosed Liquidity Puts.

48.    According to public filings, Prince's salary in 2004, 2005 and 2006 was $983,333, $1,000,000 and $1,000,000, respectively. He also received incentive bonuses in those years of $9,690,000, $12,000,000 and $13,200,000. At Citigroup, incentive compensation is based on the performance of each individual executive, his or her business unit and the Company. In this regard, the performance evaluation is based on a variety of factors, including financial performance, risk management and leadership. Accordingly, Prince's incentive bonuses were based on his performance as well as the performance of Citigroup.

**2.    Sallie L. Krawcheck**

49.    Defendant Sallie L. Krawcheck ("Krawcheck") was Citigroup's Chief Financial Officer ("CFO") from 2004 until March 2007, when Krawcheck became the Chairman and CEO of Citigroup's Global Wealth Management Division. Krawcheck signed the following documents that the Company filed with the SEC during the Class Period, which contained

materially false and misleading statements and/or omissions of material facts: the First Quarter 2005 10-Q; the Second Quarter 2005 10-Q; the Third Quarter 2005 10-Q; the First Quarter 2006 10-Q; the Second Quarter 2006 10-Q; the Third Quarter 2006 10-Q; the 2004 10-K; the 2005 10-K; and the 2006 10-K.

50.     During the Class Period, Defendant Krawcheck sold approximately 59,013 shares of Citigroup common stock for proceeds of approximately $3,149,506.93, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiffs and Class members who purchased Citigroup common stock contemporaneously with the sales by Defendant Krawcheck.

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 1/20/2006 | 8,674 | $46.52 | $403,514.48 |
| 1/22/2007 | 50,339 | $54.55 | $2,745,992.45 |
| Total | 59,013 | | $3,149,506.93 |

51.     According to public filings, Krawcheck's salary for 2004 through 2006 was $500,000. She also received incentive bonuses in 2004, 2005 and 2006 of $4,320,000, $5,280,000, and $5,820,000, respectively. At Citigroup, incentive compensation is based on the performance of each individual executive, his or her business unit and the Company. In this regard, the performance evaluation is based on a variety of factors, including financial performance, risk management and leadership. Accordingly, Krawcheck's incentive bonuses were based on her performance as well as the performance of her business group and Citigroup.

**3.     Gary L. Crittenden**

52.     Defendant Gary L. Crittenden ("Crittenden") has been Citigroup's CFO since March 2007. Defendant Crittenden made materially false and misleading public statements during the Class Period in Company press releases, conference calls with analysts and in

21

Citigroup public filings with the SEC. Crittenden signed the following documents that the Company filed with the SEC during the Class Period, which contained materially false and misleading statements and/or omissions of material facts: the First Quarter 2007 10-Q; the Second Quarter 2007 10-Q; and the Third Quarter 2007 10-Q.

53.     Defendant Crittenden also made materially false and misleading public statements during the Class Period in at least the following conference calls with analysts: the July 20, 2007 Call and the November 5, 2007 Call.

**4.     Todd S. Thomson**

54.     Defendant Todd S. Thomson ("Thomson") was Citigroup's CFO until 2004 when he became the CEO of Global Wealth Management. Defendant Thomson left the Company in January 2007 to "pursue other interests." Thomson signed the following documents that the Company filed with the SEC during the Class Period, which contained materially false and misleading statements and/or omissions of material facts: the First Quarter 2004 10-Q; the Second Quarter 2004 10-Q; the Third Quarter 2004 10-Q; and the 2003 10-K.

55.     During Class Period, Defendant Thomson sold approximately 508,306 shares of Citigroup common stock for proceeds of approximately $25,716,471.11, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiffs and Class members who purchased Citigroup common stock contemporaneously with the sales by Defendant Thomson.

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 1/16/2004 | 5,692 | $49.40 | $281,184.80 |
| 1/20/2004 | 17,199 | $49.50 | $851,350.50 |
| 1/28/2004 | 125,904 | $50.07 | $6,304,013.28 |
| 1/30/2004 | 25,622 | $49.48 | $1,267,776.56 |
| 7/20/2004 | 23,742 | $43.99 | $1,044,410.58 |

| 7/28/2004 | 22,662 | $43.90 | $994,861.80 |
|---|---|---|---|
| 7/16/2004 | 10,706 | $44.21 | $473,312.26 |
| 2/14/2005 | 9,940 | $49.25 | $489,545.00 |
| 1/20/2006 | 5,961 | $46.52 | $277,305.72 |
| 2/13/2006 | 14,410 | $45.74 | $659,113.40 |
| 10/5/2006 | 96,686 | $51.03 | $4,933,886.58 |
| 12/12/2006 | 49,519 | $52.88 | $2,618,564.72 |
| 12/15/2006 | 9,698 | $53.11 | $515,060.78 |
| 12/18/2006 | 10,831 | $54.07 | $585,632.17 |
| 12/19/2006 | 79,734 | $55.44 | $4,420,452.96 |
| **Total** | **508,306** | | **$25,716,471.11** |

56.      Defendant Thomson's sales were timed to take advantage of the artificial inflation of Citigroup stock.  For instance, on December 19, 2006, Thomson sold almost 80,000 shares of the Company's common stock at $55.44 per share, close to the Class Period high of $56.41 per share on December 27, 2006, for proceeds of over $4.4 million.

**5.      Robert Druskin**

57.      Defendant Robert Druskin ("Druskin") was the President of Citi Markets and Banking ("Citi M&B") until December 2006, and the CEO of that business segment until May 2007.  From December 2006 until his retirement in December 2007, Defendant Druskin was Citigroup's Chief Operating Officer ("COO") and a member of the Office of the Chairman.  As a member of the Office of Chairman, the heads of all Citigroup's businesses reported to Defendant Druskin.  As COO, Defendant Druskin supervised all of Citigroup's businesses.  Defendant Druskin was also a member of Citigroup's Business Heads, Operating and Management Committees.  Accordingly, Defendant Druskin had direct involvement in the daily affairs of Citigroup during the Class Period.  In addition, during the Class Period, Defendant Druskin participated in the drafting, preparation and/or approval of misstatements, including improper press releases, SEC filings and other statements made to the press, analysts and Citigroup shareholders.

23

58.    During the Class Period, Defendant Druskin sold approximately 618,932 shares of Citigroup common stock for proceeds of approximately $31,988,422.42, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiffs and Class members who purchased Citigroup common stock contemporaneously with the sales by Defendant Druskin.

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 1/6/2004 | 49,757 | $49.79 | $2,477,401.03 |
| 1/12/2004 | 2,742 | $49.69 | $136,249.98 |
| 1/16/2004 | 11,274 | $49.40 | $556,935.60 |
| 1/21/2004 | 6,000 | $50.28 | $301,680.00 |
| 1/23/2004 | 23,840 | $50.69 | $1,208,449.60 |
| 3/31/2004 | 39,281 | $51.94 | $2,040,255.14 |
| 4/2/2004 | 69,033 | $52.29 | $3,609,735.57 |
| 4/16/2004 | 1,400 | $50.24 | $70,336.00 |
| 7/12/2004 | 2,742 | $45.04 | $123,499.68 |
| 7/16/2004 | 1,300 | $43.99 | $57,187.00 |
| 1/12/2005 | 2,831 | $47.95 | $135,746.45 |
| 2/7/2005 | 16,863 | $49.78 | $839,440.14 |
| 2/14/2005 | 16,490 | $49.25 | $812,132.50 |
| 7/12/2005 | 3,533 | $46.06 | $162,729.98 |
| 7/19/2005 | 1,000 | $44.47 | $44,470.00 |
| 7/19/2005 | 5,000 | $44.48 | $222,400.00 |
| 11/18/2005 | 23,728 | $47.94 | $1,137,520.32 |
| 1/12/2006 | 2,764 | $48.99 | $135,408.36 |
| 1/20/2006 | 8,697 | $46.52 | $404,584.44 |
| 1/25/2006 | 4,200 | $46.29 | $194,418.00 |
| 2/13/2006 | 19,855 | $45.74 | $908,167.70 |
| 4/24/2006 | 5,744 | $47.87 | $274,965.28 |
| 5/1/2006 | 16,887 | $49.95 | $843,505.65 |
| 10/5/2006 | 72,874 | $51.03 | $3,718,760.22 |
| 10/25/2006 | 15,000 | $50.55 | $758,250.00 |
| 12/28/2006 | 98,573 | $56.41 | $5,560,502.93 |
| 1/22/2007 | 43,639 | $54.55 | $2,380,507.45 |
| 1/29/2007 | 20,000 | $54.02 | $1,080,400.00 |
| 4/18/2007 | 10,000 | $53.07 | $530,700.00 |

| 7/13/2007 | 23,885 | $52.84 | $1,262,083.40 |
|---|---|---|---|
| **Total** | **618,932** | | **$31,988,422.42** |

59.     Defendant Druskin's sales were well-timed to take advantage of his knowledge of key events. For example, while billions of dollars of commercial paper was being returned to Citigroup as a result of the undisclosed Liquidity Puts during the summer of 2007, Defendant Druskin dumped more than 23,000 shares of Citigroup common stock for proceeds of over $1.2 million.

60.     According to public filings, Druskin's salary for 2004 through 2006 was $500,000. He also received incentive bonuses in 2004, 2005 and 2006 of $4,860,000, $6,600,000, and $8,100,000, respectively. At Citigroup, incentive compensation is based on the performance of each individual executive, his or her business unit and the Company. In this regard, the performance evaluation is based on a variety of factors, including financial performance, risk management and leadership. Accordingly, Druskin's incentive bonuses were based on his performance as well as the performance of his business groups and Citigroup.

**6.     Thomas G. Maheras**

61.     Defendant Thomas G. Maheras ("Maheras") was the co-President of Citi M&B from January 2007 and co-Chairman and co-CEO of Citi M&B from May 2007 until his resignation in October 2007. From 2004 through his resignation, Defendant Maheras was also the CEO of Global Capital Markets, a division of Citi M&B. Citi M&B is the business segment that arranged the CDOs and other risky subprime off-balance-sheet VIEs. Notably, the $55 billion in sub-prime direct exposure that to Citigroup's massive $8 to $11 billion write-down was in Maheras' business segment. Because of his high-level positions, Defendant Maheras was directly involved in the everyday business of Citigroup. During the Class Period, Defendant Maheras participated in the drafting, preparation and/or approval of misstatements, including

improper press releases, SEC filings and other statements made to the press, analysts and Citigroup shareholders.

62.    Defendant Maheras sold approximately 23,964 shares of Citigroup common stock on July 13, 2007 for proceeds of approximately $1,266,257.76, while privy to material, non-public information, which had not been disclosed to the investing public, including, but not limited to, the fact that billions of dollars of commercial paper was being returned to Citigroup as a result of Liquidity Puts issued by Defendant Maheras' business segment.

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 7/13/2007 | 23,964 | $52.84 | $1,266,257.76 |
| Total | 23,964 | | $1,266,257.76 |

### 7.    Michael Stuart Klein

63.    Defendant Michael Stuart Klein ("Klein") has been the co-President of Citi M&B since January 2007 and co-Chairman and co-CEO of Citi M&B since May 2007. From 2004, Defendant Klein was the CEO of Global Banking, a division of Citi M&B. Citi M&B is the business segment that arranged the CDOs and other risky subprime off-balance-sheet VIEs. Notably, the $55 billion in sub-prime direct exposure that lead to Citigroup's massive $8 to $11 billion write-down was in Klein's business segment. Defendant Klein is also a member of Citigroup's Business Heads, Operating and Management Committees. Because of his high-level positions, Defendant Klein was directly involved in the daily affairs of Citigroup. During the Class Period, Defendant Klein participated in the drafting, preparation and/or approval of misstatements, including improper press releases, SEC filings and other statements made to the press, analysts and Citigroup shareholders.

64.    Defendant Klein sold approximately 19,282 shares of Citigroup common stock on July 17, 2007 for proceeds of approximately $1,006,327.58, while privy to material, non-public

information, which had not been disclosed to the investing public, including, but not limited to, the fact that billions of dollars of commercial paper was being returned to Citigroup as a result of Liquidity Puts issued by Defendant Klein's business segment.

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 7/17/2007 | 19,282 | $52.19 | $1,006,327.58 |
| Total | 19,282 | | $1,006,327.58 |

**8.    David C. Bushnell**

65.    Defendant David C. Bushnell ("Bushnell") was Citigroup's Senior Risk Officer from December 2003, and Citigroup's Chief Administrative Officer ("CAO") from September 2007 until his retirement in December 2007. Defendant Bushnell was also a member of Citigroup's Business Heads, Operating and Management Committees. As Citigroup's Senior Risk Officer, Defendant Bushnell was responsible for managing market, credit and operational risk and for regulatory compliance at the Company. As Citigroup's CAO, Defendant Bushnell was responsible for the Human Resources, Legal, Security and Investigative Services, and Compliance functions for the entire Company. Accordingly, Defendant Bushnell had direct involvement in the daily affairs of Citigroup during the Class Period. During the Class Period, Defendant Bushnell participated in the drafting, preparation and/or approval of misstatements, including improper press releases, SEC filings and other statements made to the press, analysts and Citigroup shareholders.

66.    Defendant Bushnell sold approximately 244,843 shares of Citigroup common stock during the Class Period for proceeds of approximately $12,345,172.68, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiffs and Class members who purchased Citigroup common stock contemporaneously with the sales by Defendant Bushnell.

27

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 1/6/2004 | 19,194 | $49.79 | $955,669.30 |
| 1/12/2004 | 1,720 | $49.69 | $85,466.80 |
| 1/16/2004 | 3,692 | $49.40 | $182,384.80 |
| 1/22/2004 | 3,941 | $50.36 | $198,468.80 |
| 1/23/2004 | 7,629 | $50.69 | $386,714.01 |
| 2/12/2004 | 19,000 | $49.60 | $942,400.00 |
| 3/2/2004 | 3,937 | $50.46 | $198,661.02 |
| 3/31/2004 | 6,547 | $51.94 | $340,051.18 |
| 7/12/2004 | 1,719 | $45.04 | $77,423.76 |
| 1/12/2005 | 1,820 | $47.95 | $87,269.00 |
| 2/7/2005 | 6,486 | $49.78 | $322,873.08 |
| 2/14/2005 | 6,146 | $49.25 | $302,690.50 |
| 7/12/2005 | 2,216 | $46.06 | $102,068.96 |
| 8/5/2005 | 4,200 | $43.64 | $183,288.00 |
| 1/12/2006 | 1,774 | $48.99 | $86,908.26 |
| 1/20/2006 | 5,315 | $46.52 | $247,253.80 |
| 2/13/2006 | 9,989 | $45.74 | $456,896.86 |
| 2/27/2006 | 2,006 | $46.78 | $93,840.68 |
| 2/27/2006 | 10,912 | $47.01 | $512,973.12 |
| 2/28/2006 | 13,716 | $46.78 | $641,634.48 |
| 5/1/2006 | 6,495 | $49.95 | $324,425.25 |
| 5/8/2006 | 8,056 | $50.37 | $405,780.72 |
| 8/15/2006 | 1,100 | $48.39 | $53,229.00 |
| 10/05/2006 | 23,320 | $51.03 | $1,190,019.60 |
| 12/12/2006 | 7,110 | $52.88 | $375,976.80 |
| 12/19/2006 | 8,789 | $55.44 | $487,262.16 |
| 12/28/2006 | 7,153 | $56.41 | $403,500.73 |
| 1/22/2007 | 25,528 | $54.55 | $1,392,552.40 |
| 2/27/2007 | 6,584 | $52.68 | $346,845.12 |
| 2/27/2007 | 6,940 | $52.10 | $361,574.00 |
| 7/23/2007 | 11,809 | $50.73 | $599,070.57 |
| **Total** | **244,843** | | **$12,345,172.68** |

67.    Defendant Bushnell's sales were well-timed to take advantage of his knowledge of key events.  In particular, on July 23, 2007, Bushnell sold over 15,000 shares of Citigroup

stock at $50.73 per share for proceeds of approximately $600,000, while billions of dollars of commercial paper was being returned to Citigroup as a result of the undisclosed Liquidity Puts.

### 9.    John C. Gerspach

68.    Defendant John C. Gerspach ("Gerspach") has been the Company's Chief Accounting Officer and Controller since March 2005. Prior to that time, Defendant Gerspach was the CFO of Citigroup Latin America from July 2003 until March 2005, and CAO of Citigroup Latin America from April 2002 until March 2005. Defendant Gerspach is also member of Citigroup's Management Committee.

69.    Gerspach signed the following documents that the Company filed with the SEC during the Class Period, which contained materially false and misleading statements and/or omissions of material facts: the First Quarter 2005 10-Q; the Second Quarter 2005 10-Q; the Third Quarter 2005 10-Q; the First Quarter 2006 10-Q; the Second Quarter 2006 10-Q; the Third Quarter 2006 10-Q; the First Quarter 2007 10-Q; the Second Quarter 2007 10-Q; the Third Quarter 2007 10-Q; the 2005 10-K; and the 2006 10-K.

70.    Defendant Gerspach sold approximately 97,813 shares of Citigroup common stock during the Class Period for proceeds of approximately $5,000,275.06, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiffs and Class members who purchased Citigroup common stock contemporaneously with the sales by Defendant Gerspach.

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 4/28/2005 | 6,047 | $47.05 | $284,511.35 |
| 7/12/2005 | 145 | $46.06 | $6,678.70 |
| 10/27/2005 | 6,171 | $45.65 | $281,706.15 |
| 11/28/2005 | 7,311 | $49.52 | $362,040.72 |
| 1/12/2006 | 129 | $48.99 | $6,919.71 |

| 1/20/2006 | 1,211 | $46.52 | $56,335.72 |
|---|---|---|---|
| 2/13/2006 | 1,602 | $45.74 | $73,275.48 |
| 5/1/2006 | 22,929 | $49.95 | $1,145,303.55 |
| 10/06/2006 | 10,447 | $50.99 | $532,692.53 |
| 12/12/2006 | 9,246 | $52.88 | $488,928.48 |
| 12/28/2006 | 8,873 | $56.41 | $500,525.93 |
| 1/22/2007 | 4,574 | $54.55 | $249,511.70 |
| 4/17/2007 | 19,128 | $52.93 | $1,012,445.04 |
| **Total** | **97,813** | | **$5,000,275.06** |

71.    Defendant Gerspach's sales were timed to take advantage of the artificial inflation of Citigroup stock. For example, Gerspach sold over 8,000 shares of the Company's common stock at the Class Period high of $56.41 per share, for proceeds of over $500,000.

**10.    Stephen R. Volk**

72.    Defendant Stephen R. Volk ("Volk") has been Citigroup's Vice Chairman and Senior Advisor at Citi M&B since 2004. Defendant Volk is also a member of Citigroup's Business Heads, Operating and Management Committees. Because of his positions, Defendant Volk had direct involvement in the daily affairs of Company. During the Class period, Defendant Volk participated in the drafting, preparation and/or approval of misstatements, including improper press releases, SEC filings and other statements made to the press, analysts and Citigroup shareholders.

73.    During the Class Period, Defendant Volk sold approximately 79,193 shares of Citigroup common stock for proceeds of approximately $4,003,161.83, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiffs and Class members who purchased Citigroup common stock contemporaneously with the sales by Defendant Volk.

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 9/20/2005 | 28,342 | $49.89 | $1,413,982.38 |

| 1/20/2005 | 7,108 | $46.52 | $330,664.16 |
|---|---|---|---|
| 9/20/2006 | 27,396 | $49.89 | $1,366,786.44 |
| 1/22/2007 | 16,347 | $54.55 | $891,728.85 |
| **Total** | **79,193** | | **$4,003,161.83** |

74.    According to public filings, Volk's salary for 2005 and 2006 was $200,000. He also received incentive bonuses of at least $5,500,000 in 2005 and $5,670,000 in 2006. At Citigroup, incentive compensation is based on the performance of each individual executive, his or her business unit and the Company. In this regard, the performance evaluation is based on a variety of factors, including financial performance, risk management and leadership. Accordingly, Volk's incentive bonuses were based on his performance as well as the performance of his business group and Citigroup.

**11.    George David**

75.    Defendant George David ("David") was, at all relevant times, a member of Citigroup's BOD. Defendant David has also been a member of the BOD's Audit and Risk Management Committee since 2003. David signed the following documents that the Company filed with the SEC during the Class Period which contained materially false and misleading statements and/or omissions of material facts: the 2003 10-K; the 2004 10-K; the 2005 10-K; and the 2006 10-K.

76.    Defendants Prince, Krawcheck, Crittenden, Thomson, Druskin, Maheras, Klein, Bushnell, Gerspach, Volk, and David are referred to collectively herein as the "Individual Defendants."

77.    Defendants Prince, Krawcheck, Thomson, Druskin, Bushnell, Gerspach, and Volk are referred to collectively herein as the "Section 20A Defendants."

31

## H.    KPMG LLP

78.    Defendant KPMG LLP ("KPMG"), a member firm of KPMG International, is a United States limited liability partnership with its executive offices at 757 Third Avenue, New York, New York. During the Class Period, KPMG was responsible for auditing Citigroup's financial statements, internal control over financial reporting and management's report on internal control over financial reporting.

79.    KPMG issued materially false and misleading audit opinions concerning the Company's financial statements for Citigroup's 2003, 2004, 2005, and 2006 fiscal years. As alleged herein, KPMG falsely asserted that Citigroup's annual financial statements were prepared in accordance with U.S. GAAP and that KPMG had performed its audits in compliance with Generally Accepted Auditing Standards ("GAAS") despite knowing and/or recklessly disregarding that Citigroup's financial statements materially departed from U.S. GAAP.

80.    As an "independent" auditor, KPMG was required to conform to relevant auditing standards that are intended to responsibly ensure an independent, professional opinion regarding the fairness of the financial statements promulgated by Citigroup. Rather than properly applying these auditing standards, KPMG acted with deliberate and/or reckless disregard and breached multiple relevant standards and requirements, abandoning its professional responsibilities. Had KPMG performed its duties properly and with the standard of care required, the obvious internal control weaknesses and U.S. GAAP departures that an audit is designed to uncover would have led KPMG to require the proper accounting for the VIEs at issue under U.S. GAAP and/or to issue adverse opinions on the aforementioned annual Form 10-K filings.

81.    During the Class Period, KPMG received a tremendous amount of fees from the audit work and other services that it performed on Citigroup's behalf. The table below depicts a

32

significant portion of the fees that KPMG earned in connection with providing professional services to Citigroup during the Class Period:

| (in millions of $) | 2004 | 2005 | 2006 | Totals |
|---|---|---|---|---|
| Audit Fees | 55.0 | 51.9 | 52.9 | 159.8 |
| Audit Related | 8.0 | 11.5 | 11.6 | 31.1 |
| Tax Compliance | 6.2 | 6.0 | 4.3 | 16.5 |
| Total | 69.2 | 69.4 | 68.8 | 207.4 |

## IV.    BACKGROUND AND SUMMARY OF DEFENDANTS' FRAUD

### A.    Citigroup's Subprime and Off-balance-sheet Background

82.    Citigroup's experience with off-balance-sheet transactions and the subprime mortgage industry highlights Defendants' "catch me if you can" approach to disclosure and lending obligations to the public.

83.    Through its consumer finance division, CitiFinancial Credit Company ("CitiFinancial"), Citigroup has been an industry leader in originating subprime mortgage loans.

84.    In 2000, Citigroup acquired subprime lender Associates First Capital Corporation ("Associates"). At the time of this acquisition, Associates was the largest publicly traded finance company in the United States, and it specialized in the subprime credit market, including high loan-to-value residential second mortgages. Most of Associates was merged into CitiFinancial, making Citigroup the country's largest originator of home equity loans. At the time of the acquisition, Associates was dubbed "the king of predatory lending," and was nationally recognized as the "worst of the worst" with regard to deceptive lending practices.[3]

85.    Just months after Citigroup acquired Associates, the Federal Trade Commission ("FTC"), charged Citigroup with "systematic and widespread deceptive and abusive lending

---

[3] "Citigroup Spends Money to Try to Kill Philadelphia Predatory-Lending Bill," Paul D. Davies: *Philadelphia Daily News*, April 5, 2001.

practices."[4]  In 2002, Citigroup agreed to pay $215 million to settle these charges -- at the time,

the largest consumer protection settlement in FTC history.[5]  Following the settlement, Timothy J.

Muris, Chairman of the FTC, warned Citigroup to change its ways, stating, "[t]he Commission

will not tolerate the fleecing of subprime borrowers through deceptive lending practices."[6]

86.     Despite its 2002 settlement with the FTC regarding the deceptive lending

practices in the subprime market, and despite its promises at that time to take measures to

prevent such deceptive practices, Citigroup was once again penalized for predatory lending

practices in 2004.  In May of that year, Citigroup and its subprime mortgage subsidiary,

CitiFinancial, agreed to a cease-and-desist order that was imposed by the Board of Governors of

the Federal Reserve System, and the Federal Reserve assessed a $70 million civil money penalty

for Citigroup's alleged predatory lending practices.[7]   According to a May 27, 2004 press release

issued by the Federal Reserve:

> The Order assesses a civil money penalty against CitiFinancial and
> requires CitiFinancial to pay restitution to certain subprime personal and
> home mortgage borrowers.  The civil money penalty is $70 million,
> subject to a partial credit for restitution.  The Order also requires Citigroup
> and CitiFinancial to take steps to maintain and enhance compliance with
> consumer protection laws.

87.     At the same time that regulators were demanding that Citigroup cease multiple

violations in the subprime lending arena, Citigroup's investment banking arm was finding itself

deep in controversy and legal trouble based upon its participation in the establishment and

funding of Enron Corporation's ("Enron") ignominious and deceptive off-balance-sheet entities

---

[4]  "Citigroup Settles FTC Charges Against Associates Record-Setting $215 Million for Subprime Lending Victims," Federal Trade Commission Press Release, September 19, 2002.

[5]  "Citigroup Settles FTC Charges Against Associates Record-Setting $215 Million for Subprime Lending Victims," Federal Trade Commission Press Release, September 19, 2002 ("September 19, 2002 Federal Trade Commission Press Release").

[6]  September 19, 2002 Federal Trade Commission Press Release

[7]  Federal Reserve Board Press Release, May 27, 2004.

and transactions. Citigroup had been a key banker to Enron and, among other things, funded off-balance-sheet "prepay" ventures that played a central role in the massive fraud that precipitated Enron's collapse into bankruptcy. In connection with the work that Citigroup performed for Enron, Citigroup was sued for creating false investments in elaborate and complex Enron partnerships that had the effect of deceiving investors and moving billions of dollars of debt off the company's balance sheet.

88.    In June 2003, Citigroup reached a settlement with the SEC, the Office of the Comptroller of the Currency, and the Federal Reserve, whereby Citigroup paid a combined $145.5 million for its role in Enron's deceptive accounting practices. Despite Citigroup's settlement with the SEC, it still faced the class-action lawsuit filed on behalf of investors, bondholders, and others victimized by the Enron scandal. Two years later, on June 10, 2005, Citigroup announced that it had agreed to pay $2 billion to settle the shareholder class action brought against the Company for its role in the Enron fraud.

89.    In the wake of the Enron fraud, Citigroup was ordered by, among others, the Federal Reserve Board to: "… revamp its internal controls to ensure greater disclosure of structured finance transactions, such as prepays and [special purpose entities] (SPEs)" and to "submit a revised set of standards for complex deals such as SPEs." Citigroup also agreed to strengthen its internal risk management procedures.

90.    Despite its numerous past problems and multiple fines, penalties, and settlements incurred in connection with its subprime lending practices and off-balance-sheet practices, Citigroup continued to delve ever deeper into the subprime market, becoming the leading issuer of CDOs that take subprime mortgages or other loans and repackage them into purportedly low-risk securities. In 2003, Citigroup was ranked thirteenth among top subprime lenders. As of the

35

end of the Class Period, Citigroup ranked second among United States subprime lenders with a servicing portfolio of approximately $88 billion. As set forth herein, the fraudulent conduct that directly caused the Class to incur damages results from the marriage of Citigroup's most prominent past areas of deception: subprime lending and off-balance-sheet transactions.

**B.    Defendants' Failure to Disclose Citigroup's Use of Liquidity Puts**

91.    During the Class Period, Citigroup sponsored and/or created hundreds of billions of dollars of a special sub-class of off-balance sheet special-purpose entities or conduits referred to, for accounting purposes, as VIEs. As the sponsor of these conduits, Citigroup first set up a shell entity, devoid of material assets, to provide the nucleus for the sponsored transactions. The VIEs that Citigroup sponsored and/or created during the Class Period go by a number of different names including, CDOs, SIVs, ABCP conduits and other "structured finance" vehicles. Regardless of the nomenclature, Citigroup's Class Period VIEs were structured finance products that typically issued their own debt to finance the acquisition of long-term assets. Citigroup acted as the "arranger," setting up the VIE which then issued debt to investors, the proceeds of which were used to purchase the VIE's assets. Citigroup's economic objective was for each VIE to generate a greater yield from the assets purchased than the cost of its interest payments on the debt that the VIE issued and, in the process, garner lucrative fees for various "advisory" and credit support services which Citigroup provided.

92.    The VIEs typically issued short-term rated debt to investors, e.g., commercial paper. Such debt was split into tranches reflecting varying degrees of risk. The riskiest tranche, the equity tranche, usually provided the highest yield to the investor, in exchange for incurring the greatest exposure to loss and receiving the lowest rating from ratings agencies, such as Standard & Poor's, Moody's Investors Service ("Moody's") and Fitch Ratings ("Fitch"). The debt tranche with the least exposure to loss is often described as "super senior."

36

93.     Many of Citigroup's VIEs, regardless of whether they were CDOs, SIVs, or ABCP conduits, purchased long term assets that often included relatively high-yielding bonds collateralized with subprime mortgages.

94.     Citigroup failed to disclose the massive exposure created by the subprime mortgage-backed securities that comprised a material portion of the assets of many of Citigroup's sponsored VIEs.  Even worse, Citigroup failed entirely to disclose that the Company provided Liquidity Puts to support the issuance of CDO commercial paper.  Pursuant to the Liquidity Puts, Citigroup promised to buy back CDO-issued commercial paper from a holder if the holder did not wish to refinance ("roll over") or otherwise sell the debt.  Enormous exposure to the credit markets occurred as a result of Citigroup's Liquidity Puts.  Such exposure was never disclosed to the Company's investors, as is required by U.S. GAAP and SEC regulations.

95.     By not disclosing the Liquidity Puts and other credit enhancements (such as multi-billion dollar VIE-related standby credit facilities, which are also now exposed), and by sequestering the VIE's off-balance-sheet, Citigroup was able to hide from its investors the enormous risk incurred thereby.  Moreover, as alleged in detail herein, U.S. GAAP and SEC regulations required Citigroup to disclose the specifics of the risks that the Company assumed pursuant to the Liquidity Puts.  But, Citigroup never made any such disclosures.

96.     Defendants' numerous violations of U.S. GAAP and SEC rules and regulations are set forth in detail throughout this Complaint, including below in Section VIII.  By way of example only, however, U.S. GAAP, which the SEC and the accounting profession recognize as the rules, conventions, and procedures necessary to define accepted accounting practices at a given time, requires that a company's financial statements disclose contingencies when it is reasonably possible that the company may incur a loss in connection with such contingency.  *See*

Statement of Financial Accounting Standards ("SFAS") No. 5 ¶10. When circumstances are such that a loss is reasonably possible, a company's disclosure should: (i) state the basis of the contingency; and (ii) estimate the potential loss or range of loss that such contingency may produce. Citigroup wholly failed to make the required disclosures concerning the Liquidity Puts -- let alone the fact of their existence -- which created material risk exposure as soon as the transactions involving Liquidity Puts were consummated.

97.    In fact, *Citigroup never mentioned* its rampant use of Liquidity Puts and the consequences of the Company's assumption of such previously undisclosed liabilities until *after* the Liquidity Puts had a material impact upon the Company's prior statements. On November 5, 2007, Citigroup convened a telephone conference with securities analysts, to explain the disappointing financial results that the Company issued on November 4, 2007. During this telephone conference -- and only in response to questioning -- Defendant Crittenden explained that the Liquidity Puts were behind the Company's assumption of *$25 billion* of repurchased commercial paper secured by subprime assets that contributed heavily to the Company's estimated $8 billion to $11 billion write-down announced on November 4, 2007. This write-down stands ready to erase an estimated $5 billion to $7 billion in net income on an after-tax basis.

98.    Defendants have still failed to disclose material facts regarding Citigroup's pervasive use of Liquidity Puts and other credit enhancements during the Class Period. Nevertheless, Defendant Crittenden admitted on November 5, 2007 that the Liquidity Puts are "*a funding mechanism that was used as we structured CDOs up until I believe the end of 2005.*" Based upon the volume of commercial paper returned to Citigroup pursuant to the Liquidity Puts, which directly caused the massive write-down announced on November 4, 2007, it appears

38

that the Company's use of Liquidity Puts and the corresponding impact upon Citigroup's

publicly reported financial results is far more pervasive than Defendant Crittenden indicated in

his cryptic and incomplete November 5, 2007 admission.

**C.    Citigroup's Improper Accounting for Its SIVs**

99.    In addition to Defendants' materially false and misleading statements and

omissions of material fact concerning Citigroup's use of Liquidity Puts, Defendants failed to

disclose or properly account for the Company's risk exposure to other credit enhancements (such

as standby credit facilities) and exposure based upon the Company's responsibility for numerous

SIVs, which Citigroup used to purchase mortgage-backed securities during the Class Period.

100.    Citigroup did not consolidate these high-risk vehicles on the Company's balance

sheet, purportedly relying on Financial Accounting Standards Board ("FASB") 46(R), which

requires consolidation by the "primary beneficiary," the party that is obligated to absorb the

majority of the risk of the entities' loss. Yet, as the losses in Citigroup's SIVs mounted based

upon the decreasing value of the mortgage collateral, Citigroup was forced to reveal its

previously undisclosed enormous exposure to losses in connection with the SIVs. Such exposure

is evidenced by Citigroup's recent announcement that it would take $49 billion worth of assets

from its SIV entities that have been damaged by the subprime mortgage meltdown and add that

to its own balance sheet -- a move that will cut deeply into Citigroup's capital base.

101.    As stated above, SIVs, like other VIEs, issue short-term rated debt (commercial

paper) to investors. The proceeds of the debt issued by the Citigroup-sponsored SIVs were used

to buy long-term assets, such as high-yield bonds and subprime residential mortgage-backed

securities, which have a maturity much greater than the short-term paper issued by the SIV. The

SIV provides an opportunity for arbitrage between the higher yields on the long-term assets

purchased by the SIV and the lesser interest expense on the commercial paper or other short-term

debt issued by the SIV. Thus, Citigroup's SIVs possessed long-term assets, such as subprime mortgage-backed paper, which were financed by short-term debt.

102.    Citigroup failed to disclose the massive exposure created by the subprime mortgage-backed securities which comprised a material portion of the assets of Citigroup sponsored SIVs. When subprime delinquencies and foreclosures predictably mushroomed, it became clear that these SIVs would not have enough money to pay back their debt holders. A "credit crunch" ensued and evaporated the market for Citigroup sponsored SIVs.

103.    Despite Citigroup's hollow contentions that it not obligated to provide liquidity to its SIVs, the Company was forced to provide guarantees and funding to the SIVs as they struggled for survival. For example, in its Third Quarter 2007 10-Q, Citigroup disclosed for the first time that the Company provided its SIVs with a *$10 billion line of credit, $7.6 billion of which had been drawn as of October 31, 2007.* Citigroup's contention that it was not "contractually obligated" to fund the SIVs is nothing more than a whitewash for the fact that Citigroup must finance the SIVs that it sponsored to avoid further losses and risk to the Company's already damaged reputation, and it wholly ignored the Liquidity Puts and other credit enhancements pursuant to which Citigroup was directly obligated to VIEs and their investors.

104.    The Third Quarter 2007 10-Q also summarized the seven Citigroup-advised SIVs as follows:

40

| (In billions of dollars) | | | |
|---|---|---|---|
| SIV | Assets | CP Funding | Medium Term Notes |
| Beta | $19.3 | $2.6 | $15.7 |
| Centauri | 20.1 | 2.9 | 16.1 |
| Dorada | 11.0 | 2.2 | 8.1 |
| Five | 13.2 | 5.5 | 7.1 |
| Sedna | 13.4 | 5.6 | 7.0 |
| Zela | 4.1 | 2.7 | 1.2 |
| Vetra | 2.0 | 1.4 | 0.5 |
| Total | $83.1 | $22.9 | $55.7 |

105.    In its Third Quarter 2007 10-Q, Citigroup also announced that the Company had been stuck with some $2.7 billion of subprime "warehouse inventory," which represents subprime mortgages that were earmarked for sales to Citigroup's SIVs, but which Citigroup could no longer unload off-balance-sheet to its VIEs. Citigroup later disclosed that it expected to write off an astronomical $8 - $11 billion against these and other subprime asset exposures in the fourth quarter of 2007.

106.    On November 5, 2007, news emerged that the SEC is now investigating the propriety of Citigroup's accounting for its SIVs. Details of this investigation have yet to emerge, but the Company falsely claimed in a November 5, 2007 statement that "Citigroup is confident in its SIV accounting. It is proper and in thorough accordance with all applicable rules and regulations."

107.    Even after Citigroup provided its SIVs with a $10 billion line of credit, the Company continued to claim that there was no basis for it to consolidate the SIVs on its balance sheet. Despite false repeated statements that it would not bring its SIVs onto Company books, Citigroup announced on December 13, 2007 that it would do just that.

108.    On December 17, 2007, reports surfaced indicating that the SEC had sent letters to the CFO's of several public investments banks asking that they provide more detailed disclosures concerning SIVs and CDOs (and other VIEs) in their respective upcoming annual reports.  In the foregoing letters, the SEC emphasizes that a discussion of such off-balance-sheet arrangements may be necessary to fulfill the Item 303 requirement to "discuss any known trends or uncertainties that you may reasonably expect to have a material favorable or unfavorable impact on your income from operations, liquidity and capital resources."  Additional disclosure includes ratings of the assets, any material write-downs or downgrades, the forms of funding for such investments, maximum limits on losses for first-loss note holders, and the types of variable interests held.

## V.    CLASS PERIOD EVENTS AND FALSE AND MISLEADING STATEMENTS

109.    Defendants knew and/or recklessly disregarded numerous facts known to them before and throughout the Class Period concerning Citigroup's exposure to:  (i) commercial paper issued by Citigroup-sponsored CDOs, including the staggering amount of such debt that Citigroup guaranteed through undisclosed Liquidity Puts; (ii) the debt of Citigroup's own SIVs, for which Citigroup was financially responsible; and (iii) its own portfolio of risk intensive subprime mortgage-backed securities.

110.    Notwithstanding the foregoing, Defendants made the following materially false and misleading statements and omissions of material fact set forth in this Section of Complaint.

111.    On November 4, 2003, Citigroup filed its Form 10-Q for the quarter ended September 30, 2003 (the "Third Quarter 2003 10-Q").  The Third Quarter 2003 10-Q attempted to assure investors that the Company has sound risk management policies to ensure that the risks

of delinquency of its lending portfolios were offset through other means. For example, the Third

Quarter 2003 10-Q stated:

> The Company provides a wide range of mortgage and other loan products to a
> diverse customer base. In addition to providing a source of liquidity and less
> expensive funding, securitizing these assets also reduces the Company's credit
> exposure to the borrowers. . . . *The Company's mortgage loan securitizations
> are primarily non-recourse, thereby effectively transferring the risk of future
> credit losses to the purchasers of the securities issued by the trust.*

112.    With respect to loss exposure as a result of the Company's unconsolidated VIEs,

the Third Quarter 2003 10-Q stated:

> . . . The Company *may* be a party to derivative contracts with VIEs, *may*
> provide second loss enhancement in the form of letters of credit and other
> guarantees to the VIEs, *may* be the investment manager, and *may* also have an
> ownership interest in certain VIEs. Although *actual losses are not expected to be
> material*, the Company's maximum exposure to loss as a result of its involvement
> with VIEs that are not consolidated was $50 billion at September 30, 2003.

113.    Citigroup's statements above were materially false and misleading and omitted

material facts at the time that they were made because, as Defendants knew then and failed to

disclose throughout the Class Period, Citigroup was providing Liquidity Puts and other credit

enhancements to its VIEs. When Citigroup gradually disclosed these concealed and

misrepresented exposures at the end of the Class Period -- which included being forced to absorb

more than $25 billion in commercial paper returned pursuant to previously undisclosed Liquidity

Puts -- the Company lost approximately $122 billion in market capitalization, directly causing

Class members to incur substantial damages.

114.    Citigroup's misrepresentations and omissions of material fact in connection with

its VIEs remained uncorrected at the beginning of the Class Period. As set forth below,

Defendants perpetuated and intensified these misrepresentations and omissions of material fact

throughout the Class Period.

**A.    2004 Events and False and Misleading Statements**

115.    During 2004, Defendants made and/or caused to be issued numerous materially false and misleading statements and/or omissions of material fact, some of which were made in connection with the events depicted on the following graph:



Citigroup, Inc.
2004 Events

116.    On January 20, 2004, Citigroup issued a press release (the "January 20, 2004 Press Release") announcing the Company's "record" financial results for quarter ended December 31, 2003 and the year ended 2003. Specifically, Citigroup reported net income for the fourth quarter of 2003 of $4.76 billion, or $0.91 per share, a 96% increase from the prior year.

The Company also reported net income of $17.85 billion, or $3.42 per share, for the year ended 2003, up 17% from the prior year. The January 20, 2004 Press Release stated in relevant part:

> "Citigroup's record 2003 performance exemplifies the earnings power of our best-in-class businesses and the strength of our extraordinary model. We did more, for more clients, in more places than any other financial services company, and we are entering 2004 in an excellent business position," said Charles Prince, Chief Executive Officer of Citigroup. . . .
>
> * * *
>
> Highlights of 2003 and the quarter included:
>
> •    Full year revenues increased 9% over 2002, reaching $77.4 billion, outpacing expense growth of 5%. For the fourth quarter, revenue growth was 13%, while expenses declined 6% from the fourth quarter of 2002. The prior year quarter included a $1.3 billion after-tax charge related to the establishment of reserves for regulatory settlements and related civil litigation.
>
> * * *
>
> **GLOBAL CORPORATE AND INVESTMENT BANK**
> Income of $1.28 billion for the fourth quarter, compared to a loss of $326 million the prior year, which included a $1.3 billion after-tax charge related to the establishment of reserves for regulatory settlements and related civil litigation. Full year income of $5.39 billion, up 71%. Highlights included:
>
> •    *Capital Markets and Banking* income was $1.1 billion, increasing 26% from the fourth quarter of 2002. Revenues increased 12% led by continued strong investment banking results and a 23% increased in trading-related revenue as compared to the year ago period. Fixed income and equity underwriting revenues were up 26% in the fourth quarter, and trading-related revenue benefited from improved fixed income results and a higher level of net interest revenues. . . .

117.    On March 1, 2004, Citigroup filed its Form 10-K for fiscal 2003 (the "2003 10-K"), which included the same materially false and misleading financial results previously reported in the January 20, 2004 Press Release.

118.    The above-referenced statements in the January 20, 2004 Press Release and 2003 10-K were materially false and misleading when issued. Citigroup's purported results were

materially false and misleading and omitted material facts because, among other things,
Citigroup failed to disclose, as required by U.S. GAAP and SEC regulations, that a large
component of its putative earnings was predicated on a risky subprime mortgage strategy -- as
Citigroup's summer 2007 submission to the LSE admits the Company knew as of 2004 -- that
sought to maximize profits in the short term while concealing the Company's exposure to risks
in connection with Liquidity Puts and its obligation to provide liquidity to its SIVs.  The
Company's risky subprime strategy incorporated illusory earnings at every step of the process,
including, but not limited to:  (i) subprime mortgage origination fees; (ii) securitization fees; (iii)
structured finance fees; (iv) fees for sponsoring VIEs; (v) fees for providing Liquidity Puts to
perpetuate clandestine, off-balance-sheet VIE entities owned by Citigroup, Bear Stearns, and
others; and (vi) fees from selling its subprime asset-backed securities to VIEs.  Citigroup was
required, as alleged in detail herein, to disclose all of the relevant details of its material
clandestine, off-balance-sheet, multibillion-dollar VIE arrangements including, but not limited
to, the nature and amounts of the Liquidity Puts, any of the Company's other credit enhancement
obligations and/or liabilities, including contingent obligations or liabilities.

119.    The 2003 10-K contained a certification signed by Defendant Prince, which
stated, among other things:

I, Charles Prince, certify that:

1.  I have reviewed this Annual Report on Form 10-K of Citigroup Inc.;

2.  ***Based on my knowledge, this report does not contain any untrue statement of a
    material fact or omit to state a material fact necessary to make the statements made, in
    light of the circumstances under which such statements were made, not misleading
    with respect to the period covered by this report***;

3.  Based on my knowledge, the financial statements, and other financial information
    included in this report, fairly present in all material respects the financial condition,

results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

* * *

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

120.   Defendant Thomson signed a certification in the 2003 10-K that was virtually identical to the certification of Defendant Prince.

121.   The statements in Prince's and Thomson's respective certifications were materially false and misleading and omitted material facts when issued because, among other things:

    (i)     Citigroup had been providing billions of dollars of undisclosed Liquidity Puts and other credit enhancements during the Class Period as a "funding mechanism" in connection with its structuring of VIEs, as well as the Klio CDOs that Bear Stearns structured, that obligated the Company to buy back commercial paper of the VIEs -- a risk that has resulted in Citigroup's absorption of $25 billion in returned VIE-issued paper to date;

    (ii)    Citigroup's failure to provide detailed disclosure concerning its exposure to risks in connection with the VIEs, including the existence of or any of the terms of the Liquidity Puts and other credit enhancements, violated numerous provisions of U.S. GAAP including, but not limited to the disclosure requirements concerning a guarantor's obligations set forth in FIN 45, ¶13, which provides that a "guarantor shall disclose the following information about each guarantee, or each group of similar guarantees, even if the likelihood of the guarantor's having to make any payments under the guarantee is remote";

    (iii)   Citigroup's failure to provide detailed disclosure to its exposure to risks in connection with the VIEs, including the Liquidity Puts, violated Item 303

47

of Regulation S-K, which required, among other things, that Citigroup disclose the amounts of revenues, expenses and cash flows arising from such arrangements; the nature and amounts of any interests retained, securities issued and other indebtedness incurred in connection with such arrangements; and **the nature and amounts of any other obligations or liabilities (including contingent obligations or liabilities) arising from such arrangements that are or are reasonably likely to become material and the triggering events or circumstances that could cause them to arise**; and

(iv)    the Company had wholly deficient internal accounting controls in connection with its accounting for the VIEs and other off-balance-sheet arrangements.

122.    The 2003 10-K also attempted to assure investors that the Company had sound

risk management policies to ensure that the risks of delinquency of its lending portfolios were

offset through other means.  For example, the 2003 10-K stated:

The Company provides a wide range of mortgage and other loan products to a diverse customer base.  In addition to providing a source of liquidity and less expensive funding, securitizing these assets also reduces the Company's credit exposure to the borrowers. . . . ***The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust.***

123.    With respect to Citigroup's exposure to losses as a result of the Company's

unconsolidated VIEs, the 2003 10-K stated the following in Note 12 to the Consolidated

Financial Statements (Unaudited):

. . . the Company ***may***, along with other financial institutions, provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs. The Company ***may*** be a party to derivative contracts with VIEs, ***may*** provide loss enhancement in the form of letters of credit and other guarantees to the VIEs, ***may*** be the investment manager, and ***may*** also have an ownership interest in certain VIEs.  Although ***actual losses are not expected to be material***, the Company's maximum exposure to loss as a result of its involvement with VIEs that are not consolidated was $50 billion and $63 billion at December 31, 2003 and 2002, respectively.

124.    Citigroup's statements in the First Quarter 2004 10-Q concerning its exposure to losses as a result of the Company's mortgage loan securitizations and unconsolidated VIEs were materially false and misleading when issued because:

(i)    While the Company represented that it *"may"* provide "loss enhancement" and "other guarantees" in connection with its VIEs, Citigroup had *in fact* been providing *billions of dollars* of Liquidity Puts and other credit enhancements during the Class Period as a "funding mechanism" in connection with its structuring of VIEs, and in connection with the Klio CDOs that Bear Stearns structured, which obligated the Company to buy back commercial paper of the VIEs -- a risk that has resulted in Citigroup's absorption of $25 billion in returned VIE-issued paper to date;

(ii)    As admitted in Citigroup's August 2007 submission to the LSE concerning the Company's SIVs, Defendants knew *since 2004 that continued investment in RMBS and ABS CDOs presented too much risk* and that at least in connection with the seven Citigroup SIVs disclosed on October 19, 2007, the Company was "*avoiding what we perceived as the unduly risky areas of subprime and CDOs of ABS*. Defendants' failure to disclose these known risks in connection with its Liquidity Puts was a material misrepresentation and/or omission;

(iii)    Citigroup's failure to provide detailed disclosure of its exposure to risks in connection with the VIEs, including either the existence or any of the terms of the Liquidity Puts, violated numerous provisions of U.S. GAAP including, but not limited to the disclosure requirements concerning a guarantor's obligations set forth in FIN 45, ¶13, which provides that a "guarantor shall disclose the following information about each guarantee, or each group of similar guarantees, even if the likelihood of the guarantor's having to make any payments under the guarantee is remote";

(iv)    Citigroup's mortgage loan securitizations that included Liquidity Puts were not "non-recourse"; and

(v)    Citigroup's failure to provide detailed disclosure to its exposure to risks in connection with the VIEs, including the Liquidity Puts, violated Item 303 of Regulation S-K, which required, among other things, that Citigroup disclose the amounts of revenues, expenses and cash flows arising from such arrangements; the nature and amounts of any interests retained, securities issued and other indebtedness incurred in connection with such arrangements; and *the nature and amounts of any other obligations or liabilities (including contingent obligations or liabilities) arising from such arrangements that were or were reasonably likely to become material and the triggering events or circumstances that could cause them to arise*.

125.    KPMG signed an Independent Auditors' Report in the 2003 10-K, which stated:

We have audited the accompanying consolidated balance sheet of
Citigroup Inc. and subsidiaries (the "Company") as of December 31, 2003
and 2002, and the related consolidated statements of income, changes in
stockholders' equity and cash flows for each of the years in the three-year
period ended December 31, 2003. These consolidated financial statements
are the responsibility of the Company's management. Our responsibility
is to express an opinion on these consolidated financial statements based
on our audits.

*We conducted our audits in accordance with auditing standards
generally accepted in the United States of America.* Those standards
require that we plan and perform the audit to obtain reasonable assurance
about whether the financial statements are free of material misstatement.
An audit includes examining, on a test basis, evidence supporting the
amounts and disclosures in the financial statements. An audit also
includes assessing the accounting principles used and significant estimates
made by management, as well as evaluating the overall financial statement
presentation. We believe that our audits provide a reasonable basis for our
opinion.

*In our opinion, the consolidated financial statements referred to above
present fairly, in all material respects, the financial position of
Citigroup Inc. and subsidiaries as of December 31, 2003 and 2002, and
the results of their operations and their cash flows for each of the years
in the three-year period ended December 31, 2003, in conformity with
accounting principles generally accepted in the United States of
America.*

*As discussed in Note 1 to the consolidated financial statements, in 2003
the Company changed its methods of accounting for variable interest
entities* and stock-based compensation and in 2002 the Company changed
its methods of accounting for goodwill and intangible assets and
accounting for the impairment or disposal of long-lived assets. Also, as
discussed in Note 1 to the consolidated financial statements, in 2001 the
Company changed its methods of accounting for derivative instruments
and hedging activities, accounting for interest income and impairment on
purchased and retained beneficial interests in securitized financial assets,
and accounting for goodwill and intangible assets resulting from business
combinations consummated after June 30, 2001.

/s/ KPMG LLP
New York, New York
February 26, 2004

126.    As alleged herein, KPMG's Independent Auditors' Report in the 2003 10-K was

knowingly false at the time that it was signed. While acknowledging that KPMG had examined

the Company's accounting for VIEs, in the 2003 10-K, KPMG falsely assured investors that
KPMG had performed its audit in accordance with U.S. GAAS, and that Citigroup's financial
statements presented fairly, in all material respects, the financial position of Citigroup and its
subsidiaries in compliance with U.S. GAAP.  KPMG's statements were materially false and
misleading and omitted material facts at the time that such statements were issued because,
among other things:

> (i)    Citigroup's failure to provide detailed disclosure concerning its exposure
> to risks in connection with the VIEs, including either the existence or any
> of the terms of the Liquidity Puts, violated numerous provisions of U.S.
> GAAP including, but not limited to the disclosure requirements
> concerning a guarantor's obligations set forth in FIN 45, ¶13, which
> provides that a "guarantor shall disclose the following information about
> each guarantee, or each group of similar guarantees, even if the likelihood
> of the guarantor's having to make any payments under the guarantee is
> remote";

> (ii)   Citigroup's failure to provide detailed disclosure to its exposure of risks in
> connection with the VIEs, including the Liquidity Puts, violated Item 303
> of Regulation S-K, which required, among other things, that Citigroup
> disclose the amounts of revenues, expenses and cash flows arising from
> such arrangements; the nature and amounts of any interests retained,
> securities issued and other indebtedness in connection with such
> arrangements; and *the nature and amounts of any other obligations or
> liabilities (including contingent obligations or liabilities) arising from
> such arrangements that were or were reasonably likely to become
> material and the triggering events or circumstances that could cause
> them to arise*; and

> (iii)  KPMG knew that Citigroup's financial statements:  failed to contain
> proper disclosures required by U.S. GAAP with regard to off-balance-
> sheet VIEs; failed to properly accrue for contingent liabilities that arose
> from the existence of the guarantees provided by Citigroup to many of the
> equity and debt holders in VIEs sponsored by Citigroup, Bear Stearns and
> others; and failed to properly require the consolidation of certain VIEs as a
> result of Citigroup's vulnerability to loss because of those guarantees it
> provided.

127.    On April 15, 2004, Citigroup issued a press release (the "April 15, 2004 Press

Release") announcing the Company's financial results for the quarter ended March 31, 2004.

Specifically, Citigroup reported "record" net income for the first quarter of 2004 of $5.27 billion, or $1.01 per share, up 29% from the prior year. The April 15, 2004 Press Release stated in relevant part:

> "Citigroup's record first quarter performance demonstrates our unique ability to capitalize on the continued strengthening of the global economy. We achieved double-digit income growth in each of our nine products as well as in every one of our regions," said Charles Prince, Chief Executive Officer of Citigroup. "Our results reflect a focus on increasing customer volumes while maintaining expense discipline and improving credit performance.

* * *

> Our Global Corporate and Investment Bank maintained the number one position in global debt and equity underwriting, and we were pleased with the increasing momentum of our global equities business. Our Investment Management businesses also experienced strong customer flows with assets under management increasing 15% to $530 billion, Private Bank client volumes up 17% to exceed $200 billion, and Life Insurance and Annuities business volumes up 26% to a record $73 billion. Citigroup International's income advanced 32%, with record income of $599 million in Asia and nearly $500 million in EMEA.

* * *

> Highlights of the first quarter of 2004 included:

> - Revenue growth of 16%, as revenues reached a record $21.5 billion. Revenues increased in each of Citigroup's nine businesses.

* * *

> - Citigroup was the number one global debt and equity underwriter for the tenth consecutive quarter and also ranked number one in global long-term debt, as well as in European equities and debt.

> **GLOBAL CORPORATE AND INVESTMENT BANK**
> Income of $1.71 billion for the first quarter, up 22%. Revenues up 8% for the quarter to a record $5.47 billion. Highlights included:

> - *Capital Markets and Banking* income was $1.48 billion, a 23% increase over the first quarter of 2003, a 34% increase as compared to the fourth quarter, and a record for the company.
>   - Revenues increased 8% with substantially stronger performance in global equities, led by higher levels of customer activity and particular strength in the cash and derivatives businesses, as well

52

> as stable fixed income revenues. Equities markets revenues, including related commissions, rose 45%, while equity underwriting increased 97%. Total investment banking revenue declined 5% from the first quarter of 2003 as the strength in equity underwriting was partly offset by a decline in debt underwriting revenues in the quarter. Equities markets revenues, including related commissions, rose 45%, while fixed income markets revenues rose 5% from the exceptionally strong first quarter of 2003.

128.    On May 4, 2004, Citigroup filed its Form 10-Q (the "First Quarter 2004 10-Q") for the quarter ended March 31, 2004, which included the same materially false and misleading financial results previously reported in the April 15, 2004 Press Release.

129.    The above-referenced statements in the April 15, 2004 Press Release and in the First Quarter 2004 10-Q were materially false and misleading when issued for the reasons stated above in ¶ 118.

130.    The First Quarter 2004 10-Q contained virtually identical certifications by Prince and Thomson as contained in the 2003 10-K, which were materially false and misleading and/or omitted material facts for the reasons stated above in ¶ 121.

131.    The First Quarter 2004 10-Q also attempted to assure investors that the Company had sound risk management policies to ensure that the risks of delinquency of its lending portfolios were offset through other means. For example, the First Quarter 2004 10-Q stated:

> The Company provides a wide range of mortgage and other loan products to a diverse customer base. In addition to providing a source of liquidity and less expensive funding, securitizing these assets also reduces the Company's credit exposure to the borrowers. . . . *The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust.*

132.    With respect to Citigroup's exposure to losses as a result of the Company's unconsolidated VIEs, the First Quarter 2004 10-Q stated the following in Note 12 to the Consolidated Financial Statements (Unaudited):

53

. . . The Company *may* be a party to derivative contracts with VIEs, *may* provide loss enhancement in the form of letters of credit and other guarantees to the VIEs, *may* be the investment manager, and *may* also have an ownership interest in certain VIEs. Although *actual losses are not expected to be material*, the Company's maximum exposure to loss as a result of its involvement with VIEs that are not consolidated was $54 billion at March 31, 2004.

133.    Citigroup's statements in the First Quarter 2004 10-Q concerning its exposure to losses as a result of the Company's mortgage loan securitizations and unconsolidated VIEs were materially false and misleading when issued for the reasons stated above in ¶ 124.

134.    On July 15, 2004, Citigroup issued a press release (the "July 15, 2004 Press Release") announcing the Company's financial results for the quarter ended June 30, 2004. Specifically, Citigroup reported net income for the second quarter of 2004 of $1.14 billion, or $0.22 per share, after a $4.95 billion after-tax charge for the WorldCom class action settlement. The July 15, 2004 Press Release stated in relevant part:

Highlights of the second quarter of 2004 included:

- *Citigroup continued to achieve strong business volume growth, with 24% increase in mortgage origination volumes in North America retail banking and 21% deposit* growth, as well as 21% growth in investment product sales in international retail banking. In international cards, net new accounts grew by 6.6 million along with 29% receivables growth. Private client fee-based assets increased 22%, to $222 billion, and private bank client business volumes increased 13%, to $203 billion. In transaction services, assets under custody rose 25% and liability balances increased 18%.
- Revenue growth of 15%, as revenues reached $22.3 billion. Excluding the Samba gain, revenues would have increased 9%, to $21.1 billion.

* * *

- Citigroup was the number one global debt and equity underwriter for the 11th consecutive quarter. In equity underwriting, Citigroup ranked #1 in number of transactions in the first half of 2004. Market share in announced M&A increased from 18% in the first half of 2003 to 23% in the first half of 2004. Investment banking pipelines strengthened during the quarter.

* * *

54

- *Capital Markets and Banking* income was $1.50 billion, a 28% increase over the second quarter of 2003. Revenues of $4.50 billion declined 1% from the second quarter of 2003.
  - o  Investment banking revenues declined 19%, reflecting reduced activity in fixed income and equity underwriting, partially offset by a 45% increase in advisory revenues driven by improved M&A.
  - o  Fixed income markets revenues increased 7%, with record performance in foreign exchange, commodities and securitizations.
  - o  Equity markets revenues declined 13%, resulting from a decline in market volumes in May and June leading to reduced flows in the cash trading business. Convertible activity weakened as rising interest rates and widening spreads reduced market activity. Derivatives activity was adversely affected by a decline in volatility and reduced corporate activity.
  - o  Lending revenues increased 26%, due to improved performance in credit derivatives and the impact of KorAm.

135.    On August 4, 2004, Citigroup filed its Form 10-Q (the "Second Quarter 2004 10-Q") for the quarter ended June 30, 2004, which included the same materially false and misleading financial results previously reported in the July 15, 2004 Press Release.

136.    The above-referenced statements in the July 15, 2004 Press Release and in the Second Quarter 2004 10-Q were materially false and misleading when issued for the reasons stated above in ¶ 118.

137.    The Second Quarter 2004 10-Q contained virtually identical certifications by Prince and Thomson as contained in the 2003 10-K, which were materially false and misleading and/or omitted material facts for the reasons stated above in ¶ 121.

138.    The Second Quarter 2004 10-Q also attempted to assure investors that the Company had sound risk management policies to ensure that the risks of delinquency of its lending portfolios were offset through other means.  For example, the Second Quarter 2004 10-Q stated:

> The Company provides a wide range of mortgage and other loan products to a diverse customer base.  In addition to providing a source of liquidity and less expensive funding, securitizing these assets also reduces the Company's credit

exposure to the borrowers. . . . *The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust.*

139.    With respect to Citigroup's exposure to losses as a result of the Company's

unconsolidated VIEs, the Second Quarter 2004 10-Q stated the following in Note 12 to the

Consolidated Financial Statements (Unaudited):

> . . The Company *may* be a party to derivative contracts with VIEs, *may* provide loss enhancement in the form of letters of credit and other guarantees to the VIEs, *may* be the investment manager, and *may* also have an ownership interest in certain VIEs. Although *actual losses are not expected to be material*, the Company's maximum exposure to loss as a result of its involvement with VIEs that are not consolidated was $53.7 billion at June 30, 2004.

140.    Citigroup's statements in the Second Quarter 2004 10-Q concerning its exposure

to losses as a result of the Company's mortgage loan securitizations and unconsolidated VIEs

were materially false and misleading when issued for the reasons stated above in ¶ 124.

141.    On October 14, 2004, Citigroup issued a press release (the "October 14, 2004

Press Release") announcing its financial results for the quarter ended September 30, 2004.

Specifically, Citigroup reported "record" net income of $5.31 billion, or $1.02 per share for the

third quarter of 2004, up 13% from the prior year. The October 14, 2004 Press Release stated in

relevant part:

> "Importantly, we continued to take numerous steps towards our goal of continually improving the way we do business and becoming the most respected financial services company in the world. *During this year, we have strengthened the independence and capabilities of our internal control and compliance structure*, improved how we manage our businesses, and intensified communication with employees about the kind of company we aspire to be," said Prince.

> Highlights of the third quarter of 2004 included:

> •    Revenue growth of 6% was driven by record revenues in the global consumer businesses, up 15% versus the prior year period. Transaction services also achieved record revenues, which grew 18% year over year.

56

* * *

- Citigroup achieved substantial momentum in investment banking during the quarter with the #1 ranking in global debt underwriting, the #1 ranking in US equities underwriting, and the #3 ranking in global announced M&A. The company had an outstanding quarter in bond underwriting, achieving #1 rankings in several major product league tables, including global investment grade debt, global high yield, global asset-backed securities, US long-term debt, US investment grade, US high yield, and US asset backed.

* * *

**GLOBAL CORPORATE AND INVESTMENT BANK**
Income of $1.45 billion for the third quarter, up 7%. Revenues increased 1% during the quarter, ending at $4.78 billion. Results included a $250 million pre-tax loan loss reserve release.
Highlights included:

- *Capital Markets and Banking* income was $1.16 billion, approximately even with the third quarter of 2003. Revenues of $3.73 billion decreased 3% from the third quarter of 2003.
  - o  Investment banking revenues increased 13%, reflecting strong fixed income underwriting revenues.
  - o  Fixed income markets revenues declined 12%, reflecting a bias toward rising interest rates which negatively affected trading revenues as well as lower client activity due to subdued market volatility.
  - o  Equity markets revenues declined 14%, as a decline in customer volumes and market volatility reduced flows in the cash trading business. Convertible and derivative volumes weakened as rising interest rates and widening spreads reduced market activity.
  - o  Lending revenues increased 19%, reflecting the addition of KorAm.

142.    On November 4, 2004, Citigroup filed its Form 10-Q (the "Third Quarter 2004 10-Q") for the quarter ended September 30, 2004, which included the same materially false and misleading financial results previously reported in the October 14, 2004 Press Release.

143.    The above-referenced statements in the October 14, 2004 Press Release and in the Third Quarter 2004 10-Q were materially false and misleading when issued for the reasons stated in ¶ 118.

144.    The Third Quarter 2004 10-Q contained virtually identical certifications by Prince and Thomson as contained in the 2003 10-K, which were materially false and misleading and/or omitted material facts for the reasons stated above in ¶ 121.

145.    The Third Quarter 2004 10-Q also attempted to assure investors that the Company had sound risk management policies to ensure that the risks of delinquency of its lending portfolios were offset through other means.  For example, the Third Quarter 2004 10-Q stated:

> The Company provides a wide range of mortgage and other loan products to a diverse customer base.  In addition to providing a source of liquidity and less expensive funding, securitizing these assets also reduces the Company's credit exposure to the borrowers. . . . ***The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust.***

146.    With respect to Citigroup's exposure to losses as a result of the Company's unconsolidated VIEs, the Third Quarter 2004 10-Q stated the following in Note 12 to the Consolidated Financial Statements (Unaudited):

> . . . the Company ***may***, along with other financial institutions, provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs.  The Company ***may*** be a party to derivative contracts with VIEs, ***may*** provide loss enhancement in the form of letters of credit and other guarantees to the VIEs, ***may*** be the investment manager, and ***may*** also have an ownership interest in certain VIEs.  Although ***actual losses are not expected to be material***, the Company's maximum exposure to loss as a result of its involvement with VIEs that are not consolidated was $68.9 billion at September 30, 2004.

147.    Citigroup's statements in the Third Quarter 2004 10-Q concerning its exposure to losses as a result of the Company's mortgage loan securitization and unconsolidated VIEs were materially false and misleading when issued for the reasons stated above in ¶ 124.

**B.    2005 Events and False and Misleading Statements**

148.    During 2005, Defendants made and/or caused to be issued numerous materially false and misleading statements and/or omissions of material facts, some of which were made in connection with the events depicted on the following graph:



**Citigroup, Inc.
2005 Events**

149.    On January 20, 2005, Citigroup issued a press release (the "January 20, 2005 Press Release") announcing the Company's financial results for the quarter ended December 31, 2004 and the year ended 2004. Specifically, Citigroup reported "record" net income for the fourth quarter of 2004 of $5.32 billion, or $1.02 per share, and net income of $17.0 billion, or $3.26 per share, for the year ended 2004. The January 20, 2005 Press Release stated in relevant part:

- ***Trading and investment banking momentum.*** Equity and fixed income markets revenues increased 14%, reflecting favorable interest rate positioning, and product expansion, and a recovery in capital markets volumes. In the fourth quarter, the company achieved a #1 global rank in investment grade debt underwriting, equity underwriting, high yield debt underwriting, and announced M&A.

59

* * *

## GLOBAL CORPORATE AND INVESTMENT BANK

- *Capital Markets and Banking*
  - o    Fixed income markets revenues grew 12% as favorable interest
    rate positioning and increased market volumes and volatility led to
    improved trading results in currencies and interest rate products.
  - o    Equity markets revenues were up 28%, driven by increases in cash
    market trading volumes, equity finance, and derivatives.
  - o    Investment banking revenues increased 18% due to strong growth
    in equity underwriting revenues and advisory and other fees.

150.    On February 28, 2005, Citigroup filed its Form 10-K for fiscal 2004 (the "2004

10-K"), which included the same materially false and misleading financial results previously

reported in the January 20, 2005 Press Release.

151.    The above-referenced statements in the January 20, 2005 Press Release and in the

2004 10-K were materially false and misleading when issued for the reasons stated above in ¶

118.

152.    The 2004 10-K contained a certification signed by Defendant Prince, which

stated:

I, Charles Prince, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q of Citigroup Inc.;

2.  ***Based on my knowledge, this report does not contain any untrue statement of a
    material fact or omit to state a material fact necessary to make the statements made, in
    light of the circumstances under which such statements were made, not misleading
    with respect to the period covered by this report;***

3.  Based on my knowledge, the financial statements, and other financial information
    included in this report, fairly present in all material respects the financial condition,
    results of operations and cash flows of the registrant as of, and for, the periods presented
    in this report;

* * *

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

153. Defendant Krawcheck signed a certification in the 2004 10-K that was virtually identical to the certification of Defendant Prince.

154. The statements in Prince's and Krawcheck's respective certifications were materially false and misleading and omitted material facts when issued because, among other things:

    (i) Citigroup had been providing **billions of dollars of undisclosed** Liquidity Puts and other credit enhancements during the Class Period as a "funding mechanism" in connection with its structuring of VIEs, as well as the Klio CDOs that Bear Stearns structured, that obligated the Company to buy back commercial paper of the VIEs -- a risk that has resulted in Citigroup's absorption of $25 billion in returned VIE-issued paper to date;

    (ii) Citigroup's failure to provide detailed disclosure concerning its exposure to risks in connection with the VIEs, including the existence of or any of the terms of the Liquidity Puts and other credit enhancements, violated numerous provisions of U.S. GAAP including, but not limited to the disclosure requirements concerning a guarantor's obligations set forth in FIN 45, ¶13, which provides that a "guarantor shall disclose the following information about each guarantee, or each group of similar guarantees, even if the likelihood of the guarantor's having to make any payments under the guarantee is remote";

    (iii) Citigroup's failure to provide detailed disclosure to its exposure to risks in connection with the VIEs, including the Liquidity Puts, violated Item 303 of Regulation S-K, which required, among other things, that Citigroup disclose the amounts of revenues, expenses and cash flows arising from such arrangements; the nature and amounts of any interests retained, securities issued and other indebtedness incurred in connection with such arrangements; and **the nature and amounts of any other obligations or**

*liabilities (including contingent obligations or liabilities) arising from such arrangements that were or were reasonably likely to become material and the triggering events or circumstances that could cause them to arise*; and

(iv)    the Company had wholly deficient internal accounting controls in connection with its accounting for the VIEs and other off-balance-sheet arrangements.

155.    The 2004 10-K also attempted to assure investors that the Company had sound

risk management policies to ensure that the risks of delinquency of its lending portfolios were

offset through other means.  For example, the 2004 10-K stated:

> The Company provides a wide range of mortgage and other loan products to a diverse customer base.  In addition to providing a source of liquidity and less expensive funding, securitizing these assets also reduces the Company's credit exposure to the borrowers. . . . ***The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust.***

156.    With respect to Citigroup's exposure to losses as a result of the Company's

unconsolidated VIEs, the 2004 10-K stated the following in Note 12 to the Consolidated

Financial Statements (Unaudited):

> . . . the Company *may*, along with other financial institutions, provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs. The Company *may* be a party to derivative contracts with VIEs, *may* provide loss enhancement in the form of letters of credit and other guarantees to the VIEs, *may* be the investment manager, and *may* also have an ownership interest in certain VIEs.  Although ***actual losses are not expected to be material***, the Company's maximum exposure to loss as a result of its involvement with VIEs that are not consolidated was $78 billion and $50 billion at December 31, 2004 and 2003, respectively.

157.    Citigroup's statements in the 2004 10-K concerning its exposure to losses as a

result of the Company's mortgage loan securitizations and unconsolidated VIEs were materially

false and misleading when issued for the reasons stated above in ¶ 124.

158.    KPMG signed an Independent Auditors' Report in the 2004 10-K, which stated:

> We have audited the accompanying consolidated balance sheets of Citigroup Inc. and subsidiaries (the "Company" or "Citigroup") as of

December 31, 2004 and 2003, and the related consolidated statements of income, changes in stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 2004. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

***We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).*** Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Citigroup as of December 31, 2004 and 2003, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2004, in conformity with U.S. generally accepted accounting principles.***

***As discussed in Note 1 to the consolidated financial statements, in 2003 the Company changed its methods of accounting for variable interest entities*** and stock-based compensation and in 2002 the Company changed its methods of accounting for goodwill and intangible assets and accounting for the impairment or disposal of long-lived assets.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of ***Citigroup's internal control over financial reporting*** as of December 31, 2004, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated February 25, 2005 expressed an unqualified opinion on management's assessment of, and the effective operation of, internal control over financial reporting.

/s/ KPMG LLP

New York, New York
February 25, 2005

159.    As alleged herein, KPMG's Independent Auditors' Report in the 2004 10-K was knowingly false at the time that it was signed.  While acknowledging that KPMG had examined the Company's accounting for VIEs, in the 2004 10-K, KPMG falsely assured investors that KPMG had performed its audit in accordance with the standards of the Public Company Accounting Oversight Board,[8] (the "PCAOB") and that Citigroup's financial statements presented fairly, in all material respects, the financial position of Citigroup and its subsidiaries in compliance with U.S. GAAP.  KPMG's statements were materially false and misleading and omitted material facts at the time that such statements were issued because, among other things:

(i)    Citigroup's failure to provide detailed disclosure concerning its exposure to risks in connection with the VIEs, including either the existence or any of the terms of the Liquidity Puts, violated numerous provisions of U.S. GAAP including, but not limited to the disclosure requirements concerning a guarantor's obligations set forth in FIN 45, ¶13, which provides that a "guarantor shall disclose the following information about each guarantee, or each group of similar guarantees, even if the likelihood of the guarantor's having to make any payments under the guarantee is remote";

(ii)   Citigroup's failure to provide detailed disclosure to its exposure to risks in connection with the VIEs, including the Liquidity Puts, violated Item 303 of Regulation S-K, which required, among other things, that Citigroup disclose the amounts of revenues, expenses and cash flows arising from such arrangements; the nature and amounts of any interests retained, securities issued and other indebtedness incurred in connection with such arrangements; and *the nature and amounts of any other obligations or liabilities (including contingent obligations or liabilities) arising from such arrangements that were or were reasonably likely to become material and the triggering events or circumstances that could cause them to arise*;

(iii)  KPMG knew that Citigroup's financial statements:  failed to contain proper disclosures required by U.S. GAAP with regard to off-balance-sheet VIEs; failed to properly accrue for contingent liabilities that arose from the existence of the guarantees provided by Citigroup to many of the equity and debt holders in VIEs sponsored by Citigroup, Bear Stearns and others; and failed to properly require the consolidation of certain VIEs as a

---

[8] The PCAOB has incorporated all relevant GAAS issued by the AICPA on or before April 2003 into its body of auditing standards

result of Citigroup's vulnerability to loss because of those guarantees it provided; and

(iv)    KPMG knew and/or recklessly disregarded the fact that the Company had wholly deficient internal accounting controls in connection with its accounting for the VIEs and other off-balance-sheet arrangements.

160.    On April 15, 2005, Citigroup issued a press release (the "April 15, 2005 Press Release") announcing the Company's financial results for the quarter ended March 31, 2005. Specifically, Citigroup reported "record" net income for the first quarter of 2005 of $5.44 billion, or $1.04 per share. The April 15, 2005 Press Release stated in relevant part:

"We are proud of our record global earnings, driven by the strength and diversity of our global franchises. As we have seen in prior quarters, weakness in certain products or regions was more than offset by strength in others.

\* \* \*

"Citigroup's businesses continue to generate industry-leading returns and, as a result, substantial capital. Over the past nine months, we have significantly strengthened our capital ratios.

\* \* \*

"In addition, in the first quarter we launched our Five Point Plan, which marked the beginning of a very important chapter in Citigroup's history. The Plan strengthens a foundation of values, priorities and internal controls that are essential for sustained long-term growth. Implementation of the Plan is our top priority," said Prince.

**FIRST QUARTER HIGHLIGHTS**

\* \* \*

•    ***Revenue growth.*** Revenue growth of 6% reflected record revenues in retail banking, up 15%; fixed income markets, up 16%; and transactions services, up 21%. Growth in these businesses was offset by revenue declines in wealth management, down 6%, due to reduced client transaction volumes and the wind-down of the Japan private bank, and in North America cards, down 5%, due to net interest margin compression and higher payment rates. Lower credit costs in North America cards drove a 7% increase in net credit margin.

\* \* \*

- ***Record revenues in fixed income markets and transaction services.***
  Fixed income markets revenues increased 16% and were driven by increased customer trading activity, strong results in commodities and favorable interest rate positioning. Transaction services revenues grew 21%, including 26% growth in cash management.

* * *

## CORPORATE AND INVESTMENT BANKING

- ***Capital Markets and Banking***
  o   Record fixed income markets revenues, which increased 16%, reflected increased customer activity, favorable interest rate positioning and strong results in commodities.
  o   Equity markets revenues declined 5% as an increase in cash market volumes was offset by weakness in derivative and convertible activity.
  o   Investment banking revenues increased 6%, as strong growth in completed M&A transactions led to a 26% increase in advisory and other fees, which was partially offset by lower equity underwriting market volumes and revenues.

161.    On May 4, 2005, Citigroup filed its Form 10-Q (the "First Quarter 2005 10-Q") for the quarter ended March 31, 2005, which included the same materially false and misleading financial results previously reported in the April 15, 2005 Press Release.

162.    The above-referenced statements in the April 15, 2005 Press Release and in the First Quarter 2005 10-Q were materially false and misleading when issued for the reasons stated above in ¶ 118.

163.    The First Quarter 2005 10-Q contained virtually identical certifications by Prince and Krawcheck as contained in the 2004 10-K, which were materially false and misleading and/or omitted material facts for the reasons stated above in ¶ 154.

164.    The First Quarter 2005 10-Q also attempted to assure investors that the Company had sound risk management policies to ensure that the risks of delinquency of its lending portfolios were offset through other means. For example, the First Quarter 2005 10-Q stated:

The Company provides a wide range of mortgage and other loan products to a diverse customer base. In addition to providing a source of liquidity and less expensive funding, securitizing these assets also reduces the Company's credit exposure to the borrowers. . . . *The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust.*

165.   With respect to Citigroup's exposure to losses as a result of the Company's unconsolidated VIEs, the First Quarter 2005 10-Q stated the following in Note 12 to the Consolidated Financial Statements (Unaudited):

> . . . the Company *may*, along with other financial institutions, provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs. The Company *may* be a party to derivative contracts with VIEs, *may* provide loss enhancement in the form of letters of credit and other guarantees to the VIEs, *may* be the investment manager, and *may* also have an ownership interest in certain VIEs. Although *actual losses are not expected to be material*, the Company's maximum exposure to loss as a result of its involvement with VIEs that are not consolidated was $89.6 billion at March 31, 2005.

166.   Citigroup's statements in the First Quarter 2005 10-Q concerning its exposure to losses as a result of the Company's mortgage loan securitizations and unconsolidated VIEs were materially false and misleading when issued for the reasons stated above in ¶ 124.

167.   On July 18, 2005, Citigroup issued a press release (the "July 18, 2005 Press Release") announcing the Company's financial results for the quarter ended June 30, 2005. Specifically, Citigroup reported net income for the second quarter of 2005 of $5.07 billion, or $0.97 per share. The July 18, 2005 Press Release stated in relevant part:

**CORPORATE AND INVESTMENT BANKING**

- *Capital Markets and Banking*
  - o   Fixed income markets revenues declined 28%. Difficult capital markets conditions and a flattening yield curve led to lower trading results in interest rate and credit products, which were partially offset by increased revenues from foreign exchange and commodities.
  - o   Equity markets revenues increased 40%, driven by improved performance and growth in cash trading, *derivatives products* and

equity finance.

o      Investment banking revenues declined 1%, as lower high yield
       debt underwriting revenues were partially offset by strong growth
       in completed M&A transactions, which led to a 13% increase in
       advisory and other fees.

168.    On August 4, 2005, Citigroup filed its Form 10-Q (the "Second Quarter 2005 10-Q") for the quarter ended June 30, 2005, which included the same materially false and misleading financial results previously reported in the July 18, 2005 Press Release.

169.    The above-referenced statements in the July 18, 2005 Press Release and in the Second Quarter 2005 10-Q were materially false and misleading when issued for the reasons stated above in ¶ 118.

170.    The Second Quarter 2005 10-Q also contained virtually identical certifications by Prince and Krawcheck as contained in the 2004 10-K, which were materially false and misleading and/or omitted material facts for the reasons stated above in ¶ 154.

171.    The Second Quarter 2005 10-Q also attempted to assure investors that the Company had sound risk management policies to ensure that the risks of delinquency of its lending portfolios were offset through other means. For example, the Second Quarter 2005 10-Q stated:

> The Company provides a wide range of mortgage and other loan products to a diverse customer base. In addition to providing a source of liquidity and less expensive funding, securitizing these assets also reduces the Company's credit exposure to the borrowers. . . . ***The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust.***

172.    With respect to Citigroup's exposure to losses as a result of the Company's unconsolidated VIEs, the Second Quarter 2005 10-Q stated the following in Note 12 to the Consolidated Financial Statements (Unaudited):

. . . the Company *may*, along with other financial institutions, provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs. The Company *may* be a party to derivative contracts with VIEs, *may* provide loss enhancement in the form of letters of credit and other guarantees to the VIEs, *may* be the investment manager, and *may* also have an ownership interest in certain VIEs. Although *actual losses are not expected to be material,* the Company's maximum exposure to loss as a result of its involvement with VIEs that are not consolidated was $91.7 billion at June 30, 2005.

173.    Citigroup's statements in the Second Quarter 2005 10-Q concerning its exposure to losses as a result of the Company's mortgage loan securitizations and unconsolidated VIEs were materially false and misleading when issued for the reasons stated above in ¶ 124.

174.    On October 17, 2005, Citigroup issued a press release (the "October 17, 2005 Press Release") announcing its financial results for the quarter ended September 30, 2005. Specifically, Citigroup reported net income of $7.14 billion, or $1.38 per share for the third quarter of 2005. The October 17, 2005 Press Release stated in relevant part:

"Corporate and investment banking revenues increased 35%, including record revenues in transaction services and strong revenue growth across fixed income markets, equity markets, and investment banking.

* * *

**THIRD QUARTER SUMMARY – CONTINUING OPERATIONS**

- *Franchise strength in corporate and capital markets driven businesses.* Capital markets and banking achieved market share gains across several products, resulting in a #1 global rank in equity underwriting, debt underwriting, completed M&A, and syndicated loans during the third quarter. In transaction services, an expanded coverage effort and continued deepening of client relationships led to a 15% increase in assets under custody and 21% growth in liability balances.

* * *

**CORPORATE AND INVESTMENT BANKING**

- *Capital Markets and Banking*
  - o    Fixed income markets revenues increased 53%, driven by strong performance in interest rate products, foreign exchange, and

        commodities.

o      Equity markets revenues increased 78%, driven by improved performance and growth in cash trading, alternative execution, and derivatives products.

o      Investment banking revenues increased 22%, driven by a 63% increase in advisory fees, which reflected strong growth in completed M&A transactions, and 45% growth in equity underwriting.

175.    On November 4, 2005, Citigroup filed its Form 10-Q for the quarter ended September 30, 2005, (the "Third Quarter 2005 10-Q") which included the same materially false and misleading financial results previously reported in the October 17, 2005 Press Release.

176.    The above-referenced statements in the October 17, 2005 Press Release and in the Third Quarter 2005 10-Q were materially false and misleading when issued for the reasons stated above in ¶ 118.

177.    The Third Quarter 2005 10-Q contained virtually identical certifications by Prince and Krawcheck as contained in the 2004 10-K, which were materially false and misleading and/or omitted material facts for the reasons stated above in ¶ 154.

178.    The Third Quarter 2005 10-Q also attempted to assure investors that the Company had sound risk management policies to ensure that the risks of delinquency of its lending portfolios were offset through other means. For example, the Third Quarter 2005 10-Q stated:

The Company provides a wide range of mortgage and other loan products to a diverse customer base. In addition to providing a source of liquidity and less expensive funding, securitizing these assets also reduces the Company's credit exposure to the borrowers. . . . ***The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust.***

179.    With respect to Citigroup's exposure to losses as a result of the Company's unconsolidated VIEs, the Third Quarter 2005 10-Q stated the following in Note 13 to the Consolidated Financial Statements (Unaudited):

. . . the Company *may*, along with other financial institutions, provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs. The Company *may* be a party to derivative contracts with VIEs, *may* provide loss enhancement in the form of letters of credit and other guarantees to the VIEs, *may* be the investment manager, and *may* also have an ownership interest in certain VIEs. Although *actual losses are not expected to be material*, the Company's maximum exposure to loss as a result of its involvement with VIEs that are not consolidated was $85.7 billion at September 30, 2005.

180.    Citigroup's statements in the Third Quarter 2005 10-Q concerning its exposure to losses as a result of the Company's mortgage loan securitizations and unconsolidated VIEs were materially false and misleading when issued for the reasons stated above in ¶ 124.

C.    **2006 Events and False and Misleading Statements**

181.    During 2006, Defendants made and/or caused to be issued numerous materially false and misleading statements and/or omissions of material facts, some of which were made in connection with the events depicted on the following graph:



**Citigroup Inc.**
**2006 Events**

182.    On January 20, 2006, Citigroup issued a press release (the "January 20, 2006

Press Release") announcing the Company's financial results for the quarter ended December 31,

2005.  Specifically, Citigroup reported net income for the fourth quarter of 2005 of $6.93 billion,

or $1.37 per share.  The January 20, 2006 Press Release stated in relevant part:

- ***Continued momentum in capital markets driven businesses.***  In capital
  markets and banking, continued franchise momentum resulted in a 39%
  increase in equity markets revenues and a #1 rank in global equity and
  equity-linked underwriting for 2005.

* * *

**CORPORATE AND INVESTMENT BANKING**

- ***Capital Markets and Banking***

72

o      Fixed income markets revenues decreased 9%, reflecting lower results in commodities and structured corporate finance.

o      Equity markets revenues increased 39%, driven by improved performance and growth in cash trading, derivatives, and structured products.

o      Investment banking revenues increased 3%, as record advisory revenues, up 25%, were offset by a decline in debt and equity underwriting.

o      Lending revenues increased 31%, driven by hedging gains in credit derivatives.

183.    On February 24, 2006, Citigroup filed its Form 10-K for fiscal 2005 (the "2005 10-K"). In the 2005 10-K, Citigroup reported net income of $2.6 billion, or $4.75 per share, for the year ended 2005.

184.    The above-referenced statements in the January 20, 2006 Press Release and the 2005 10-K were materially false and misleading when issued for the reasons stated above in ¶ 118.

185.    The 2005 10-K contained virtually identical certifications by Prince and Krawcheck as contained in the 2004 10-K, which were materially false and misleading and/or omitted material facts for the reasons stated above in ¶ 154.

186.    The 2005 10-K also attempted to assure investors that the Company had sound risk management policies to ensure that the risks of delinquency of its lending portfolios were offset through other means. For example, the 2005 10-K stated:

> The Company provides a wide range of mortgage and other loan products to its customers. In addition to providing a source of liquidity and less expensive funding, securitizing these assets also reduces the Company's credit exposure to the borrowers. *The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust.*

187.    The 2005 10-K also stated that Citigroup mitigates risk in its mortgage portfolio by selling most of the loans it originates:

As with all other lending activity, this exposes Citigroup to several risks, including credit, liquidity and interest rate risks. To manage credit and liquidity risk, Citigroup sells most of the mortgage loans it originates, but retains the servicing.

188.    With respect to Citigroup's exposure to losses as a result of the Company's

unconsolidated VIEs, the 2005 10-K stated the following in Note 13 to the Consolidated

Financial Statements (Unaudited):

> . . . the Company *may*, along with other financial institutions, provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs. The Company *may* be a party to derivative contracts with VIEs, *may* provide loss enhancement in the form of letters of credit and other guarantees to the VIEs, *may* be the investment manager, and *may* also have an ownership interest in certain VIEs. Although *actual losses are not expected to be material*, the Company's maximum exposure to loss as a result of its involvement with VIEs that are not consolidated was $91 billion and $78 billion at December 31, 2005 and 2004 respectively.

189.    Citigroup's statements in the 2005 10-K concerning its exposure to losses as a

result of the Company's mortgage loan securitizations and unconsolidated VIEs were materially

false and misleading when issued for the reasons stated above in ¶ 124.

190.    KPMG signed an Independent Auditors' Report in the 2005 10-K, which stated:

> We have audited the accompanying consolidated balance sheets of Citigroup Inc. and subsidiaries (the "Company" or "Citigroup") as of December 31, 2005 and 2004, the related consolidated statements of income, changes in stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 2005, and the related consolidated balance sheets of Citibank, N.A. and subsidiaries as of December 31, 2005 and 2004. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.
>
> *We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).* Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also

includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

***In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Citigroup as of December 31, 2005 and 2004, the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2005, and the financial position of Citibank, N.A. and subsidiaries as of December 31, 2005 and 2004, in conformity with U.S. generally accepted accounting principles.***

As discussed in Note 1 to the Consolidated Financial Statements, in 2005 the Company changed its method of accounting for conditional asset retirement obligations associated with operating leases, and in 2003 the Company changed its methods of accounting for variable interest entities and stock-based compensation.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Citigroup's internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated February 23, 2006 expressed an unqualified opinion on management's assessment of, and the effective operation of, internal control over financial reporting.

/s/ KPMG LLP
New York, New York
February 23, 2006

191.    As alleged herein, KPMG's Independent Auditors' Report in the 2005 10-K was knowingly false at the time that it was signed. In the 2005 10-K, KPMG falsely assured investors that KPMG had performed its audit in accordance with the standards of the Public Company Accounting Oversight Board and that Citigroup's financial statements presented fairly, in all material respects, the financial position of Citigroup and its subsidiaries in compliance with U.S. GAAP. KPMG's statements were materially false and misleading and omitted material facts at the time that such statements were issued because, among other things:

(i)     Citigroup's failure to provide detailed disclosure concerning its exposure
        to risks in connection with the VIEs, including either the existence or any
        of the terms of the Liquidity Puts, violated numerous provisions of U.S.
        GAAP including, but not limited to the disclosure requirements
        concerning a guarantor's obligations set forth in FIN 45, ¶13, which
        provides that a "guarantor shall disclose the following information about
        each guarantee, or each group of similar guarantees, even if the likelihood
        of the guarantor's having to make any payments under the guarantee is
        remote";

(ii)    Citigroup's failure to provide detailed disclosure to its exposure to risks in
        connection with the VIEs, including the Liquidity Puts, violated Item 303
        of Regulation S-K, which required, among other things, that Citigroup
        disclose the amounts of revenues, expenses and cash flows arising from
        such arrangements; the nature and amounts of any interests retained,
        securities issued and other indebtedness incurred in connection with such
        arrangements; and *the nature and amounts of any other obligations or
        liabilities (including contingent obligations or liabilities) from such
        arrangements that were or were reasonably likely to become material
        and the triggering events or circumstances that could cause them to
        arise*;

(iii)   KPMG knew that Citigroup's financial statements:  failed to contain
        proper disclosures required by U.S. GAAP with regard to off-balance-
        sheet VIEs; failed to properly accrue for contingent liabilities that arose
        from the existence of the guarantees provided by Citigroup to many of the
        equity and debt holders in VIEs sponsored by Citigroup, Bear Stearns and
        others; and failed to properly require the consolidation of certain VIEs as a
        result of Citigroup's vulnerability to loss because of those guarantees it
        provided; and

(iv)    KPMG knew and/or recklessly disregarded the fact that the Company had
        wholly deficient internal accounting controls in connection with its
        accounting for the VIEs and other off-balance-sheet arrangements.

192.    On April 17, 2006, Citigroup issued a press release (the "April 17, 2006 Press

Release") announcing the Company's financial results for the quarter ended March 31, 2006.

Specifically, Citigroup reported net income for the first quarter of 2006 of $5.64 billion, or $1.12 per

share.  The April 17, 2006 Press Release stated in relevant part:

**First Quarter Highlights**

* * *

- Record corporate and investment banking revenues, up 21%, driven by

strong franchise momentum.

    o    Record international corporate and investment banking revenues, up 34%, and net income, up 80%

    o    Record fixed income markets revenues of $3.15 billion, up 8%; record equity market revenues of $1.18 billion, up 67%; record investment banking revenue of $1.22 billion, up 34%

    o    #1 rank in global debt underwriting; #1 in announced global M&A; #2 in global equity underwriting

    o    Record transaction services revenues, up 22%, driven by double-digit growth in customer balances

* * *

- U.S. consumer average loans grew 10%, reflecting loan growth in consumer lending and retail distribution of 18% and 8% respectively, and commercial business core loans, up 23%. Card purchase sales increased 11%, while average managed receivables declined 2%

* * *

**CORPORATE AND INVESTMENT BANKING**

- ***Capital Markets and Banking***
  - o    Record fixed income markets revenues of $3.15 billion, up 8%, reflected broad-based performance across products and regions, including record results in emerging markets trading, municipals, and credit products. Compared to the fourth quarter 2005, fixed income market revenues increased 51%.
  - o    Record equity markets revenues of $1.18 billion, up 67%, were driven by strong growth globally, including cash trading, derivatives, and convertibles.
  - o    Record investment banking revenues increased 34%, driven by higher debt underwriting and advisory fees.

193.    On May 5, 2006, Citigroup filed its Form 10-Q for the quarter ended March 31, 2006 (the "First Quarter 2006 10-Q"), which included the same materially false and misleading financial results previously reported in the April 17, 2006 Press Release.

194.    The above-referenced statements in the April 17, 2006 Press Release and in the First Quarter 2006 10-Q were materially false and misleading when issued for the reasons stated above in ¶ 118.

195.    The First Quarter 2006 10-Q contained virtually identical certifications by Prince and Krawcheck as contained in the 2004 10-K, which were materially false and misleading and/or omitted material facts for the reasons stated above in ¶ 154.

196.    The First Quarter 2006 10-Q also attempted to assure investors that the Company had sound risk management policies to ensure that the risks of delinquency of its lending portfolios were offset through other means. For example, the First Quarter 2006 10-Q stated:

> The Company provides a wide range of mortgage and other loan products to its customers. In addition to providing a source of liquidity and less expensive funding, securitizing these assets also reduces the Company's credit exposure to the borrowers. ***The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust.***

197.    With respect to Citigroup's exposure to losses as a result of the Company's unconsolidated VIEs, the First Quarter 2006 10-Q stated the following in Note 8 to the Consolidated Financial Statements (Unaudited):

> . . . the Company *may*, along with other financial institutions, provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs. The Company *may* be a party to derivative contracts with VIEs, *may* provide loss enhancement in the form of letters of credit and other guarantees to the VIEs, *may* be the investment manager, and *may* also have an ownership interest in certain VIEs. Although ***actual losses are not expected to be material***, the Company's maximum exposure to loss as a result of its involvement with VIEs that are not consolidated was $90 billion and $91 billion at March 31, 2006 and December 31, 2005, respectively.

198.    Citigroup's statements in the First Quarter 2006 10-Q concerning its exposure to losses as a result of the Company's mortgage loan securitizations and unconsolidated VIEs were materially false and misleading when issued for the reasons stated above in ¶ 124.

199.    On July 17, 2006, Citigroup issued a press release (the "July 17, 2006 Press

Release") announcing the Company's financial results for the quarter ended June 30, 2006.

Specifically, Citigroup reported net income for the second quarter of 2006 of $5.27 billion, or

$1.05 per share.  The July 17, 2006 Press Release stated in relevant part:

### Second Quarter Highlights

* * *

- Corporate and investment banking revenues were the second highest ever, increasing 31%; income up 26%.

    o    International corporate and investment banking revenues up 23%; U.S. revenues up 44%.
    o    Fixed income and equity markets revenues up 51% and 30%, respectively, despite volatile emerging market conditions. Investment banking revenues were up 24%.
    o    YTD #1 rank in global debt underwriting; #2 in global announced M&A; #2 in global equity underwriting.
    o    Record transaction services revenues and net income, up 26% and 18%, respectively, driven by double-digit growth in customer balances.

* * *

- U.S. consumer revenues and net income increased 1% and 11%, respectively.  Average loans were up 13% and deposits increased 8%. Retail banking investment product sales increased 37%, and card purchase sales grew 12%.

* * *

### Management Comment

"In the second quarter, we achieved our second highest income from continuing operations while making significant progress on our strategic initiatives.

* * *

U.S. consumer also achieved strong volume growth and, despite headwinds from spread compression, showed improving momentum from the first quarter.  And in corporate and investment banking, we achieved our second highest revenues, despite challenging conditions in the emerging markets," said Prince.

"We are very pleased with the momentum we are building as we execute on our strategic initiatives, strengthen our franchises, and position Citigroup for continued long-term earnings growth," said Prince.

\* \* \*

## CORPORATE AND INVESTMENT BANKING

- ***Capital Markets and Banking***
    - o     Fixed income markets revenues of $2.76 billion, up 51%, were driven by strong results in municipals, foreign exchange, and credit products.
    - o     Equity markets revenues of $945 million, up 30%, reflected strong performance in derivatives, convertibles, and cash trading.
    - o     Investment banking revenues of $1.15 billion, up 24%, were driven by higher debt and equity underwriting revenues and increased advisory fees.

200.    On August 4, 2006, the Company filed its Form 10-Q for the quarter ended June 30, 2006 (the "Second Quarter 2006 10-Q"), which included the same materially false and misleading financial results previously reported in the July 17, 2006 Press Release.

201.    The above-referenced statements in the July 17, 2006 Press Release and in the Second Quarter 2006 10-Q were materially false and misleading when issued for the reasons stated above in ¶ 118.

202.    The Second Quarter 2006 10-Q also contained virtually identical certifications by Prince and Krawcheck as contained in the 2004 10-K, which were materially false and misleading and/or omitted material facts for the reasons stated above in ¶ 154.

203.    The Second Quarter 2006 10-Q also attempted to assure investors that the Company had sound risk management policies to ensure that the risks of delinquency of its lending portfolios were offset through other means. For example, the Second Quarter 2006 10-Q stated:

The Company provides a wide range of mortgage and other loan products to its customers. In addition to providing a source of liquidity and less expensive

funding, securitizing these assets also reduces the Company's credit exposure to the borrowers. ***The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust.***

204.    With respect to Citigroup's exposure to losses as a result of the Company's unconsolidated VIEs, the Second Quarter 2006 10-Q stated the following in Note 14 to the Consolidated Financial Statements (Unaudited):

> . . . the Company ***may***, along with other financial institutions, provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs. The Company ***may*** be a party to derivative contracts with VIEs, ***may*** provide loss enhancement in the form of letters of credit and other guarantees to the VIEs, ***may*** be the investment manager, and ***may*** also have an ownership interest in certain VIEs. Although ***actual losses are not expected to be material***, the Company's maximum exposure to loss as a result of its involvement with VIEs that are not consolidated was $89 billion and $91 billion at June 30, 2006 and December 31, 2005, respectively.

205.    Citigroup's statements in the Second Quarter 2006 10-Q concerning its exposure to losses as a result of the Company's mortgage loan securitizations and unconsolidated VIEs were materially false and misleading when issued for the reasons stated above in ¶ 124.

206.    On October 19, 2006, Citigroup issued a press release (the "October 19, 2006 Press Release") announcing its financial results for the quarter ended September 30, 2006. Specifically, Citigroup reported net income of $5.5 billion, or $1.10 per share for the third quarter of 2006. The October 19, 2006 Press Release stated in relevant part:

**Third Quarter Summary**

- Total revenues were approximately even with the third quarter 2005, as international revenue growth was offset by a decline in U.S. revenues, reflecting lower revenues in capital markets driven businesses.

* * *

- Corporate and investment banking revenues and net income declined 6% and 4%, respectively.

o    Capital markets and banking revenues and net income declined 12% and 6%, respectively, driven by lower revenues in fixed income markets and equity underwriting, which was partially offset by growth in debt underwriting and advisory.

o    YTD #1 rank in global debt underwriting, #2 in global announced M&A, and #2 in global equity underwriting.

o    Transaction services revenues were a record, up 20%, and net income increased 18%, driven by double-digit growth in customer balances.

\* \* \*

**Management Comment**

"Our third quarter results were driven by strength in several businesses, including international revenues, up 11%. In our U.S. consumer franchise, we are pleased with the trends we are seeing, and throughout our businesses we had good expense discipline. That said, results from our capital markets related businesses fell short of my expectations, and *I expect improved results from these businesses going forward,*" said Charles Prince, Chairman and Chief Executive Officer of Citigroup.

\* \* \*

**CORPORATE AND INVESTMENT BANKING**

- *Capital Markets and Banking*
  o    Fixed income markets revenues declined 16% to $2.3 billion, primarily driven by lower results in commodities, interest rate products, and foreign exchange.
  o    Equity markets revenues of $868 million were approximately even with the prior-year period, as improved performance in derivatives and equity finance was offset by lower results in convertibles and cash trading.
  o    Investment banking revenues of $1.1 billion were approximately even with the prior-year period, as 13% growth in debt underwriting revenues and increased advisory fees were offset by a decline in equity underwriting.

207.    On November 3, 2006, the Company filed its Form 10-Q for the third quarter of 2006 (the "Third Quarter 2006 10-Q"), which included the same materially false and misleading financial results previously reported in the October 19, 2006 Press Release.

208.    The above-referenced statements in the October 19, 2006 Press Release and in the Third Quarter 2006 10-Q were materially false and misleading when issued for the reasons stated above in ¶ 118.

209.    The Third Quarter 2006 10-Q also contained virtually identical certifications by Prince and Krawcheck as contained in the 2004 10-K, which were materially false and misleading and/or omitted material facts for the reasons stated above in ¶ 154.

210.    The Third Quarter 2006 10-Q also attempted to assure investors that the Company had sound risk management policies to ensure that the risks of delinquency of its lending portfolios were offset through other means.  For example, the Third Quarter 2006 10-Q stated:

> The Company provides a wide range of mortgage and other loan products to its customers.  In addition to providing a source of liquidity and less expensive funding, securitizing these assets also reduces the Company's credit exposure to the borrowers. ***The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust.***

211.    With respect to Citigroup's exposure to losses as a result of the Company's unconsolidated VIEs, the Third Quarter 2006 10-Q stated the following in Note 14 to the Consolidated Financial Statements (Unaudited):

> . . . the Company ***may***, along with other financial institutions, provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs. The Company ***may*** be a party to derivative contracts with VIEs, ***may*** provide loss enhancement in the form of letters of credit and other guarantees to the VIEs, ***may*** be the investment manager, and ***may*** also have an ownership interest in certain VIEs. Although ***actual losses are not expected to be material***, the Company's maximum exposure to loss as a result of its involvement with VIEs that are not consolidated was $93 billion and $91 billion at September 30, 2006 and December 31, 2005, respectively.

212.    Citigroup's statements in the Third Quarter 2006 10-Q concerning its exposure to losses as a result of the Company's mortgage loan securitizations and unconsolidated VIEs were materially false and misleading when issued for the reasons stated above in ¶ 124.

**D.    January 2007 - September 2007 Events and False and Misleading Statements**

213.    During 2007, Defendants made and/or caused to be issued numerous materially false and misleading statements and/or omissions of material facts, some of which were made in connection with the events depicted on the following graph:



214.    On January 19, 2007, Citigroup issued a press release (the "January 19, 2007 Press Release") announcing the Company's financial results for the quarter ended December 31, 2006 and the year ended 2006.  Specifically, Citigroup reported net income for the fourth quarter

of 2006 of $5.13 billion, or $1.03 per share, and net income of $21.54 billion, or $4.31 per share,

for the year ended 2006. The January 19, 2007 Press Release stated in relevant part:

**Management Comment**

"Our results were highlighted by ***double-digit revenue growth in our corporate and investment banking, wealth management and alternative investment businesses***.

\* \* \*

**Fourth Quarter Summary**

- ***Revenues were a record, up 15%, driven by 14% revenue growth in corporate and investment banking, 79% in alternative investments*** and 21% in global wealth management. Global consumer revenues increased 9%.

\* \* \*

   o    Deposits and loans grew 20% and 16%, respectively. In global consumer, investment AUMs increased 17%. Capital markets and banking ranked #1 in global debt underwriting, #2 in announced M&A and #2 in global equity underwriting and global loan syndications for the full year 2006. In global wealth management, client assets under fee-based management grew 15%.

\* \* \*

**CORPORATE AND INVESTMENT BANKING**

- ***Capital Markets and Banking***
  - o    Fixed income markets revenues increased 32% to $2.75 billion, primarily driven by improved results in interest rate and credit products and foreign exchange.
  - o    Equity markets revenues grew 17% to $900 million on higher results in cash trading, convertibles and equity finance and prime brokerage.
  - o    Investment banking revenues increased 16% to a record $1.34 billion, reflecting higher debt and equity underwriting revenues, up 17% and 47% respectively.

215.    The above-referenced statements in the January 19, 2007 Press Release and in the 2006 10-K (discussed and defined below) were materially false and misleading when issued for the reasons stated above in ¶ 118.

216.    On February 7, 2007, New Century Financial Corporation ("New Century"), the second-largest subprime lender in the United States, announced that it was restating its financial results for the first three quarters of 2006 to correct improper accounting for the company's allowance for loan repurchase losses. In this respect, New Century disclosed the intensifying industry trend of early-payment defaults and the corresponding increase in loan repurchases which lead to the company's restatement. Similarly, HSBC Holdings PLC ("HSBC") announced on February 7, 2007 that the company's loan impairment charges for 2006 would exceed analyst estimates by more than 20% due to accelerated delinquency trends across the United States subprime mortgage market. As alleged below, Defendants continued to misrepresent Citigroup's exposure to subprime losses even in light of this intensifying downturn in the market.

217.    On February 23, 2007, Citigroup filed its Form 10-K for fiscal 2006 (the "2006 10-K"), which included the same materially false and misleading financial results previously reported in the January 19, 2007 Press Release.

218.    The 2006 10-K also contained virtually identical certifications by Prince and Krawcheck as contained in the 2004 10-K, which were materially false and misleading and/or omitted material facts for the reasons stated above in ¶ 154.

219.    The 2006 10-K also attempted to assure investors that the Company had sound risk management policies to ensure that the risks of delinquency of its lending portfolios were offset through various means. For example, the 2006 10-K stated:

>   The Company provides a wide range of mortgage and other loan products to its customers. In addition to providing a source of liquidity and less expensive

funding, securitizing these assets also reduces the Company's credit exposure to the borrowers. *The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust.*

220.    The 2006 10-K also stated that Citigroup mitigates risk in its mortgage portfolio

by selling most of the loans it originates:

> As with all other lending activity, this exposes Citigroup to several risks, including credit, liquidity and interest rate risks. To manage credit and liquidity risk, Citigroup sells most of the mortgage loans it originates, but retains the servicing.

221.    With respect to Citigroup's exposure to losses as a result of the Company's

unconsolidated VIEs, the 2006 10-K stated the following in Note 22 to the Consolidated

Financial Statements (Unaudited):

> . . . the Company *may*, along with other financial institutions, provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs. The Company *may* be a party to derivative contracts with VIEs, *may* provide loss enhancement in the form of letters of credit and other guarantees to the VIEs, *may* be the investment manager, and *may* also have an ownership interest in certain VIEs. Although *actual losses are not expected to be material*, the Company's maximum exposure to loss as a result of its involvement with VIEs that are not consolidated was $109 billion and $91 billion at December 31, 2006 and 2005, respectively.

222.    Citigroup's statements in the 2006 10-K concerning its exposure to losses as a

result of the Company's mortgage securitizations and unconsolidated VIEs were materially false

and misleading when issued for the reasons stated above in ¶124.

223.    KPMG signed an Independent Auditors' Report in the 2006 10-K, which stated:

> We have audited the accompanying consolidated balance sheets of Citigroup Inc. and subsidiaries (the "Company" or "Citigroup") as of December 31, 2006 and 2005, the related consolidated statements of income, changes in stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 2006, and the related consolidated balance sheets of Citibank, N.A. and subsidiaries as of December 31, 2006 and 2005. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to

express an opinion on these consolidated financial statements based on our audits.

***We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).*** Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Citigroup as of December 31, 2006 and 2005, the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2006, and the financial position of Citibank, N.A. and subsidiaries as of December 31, 2006 and 2005, in conformity with U.S. generally accepted accounting principles.***

As discussed in Note 1 to the consolidated financial statements, in 2006 the Company changed its methods of accounting for defined benefit pensions and other postretirement benefits, stock-based compensation, certain hybrid financial instruments and servicing of financial assets, and in 2005 the Company changed its method of accounting for conditional asset retirement obligations associated with operating leases.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Citigroup's internal control over financial reporting as of December 31, 2006, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated February 23, 2007 expressed an unqualified opinion on management's assessment of, and the effective operation of, internal control over financial reporting.



New York, New York
February 23, 2007

224.    As alleged herein, KPMG's Independent Auditors' Report in the 2006 10-K was knowingly false at the time that it was signed. In the 2006 10-K, KPMG falsely assured

investors that KPMG had performed its audit in accordance with the standards of the Public

Company Accounting Oversight Board and that Citigroup's financial statements presented fairly,

in all material respects, the financial position of Citigroup and its subsidiaries in compliance with

U.S. GAAP. KPMG's statements were materially false and misleading and omitted material

facts at the time that such statements were issued because, among other things:

(i) Citigroup's failure to provide detailed disclosure concerning its exposure to risks in connection with the VIEs, including either the existence or any of the terms of the Liquidity Puts, violated numerous provisions of U.S. GAAP including, but not limited to the disclosure requirements concerning a guarantor's obligations set forth in FIN 45, ¶13, which provides that a "guarantor shall disclose the following information about each guarantee, or each group of similar guarantees, even if the likelihood of the guarantor's having to make any payments under the guarantee is remote";

(ii) Citigroup's failure to provide detailed disclosure to its exposure to risks in connection with the VIEs, including the Liquidity Puts, violated Item 303 of Regulation S-K, which required, among other things, that Citigroup disclose the amounts of revenues, expenses and cash flows arising from such arrangements; the nature and amounts of any interests retained, securities issued and other indebtedness incurred in connection with such arrangements; and *the nature and amounts of any other obligations or liabilities (including contingent obligations or liabilities) arising from such arrangements that were or were reasonably likely to become material and the triggering events or circumstances that could cause them to arise*;

(iii) KPMG knew that Citigroup's financial statements: failed to contain proper disclosures required by U.S. GAAP with regard to off-balance-sheet VIEs; failed to properly accrue for contingent liabilities that arose from the existence of the guarantees provided by Citigroup to many of the equity and debt holders in VIEs sponsored by Citigroup, Bear Stearns and others; and failed to properly require the consolidation of certain VIEs as a result of Citigroup's vulnerability to loss because of those guarantees it provided; and

(iv) KPMG knew and/or recklessly disregarded the fact that the Company had wholly deficient internal accounting controls in connection with its accounting for the VIEs and other off-balance-sheet arrangements.

225.    On April 2, 2007, leading subprime lender, New Century, filed Chapter 11

Bankruptcy proceedings.

226.    On April 16, 2007, Citigroup issued a press release (the "April 16, 2007 Press Release") announcing the Company's financial results for the quarter ended March 31, 2007. Specifically, Citigroup reported net income for the first quarter of 2007 of $5.01 billion, or $1.01 per share, which included a charge of $1.38 billion related to a structural expense review conducted during the quarter. The April 16, 2007 Press Release stated in relevant part:

**Management Comment**

"We generated strong momentum this quarter, with revenues increasing 15% to a record, driven by growing customer business volumes. Global consumer deposits were up 12% and global consumer loans grew 11%. In our international franchises, revenues grew 18%, led by international markets & banking revenue up 20%. Our revenue growth combined with improving expense management and, after adjusting for certain non-recurring items, we generated positive operating leverage. Offsetting our improved revenue and expense performance were higher credit costs and a lower level of tax benefits than last year," said Charles Prince, Chairman and Chief Executive Officer of Citi.

* * *

**FIRST QUARTER SUMMARY**

- ***Revenues were a record, up 15%, driven by 23% revenue growth in markets & banking***, including record revenues in fixed income and equity markets, investment banking and transaction services. International consumer revenues grew 14% and global wealth management revenues were a record, up 13%. U. S. consumer revenue growth continued to trend positively, up 6%.

    o    Revenue growth reflected customer volume growth. Deposits and loans grew 18% and 15%, respectively. In global consumer, AUMs increased 12%. Securities and banking ranked #1 in global debt and equity underwriting and #2 in completed M&A for the first quarter. In global wealth management, client assets under fee-based management grew 13% and client capital in alternative investments grew 52%.

    o    Net interest revenues grew 8% as volume growth was partially offset by net interest margin compression.

* * *

- **Credit costs** increased $1.26 billion, primarily driven by an increase in net

credit losses of $509 million and a net charge of $597 million to increase loan loss reserves. The $597 million net charge compares to a net reserve release of $154 million in the prior-year period.

o    In U.S. consumer, higher credit costs reflected an increase in net credit losses of $164 million and a net charge of $182 million to increase loan loss reserves. The $182 million net charge compares to a net reserve release of $196 million in the prior-year period. Credit costs increased primarily in U.S. consumer lending and U.S. retail distribution, reflecting portfolio growth, an increase in delinquencies in second mortgages, and a change in estimate of loan losses inherent in the portfolio.

* * *

o    Markets & banking credit costs increased primarily due to a net charge of $286 million to increase loan loss reserves due to portfolio growth, which includes higher commitments to leveraged transactions and an increase in average loan tenor. The $286 million net charge compares to a $33 million net charge to increase reserves in the prior-year period. The global corporate credit environment remained stable.

* * *

## MARKETS & BANKING

- ### *Securities and Banking*

  o    Fixed income markets revenues increased 20% to a record $3.8 billion, driven by improved results across all products, including interest rates and currencies, and credit and securitized products.
  o    Equity markets revenues grew 26% to a record $1.5 billion on higher results in cash trading, derivatives, equity finance and prime brokerage.
  o    Gross investment banking revenues were a record $1.8 billion, reflecting record equity underwriting revenues, up 83%, and record advisory and other fees, up 45%. Net investment banking revenues increased 31% to $1.6 billion.
  o    Operating expenses increased 7% due to increased staffing and higher business volumes. The rate of growth in expenses also reflects the absence of a $346 million pre-tax charge related to SFAS 123(R) in the prior-year period.
  o    Credit costs increased due to a net charge of $286 million to increase loan loss reserves. The increase in loan loss reserves was driven by portfolio growth, which includes higher commitments to leveraged transactions and an increase in average loan tenor.
  o    Net income increased 34% to a record $2.2 billion.

227.    The results that Citigroup announced in the April 16, 2007 Press Release obtained the desired favorable reaction in the market. Citigroup's common stock price increased by 3.9% over the prior trading day's close, to close at $53.59 per share. Moreover, based upon the statements in the April 16, 2007 Press Release, those covering the market for investors believed, as Defendants desired, that Citigroup was well-protected against subprime loan losses that began to hit the market as a result of, among other things, New Century's April 2, 2007 bankruptcy filing. For example, Paul Nolte of the money management firm, Hinsdale Associates, stated that "[o]ne of the questions coming into earnings season has been the mortgage issue, and *Citigroup making positive comments about its business has lent some strength to the overall market.*"

228.    On May 4, 2007, Citigroup filed its Form 10-Q for the first quarter of 2007 (the "First Quarter 2007 10-Q"), which included the same materially false and misleading financial results previously reported in the April 16, 2007 Press Release.

229.    The above-referenced statements in the April 16, 2007 Press Release and in the First Quarter 2007 10-Q were materially false and misleading when issued for the reasons stated above in ¶ 118.

230.    The First Quarter 2007 10-Q also contained virtually identical certifications by Prince and Crittenden as contained in the 2004 10-K, which were materially false and misleading and/or omitted material facts for the reasons stated above in ¶ 154.

231.    The First Quarter 2007 10-Q also attempted to assure investors that the Company had sound risk management policies to ensure that the risks of delinquency of its lending portfolios were offset through other means. For example, the First Quarter 2007 10-Q stated:

> The Company provides a wide range of mortgage and other loan products to its customers. In addition to providing a source of liquidity and less expensive funding, securitizing these assets also reduces the Company's credit exposure to

the borrowers. *The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust.*

232.    With respect to Citigroup's exposure to losses as a result of the Company's unconsolidated VIEs, the First Quarter 2007 10-Q stated the following in Note 13 to the Consolidated Financial Statements (Unaudited):

> . . . the Company *may*, along with other financial institutions, provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs. The Company *may* be a party to derivative contracts with VIEs, *may* provide loss enhancement in the form of letters of credit and other guarantees to the VIEs, *may* be the investment manager, and *may* also have an ownership interest in certain VIEs. Although *actual losses are not expected to be material*, the Company's maximum exposure to loss as a result of its involvement with VIEs that are not consolidated was $108 billion and $109 billion at March 31, 2007 and December 31, 2006, respectively

233.    Citigroup's statements in the First Quarter 2007 10-Q concerning its exposure to losses as a result of the Company's mortgage loan securitizations and unconsolidated VIEs were materially false and misleading when issued for the reasons stated above in ¶ 124.

234.    By mid-June 2007, Bear Stearns began selling off the assets of its heavily subprime-invested hedge funds in order to meet investor redemption requests and margin calls. Unable to generate sufficient cash due the significant declines in the value of the funds' assets, Bear Stearns ultimately had to wind-down the funds which had "effectively no value left for investors." Despite these developments, Citigroup continued to misrepresent its exposure to subprime-related losses.

235.    On July 10, 2007, the *Financial Times* published an article detailing an interview conducted with Defendant Prince (the "July 10, 2007 FT Article") in which he down-played the turmoil in the U.S. subprime mortgage market. With respect to Prince's view that the turmoil was not a big risk, the July 10, 2007 FT Article quoted Prince as stating, "[t]he depth of the pools

of liquidity is so much larger than it used to be that a disruptive event now needs to be much more disruptive than it used to be." Prince further stated that **"*[w]hen the music stops, in terms of liquidity, things will be complicated. But as long as the music is playing, you've got to get up and dance. We're still dancing.*"**

236.    Prince's statements to the *Financial Times* were materially false and misleading and omitted material facts. While Prince cavalierly claimed that Citigroup was unaffected by the turmoil in the credit markets, Citigroup was increasing its risk exposure by issuing Liquidity Puts to purchasers of Citigroup-sponsored CDO commercial paper. Moreover, as Crittenden admitted on November 5, 2007, a substantial portion of the $25 billion in returned Liquidity Puts were redeemed during the summer of 2007.

237.    On July 20, 2007, Citigroup issued a press release (the "July 20, 2007 Press Release") announcing the Company's financial results for the quarter ended June 30, 2007. Specifically, Citigroup reported net income for the second quarter of 2007 of $6.23 billion, or $1.24 per share, up 18% from the prior year. The July 20, 2007 Press Release stated in relevant part:

> **Management Comment**
>
> "We have very clear priorities to drive growth and we are executing on all of them. We generated *record revenues*, up 20%, and record earnings from continuing operations, up 18%, both driven by our record international results," said Charles Prince, Citi Chairman and Chief Executive Officer.
>
> "We continued to generate revenue and volume growth in our U.S. consumer franchise, while making excellent progress in re-weighting Citi toward our other businesses, especially our international franchises, where revenues and net income increased over 30%. Our capital markets-driven businesses performed extremely well and international consumer revenues and volumes grew at a double-digit pace," said Prince.
>
> * * *
>
> **SECOND QUARTER SUMMARY**

- **Revenues** were a record, up 20%, led by 34% growth in international revenues. International markets & banking revenues grew 50%, international consumer revenues increased 16%, and wealth management revenues more than doubled.

  o Revenue growth reflected double-digit customer volume growth. Deposits and loans grew 20% and 17%, respectively. Securities and banking ranked #1 in global debt underwriting, #2 in announced M&A, #3 in global equity underwriting, and achieved record revenues in equity markets and transaction services. In global wealth management, client assets under fee-based management grew 40%, and client capital in alternative investments increased 55%.

  o Strong volume growth drove a 16% increase in net interest revenues.

  o Excluding the impact of acquisitions, organic revenue growth was 16%.

* * *

- **Credit costs** increased $934 million, primarily driven by an increase in net credit losses of $259 million and a net charge of $465 million to increase loan loss reserves. The $465 million net charge compares to a net reserve release of $210 million in the prior-year period.

  o In U.S. consumer, higher credit costs reflected an increase in net credit losses of $183 million and a net charge of $245 million to increase loan loss reserves. The $245 million net charge compares to a net reserve release of $274 million in the prior-year period. The increase in net credit losses and loan loss reserves primarily reflected higher delinquencies in second mortgages in consumer lending, a change in estimate of loan losses inherent in the cards portfolio, and portfolio growth.

* * *

  o Markets & banking credit costs declined, reflecting a stable global credit environment and the absence of a $118 million net increase to loan loss reserves recorded in the prior-year period.

* * *

## MARKETS & BANKING

- *Securities and Banking*
  o Fixed income markets revenues increased 24% to $3.42 billion,

   driven by improved results across all products, including interest
   rates and currencies, credit and securitized products, and
   commodities.

o  Equity markets revenues grew 67% to a record $1.58 billion on
   higher results in cash trading, derivatives, equity finance, and
   convertibles.

o  Gross investment banking revenues were $1.65 billion, reflecting
   record equity underwriting revenues of $539 million, up 90%, and
   increased advisory and other fees, up 34%. Net investment
   banking revenues increased 28% to $1.47 billion.

o  Operating expenses increased 30% due to higher business volumes
   and compensation costs.

o  Credit costs decreased reflecting a stable global corporate credit
   environment and the absence of a $120 million net increase to loan
   loss reserves recorded in the prior-year period.

o  Net income increased 52% to $2.15 billion.

(Footnote omitted)

  238.  Also on July 20, 2007, Defendant Crittenden participated in a conference call with

analysts discussing Citigroup's second quarter 2007 results (the "July 20, 2007 Call"). During

the July 20, 2007 Call, *Crittenden made materially false* and misleading statements in an effort

to quell investor fears regarding subprime exposure:

  . . . Our subprime exposure in Markets and Banking can be divided into two
  categories, which together account for 2% of the Securities and Banking revenues
  in 2006. The first is secured lending and the second is trading. With regards to
  secured lending, we have been actively managing down our exposure for some
  time. We had $24 billion in assets here at the end of 2006. It was at $20 billion at
  the end of the first quarter and $13 billion at the end of the second quarter while
  adjusting at the same time collateral and margin requirements.

  As for our trading activities, we continue to be an active market maker and as
  such, we hedge our risks using a variety of methods to monitor the health of our
  counter-parties very carefully. We monitor every aspect of our Subprime
  business daily and we have a rigorous process in place for marking our book
  using fundamental valuation techniques, market references, and liquidity analysis.

  239.  The above-referenced statements made during the July 20, 2007 Call were

materially false and misleading and omitted material facts. Crittenden failed to disclose, among

other things, the billions of dollars in subprime-backed paper that was being returned to Citigroup pursuant to the undisclosed Liquidity Puts.

240.    On August 3, 2007, Citigroup filed its Form 10-Q for the second quarter of 2007 (the "Second Quarter 2007 10-Q"), which included the same materially false and misleading financial results previously reported in the July 20, 2007 Press Release.

241.    The above-referenced statements in the July 20, 2007 Press Release and in the Second Quarter 2007 10-Q were materially false and misleading when issued for the reasons stated above in ¶ 118.

242.    In addition, the statements were false and misleading at the time they were made because Defendants failed to disclose that, during the summer of 2007, approximately $25 billion of commercial paper was returned to the Company's balance sheet as a result of the Liquidity Puts: a fact that Citigroup did not disclose until November 5, 2007.

243.    The Second Quarter 2007 10-Q also contained virtually identical certifications by Prince and Crittenden as contained in the 2004 10-K, which were materially false and misleading and/or omitted material facts for the reasons stated above in ¶ 154.

244.    The Second Quarter 2007 10-Q also attempted to assure investors that the Company had sound risk management policies to ensure that the risks of delinquency of its lending portfolios were offset through other means.  For example, the Second Quarter 2007 10-Q stated:

> The Company provides a wide range of mortgage and other loan products to its customers.  In addition to providing a source of liquidity and less expensive funding, securitizing these assets also reduces the Company's credit exposure to the borrowers.

* * *

*The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust.*

245.    With respect to Citigroup's exposure to losses as a result of the Company's unconsolidated VIEs, the Second Quarter 2007 10-Q stated the following in Note 13 to the Consolidated Financial Statements (Unaudited):

> . . . the Company *may*, along with other financial institutions, provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs. The Company *may* be a party to derivative contracts with VIEs, *may* provide loss enhancement in the form of letters of credit and other guarantees to the VIEs, *may* be the investment manager, and *may* also have an ownership interest in certain VIEs. Although *actual losses are not expected to be material*, the Company's maximum exposure to loss as a result of its involvement with VIEs that are not consolidated was $89 billion and $91 billion at June 30, 2006 and December 31, 2005, respectively.

246.    Citigroup's statements in the Second Quarter 2007 10-Q concerning its exposure to losses as a result of the Company's mortgage loan securitizations and unconsolidated VIEs were materially false and misleading when issued for the reasons stated above in ¶ 124.

247.    On September 6, 2007, the LSE released a series of submissions that Citigroup made concerning its seven SIVs with exposure to subprime losses. The Company did not make direct disclosure of details pertaining to these seven SIVs until October 19, 2007.

248.    In the Company's submission to the LSE, Citigroup represented that "*portfolio quality is extremely high and we have no credit concerns about any of the constituent issues*." Citigroup further represented that "*Citi's SIVs remain robust and their asset portfolios are performing well*."

249.    In addition to the misrepresentation in the immediately preceding paragraph concerning the credit and asset quality in Citigroup's SIVs, Citigroup's submissions to the LSE *__admit that Defendants knew since 2004 that continued investment in RMBS and ABS CDOs__*

*presented too much risk*.  In its August 2007 "Portfolio Commentary for Beta Finance Corporation", *Citigroup stated that "[w]e stopped buying ABS CDO deals for any of the SIV portfolios in 2004, due to concerns about the correlation of the underlying products."*

250.    In the foregoing submission pertaining to the Beta SIV, Citigroup further states :

> *Over recent years, the tight credit spread environment drove us to reduce risk by pursuing the following strategies in return for a minimal give up in yield:*
>
> - *Protecting the more volatile sectors (USRMBS, CMBS and arbitrage CDOs) well beyond the rating agency's requirements for AAA*
> - *Avoiding what we perceived as the unduly risky areas of sub prime and CDOs of ABS*

251.    Citigroup's admissions concerning its deliberate election to avoid investing in securities backed by subprime mortgages as of 2004 based upon the volatility and unacceptable risks inherent in such investments demonstrates that Citigroup knowingly incurred such risks in connection with the Liquidity Puts that it issued to purchasers of VIE-issued commercial paper during the Class Period.  Despite knowing of these risks, and deliberately avoiding them in some contexts, Citigroup incurred such risks in what it hoped would be hidden off-balance-sheet transactions in order to earn fees based upon its arrangement and management of its VIEs.  As the Company was forced to disclose on November 5, 2007, Citigroup lost its knowing gamble with the Liquidity Puts to the tune of at least *$25 billion*.

252.    On September 12, 2007, Steven J. Freiberg ("Freiberg"), Chairman and CEO of Citigroup's Global Consumer Group, participated in the Lehman Brothers Financial Services Conference (the "September 12, 2007 Conference").  During the September 12, 2007 Conference, Freiberg made statements concerning the "terrific category," subprime, that was "growing at a very nice clip."  In this regard, Freiberg stated, "[w]here you think there would be a fire which is in our subprime portfolio, it actually looks very good."

253. The statements made during the September 12, 2007 Conference were materially false and misleading and omitted material facts concerning Citigroup's crippling exposure to the escalating defaults in the subprime mortgage market. In a matter of weeks, Citigroup would disclose tremendous write-downs and losses in connection with its subprime portfolio.

254. On Sunday, September 16, 2007 -- just days after assuring investors that Citigroup had no "credit concerns" in connection with its SIVs -- Company officials met with officials from the United States Department of Treasury ("Treasury") and representatives of several other large financial institutions (including Bank of America and JP MorganChase & Co.) at Treasury offices in Washington, D.C. to discuss potential solutions for what Treasury perceived as a mounting inability for SIVs and other conduits to continue to sell their mortgage-backed short term debt. According to an October 15, 2007 article issued by *Reuters*, this meeting was chaired by two senior Treasury officials: Robert Steel, the Under Secretary for Domestic Finance, and Anthony Ryan, the Assistant Secretary for Financial Markets.

255. At the September 16, 2007 meeting, the attendees discussed the framework for a proposed M-LEC; a fund established by financial institutions to create a market into which SIVs could sell their undesirable assets and/or commercial paper at non-fire sale prices. Over the next several weeks, Citigroup officials and representatives of Treasury and other large financial institutions met to continue to refine the M-LEC plan, which was eventually disclosed on October 15, 2007. In effect, the M-LEC would create an artificial market for the SIVs. Citigroup embraced the M-LEC concept as a last-ditch effort to avoid admitting its financial responsibility for its seven significant SIVs and appropriately bringing them onto the Company's balance sheet where they belonged since the time they were formed.

256.    From the date of the September 16, 2007 meeting with Treasury officials to the October 15, 2007 announcement of the M-LEC, Citigroup did not make any statements to correct its materially misleading statement released on September 6, 2007 that the Company did not have any "credit concerns" in connection with its SIVs.

## VI.    THE DEFENDANTS BEGIN TO DISCLOSE THE TRUTH

257.    Beginning in October 2007, Defendants could no longer misrepresent and/or conceal Citigroup's exposure to:  (i) commercial paper issued by Citigroup-sponsored CDOs, including the staggering amount of such debt that Citigroup guaranteed through undisclosed Liquidity Puts; (ii) the debt of Citigroup's own SIVs, for which Citigroup was financially responsible; and (iii) its own portfolio of risk intensive subprime mortgage-backed securities.  As Defendants gradually disclosed the truth, Citigroup's common stock price declined in a series of material steps from $47.10 per share on October 1, 2007 to $30.73 per share on November 21, 2007 as the market processed the truth's implications.  Each such disclosure removed a portion of the artificial inflation in the price of Citigroup's common stock and directly caused Plaintiffs and the other members of the Class to suffer damages.

258.    The graph below depicts the impact of Defendants' selective disclosure of portions of the truth during the period from October 1, 2007 thorough the end of the Class Period on November 21, 2007:



**Citigroup Inc.
Selected Events from
October 2007 to November 2007**

10/1/07: Citigroup announces that it anticipates a 60% decline in 3Q profits.

10/11/07: Citigroup announces that Vikram Pandit will lead new group, Comprising Markets & Banking and Alternative Investments. Maheras was leaving Citigroup.

10/15/07: Citigroup announces its 3Q'07 results fell 57%, after accounting for write-downs. It also reported an additional $500 million in write-offs. The company warned that related issues concerning consumer mortgages could affect results for the 4Q'07.

10/5/07: Global banks, including Citigroup, announced that they agreed to create a superfund to bail out SIVs. Shares decrease 3.4%

10/19/07: Citigroup issues a one-page fact sheet regarding seven of the off-balance sheet SIVs it sponsors. The SIVs hold a total of approximately $80 billion in assets. Shares decrease 3.3%.

11/1/07: Credit Suisse and CIBC downgrade Citigroup's stock.

11/1/07: Citigroup discloses that two fixed-income executives left the Company. According to the Financial Times, Raynes, head of structured credit, and Domínguez, co-Chief of CDOs, were fired.

11/3/07 (Sat): The Wall Street Journal reports that the SEC is reviewing how Citigroup's off-balance sheet transactions, how it values its high risk mortgage assets and its disclosure of losses to investors.

11/4/07 (Sun): CEO and Chairman Prince stepped down. Citigroup announces "significant declines" in the fair value of approximately $55 billion in U.S. sub-prime related direct exposures. It estimated that the reduction in revenues ranged from approximately $8 to $11 billion. In the days following these announcements, shares decreased 12.8%

11/5/07: Moody's and Fitch downgrade Citigroup, S&P placed the Company on negative credit watch.

11/6/07: Bushnell announces retirement. Citigroup names Jorge Bermudez as Chief Risk Officer.

11/7/07: Moody's downgrades the ratings on $33 billion in SIV assets, including several affiliated with Citigroup.

11/19/07: Citigroup downgraded to sell by Goldman Sachs.

11/21/07: End of Class Period.

102

259.    On October 1, 2007, Citigroup issued a press release, entitled "Citigroup Expects Substantial Declines in Third Quarter Net Income" (the "October 1, 2007 Press Release"). In the October 1, 2007 Press Release, Citigroup estimated a *60% decline* in net income from the prior-year quarter as a result of "dislocations in the mortgage-backed securities and credit markets." Prince stated that "the decline in income was driven primarily by weak performance in fixed income credit market alternatives, write-downs in leveraged loan commitments, and increases in consumer credit costs." The October 1, 2007 Press Release also stated in relevant part:

**Securities and Banking**

Revenue reductions from:

o    ***Write-downs of approximately $1.4 billion pre-tax, net of underwriting fees, on funded and unfunded highly leveraged finance commitments***. These commitments totaled $69 billion at the end of the second quarter, and $57 billion at the end of the third quarter. Write-downs were recorded on all highly leveraged finance commitments where there was value impairment, regardless of the expected funding date.

o    ***Losses of approximately $1.3 billion pre-tax, net of hedges, on the value of sub-prime mortgage-backed securities warehoused for future collateralized debt obligation ("CDO") securitizations***, CDO positions, and leveraged loans warehoused for future collateralized loan obligation ("CLO") securitizations.

o    Losses of approximately $600 million pre-tax in fixed income credit trading due to significant market volatility and the disruption of historical pricing relationships.

260.    The first casualty as a result of the abysmal earnings was Defendant Maheras. On October 11, 2007, Citigroup issued a press release, entitled "Vikram Pandit to Lead New Group, Comprising Markets & Banking and Alternative Investments" (the October 11, 2007 Press Release"). The October 11, 2007 Press Release stated that Prince's "great partner and friend," Maheras, was leaving Citigroup "to pursue other interests."

261.    On October 15, 2007, Citigroup issued a press release, entitled "Citigroup Reports Net Income of $2.4 Billion, Earnings Per Share of $0.47" (the "October 15, 2007 Press Release"), in which the Company announced its third quarter 2007 results.  The October 15, 2007 Press Release, where *Citigroup reported a decline in net income of 57% from the prior year,* also stated in relevant part:

> The Company has revised its financial results for the third quarter of 2007 from the results released in the Company's October 15, 2007 Earnings Release and Current Report on Form 8-K filing.  ***The revision relates to the correction of the valuation on the Company's $43 billion in Asset-Backed Securities Collateralized Debt Obligations (ABS CDOs) super senior exposures.  The impact of this correction is a $270 million reduction in Principal Transactions Revenue, a $166 million reduction in Net Income and a $0.03 reduction in Diluted Earnings per Share*** (please see Form 10-Q filed on November 5th for further details).

> . . . Citigroup Inc. today reported net income for the 2007 third quarter of $2.21 billion, or $0.44 per share, a decline of 60% from the prior-year quarter. Results include a $729 million pre-tax gain on the sale of Redecard shares. Return on equity was 6.9%. On October 1, 2007, Citigroup announced that it expected third quarter 2007 net income to decline in the range of 60%, subject to finalizing third quarter results.

> **Management Comment**

> "This was a disappointing quarter, even in the context of the dislocations in the sub-prime mortgage and credit markets. A significant amount of our income decline was in our fixed income business, where we have a long track record of strong earnings, and this quarter's performance was well below our expectations. Although we generated strong momentum in many of our franchises, our fixed income results, along with higher credit costs in global consumer, led to significantly lower net income," said Charles Prince, Chairman and CEO.

> * * *

> "As we move into the fourth quarter, we are focusing closely on improving those areas where we performed below expectation, while at the same time continuing to execute on our strategic priorities," said Prince

> **THIRD QUARTER SUMMARY**

> •    **Revenues** were up 5%, led by 29% growth in international revenues.

o    Global consumer revenues increased 14%, driven by international consumer up 35%, which included a $729 million pre-tax gain on the sale of Redecard shares. Excluding the gain, international consumer revenues increased 21%, reflecting deposit and loan growth of 18% and 29%, respectively, and higher investment sales, up 26%. U.S. consumer revenues were flat with the prior-year period as deposit and managed loan growth of 16% and 8%, respectively, was offset by lower securitization results in cards and the absence of gains on sale of securities in the prior-year period in consumer lending.

o    Markets & banking revenues declined 29%, reflecting record transaction services revenues, up 38%, offset by a 50% decline in securities and banking. *Securities and banking revenues declined due to write-downs and losses related to dislocations in the mortgage-backed securities and credit markets*, including:

▪    Write-downs of $1.35 billion pre-tax, net of underwriting fees, on funded and unfunded highly leveraged finance commitments.

▪    *Losses of $1.83 billion pre-tax, net of hedges, on the value of sub-prime mortgage-backed securities warehoused for future collateralized debt obligation ("CDO") securitizations, CDO positions, and leveraged loans warehoused for future collateralized loan obligation ("CLO") securitizations.*

▪    Losses of $636 million pre-tax in fixed income credit trading due to significant market volatility and the disruption of historical pricing relationships.

U.S. markets & banking revenues declined 98% and international revenues grew 6%. International revenues included strong double-digit revenue growth in Asia, Latin America, and Mexico.

* * *

o    *Alternative investments revenues declined 63% as strong growth in client revenues was offset by lower revenues from proprietary investment activities.*

* * *

•    **Credit costs** increased $2.98 billion, primarily driven by an increase in net credit losses of $780 million and a net charge of $2.24 billion to increase loan loss reserves.

o     In U.S. consumer, higher credit costs reflected an increase in net credit losses of $278 million and a net charge of $1.30 billion to increase loan loss reserves. The $1.30 billion net charge compares to a net reserve release of $197 million in the prior-year period. The increase in credit costs primarily reflected a weakening of leading credit indicators, including increased delinquencies on mortgages and unsecured personal loans, as well as trends in the U.S. macro-economic environment, portfolio growth, and a change in estimate of loan losses inherent in the portfolio but not yet visible in delinquencies ("a change in estimate of loan losses").

o     In international consumer, higher credit costs reflected an increase in net credit losses of $460 million and a net charge of $717 million to increase loan loss reserves. The $717 million net charge compares to a net charge of $101 million in the prior-year period. The increase in credit costs primarily reflected the impact of recent acquisitions, portfolio growth, and a change in estimate of loan losses.

o     Markets & banking credit costs increased $98 million, primarily reflecting higher net credit losses and a $123 million net charge to increase loan loss reserves for specific counterparties. Credit costs reflected a slight weakening in portfolio credit quality.

262.    Despite announcing the foregoing poor performance results, Citigroup never disclosed its massive exposure to $55 billion in subprime securities, $25 billion of which Citigroup would soon announce it was taking directly onto its books based upon Citigroup's undisclosed practice of selling CDO commercial paper pursuant to Liquidity Puts.

263.    Also on October 15, 2007, Citigroup issued a press release, entitled "Global Banks Announced Plans for Major Liquidity Facility to Bolster Asset-Backed Commercial Paper Markets" (the "Second October 15, 2007 Press Release") which first disclosed the plan to bail-out Citigroup's ailing SIVs through the M-LEC. The Second October 15, 2007 Press Release disclosed that Bank of America Corporation, Citigroup, JPMorgan Chase & Co. and several other financial institutions agreed to create and provide liquidity support to the proposed $75-100 billion M-LEC in order to enhance liquidity in the market for asset-backed commercial paper and

medium-term notes issued by SIVs. Citigroup would days later disclose its exposure to additional subprime losses based upon its SIVs.

264.  As a result of the disclosures, Citi's stock price declined $5.44 per share from a closing price of $47.25 per share on October 12, 2007 to $41.81 per share on October 19, 2007. During this period, Citigroup lost over $25 billion in market capitalization.

265.  On October 19, 2007, Citigroup disclosed that the Company sponsored seven SIVs with a total of ***$80 billion*** in assets. In Citigroup's press release, entitled "Fact Sheet – Citigroup-Advised Structured Investment Vehicles (SIVs)," the Company stated that third-party investors provide the equity capital to the SIVs, which are "advised" by Citi Alternative Investments. This release was designed to make investors believe that Citigroup was not responsible for providing liquidity to its SIVs and to "justify" Citigroup's ongoing reluctance and refusal to bring the SIVs onto the Company's balance sheet. The press release stated in relevant part:

- The SIVs have no direct exposure to U.S. subprime assets and approximately $70 million of indirect exposure to subprime assets through securities;

- Citigroup has no *contractual obligation* to provide liquidity facilities or guarantees to any of the Citigroup-advised SIVs;

- As of today [October 19, 2007], approximately 98% of the SIVs' assets are fully funded through the end of the year;

- ***Beginning in July***, Citigroup over time has sold more than $20 billion of SIV assets, bringing the combined assets of the SIVs to approximately $80 billion; and

- *While Citigroup will not consolidate the assets of the SIVs, Citigroup has and will, from time to time, continue to provide liquidity to the SIVs on an* arm's length basis on commercial terms consistent with those provided by unaffiliated third parties.

266.    Financial commentators appropriately expressed skepticism concerning the representations that Citigroup made in its October 19, 2007 "Fact Sheet."  Later that day, Jonathan Weil published commentary on Bloomberg's news service remarking that Citigroup's coy representation that it does not have any "contractual obligation" to fund its struggling SIVs dodged the critical issue.  Weil recognized that if Citigroup had even an implicit obligation to fund its SIVs, the SIVs should have been on Citigroup's balance sheet long ago.  In this regard, Weil noted that Citigroup "organized, pitched, and manages the SIVs it sponsors, creating expectations it would stand behind the funds and protect their investors."  Citigroup would nevertheless persist in keeping the SIVs off Company books until December 13, 2007.

267.    On November 1, 2007, several analysts downgraded the Company, including CIBC World Markets ("CIBC"), Credit Suisse Group ("Credit Suisse") and Morgan Stanley. For example, CIBC lowered its rating on Citigroup to "sell."  In this regard, CIBC analyst, Meredith Whitney, stated that Citigroup may have to cut its dividend, raise cash or sell assets in order to raise more than $30 billion in capital.  Also on November 1, 2007, Citigroup spokeswoman, Danielle Romero-Apsilos, disclosed that two of the Company's fixed-income executives left the Company.  According to the *Financial Times*, Michael Raynes, head of structured credit, and Nestor Dominguez, co-Chief of CDOs, were fired.

268.    As a result of these disclosures, the price of Citigroup common stock declined $3.84 per share, from $41.36 per share on October 31, 2007 to $37.73 per share on November 2, 2007, on significant trading volume of over 1 billion shares.  During this period, Citigroup lost another $18.2 billion in market capitalization.

269.    On November 4, 2007, Citigroup issued a press release, entitled "Citigroup's Sub-Prime Related Exposure in Securities and Banking" (the "November 4, 2007 Press Release"), in

which the Company cited severe declines since September 30, 2007 "in the fair value of approximately $55 billion in U.S. sub-prime related direct exposures in its Securities and Banking (S&B) business." Based upon the pummeling of Citigroup's direct subprime exposures, the Company announced a *massive $8 to $11 billion write-down of revenue, which Citigroup stated represented a decline of approximately $5 to $7 billion in net income on an after-tax basis*. In this regard, the November 4, 2007 Press Release stated in relevant part:

> These declines in the fair value of Citigroup's sub-prime related direct exposures followed a series of rating agency downgrades of sub-prime U.S. mortgage related assets and other market developments, which occurred after the end of the third quarter. *The impact on Citigroup's financial results for the fourth quarter from changes in the fair value of these exposures will depend on future market developments and could differ materially from the range above.*
>
> Citigroup also announced that, while significant uncertainty continues to prevail in financial markets, it expects, taking into account maintaining its current dividend level, its capital ratios will return within the range of targeted levels by the end of the second quarter of 2008. Accordingly, Citigroup has no plans to reduce its current dividend level.
>
> The $55 billion in U.S. sub-prime direct exposure in S&B as of September 30, 2007 consisted of (a) approximately $11.7 billion of sub-prime related exposures in its lending and structuring business, and (b) approximately $43 billion of exposures in the most senior tranches (super senior tranches) of collateralized debt obligations which are collateralized by asset-backed securities (ABS CDOs).
>
> **Lending and Structuring Exposures**
>
> Citigroup's approximately $11.7 billion of sub-prime related exposures in the lending and structuring business as of September 30, 2007 compares to approximately $13 billion of sub-prime related exposures in the lending and structuring business at the end of the second quarter and approximately $24 billion at the beginning of the year. The $11.7 billion of sub-prime related exposures includes approximately $2.7 billion of CDO warehouse inventory and unsold tranches of ABS CDOs, approximately $4.2 billion of actively managed sub-prime loans purchased for resale or securitization at a discount to par primarily in the last six months, and approximately $4.8 billion of financing transactions with customers secured by sub-prime collateral.[2] These amounts represent fair value determined based on observable transactions and other market data. Following the downgrades and market developments referred to above, the fair value of the CDO warehouse inventory and unsold tranches of ABS CDOs

has declined significantly, while the declines in the fair value of the other sub-prime related exposures in the lending and structuring business have not been significant.

**ABS CDO Super Senior Exposures**

***Citigroup's $43 billion in ABS CDO super senior exposures as of September 30, 2007 is backed primarily by sub-prime RMBS collateral. These exposures include approximately $25 billion in commercial paper principally secured by super senior tranches of high grade ABS CDOs*** and approximately $18 billion of super senior tranches of ABS CDOs, consisting of approximately $10 billion of high grade ABS CDOs, approximately $8 billion of mezzanine ABS CDOs and approximately $0.2 billion of ABS CDO-squared transactions.

Although the principal collateral underlying these super senior tranches is U.S. sub-prime RMBS, as noted above, these exposures represent the most senior tranches of the capital structure of the ABS CDOs. These super senior tranches are not subject to valuation based on observable market transactions. Accordingly, fair value of these super senior exposures is based on estimates about, among other things, future housing prices to predict estimated cash flows, which are then discounted to a present value. The rating agency downgrades and market developments referred to above have led to changes in the appropriate discount rates applicable to these super senior tranches, which have resulted in significant declines in the estimates of the fair value of S&B super senior exposures.

(Footnotes omitted.)

270.    While providing the most complete information concerning the Company's exposure to subprime losses, the Company's November 4, 2007 Press Release remained materially false and misleading. As Citigroup would disclose the next day, the $25 billion in commercial paper to which the Company was exposed was based upon Citigroup's use of Liquidity Puts to guarantee purchasers a market for the commercial paper that Citigroup's VIEs issued during the Class Period.

271.    Also on November 4, 2007, Citigroup announced in a press release (the "Second November 4, 2007 Press Release") that Defendant Prince had elected to resign from his positions of Chairman and CEO of Citigroup. In connection with the announcement of his resignation,

Prince stated: "it is my judgment that given the size of the recent losses in our mortgage-backed securities business, the only honorable course for me to take as Chief Executive Officer is to step down." In doing so, Prince walked away with almost $95 million, including $28 million in stock awards, an incentive award of approximately $12 million, and $53 million in Citigroup stock he already held. In the Second November 4, 2007 Press Release, Citigroup also announced that Robert E. Rubin would serve as Chairman and Sir Win Bischoff would serve as acting CEO.

272.    On November 5, 2007, Citigroup held a conference call with analysts to discuss the massive anticipated write-down that the Company announced the prior day (the "November 5, 2007 Call"). ***During the November 5, 2007 Call, Defendant Crittenden disclosed Citigroup's use of Liquidity Puts and their previously hidden risks and ultimate impact upon the Company's financial exposure for the first time.*** When questioned regarding the $25 billion of commercial paper exposure with underlying subprime exposures disclosed above in the November 4, 2007 Press Release, Crittenden responded, in relevant part, as follows:

> ***So this was, this was essentially <u>a funding mechanism that was used as we</u>*** <u>***structured CDOs up until I believe the end of 2005***</u>***, so we would sell a structured CDO to a customer. We would provide a liquidity put essentially to that*** customer during the course of the summer. And this was all backed by subprime collateral, I might add, as you know. But essentially looks like a super senior CDO for all intents and purposes that those – ***we decided actually to buy the commercial paper associated with that during the course of the summer and as result that came back on our books and obviously we had the exposure to the underlying security there. And so that's what the $25 billion is made up of.*** Once it's back on our books for all intents and purposes, it operates and looks like a super senior CDO position. That's what it is because in essence this was a financing mechanism.
>
> *             *             *
>
> ***So the 25 billion is a kind of 2006 and older liquidity put*** that has come back to us that feels and has all of the characteristics of a super senior CDO.

273.    Citigroup's use of Liquidity Puts meant that billions of dollars in illiquid, extremely risky CDO commercial paper came back home to roost with Citigroup. Projected losses in connection with this undesirable paper are in the multibillions and, based on Citigroup's inside knowledge of the subprime market, were well-known to the Defendants as of at least 2004. Nonetheless, Citigroup never disclosed its enormous contingent liability in this regard, as it was required under U.S. GAAP and SEC regulations. Later during the November 5, 2007 Call, when asked to address whether the SEC was investigating Citigroup's SIV accounting, Crittenden had no comment.

274.    Citigroup's November 4 and November 5, 2007 disclosures caused investors to lose more confidence and suffer additional losses. Just a few short weeks earlier, Citigroup stated that its third quarter 2007 losses attributable to the Company's subprime exposure would be $1.56 billion. The disclosure of mounting losses, which Citigroup was still unable to quantify with any real degree of precision, cast grim shadows upon the Company's ability to value its assets or quantify its losses.

275.    As a result of the disclosure of the massive write-down and its use of Liquidity Puts, Citigroup's stock price declined an additional $4.83 per share from a closing price of $37.73 per share on November 2, 2007 to $32.90 per share on November 8, 2007, with a huge trading volume of over 1 billion shares each day. During this period, Citigroup lost another $22.9 billion in market capitalization.

276.    Also on November 5, 2007, Citigroup filed its Form 10-Q for the quarter ended September 30, 2007. In the Third Quarter 2007 10-Q, Citigroup disclosed that the Company provided its SIVs with a *$10 billion line of credit, $7.6 billion of which had been drawn as of*

112

*October 31, 2007.* The Third Quarter 2007 10-Q also summarized the seven Citigroup-advised SIVs as follows:

| (In billions of dollars) | | | |
|---|---|---|---|
| SIV | Assets | CP Funding | Medium Term Notes |
| Beta | $19.3 | $2.6 | $15.7 |
| Centauri | 20.1 | 2.9 | 16.1 |
| Dorada | 11.0 | 2.2 | 8.1 |
| Five | 13.2 | 5.5 | 7.1 |
| Sedna | 13.4 | 5.6 | 7.0 |
| Zela | 4.1 | 2.7 | 1.2 |
| Vetra | 2.0 | 1.4 | 0.5 |
| Total | $83.1 | $22.9 | $55.7 |

277.    On November 16, 2007, Citigroup announced in a press release that it was appointing Jorge A. Bermudez as the Company's new Chief Risk Officer and that it would form a committee consisting of "senior leaders from across the company that will provide input on ways to strengthen Citi's risk management processes." The Company simultaneously announced that Defendant Bushnell "decided to retire."

278.    On November 19, 2007, several analysts downgraded the Company, including Goldman Sachs Group Inc. ("Goldman Sachs") and Deutsche Bank Securities Inc. ("Deutsche Bank"). For example, Goldman Sachs lowered its rating on Citigroup to "sell." In this regard, Goldman Sachs analyst, William Tanona, stated that Citigroup may have to write off $15 billion for debt losses over the next two quarters. As a result of the downgrades, Citigroup's common stock price declined $1.27 per share, from $32.00 per share on November 19, 2007 to $30.73 per share at the end of the Class Period on November 21, 2007. During this period, Citigroup lost another $6 billion in market capitalization.

## VII.    POST CLASS PERIOD EVENTS

279.    On November 26, 2007, CNBC reported that Citigroup was planning a massive layoff of between 17,000 and 45,000 people.  After the market closed on that day, Citigroup issued a press release, entitled "Citigroup to Sell $7.5 Billion of Equity Units to the Abu Dhabi Investment Authority" (the "November 26, 2007 Press Release").  In the November 26, 2007 Press Release, Citigroup announced that it will receive a $7.5 billion cash infusion from Abu Dhabi Investment Authority ("ADIA") to replenish capital.  ADIA will buy securities that convert to stock and yield 11%, almost double the interest Citigroup offers bond investors.

280.    As a result of the disclosures, Citigroup's stock price declined another $1.38 per share from a closing price of $31.70 per share on November 23, 2007 to $30.32 per share on November 27, 2007, with a huge trading volume of over 1 billion shares each day.

281.    Also on November 26, 2007, HSBC announced that the company was consolidating $45 billion of SIV assets onto its balance sheet as a result of funding constraints in the SIV sector.  In this regard, HSBC stated that the SIV sector has been under significant funding pressure, as evidenced by the inability of most SIVs to fully roll over their commercial paper or medium term notes.  In the wake of this news, Citigroup spokesman, Jon Diat, confirmed on November 30, 2007 *that Citigroup would not consolidate the assets* of the SIVs and would "continue to focus on liquidity and reducing leverage."

282.    On November 30, 2007, Moody's cut or placed on review for a downgrade $64.9 billion of debt sold by Citigroup's SIVs.  In this regard, Moody's cited "material declines in the market value across most asset classes in SIV portfolios."  For example, Centauri Corporation, Citigroup's largest SIV with $16.9 billion in debt, had its commercial paper rating placed on review after its net asset value dropped to 60% from 85% since September 5, 2007.  Similarly, Beta Finance Corporation, Citigroup's second largest SIV with $16 billion in debt, had its senior

debt ratings placed on review after its net asset value declined to 60% from 87%. Subsequently, on December 4, 2007, Fitch downgraded the junior debt of Citigroup-advised Sedna Finance Corporation an unprecedented *twelve* levels after declines in the SIV's assets.

283. On December 6, 2007, Rabobank, a Dutch bank, consolidated the remaining assets of its SIV, Tango Finance ("Tango"), onto its balance sheet. Notably, Tango is also managed by Citigroup, even though Citigroup did not list Tango as one of the Company's seven "Citigroup-advised SIVs" in the Third Quarter 2007 10-Q. Rabobank had previously announced that Tango sold almost half of its assets, $6.6 billion worth.

284. On December 13, 2007, Citigroup disclosed that the Company committed to provide a support facility to its ailing SIVs. As a result, Citigroup announced that the Company will consolidate the SIVs' assets and liabilities onto its balance sheet. The Company further disclosed that the SIVs' assets had been reduced from $87 billion to $49 billion. Subsequently, on December 14, 2007, Moody's downgraded Citigroup's Bank Financial Strength Rating to B from A1 and the Company's long-term debt ratings to Aa3 from Aa2, stating that it was doubtful that Citigroup could rebuild its capital ratios in the near future.

285. On December 26, 2007, Goldman Sachs analysts William F. Tanona, Betsy Miller, and Neil Sanyal issued a note to investors concerning Citigroup. In the foregoing note, the Goldman Sachs analysts expressed their belief that Citigroup could write off as much as $18.7 billion in the fourth quarter of 2007 -- a tremendous increase from the $8 billion to $11 billion that Citigroup estimated in its November 4, 2007 Press Release. These Goldman Sachs analysts further opined that Citigroup may be forced to cut its dividend by approximately 40% and that the full impact of Citigroup's exposure to subprime losses has not yet been disclosed.

## VIII.    DEFENDANTS VIOLATED GENERALLY ACCEPTED ACCOUNTING PRINCIPLES AND OTHER REPORTING REGULATIONS

286.    U.S. GAAP are those generally accepted principles recognized by the SEC and the accounting profession as the conventions, rules and procedures necessary to define accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) requires that financial statements filed with the SEC be prepared in conformity with U.S. GAAP and those that are not in conformity with U.S. GAAP, are presumed to be misleading and inaccurate, despite footnotes or other disclosures.  *Id.*  The most authoritative sources of U.S. GAAP are statements and interpretations issued by the FASB, also sometimes referred to as "FAS" statements, and opinions issued by the Accounting Principles Board ("APB").

287.    During the Class Period, Citigroup's financial statements failed to comply with U.S. GAAP.  In particular, Citigroup failed to account properly for the Company's exposure to losses based upon:  (i) commercial paper issued by Citigroup-sponsored CDOs, including the staggering amount of such debt that Citigroup *guaranteed* through undisclosed Liquidity Puts; (ii) the debt of Citigroup's own SIVs, for which Citigroup was financially responsible; and (iii) its own portfolio of risk intensive subprime mortgage and related derivative products.  Discussed below are the provisions of U.S. GAAP with which Citigroup's Form 10-Ks and quarterly reports disseminated during the Class Period failed to comply.

288.    As a threshold matter, Citigroup's failure to disclose and account for risks and contingent liabilities rendered the Company's presentation of its financial results incomplete and materially false and misleading, violating the following U.S. GAAP principles:

    a.    The principle that financial reporting should provide
          information that is useful to present potential investors and
          creditors and other users in making rational investment,
          credit and similar decisions (FASB Statement of Concepts
          No. 1, ¶34);

b.    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶40);

c.    The principle that financial reporting should provide information about an enterprise's financial performance during a period so that investors and creditors may use information about the past to help in assessing the prospects of an enterprise (FASB Statement of Concepts No. 1, ¶40) (FASB Statement of Concepts No. 1, ¶42);

d.    The principle that financial reporting should be reliable so that such reporting represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

e.    The principle of completeness, which means that there are no omissions of information that may be necessary to validly represent underlying events and conditions (FASB Statement of Concepts No. 2, ¶79);

f.    The principle that financial reporting should be verifiable so that it provides a significant degree of assurance that accounting measures represent what they purport to represent (FASB Statement of Concepts No. 2, ¶81);

g.    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97);

h.    The principle that revenues and related earnings should not be recognized until earned and that expenses should be recognized in the period incurred (FASB Statement of Concepts No. 5 and No. 6); and

i.    The principle that revenues considered to be earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues. (FASB Statement of Concepts No. 5. ¶83(b)).

## A.    Defendants' Omission of Material Facts Concerning the Liquidity Puts Violated U.S. GAAP

289.    Defendants' material misrepresentations and omissions of material fact with regard to Citigroup's use of undisclosed Liquidity Puts violated numerous provisions of U.S. GAAP including FASB Interpretation No. 45 (FIN 45), entitled "Guarantor's Accounting and

Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of

Others." FIN 45 is an interpretation of other provisions of U.S. GAAP that require disclosures of

guarantees to others, including SFAS 5, SFAS 57, SFAS 107, and FIN 34 (which was

superseded by FIN 45). According to the summary of FIN 45:

> This Interpretation elaborates on the disclosures to be made by a guarantor in its
> interim and annual financial statements about its obligations under certain
> guarantees that it has issued. It also clarifies that a guarantor is required to
> recognize, *at the inception of a guarantee*, a liability for the fair value of the
> obligation undertaken in issuing the guarantee.

290. Demonstrating its applicability to Citigroup's rampant undisclosed use of

Liquidity Puts during the Class Period, FIN 45, ¶3(a) states that its provisions apply to:

> Contracts that contingently require the guarantor to make payments (either in
> cash, financial instruments, other assets, shares of stock, or provision of services)
> to the guaranteed party based on changes in an underlying [defined as "a specified
> interest rate, security price, commodity price, foreign exchange rate, index of
> prices or rates, or other variable"] that is related to an asset, a liability, or an
> equity security of the guaranteed party.

(Footnotes omitted)

291. Citigroup's Liquidity Puts are governed by the requirements of FIN 45 because

the Puts obligated Citigroup in the two following respects: (i) Citigroup (the guarantor) was

obligated to *stand ready* to perform in the event that the triggering events occur (noncontingent

aspect); and (ii) Citigroup assumed a contingent obligation to *make payments* if the triggering

events occur (contingent aspect). As a result of the noncontingent aspect of the Citigroup's

obligation, FIN 45 actually increases the burden set forth in SFAS 5 to recognize contingent

losses with regard to guarantees:

> Because the issuance of a guarantee imposes a noncontingent obligation to stand
> ready to perform in the event that the specified triggering events or conditions
> occur, the provisions of paragraphs 8-12 of Statement 5 regarding the guarantor's
> contingent obligation under a guarantee should not be interpreted as prohibiting
> the guarantor from initially recognizing a liability for a guarantee even though it

is *not* probable that payments will be required under that guarantee. At the inception of a guarantee, the guarantor shall recognize in its statement of financial position a liability for that guarantee. (emphasis in original).

292.    As the language quoted in the preceding paragraph indicates, the FASB requires

that a company recognize, or accrue, a liability at the inception of a guarantee *even if it is not*

*probable that payments will be required under the guarantee.* As such, Citigroup should have

booked a liability immediately for its Liquidity Puts without even considering whether it was

probable that the Company would have to make payments under those agreements.

293.    Citigroup's complete failure to disclose the existence of or any of the terms of the

Liquidity Puts also failed to comport with the following disclosure requirements concerning a

guarantor's obligations set forth in FIN 45, ¶13:

A guarantor shall disclose the following information about each guarantee, or each group of similar guarantees, even if the likelihood of the guarantor's having to make any payments under the guarantee is remote, except as provided in paragraph 14 with respect to the disclosure specified in paragraph 13(b):

a.    The nature of the guarantee, including the approximate term of the guarantee, how the guarantee arose, and the events and circumstances that would require the guarantor to perform under the guarantee.

b.    The maximum potential amount of future payments (undiscounted) the guarantor could be required to make under the guarantee. That maximum potential amount of future payments shall not be reduced by the effect of any amounts that may possibly be recovered under recourse or collateralization provisions in the guarantee (which are addressed under (d) below). If the terms of the guarantee provide for no limitation to the maximum potential future payments under the guarantee, that fact shall be disclosed. If the guarantor is unable to develop an estimate of the maximum potential amount of future payments under its guarantee, the guarantor shall disclose the reasons why it cannot estimate the maximum potential amount. (Refer to the following paragraph for an exception to the requirements of this subparagraph.)

c.    The current carrying amount of the liability, if any, for the guarantor's obligations under the guarantee (including the amount, if any, recognized under paragraph 8 of Statement 5), regardless of whether the guarantee is freestanding or embedded in another contract.

d.  The nature of (1) any recourse provisions that would enable the guarantor to recover from third parties any of the amounts paid under the guarantee and (2) any assets held either as collateral by third parties that, upon the occurrence of any triggering event or condition under the guarantee, the guarantor can obtain and liquidate to recover all or a portion of the amounts paid under the guarantee. The guarantor shall indicate, if estimable, the approximate extent to which the proceeds from liquidation of those assets would be expected to cover the maximum potential amount of future payments under the guarantee.

294.    In connection with the Liquidity Puts, Citigroup failed to make any of the disclosures that FIN 45, ¶13 requires even if "the likelihood of the guarantor's having to make any payments under the guarantee is *remote*."  During the Class Period, the likelihood that a holder of VIE-issued commercial paper would exercise its rights under Citigroup's Liquidity Puts was certainly, at the very least, "remote" and arguably, "likely".  Defendants, nevertheless, failed to make any of the required disclosures about the nature of the Liquidity Puts, including, without limitation, how they arose, events that would require performance, or information about the collateral (including subprime assets) that could potentially offset the obligation.  Instead, as alleged herein, Defendants only disclosed the mere fact of Citigroup's guarantee of VIE-issued commercial paper *after*:  (i) providing VIE debt holders with Liquidity Puts for several years; and (ii) Citigroup was forced to honor the terms of the Liquidity Puts to the tune of $25 billion. The Defendants, however, have still failed to disclose any of the material terms of Citigroup's Liquidity Puts and Class members still have no basis for evaluating the Company's continuing exposure to these risks.

**B.  Defendants' Omission of Material Facts Concerning the Liquidity Puts Violated Item 303, Regulation S-K – Management's Discussion and Analysis of Financial Condition and Results of Operations**

295.    In addition to the specific disclosures required by U.S. GAAP, Defendants failed to comply with comprehensive disclosures required by SEC regulation.  The SEC requires,

among other things, that the Management Discussion and Analysis (MD&A) section of the appropriate filings provide the reader with an understanding of what the financial statements show and do not show, as well as highlight important trends and risks that have shaped the past or are reasonably likely to shape the future. The MD&A rules require that the registrant provide information, where appropriate, not otherwise required under U.S. GAAP and/or which cannot be found in the financial statements.

296.    Specifically, Item 303 requires a registrant to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

297.    The SEC MD&A criteria specifically address, e.g., disclosures regarding off-balance-sheet arrangements (including guarantees and variable interests). These rules require a registrant to disclose all material facts and circumstances that provide investors with a clear understanding of a registrant's off-balance-sheet arrangements and their material effects.

298.    Item 303 requires disclosures regarding liquidity, capital resources, results of operations, off-balance-sheet arrangements, as well as contractual obligations. Specifically, Item 303, ¶4(i) states the following concerning MD&A:

> The disclosure shall include the items specified in paragraphs (a)(4)(i)(A), (B), (C) and (D) [below] of this Item to the extent necessary to an understanding of such arrangements and effect and shall also include such other information that the registrant believes is necessary for such an understanding.

> A.   The nature and business purpose to the registrant of such off-balance-sheet arrangements;

> B.   The importance to the registrant of such off-balance-sheet arrangements in respect of its liquidity, capital resources, market risk support, credit risk support or other benefits;

C.  The amounts of revenues, expenses and cash flows of the registrant arising from such arrangements; the nature and amounts of any interests retained, securities issued and other indebtedness incurred by the registrant in connection with such arrangements; and *the nature and amounts of any other obligations or liabilities (including contingent obligations or liabilities) of the registrant arising from such arrangements that are or are reasonably likely to become material and the triggering events or circumstances that could cause them to arise*; and

D.  Any known event, demand, commitment, trend or uncertainty that will result in or is reasonably likely to result in the termination, or material reduction in availability to the registrant, of its off-balance-sheet arrangements that provide material benefits to it, and the course of action that the registrant has taken or proposes to take in response to any such circumstances.

299.  Citigroup's VIEs and the Company's use of Liquidity Puts in connection therewith failed to comply with the above-listed disclosure requirements under Item 303, ¶4(ii).[9] Moreover, a recent Final Rule promulgated by the SEC entitled "Disclosure in Management's Discussion and Analysis about Off-balance-sheet Arrangements and Aggregate Contractual Obligations," amends Item 303 of Regulation S-K to clarify the MD&A disclosures required relating to off-balance-sheet arrangements. This amendment reaffirms the definition of "off-balance-sheet arrangements" in Item 303, ¶4(ii)(A)-(D) to include guarantees like the Liquidity Puts at issue here. Section III of the Final Rule prescribes the disclosure threshold for such off-balance-sheet arrangements at subsection B as follows:

The amendments require disclosure of off-balance-sheet arrangements that either have, or are *reasonably likely* to have, a current or future effect on the registrant's financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that is material to investors. That disclosure threshold is consistent with the existing disclosure threshold under which information that could have a material effect on financial

---

[9] Item 303, ¶4(ii) defines off-balance-sheet arrangements as (A) any transaction, agreement or other contractual arrangement with an unconsolidated entity that falls under FIN 45, (B) a retained or contingent interest (C), any obligation that qualifies as a derivative instrument under SFAS 133 (D), and any obligation that qualifies as a variable interest in an unconsolidated VIE as referenced in FIN 46(R).

condition [Item 303 of Regulation S-K], changes in financial condition or results of operations must be included in MD&A.

The Final Rule goes on to state:

> If management concludes that the known trend, demand, commitment, event or uncertainty is not *reasonably likely* to occur, then no disclosure is required in MD&A. If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty *on the assumption that it will come to fruition. Disclosure is then required* unless management determines that a material effect on the registrant's financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources is not *reasonably likely* to occur.

300.    Defendants failed to fulfill their disclosure obligations under Item 303 during the Class Period. It was not only "reasonably likely" that Citigroup would assume material liabilities during the Class Period pursuant to the Liquidity Puts, but that is precisely what happened, as Defendant Crittenden belatedly admitted on November 5, 2007. Based upon these undisclosed and unmentioned guarantees that Citigroup provided during the Class Period, the Company was forced to absorb $25 billion in commercial paper that had massive, multi-billion dollar losses imbedded within.

C.    **Defendants Failed to Consolidate Citigroup's SIVs As Required**

301.    Citigroup failed to disclose and properly account for its participation in numerous SIVs, and the huge amounts of illiquid mortgage-backed securities that served as Citigroup's collateral for loans it guaranteed in connection with the SIVs. Citigroup failed to consolidate these once lucrative vehicles, as required by among other things, FIN 46 (R), which requires consolidation by the "primary beneficiary" defined to include that party which absorbs a majority of the VIE's expected losses. At the end of the Class Period, however, Citigroup's responsibility for the SIVs losses was clear.

302.    As Citigroup disclosed in its Third Quarter 2007 10-Q filed with the SEC on November 5, 2007, the Company provided its unconsolidated SIVs with a $10 billion line of credit, $7.6 billion of which had been drawn as of October 31, 2007.

303.    FIN 46 (R) ¶14 required Citigroup to consolidate the SIVs if Citigroup had "a variable interest (or combination of variable interests) that will absorb a majority of the entity's expected losses, receive a majority of the entity's residual returns, or both."

304.    FIN 46 (R) ¶15 provides, in pertinent part:

> [a]n enterprise shall determine whether it is the primary beneficiary of a variable interest entity at the time the enterprise becomes involved with the entity. An enterprise with an interest in a variable interest entity shall reconsider whether it is the primary beneficiary of the entity if the entity's governing documents or contractual arrangements are changed in a manner that reallocates between the primary beneficiary and other unrelated parties (a) the obligation to absorb the expected losses of the variable interest entity or (b) the right to receive the expected residual returns of the variable interest entity.

305.    After:  (i) spearheading the M-LEC rescue plan to provide liquidity support to its SIVs; (ii) claiming as of October 19, 2007 that it "will not consolidate the assets of the SIVs, [the Company] has and will, from time to time, continue to provide liquidity to the SIVs on an arm's length basis on commercial terms consistent with those provided by unaffiliated third parties"; and (iii) announcing on November 5, 2007 that it had provided its unconsolidated SIVs with a $10 billion line of credit, $7.6 billion of which had been drawn as of October 31, 2007, Citigroup recognized that it could no longer perpetuate its Class Period deception concerning its responsibility for the SIVs.  On December 13, 2007, the Company announced that it would consolidate the SIVs.  Of course, this decision came far too late as FIN 46 (R) required consolidation from the later of:  (i) each SIV's respective date of establishment; or (ii) December 31, 2003.

306.    In electing to consolidate the SIVs, Citigroup did not cite a change in any of the SIVs' governing documents or contractual arrangements that reallocates between the primary beneficiary and other unrelated parties (a) the obligation to absorb the expected losses of the variable interest entity or (b) the right to receive the expected residual returns of the variable interest entity. Thus, the Company's basis for consolidating the SIVs had existed all along.

## IX.    KPMG VIOLATED AUDITING STANDARDS AND REQUIREMENTS OF THE PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD

307.    During the Class Period, KPMG issued the audit opinions identified herein, each of which was materially false and misleading when issued for numerous reasons, including, but not limited to, those reasons identified in Section V of this Complaint.

308.    KPMG's materially false and misleading audit opinions resulted from KPMG's numerous violations of GAAS and the auditing standards required by the PCAOB in connection with planning and conducting its Class Period audits of Citigroup. KPMG also failed to investigate and evaluate properly Citigroup's internal controls.

309.    As an "independent" auditor, KPMG was required to observe and uphold the auditing standards. AU §312 – Audit Risk and Materiality in Conducting an Audit, describes the auditor's responsibility for identifying misstatements. In addition, AU §9312A provides guidance on the required interpretation of the term "misstatement"[10] as follows:

> ...a misstatement causes the financial statements not to be in conformity with generally accepted accounting principles. A misstatement may consist of any of the following:
>
>> a.  A difference between the amount, classification, or presentation of a reported financial statement element, account, or item and the amount, classification, or presentation that would have been reported under generally accepted accounting principles

---

[10] Regulation S-X specifically states that a violation of U.S. GAAP (*i.e.*, a misstatement) is *per se* misleading.

    b.  The omission of a financial statement element, account, or item

    c.  A financial statement disclosure that is not presented in accordance with generally accepted accounting principles

    d.  The omission of information required to be disclosed in accordance with generally accepted accounting principles.

310.    Citigroup's financial statements contained numerous material misrepresentations and omissions during the Class Period relating to, among other things, the Company's inappropriate accounting for VIEs and the guarantees related thereto. KPMG was required to recognize such pervasive material misstatements and omissions and to insist upon corrections thereto, without which, KPMG should not have issued an "unqualified" opinion as to the fairness of Citigroup's financial statements.

311.    According to the PCAOB, at AU §150.02, there are ten standards of auditing divided into the following three categories including: (i) the general standards (three standards); (ii) the standards of field work (three standards); and (iii) the standards of reporting (four standards). As set forth below, KPMG breached, at a minimum, seven of these ten standards (one general standard, all three standards of field work, and at least three of the four standards of reporting).

312.    KPMG's breaches of the standards governing its audit work were fundamental, inexcusable, and resulted in Citigroup issuing materially false and misleading statements and omissions of material fact during the Class Period. As a result, KPMG's improper audit of: (i) Citigroup's VIE's and related transactions, (ii) the VIEs and related transactions' impact upon the Company's financial statements, and (iii) the Company's failure to adhere properly to appropriate U.S. GAAP relating thereto, amounted to "no audit at all."

313.    As set forth below, KPMG's knowing and/or reckless failure to adhere to its professional standards included, but was not limited to:  (i) the third general standard relating to due professional care (AU §230); (ii) the first standard of field work relating to adequate planning of the audit (AU §311); (iii) the second standard of field work relating to gaining an understanding of internal controls (AU §319); (iv) the third standard of field work relating to obtaining sufficient competent evidential matter (AU §326); (v) the first standard of reporting relating to whether the client's financials are presented in accordance with U.S. GAAP (AU §410); (vi) the second standard of reporting relating to the identification of U.S. GAAP departures (AU §420); and (vii) the fourth standard of reporting relating to the expression of an opinion (AU §508.20).

314.    KPMG failed to exercise due care in conducting its audit, as required by AU §230.  The due professional care requirement imposes a responsibility upon the independent auditor to observe the standards of field work and reporting.[11]  Due professional care requires the auditor to exercise professional skepticism as well as obtain reasonable assurances that the financial statements are free of material misstatements, whether caused by error or fraud.  AU §230.07 states that due professional care requires an auditor to exercise professional skepticism throughout the entire audit and defines professional skepticism as "…an attitude that includes a questioning mind and a critical assessment of audit evidence."  KPMG's failure to exercise the required degree of due care is evidenced by, among other things, failure to require disclosure in the financial statements of:  (i) Citigroup's massive exposure to VIE guarantees such as the Liquidity Puts, which resulted in $25 billion of returned commercial paper with underlying subprime exposures; and (ii) Citigroup's need to provide liquidity to its SIVs, which the

---

[11] SAS No. 1, section 230, SAS No. 41, SAS No. 82, SAS No. 99, AU §230.02

Company brought onto its balance sheet after years of improper accounting and the enormous

risk exposure related thereto.

315.    Audit planning involves developing an overall strategy for the expected conduct

and scope of the audit. In planning the audit the auditor should consider, among other things:[12]

- Matters relating to the entity's business and the industry in which it operates;

- The entity's accounting policies and procedures;

- The methods used by the entity to process significant accounting information, including the use of service organizations, such as outside service centers;

- Assessed level of control risk;

- Preliminary judgment about materiality levels for audit purposes;

- Financial statement items likely to require adjustment;

- Conditions that may require extension or modification of audit tests, such as the risk of material error or fraud or the existence of related party transactions; and

- The nature of reports expected to be rendered.

316.    KPMG's failure to properly plan its audit work is evidenced by, among other

things, its failure to properly consider: (i) Citigroup's massive exposure to VIE guarantees such

as the Liquidity Puts, which resulted in $25 billion of returned commercial paper with underlying

subprime exposures; and (ii) Citigroup's need to provide liquidity to its SIVs, which the

Company brought onto its balance sheet after years of improper accounting. In issuing

unqualified audit opinions during the Class Period, KMPG knowingly and/or recklessly

overlooked Citigroup's material misrepresentations and omissions concerning its exposure to

subprime risks.

---

[12] SAS No. 22, SAS No. 47, SAS No. 48, SAS No. 77, AU §311.03

317.    AU §319 provides guidance on the independent auditor's consideration of

internal controls in a financial statement audit.  AU §319 defines "internal control" as follows:

> Internal control is a process – affected by an entity's board of directors,
> management, and other personnel – designed to provide reasonable assurance
> regarding the achievement of objectives in the following categories:  (a) reliability
> of financial reporting, (b) effectiveness and efficiency of operations, and (c)
> compliance with applicable laws and regulations.[13]

318.    Upon establishing internal control objectives, a company must adopt policies and

procedures that encourage employees to follow and meet those established objectives.  As stated

above, per AU §319.07(a) through AU §319.07(e), internal control consists of five interrelated

components:

      a. ***Control environment*** sets the tone of an organization, which
         influences the control consciousness of its employees.  The
         control environment is the foundation for all other components of
         internal control, because it provides discipline and structure.

      b. ***Risk assessment*** is the process that an entity must conduct to
         identify and assess any relevant risks to its accounting objectives.
         Once this is done, management must determine how the risks
         should be managed.

      c. ***Control activities*** are the policies and procedures that help ensure
         that management directives are carried out.

      d. ***Information and communication*** are two key elements that help
         management carry out its accounting responsibilities.
         Management must establish a timely and effective process for
         relaying information.

      e. ***Monitoring*** is a process that an entity uses to assess the quality of
         its internal control performance over time.

319.    Citigroup had defective systems of internal control relating to its accounting for

off-balance-sheet arrangements (*i.e.* VIEs) that failed demonstrably in each of the five areas of

internal control highlighted by AU §319.  In this case, Citigroup's dysfunctional system for off-

---

[13] AU §319.06

balance-sheet accounting, including Citigroup's complete lack of meaningful checks and balances in this area, permeated its accounting for VIEs. The existence of these problems should have heightened the awareness of KPMG and caused the auditor to identify and require prompt corrective action with regard to the accounting and disclosures related to the VIEs. Instead, KPMG issued unqualified opinions on Citigroup's financial statements.

320.    AU §326 provides information on the third standard of field work regarding evidential matter. Much of the independent auditor's work in forming an opinion on financial statements consists of obtaining and evaluating evidential matter concerning the reported items in such financial statements. In obtaining evidential matter in support of financial statement assertions, the auditor develops specific audit objectives in the light of those assertions. The independent auditor's objective is to obtain sufficient competent evidential matter to provide the auditor with a reasonable basis for forming an opinion. The auditor should be thorough in his search for evidential matter and unbiased in his evaluation.[14]

321.    KPMG knowingly and/or recklessly failed to obtain sufficient competent evidential matter, as required by AU §326, such as substantively reviewing the Liquidity Put contracts pertaining to Citigroup-sponsored VIEs including those provided to investors in the Bear Stearns Klio entities.[15] The need for competent evidential matter was particularly high considering the magnitude of exposure -- $55 billion and counting -- from Citigroup's involvement in the subprime market.

322.    AU §410 directly relates to the first standard of reporting: "The report shall state whether the financial statements are presented in accordance with generally accepted accounting principles." As alleged in detail in Section VIII, Citigroup violated U.S. GAAP in numerous

---

[14] SAS No. 31, SAS No. 48, SAS No. 80, AU §326

[15] AU §326.17

instances during the Class Period by failing to properly account for either the Company's massive exposure to VIE guarantees such as the Liquidity Puts, or Citigroup's SIVs. These same failures by KPMG violated the second standard of reporting relating to the identification of U.S. GAAP departures (AU § 420).

323.    Based upon the foregoing violations of applicable auditing standards, as well as Citigroup's blatant violations of U.S. GAAP in connection with its VIEs, KPMG should not have issued unqualified audit opinions on Citigroup's consolidated financial statements, the financial position of Citigroup and the results of its operations and its cash flows during the Class Period. The issuance of such unqualified audit opinions violated the fourth standard of reporting relating to the expression of an opinion (AU § 508.20).

324.    During the Class Period, KPMG also conducted separate audits of Citigroup's internal controls over financial reporting for years ended December 31, 2004, 2005, and 2006 and improperly issued unqualified audit opinions on both Citigroup management's assessment of and the effect of operation of Citigroup's internal controls over the financial reporting process. It is clear that the internal controls with regard to Citigroup's accounting for its unconsolidated VIEs and guarantees were manifestly ineffective and allowed Citigroup to improperly account for many of its VIEs and related transactions. A proper audit of internal controls over financial reporting would have precluded KPMG from issuing the unqualified opinions it issued in the Class Period, and would have alerted the public to the material weaknesses in Citigroup's financial reporting process, putting them on notice that Citigroup's financial reporting with regard to its VIEs was inappropriate and inadequate and should not be relied upon.

## X.    THE INDIVIDUAL DEFENDANTS' INSIDER SELLING

325.    As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or recklessly disregarded that the public statements and documents

issued and disseminated in the name of the Company were materially false and misleading, knew or recklessly disregarded that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated in and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

326.    In addition to their conscious misbehavior, each of the Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer and/or director of Citigroup and, thus, controlled the information disseminated to the investing public in the Company's press releases, SEC filings and communications with analysts. The Individual Defendants were privy to confidential financial information concerning the Company's business, financial condition and future business outlook, and had access to material, nonpublic information concerning the Company's true financial condition. As a result, each of the Individual Defendants could falsify the information that reached the public about the Company's business and performance. With respect to non-forward looking statements and/or omissions, the Individual Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public.

327.    During the Class Period, the Individual Defendants were motivated to engage in the fraudulent practices detailed herein, resulting in the artificial inflation of the Company's stock, so that Individual Defendants could sell their personally held shares at artificially inflated prices. Notwithstanding their duty not to sell Citigroup common stock under these circumstances, or to disclose the non-public, inside information prior to selling their stock, each

of the Individual Defendants sold Citigroup stock at prices that were artificially inflated by Defendants' materially false and misleading statements and omissions.

328.    The Individual Defendants' sales of Citigroup common stock during the Class Period were unusual in timing and/or amount.  These Class Period sales were also suspicious in that they were inconsistent with prior trading practices and made at times calculated to maximize the personal benefits from undisclosed inside information.

329.    During the Class Period, the Individual Defendants sold approximately *2,169,405 shares of Citigroup stock at artificially inflated prices for proceeds of approximately $110,951,714, as follows*:

**Defendant Bushnell**

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 1/6/2004 | 19,194 | $49.79 | $955,669.30 |
| 1/12/2004 | 1,720 | $49.69 | $85,466.80 |
| 1/16/2004 | 3,692 | $49.40 | $182,384.80 |
| 1/22/2004 | 3,941 | $50.36 | $198,468.80 |
| 1/23/2004 | 7,629 | $50.69 | $386,714.01 |
| 2/12/2004 | 19,000 | $49.60 | $942,400.00 |
| 3/2/2004 | 3,937 | $50.46 | $198,661.02 |
| 3/31/2004 | 6,547 | $51.94 | $340,051.18 |
| 7/12/2004 | 1,719 | $45.04 | $77,423.76 |
| 1/12/2005 | 1,820 | $47.95 | $87,269.00 |
| 2/7/2005 | 6,486 | $49.78 | $322,873.08 |
| 2/14/2005 | 6,146 | $49.25 | $302,690.50 |
| 7/12/2005 | 2,216 | $46.06 | $102,068.96 |
| 8/5/2005 | 4,200 | $43.64 | $183,288.00 |
| 1/12/2006 | 1,774 | $48.99 | $86,908.26 |
| 1/20/2006 | 5,315 | $46.52 | $247,253.80 |
| 2/13/2006 | 9,989 | $45.74 | $456,896.86 |
| 2/27/2006 | 2,006 | $46.78 | $93,840.68 |
| 2/27/2006 | 10,912 | $47.01 | $512,973.12 |
| 2/28/2006 | 13,716 | $46.78 | $641,634.48 |
| 5/1/2006 | 6,495 | $49.95 | $324,425.25 |

| 5/8/2006 | 8,056 | $50.37 | $405,780.72 |
| 8/15/2006 | 1,100 | $48.39 | $53,229.00 |
| 10/05/2006 | 23,320 | $51.03 | $1,190,019.60 |
| 12/12/2006 | 7,110 | $52.88 | $375,976.80 |
| 12/19/2006 | 8,789 | $55.44 | $487,262.16 |
| 12/28/2006 | 7,153 | $56.41 | $403,500.73 |
| 1/22/2007 | 25,528 | $54.55 | $1,392,552.40 |
| 2/27/2007 | 6,584 | $52.68 | $346,845.12 |
| 2/27/2007 | 6,940 | $52.10 | $361,574.00 |
| 7/23/2007 | 11,809 | $50.73 | $599,070.57 |
| **Total** | **244,843** | | **$12,345,172.68** |

**Defendant Druskin**

| Date | Number of Shares Sold | Share Price | Total Proceeds |
| --- | --- | --- | --- |
| 1/6/2004 | 49,757 | $49.79 | $2,477,401.03 |
| 1/12/2004 | 2,742 | $49.69 | $136,249.98 |
| 1/16/2004 | 11,274 | $49.40 | $556,935.60 |
| 1/21/2004 | 6,000 | $50.28 | $301,680.00 |
| 1/23/2004 | 23,840 | $50.69 | $1,208,449.60 |
| 3/31/2004 | 39,281 | $51.94 | $2,040,255.14 |
| 4/2/2004 | 69,033 | $52.29 | $3,609,735.57 |
| 4/16/2004 | 1,400 | $50.24 | $70,336.00 |
| 7/12/2004 | 2,742 | $45.04 | $123,499.68 |
| 7/16/2004 | 1,300 | $43.99 | $57,187.00 |
| 1/12/2005 | 2,831 | $47.95 | $135,746.45 |
| 2/7/2005 | 16,863 | $49.78 | $839,440.14 |
| 2/14/2005 | 16,490 | $49.25 | $812,132.50 |
| 7/12/2005 | 3,533 | $46.06 | $162,729.98 |
| 7/19/2005 | 1,000 | $44.47 | $44,470.00 |
| 7/19/2005 | 5,000 | $44.48 | $222,400.00 |
| 11/18/2005 | 23,728 | $47.94 | $1,137,520.32 |
| 1/12/2006 | 2,764 | $48.99 | $135,408.36 |
| 1/20/2006 | 8,697 | $46.52 | $404,584.44 |
| 1/25/2006 | 4,200 | $46.29 | $194,418.00 |
| 2/13/2006 | 19,855 | $45.74 | $908,167.70 |
| 4/24/2006 | 5,744 | $47.87 | $274,965.28 |
| 5/1/2006 | 16,887 | $49.95 | $843,505.65 |
| 10/5/2006 | 72,874 | $51.03 | $3,718,760.22 |

| 10/25/2006 | 15,000 | $50.55 | $758,250.00 |
| 12/28/2006 | 98,573 | $56.41 | $5,560,502.93 |
| 1/22/2007 | 43,639 | $54.55 | $2,380,507.45 |
| 1/29/2007 | 20,000 | $54.02 | $1,080,400.00 |
| 4/18/2007 | 10,000 | $53.07 | $530,700.00 |
| 7/13/2007 | 23,885 | $52.84 | $1,262,083.40 |
| **Total** | **618,932** | | **$31,988,422.42** |

**Defendant Gerspach**

| Date | Number of Shares Sold | Share Price | Total Proceeds |
| --- | --- | --- | --- |
| 4/28/2005 | 6,047 | $47.05 | $284,511.35 |
| 7/12/2005 | 145 | $46.06 | $6,678.70 |
| 10/27/2005 | 6,171 | $45.65 | $281,706.15 |
| 11/28/2005 | 7,311 | $49.52 | $362,040.72 |
| 1/12/2006 | 129 | $48.99 | $6,919.71 |
| 1/20/2006 | 1,211 | $46.52 | $56,335.72 |
| 2/13/2006 | 1,602 | $45.74 | $73,275.48 |
| 5/1/2006 | 22,929 | $49.95 | $1,145,303.55 |
| 10/06/2006 | 10,447 | $50.99 | $532,692.53 |
| 12/12/2006 | 9,246 | $52.88 | $488,928.48 |
| 12/28/2006 | 8,873 | $56.41 | $500,525.93 |
| 1/22/2007 | 4,574 | $54.55 | $249,511.70 |
| 4/17/2007 | 19,128 | $52.93 | $1,012,445.04 |
| **Total** | **97,813** | | **$5,000,275.06** |

**Defendant Klein**

| Date | Number of Shares Sold | Share Price | Total Proceeds |
| --- | --- | --- | --- |
| 7/17/2007 | 19,282 | $52.19 | $1,006,327.58 |
| **Total** | **19,282** | | **$1,006,327.58** |

**Defendant Krawcheck**

| Date | Number of Shares Sold | Share Price | Total Proceeds |
| --- | --- | --- | --- |
| 1/20/2006 | 8,674 | $46.52 | $403,514.48 |
| 1/22/2007 | 50,339 | $54.55 | $2,745,992.45 |
| **Total** | **59,013** | | **$3,149,506.93** |

**Defendant Maheras**

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 7/13/2007 | 23,964 | $52.84 | $1,266,257.76 |
| Total | 23,964 | | $1,266,257.76 |

**Defendant Prince**

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 1/12/2004 | 3,564 | $49.69 | $177,095.16 |
| 1/16/2004 | 9,023 | $49.40 | $445,736.20 |
| 1/22/2004 | 15,172 | $50.36 | $764,061.92 |
| 1/23/2004 | 38,492 | $50.69 | $1,951,159.48 |
| 3/31/2004 | 54,330 | $51.94 | $2,821,900.20 |
| 7/12/2004 | 3,495 | $45.04 | $157,414.80 |
| 1/12/2005 | 3,558 | $47.95 | $170,606.10 |
| 2/14/2005 | 13,944 | $49.25 | $686,742.00 |
| 7/12/2005 | 4,381 | $46.06 | $201,788.86 |
| 11/30/2005 | 68,510 | $49.09 | $3,363,155.90 |
| 1/12/2006 | 3,412 | $48.99 | $167,153.88 |
| 1/20/2006 | 18,866 | $46.52 | $877,646.32 |
| 2/13/2006 | 18,145 | $45.74 | $829,952.30 |
| 10/5/2006 | 116,924 | $51.03 | $5,966,631.72 |
| 1/22/2007 | 81,087 | $54.55 | $4,423,295.85 |
| 4/17/2007 | 13,419 | $52.93 | $710,267.67 |
| 5/17/2007 | 13,395 | $54.91 | $735,519.45 |
| 7/13/2007 | 38,342 | $52.84 | $2,025,991.28 |
| Total | 518,059 | | $26,476,119.09 |

**Defendant Thomson**

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 1/16/2004 | 5,692 | $49.40 | $281,184.80 |
| 1/20/2004 | 17,199 | $49.50 | $851,350.50 |
| 1/28/2004 | 125,904 | $50.07 | $6,304,013.28 |
| 1/30/2004 | 25,622 | $49.48 | $1,267,776.56 |
| 7/20/2004 | 23,742 | $43.99 | $1,044,410.58 |
| 7/28/2004 | 22,662 | $43.90 | $994,861.80 |
| 7/16/2004 | 10,706 | $44.21 | $473,312.26 |

| 2/14/2005 | 9,940 | $49.25 | $489,545.00 |
|-----------|-------|--------|-------------|
| 1/20/2006 | 5,961 | $46.52 | $277,305.72 |
| 2/13/2006 | 14,410 | $45.74 | $659,113.40 |
| 10/5/2006 | 96,686 | $51.03 | $4,933,886.58 |
| 12/12/2006 | 49,519 | $52.88 | $2,618,564.72 |
| 12/15/2006 | 9,698 | $53.11 | $515,060.78 |
| 12/18/2006 | 10,831 | $54.07 | $585,632.17 |
| 12/19/2006 | 79,734 | $55.44 | $4,420,452.96 |
| **Total** | **508,306** | | **$25,716,471.11** |

**Defendant Volk**

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|------|------------------------|-------------|----------------|
| 9/20/2005 | 28,342 | $49.89 | $1,413,982.38 |
| 1/20/2005 | 7,108 | $46.52 | $330,664.16 |
| 9/20/2006 | 27,396 | $49.89 | $1,366,786.44 |
| 1/22/2007 | 16,347 | $54.55 | $891,728.85 |
| **Total** | **79,193** | | **$4,003,161.83** |

## XI.     LOSS CAUSATION

330.    At all relevant times, Citigroup's common stock was traded on the NYSE. As described above, Defendants' material misrepresentations and omissions had the effect of creating and maintaining an artificially inflated price for Citigroup's common stock. Those misrepresentations and omissions that were not immediately followed by an upward movement in the Company's stock price served to maintain the share price at artificially inflated levels by maintaining and supporting the false positive public perception of Citigroup's business, operations, performance and prospects, and particularly its exposure to subprime-related losses.

331.    Defendants had a duty to promptly disseminate accurate and truthful information with respect to Citigroup's financial and operational condition or to cause and direct that such information be disseminated, and to promptly correct any previously disseminated information that was materially misleading to the market. As a result of their failure to do so, the price of

Citigroup's common stock was artificially inflated during the Class Period, directly causing Plaintiffs and the Class to suffer damages when the Defendants eventually disclosed the truth.

332.    Defendants' false and misleading statements and omissions in their press releases, SEC filings and other public statements during the Class Period directly caused losses to the Class. On the strength of these false statements, the Company's stock was artificially inflated to a Class Period high of $56.41 per share on December 27, 2006.

333.    As Defendants began to disclose the truth regarding Citigroup's exposure to risks associated with its VIEs, the price of Citigroup common stock declined in a series of material steps from $47.10 per share on October 1, 2007 to $30.73 per share on November 21, 2007 as the market processed each set of previously undisclosed facts. Each such disclosure removed a portion of the artificial inflation in the price of Citigroup's common stock and directly caused Plaintiffs and the other members of the Class to suffer damages. At the end of the Class Period, Citigroup's common stock had declined by $25.68 (46%) per share from its Class Period high of $56.41 -- erasing $122 billion in shareholder value and giving Citigroup common stock the distinction of being the worst performing stock in the Dow Jones Industrial Average for 2007.

334.    Until shortly before Plaintiffs filed this Complaint, they were unaware of the facts alleged herein and could not have reasonably discovered the Defendants' fraudulent scheme by the exercise of reasonable diligence.

## XII.    GROUP PLEADING

335.    The Individual Defendants are liable for the materially false and misleading statements pleaded herein that were issued by or in the name of the Company, as each of those statements was "group-published" information, the result of the collective actions of the Individual Defendants. It is appropriate to treat the Individual Defendants as a group and to presume that the public filings, press releases and other public statements complained of herein

are the product of the collective actions of the narrowly defined group of Individual Defendants.

The Individual Defendants, by virtue of their high-level positions within Citigroup, directly and

actively participated in the management and day-to-day operations of the Company, and were

privy to confidential non-public information concerning the business and operations of

Citigroup. In addition, the Individual Defendants were involved in drafting, reviewing and/or

disseminating the materially false and misleading statements issued by Citigroup and approved

or ratified those statements, and, therefore, adopted them as their own.

## XIII.    FRAUD ON THE MARKET PRESUMPTION

336. At all relevant times, the market for Citigroup common stock was an efficient

market for the following reasons, among others:

(a)    Citigroup's common stock was listed and actively traded on the NYSE, a highly efficient national market, with more than 4.9 billion shares issued and outstanding and public trading float of 4745.09 million shares as of the end of the Class Period;

(b)    As a registered and regulated issuer of securities, Citigroup filed periodic reports with the SEC, in addition to the frequent voluntary dissemination of information described in this Complaint;

(c)    Citigroup regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

(d)    Citigroup was followed by several different securities analysts employed by major brokerage firms, including Punk, Ziegel & Company, Banc of America Securities LLC, CIBC, Credit Suisse and Deutsche Bank, which followed Citigroup's business and wrote reports which were distributed to the sales force and customers of their respective brokerage firms. Those reports were publicly available and affected the public marketplace;

(e)    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Citigroup's securities; and

(f)    Without knowledge of the misrepresented or omitted facts, Plaintiffs and the other members of the Class purchased or otherwise acquired Citigroup securities between the time that Defendants made the material misrepresentations and omissions and the time that the truth was revealed, during which time the price of Citigroup securities was artificially inflated by Defendants' misrepresentations and omissions.

337.    As a result of the above, the market for Citigroup common stock promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the security's price.  Under these circumstances, all purchasers of Citigroup common stock during the Class Period suffered similar injuries through their purchases of shares at prices which were artificially inflated by the Defendants' misrepresentations and omissions.  Thus, a presumption of reliance applies.

## XIV.    THE SAFE HARBOR PROVISION OF THE PSLRA IS INAPPLICABLE

338.    As alleged herein, Defendants acted with scienter because at the time that they issued public documents and other statements in Citigroup's name, they knew or recklessly disregarded the fact that such statements were materially false and misleading or omitted material facts.  Moreover, the Defendants knew that such documents and statements would be issued or disseminated to the investing public; knew that persons were likely to rely upon those misrepresentations and omissions; and knowingly and/or recklessly participated in the issuance and/or dissemination of such statements and/or documents as primary violators of the federal securities laws.

339.    As set forth in detail in this Complaint, the Defendants, by virtue of their control over, and/or receipt of Citigroup's materially misleading statements and/or their association with

the Company, which made them privy to confidential proprietary information concerning

Citigroup that was used to artificially inflate financial results and which Defendants caused or

were informed of, participated in and knew of the fraudulent scheme alleged herein.  With

respect to non-forward looking statements and/or omissions, Defendants knew and/or recklessly

disregarded the falsity and misleading nature of that information, which they caused to be

disseminated to the investing public.

340.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the false statements pleaded in this Complaint because

none of the statements pleaded herein are "forward-looking" statements, and no such statement

was appropriately identified as a "forward-looking statement" when made.  Rather, the

statements alleged herein to be false and misleading all relate to facts and conditions existing at

the time the statements were made.  Moreover, meaningful cautionary statements did not identify

important factors that could cause actual results to differ materially from those in any putative

forward-looking statements.

341.    In the alternative, to the extent that the statutory safe harbor does apply to any

statement pleaded herein which is deemed to be forward-looking, Defendants are liable for the

false forward-looking statements because at the time each such statement was made, the speaker

actually knew and/or recklessly disregarded the fact that any such forward-looking statement was

materially false or misleading, and/or that each such statement was authorized and/or approved

by a director and/or executive officer of Citigroup who actually knew or recklessly disregarded

the fact that each such statement was false and/or misleading when made.  None of the historic or

present tense statements made by Defendants was an assumption underlying or relating to any

plan, projection, or statement of future economic performance, as they were not stated to be such

an assumption underlying or relating to any projection or statement of future economic

performance when made, nor were any of the projections or forecasts made by the Defendants

expressly related to or stated to be dependent on those historic or present tense statements when

made.

## XV.    CLASS ACTION ALLEGATIONS

342.    Plaintiffs bring this class action pursuant to Rules 23(a) and 23(b)(3) of the

Federal Rules of Civil Procedure, on behalf of itself and a class of all persons who purchased

Citigroup common stock during the Class Period (or their successors in interest), and who

thereby suffered damages.  Excluded from the Class are the Defendants named herein, members

of the immediate families of the Defendants, any firm, trust, partnership, corporation, officer,

director or other individual or entity in which a Defendant has a controlling interest or which is

related to or affiliated with any of the Defendants, and the legal representatives, heirs,

successors-in-interest or assigns of any such excluded person.

343.    The Class is so numerous that joinder of all members is impracticable.  According

to the Company, as of September 30, 2007, Citigroup had more than 4.9 billion shares of

common stock issued and outstanding.  Citigroup shares were actively traded on the NYSE.

While the exact number of Class members is unknown to Plaintiffs at this time and can only be

ascertained through appropriate discovery, Plaintiffs believe that there are, at a minimum,

thousands of geographically dispersed Class members.  Record owners and Class members can

be identified from records maintained by Citigroup, or its transfer agent, and can be notified of

the pendency of this action by mail and publication, using forms of notice similar to those

customarily used in securities class actions.

344.    Plaintiffs' claims are typical of the members of the Class, because Plaintiffs and all of the Class members sustained damages that arose out of the Defendants' unlawful conduct complained of herein.

345.    Plaintiffs will fairly and adequately protect the interests of the members of the Class, and Plaintiffs have no interests that are contrary to, or in conflict with, the interests of the Class members that they seek to represent.  Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to ensure such protection, and intends to prosecute this action vigorously.

346.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually seek redress for the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

347.    The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications, which could establish incompatible standards of conduct for Defendants.  Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that, Defendants have acted on grounds generally applicable to the entire Class.  The questions of law and fact common to the Class include:

> (a)    whether Defendants' acts violated the federal securities laws as alleged herein;
>
> (b)    whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts and whether Defendants

breached any duty to convey material facts or to correct
material facts previously disseminated;

(c)     whether Defendants participated in and pursued the
common course of conduct complained of herein;

(d)     whether Defendants acted with scienter in omitting and/or
misrepresenting material facts;

(e)     whether the price of Citigroup common stock was
artificially inflated during the Class Period as a result of the
material misrepresentations and omissions complained of
herein;

(f)     whether the Individual Defendants were controlling persons
as alleged herein; and

(g)     whether members of the Class have sustained damages and,
if so, the proper measure of such damages.

348.    Plaintiffs will rely, in part, upon the presumption of reliance established by the

fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to
disclose material facts during the Class Period;

(b)     such misrepresentations and omissions were material;

(c)     the securities of the Company traded in an efficient market;

(d)     the misrepresentations and omissions alleged herein would
tend to induce a reasonable investor to misjudge the value
of the Company's securities; and

(e)     Plaintiffs and the other members of the Class purchased
Citigroup common stock between the time the Defendants
failed to disclose or misrepresented material facts and the
time the true facts were disclosed, without knowledge of
the misrepresented or omitted facts.

Based upon the factors set forth in the preceding paragraph, Plaintiffs and the other members of

the Class are entitled to the presumption of reliance upon the integrity of the market.

## XVI.    CAUSES OF ACTION

### COUNT I:  Violation of § 10(b) of The Exchange Act And
### Rule 10b-5 Promulgated Thereunder

349.    Plaintiffs incorporate by reference and reallege all preceding paragraphs as fully set forth herein.  This claim is asserted against all Defendants.

350.    During the Class Period, Defendants used the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges to make materially false and misleading statements and omissions of material fact to:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Citigroup common stock; and (iii) cause Plaintiffs and other members of the Class to purchase Citigroup common stock at artificially inflated prices that did not reflect their true value.  As the Defendants gradually disclosed the truth, the trading price of Citigroup common stock fell precipitously.  In furtherance of their unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

351.    Defendants, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading, and/or substantially participated in the creation of the alleged misrepresentations, which operated as a fraud and deceit upon the purchasers of Citigroup common stock in an effort to maintain artificially high market prices for Citigroup common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).  All Defendants are sued as primary participants in the wrongful conduct alleged herein.

352.    The Individual Defendants were privy to and participated in the creation, development and issuance of the materially false and misleading statements alleged herein,

and/or were aware of the Company's and other Defendants' dissemination of information to the

investing public they either knew, or recklessly disregarded, was materially false and misleading.

353.    Defendants had actual knowledge of the misrepresentations and omissions of

material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were readily available to them.

Defendants' material misrepresentations and omissions were done knowingly, or recklessly, and

for the purpose and effect of concealing the truth with respect to Citigroup's operations,

business, performance and prospects from the investing public and supporting the artificially

inflated price of its common stock.

354.    Defendant KPMG is primarily responsible for the materially false and misleading

audit opinions that it issued concerning the Company's financial statements for Citigroup's 2003,

2004, 2005, and 2006 fiscal years.  As alleged herein, KPMG falsely asserted that Citigroup's

annual financial statements were prepared in accordance with U.S. GAAP, and that KPMG had

performed its audits in compliance with U.S. GAAS despite knowing and/or recklessly

disregarding that Citigroup's financial statements materially departed from U.S. GAAP.  As an

"independent" auditor, KPMG was required to conform to relevant auditing standards that are

intended to responsibly ensure an independent, professional opinion regarding the fairness of the

financial statements promulgated by Citigroup.  Rather than properly applying these auditing

standards, KPMG acted with deliberate and/or reckless disregard and breached multiple relevant

standards and requirements, abandoning its professional responsibilities.  Had KPMG performed

its duties properly and with the standard of care required, the obvious internal control

weaknesses and U.S. GAAP departures which an audit is designed to uncover would have led

KPMG to require the proper accounting for the VIEs at issue under U.S. GAAP, and/or to issue adverse opinions on the aforementioned annual Form 10-K filings.

355.    The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Citigroup's common stock during the Class Period. In ignorance of the fact that the market prices of Citigroup's common stock were artificially inflated, and relying directly or indirectly on the materially false and misleading statements made by Defendants, and on the integrity of the market in which the Company's common stock trades, or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and other members of the Class purchased Citigroup's common stock during the Class Period at artificially high prices. As the truth eventually emerged, the price of Citigroup's common stock fell.

356.    At the time of the material misrepresentations and omissions alleged herein, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and other members of the Class and the marketplace known the truth with respect to the business, operations, performance and prospects of Citigroup, which was concealed by Defendants, Plaintiffs and other members of the Class would not have purchased Citigroup's common stock, or if they had purchased such securities, would not have done so at the artificially inflated prices that they paid.

357.    By virtue of the foregoing, Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

358.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their transactions in the Company's common stock during the Class Period.

### COUNT II:  Violation of § 20(a) of The Exchange Act

359.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Claim is asserted against each of the Individual Defendants.

360.    During the Class Period, each of the Individual Defendants was a senior executive officer and/or director of Citigroup and was privy to confidential and proprietary information concerning Citigroup and its business, operations, performance and prospects, including its compliance with applicable federal, state and local laws and regulations.  Because of their high-level positions with Citigroup, the Individual Defendants had regular access to non-public information about its business, operations, performance and prospects through access to internal corporate documents and information, conversations and connections with other corporate officers and employees, attendance at management meetings and the Company's BOD, and committees thereof, and reports and other information provided to them in connection therewith.

361.    Each of the Individual Defendants acted as a controlling person of Citigroup within the meaning of § 20(a) of the Exchange Act, as alleged herein.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements Plaintiffs allege were materially false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to

have been misleading prior to and/or shortly after those statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

362.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore had, or are presumed to have had, the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

363.    As set forth above, Citigroup and the Individual Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

### COUNT III:  Violation of § 20A of The Exchange Act

364.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

365.    This claim is asserted by Plaintiffs on behalf of itself and all other Class members who purchased Citigroup common stock contemporaneously with the sales of the Company's common stock by the Section 20A Defendants.

366.    The Section 20A Defendants were privy to confidential, material, non-public adverse information concerning the Company as alleged herein.  Notwithstanding the Section 20A Defendants' duty to refrain from trading in Citigroup common stock unless they disclosed the foregoing material facts, the Section 20A Defendants sold, in the aggregate, approximately 1,559,622 shares of Citigroup common stock during the Class Period contemporaneously with

Plaintiffs and realized proceeds of over $76,864,184.68, while in possession of material, non-public adverse information, as set forth immediately below:

### Defendant Bushnell

| DEFENDANT BUSHNELL'S SALES | | | |
| --- | --- | --- | --- |
| Date | Number of Shares Sold | Share Price | Total Proceeds |
| 1/6/2004 | 19,194 | $49.79 | $955,669.26 |
| 1/12/2004 | 1,720 | $49.69 | $85,466.80 |
| 1/16/2004 | 3,692 | $49.40 | $182,384.80 |
| 2/12/2004 | 19,000 | $49.60 | $942.400.00 |
| 3/31/2004 | 6,547 | $51.94 | $340,051.18 |
| 7/12/2004 | 1,719 | $45.04 | $77,423.76 |
| 2/7/2005 | 6,486 | $49.78 | $322,873.08 |
| 8/5/2005 | 4,200 | $43.64 | $183,288.00 |
| 5/1/2006 | 6,495 | $49.95 | $324,425.25 |
| 8/15/2006 | 1,100 | $48.39 | $53,229.00 |
| 12/12/2006 | 7,110 | $52.88 | $375,976.80 |
| 2/27/2007 | 6,584 | $52.68 | $346,845.12 |
| 2/27/2007 | 6,940 | $52.10 | $361,574.00 |
| **Total** | **90,787** | | **$3,610,149.45** |

| COPERA'S PURCHASES | | | |
| --- | --- | --- | --- |
| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 1/13/2004 | 61,100 | $49.72 | $3,037,892 |
| | | | |
| | | | |
| 2/19/2004 | 3,400 | $49.86 | $ 169,524 |
| 4/5/2004 | 26,700 | 51.88 | $1,385,196 |
| 7/2/2004 | 1,200 | $45.77 | $ 54,924 |
| 2/1/2005 | 1,200 | $49.34 | $ 59,208 |
| 8/1/2005 | 300 | $43.73 | $ 13,119 |
| 4/27/2006 | 2,100 | $47.78 | $ 100,338 |
| 8/14/2006 | 7,000 | $47.69 | $ 333,830 |
| 12/5/2006 | 4,300 | $50.40 | $ 216,720 |
| 3/5/2007 | 23,000 | $50.02 | $1,150,460 |
| 3/6/2007 | 5,900 | $49.94 | $ 294,646 |
| **Total** | **136,200** | | **$6,815,857** |

| DEFENDANT BUSHNELL'S SALES | | | |
| --- | --- | --- | --- |
| Date | Number of Shares Sold | Share Price | Total Proceeds |
| 3/2/2004 | 3,937 | $50.46 | $ 198,661.02 |
| 3/31/2004 | 6,547 | $51.94 | $ 340,051.18 |
| 2/14/2005 | 6,146 | $49.25 | $ 302,690.50 |
| 2/13/2006 | 9,989 | $45.74 | $ 456,896.86 |
| 2/27/2006 | 2,006 | $46.78 | $ 93,840.68 |
| 2/27/2006 | 10,912 | $47.01 | $ 512,973.12 |
| 2/28/2006 | 13,716 | $46.78 | $ 641,634.48 |
| 5/1/2006 | 6,495 | $49.95 | $ 324,425.25 |
| 5/8/2006 | 8,056 | $50.37 | $ 405,780.72 |
| 12/12/2006 | 7,110 | $52.88 | $ 375,976.80 |
| 1/22/2007 | 25,528 | $54.55 | $1,392,552.40 |
| 2/27/2007 | 6,584 | $52.68 | $346,845.12 |

| TCRS' PURCHASES | | | |
| --- | --- | --- | --- |
| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 2/27/2004 | 300,000 | $50.09 | $15,027,000 |
| 4/1/2004 | 50,000 | $52.31 | $ 2,615,500 |
| 2/17/2005 | 50,000 | $49.01 | $ 2,450,500 |
| 2/13/2006 | 75,000 | $45.72 | $ 3,429,000 |
| 3/6/2006 | 162,000 | $45.97 | $ 7,447,140 |
| | | | |
| | | | |
| | | | |
| 5/8/2006 | 39,000 | $50.30 | $ 1,961,700 |
| | | | |
| 12/11/2006 | 10,000 | $52.51 | $ 525,100 |
| 1/23/2007 | 10,000 | $54.69 | $ 546,900 |
| 2/20/2007 | 140,000 | $54.36 | $ 7,610,400 |

| | | | |
|---|---|---|---|
| 2/27/2007 | 6,940 | $52.10 | $361,574.00 |
| **Total** | **113,966** | | **$5,753,902.13** |

| | | | |
|---|---|---|---|
| **Total** | **836,000** | | **$41,613,240** |

| DEFENDANT BUSHNELL'S SALES | | | |
|---|---|---|---|
| Date | Number of Shares Sold | Share Price | Total Proceeds |
| 1/16/2004 | 19,194 | $49.79 | $955,669.26 |
| 1/22/2004 | 3,941 | $50.36 | $198,468.80 |
| 1/23/2004 | 7,629 | $50.69 | $386,714.01 |
| 1/12/2005 | 1,820 | $47.95 | $87,269.00 |
| 2/7/2005 | 6,486 | $49.78 | $322,873.08 |
| 1/12/2006 | 1,774 | $48.99 | $86,908.26 |
| 12/12/2006 | 7,110 | $52.88 | $375,976.80 |
| 12/19/2006 | 8,789 | $55.44 | $487,262.16 |
| 2/27/2007 | 6,584 | $52.68 | $346,845.12 |
| 2/27/2007 | 6,940 | $52.10 | $361,574.00 |
| **Total** | **70,267** | | **$3,609,560.49** |

| AP7'S PURCHASES | | | |
|---|---|---|---|
| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 1/26/2004 | 188,500 | $50.92 | $9,598,420 |
| | | | |
| 1/10/05 | 199,705 | $48.33 | $9,651,742.65 |
| 1/31/2005 | 42,300 | $49.05 | $2,074,815.00 |
| 1/9/2006 | 129,600 | $48.39 | $6,271,344.00 |
| 12/12/2006 | 62,217 | $52.24 | $3,250,216.08 |
| | | | |
| 2/26/2007 | 13,000 | $52.68 | $684,840.00 |
| **Total** | **435,617** | | **$31,531,377.73** |

| DEFENDANT BUSHNELL'S SALES | | | |
|---|---|---|---|
| Date | Number of Shares Sold | Share Price | Total Proceeds |
| 5/1/2006 | 6,495 | $49.95 | $324,425.25 |
| 5/8/2006 | 8,056 | $50.37 | $405,780.72 |
| 8/15/2006 | 1,100 | $48.39 | $53,229.00 |
| **Total** | **15,651** | | **$783,434.97** |

| AP4'S PURCHASES | | | |
|---|---|---|---|
| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 5/8/2006 | 200,000 | $50.39 | $10,078,000.00 |
| 8/14/2006 | 47,000 | $48.02 | $2,256,940.00 |
| **Total** | **247,000** | | **$12,334,940.00** |

| DEFENDANT BUSHNELL'S SALES | | | |
|---|---|---|---|
| Date | Number of Shares Sold | Share Price | Total Proceeds |
| 1/16/2004 | 19,194 | $49.79 | $955,669.30 |
| 1/22/2004 | 3,941 | $50.36 | $198,468.80 |
| 1/23/2004 | 7,629 | $50.69 | $386,714.01 |
| 7/12/2004 | 1,719 | $45.04 | $77,423.76 |
| 1/12/2005 | 1,820 | $47.95 | $87,269.00 |
| 2/7/2005 | 6,486 | $49.78 | $322,873.08 |
| 2/14/2005 | 6,146 | $49.25 | $302,690.50 |
| 2/13/2006 | 9,989 | $45.74 | $456,896.86 |
| 2/27/2006 | 2,006 | $46.78 | $93,840.68 |

| PKA'S PURCHASES | | | |
|---|---|---|---|
| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 1/22/2004 | 2,000 | $50.70 | $101,396.20 |
| | | | |
| | | | |
| 7/6/2004 | 1,000 | $45.29 | $45,290.00 |
| 1/18/2005 | 1,116 | $47.40 | $52,898.40 |
| 2/7/2005 | 4,156 | $49.73 | $206,670.81 |
| | | | |
| 2/21/2006 | 5,700 | $46.12 | $262,861.20 |
| | | | |

| 2/27/2006 | 10,912 | $47.01 | $512,973.12 | | | | |
|---|---|---|---|---|---|---|---|
| 2/28/2006 | 13,716 | $46.78 | $641,634.48 | | | | |
| 5/1/2006 | 6,495 | $49.95 | $324,425.25 | 5/1/2006 | 17,700 | $49.46 | $875,442.00 |
| 5/8/2006 | 8,056 | $50.37 | $405,780.72 | | | | |
| 12/12/2006 | 7,110 | $52.88 | $375,976.80 | 12/14/2006 | 4,000 | $52.79 | $211,169.20 |
| 12/19/2006 | 8,789 | $55.44 | $487,262.16 | | | | |
| 1/22/2007 | 25,528 | $54.55 | $1,392,552.40 | 1/22/2007 | 2,696 | $55.47 | $149,547.12 |
| | | | | 1/22/2007 | 60,874 | $55.02 | $3,349,250.96 |
| 2/27/2007 | 6,584 | $52.68 | $346,845.12 | 2/21/2007 | 5,270 | $53.82 | $283,652.48 |
| 2/27/2007 | 6,940 | $52.10 | $361,574.00 | | | | |
| 7/23/2007 | 11,809 | $50.73 | $599,070.57 | 7/25/2007 | 6,400 | $49.71 | $318,126.72 |
| **Total** | **153,299** | | **$8,329,940.61** | **Total** | **110,912** | | **$5,856,305.09** |

## Defendant Druskin

| DEFENDANT DRUSKIN'S SALES | | | | COPERA'S PURCHASES | | | |
|---|---|---|---|---|---|---|---|
| Date | Number of Shares Sold | Share Price | Total Proceeds | Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 1/06/2004 | 49,757 | $49.79 | $2,477,401.03 | 1/13/2004 | 61,100 | $49.72 | $3,037,892 |
| 1/12/2004 | 2,742 | $49.69 | $136,249.98 | | | | |
| 1/16/2004 | 11,274 | $49.40 | $556,935.60 | | | | |
| 1/21/2004 | 6,000 | $50.28 | $301,680.00 | | | | |
| 3/31/2004 | 39,281 | $51.94 | $2,040,255.14 | 4/5/2004 | 26,700 | $51.88 | $1,385,196 |
| 4/2/2004 | 69,033 | $52.29 | $3,609,735.57 | | | | |
| 7/12/2004 | 2,742 | $45.04 | $123,499.68 | 7/2/2004 | 1,200 | $45.77 | $54,924 |
| 2/7/2005 | 16,863 | $49.78 | $839,440.14 | 2/1/2005 | 1,200 | $49.34 | $59,208 |
| 1/25/2006 | 4,200 | $46.29 | $194,418.00 | 2/1/2006 | 2,100 | $46.42 | $97,482 |
| 4/24/2006 | 5,744 | $47.87 | $274,965.28 | 4/27/2006 | 2,100 | $47.78 | $100,338 |
| 4/18/2007 | 10,000 | $53.07 | $530,700.00 | 4/19/2007 | 43,000 | $53.36* | $2,294,480 |
| **Total** | **217,636** | | **$11,085,280.42** | **Total** | **137,400** | | **$7,029,520** |

| DEFENDANT DRUSKIN'S SALES | | | | TCRS' PURCHASES | | | |
|---|---|---|---|---|---|---|---|
| Date | Number of Shares Sold | Share Price | Total Proceeds | Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 3/31/2004 | 39,281 | $51.94 | $2,040,255.14 | 4/1/2004 | 50,000 | $52.31 | $2,615,500 |
| 4/2/2004 | 69,033 | $52.29 | $3,609,735.57 | | | | |
| 2/14/2005 | 16,490 | $49.25 | $812,132.50 | 2/17/2005 | 50,000 | $49.01 | $2,450,500 |
| 7/19/2005 | 1,000 | $44.47 | $44,470.00 | 7/20/2005 | 150,000 | $44.31 | $6,646,500 |
| 7/19/2005 | 5,000 | $44.48 | $222,400.00 | | | | |
| 11/18/2005 | 23,728 | $47.94 | $1,137,520.32 | 11/16/2005 | 10,000 | $47.87 | $478,700 |

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| | | | |
| 1/25/2006 | 4,200 | $46.29 | $194,418.00 |
| 2/13/2006 | 19,855 | $45.74 | $908,167.70 |
| 5/1/2006 | 16,887 | $49.95 | $843,505.65 |
| 10/25/2006 | 15,000 | $50.55 | $758,250.00 |
| | | | |
| 1/22/2007 | 43,639 | $54.55 | $2,380,507.45 |
| 1/29/2007 | 20,000 | $54.02 | $1,080,400.00 |
| 4/18/2007 | 10,000 | $53.07 | $530,700.00 |
| **Total** | **284,113** | | **$14,562,462.33** |

| Date | Number of Shares | Share Price | Total |
|---|---|---|---|
| 11/17/2005 | 5,000 | $47.63 | $238,150 |
| 11/28/2005 | 5,000 | $49.47 | $247,350 |
| 2/1/2006 | 150,000 | $46.53 | $6,979,500 |
| 2/13/2006 | 75,000 | $45.72 | $3,429,000 |
| 5/8/2006 | 39,000 | $50.30 | $1,961,700 |
| 10/23/2006 | 20,000 | $50.13 | $1,002,600 |
| 10/24/2006 | 40,000 | $50.46 | $2,018,400 |
| 10/26/2006 | 10,000 | $50.96 | $509,600 |
| 1/23/2007 | 10,000 | $54.69 | $546,900 |
| | | | |
| 4/16/2007 | 10,000 | $52.84 | $528,400 |
| 4/17/2007 | 5,000 | $52.58 | $262,900 |
| **Total** | **629,000** | | **$29,915,700** |

| DEFENDANT DRUSKIN'S SALES | | | |
|---|---|---|---|
| Date | Number of Shares Sold | Share Price | Total Proceeds |
| 1/21/2004 | 6,000 | $50.28 | $  301,680.00 |
| 1/23/2004 | 23,840 | $50.69 | $1,208,449.60 |
| 1/12/2005 | 2,831 | $47.95 | $135,746.45 |
| 1/12/2006 | 2,764 | $48.99 | $135,408.36 |
| 1/25/2006 | 4,200 | $46.29 | $194,418.00 |
| **Total** | **39,635** | | **$$1,975,702.41** |

| AP7'S PURCHASES | | | |
|---|---|---|---|
| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 1/26/2004 | 188,500 | $50.92 | $9,598,420 |
| | | | |
| 1/10/2005 | 199,705 | $48.33 | $9,651,742.65 |
| 1/9/2006 | 129,600 | $48.39 | $6,271,344.00 |
| 1/31/2006 | 12,600 | $46.58 | $586,908.00 |
| **Total** | **530,405** | | **$26,108,414.65** |

| DEFENDANT DRUSKIN'S SALES | | | |
|---|---|---|---|
| Date | Number of Shares Sold | Share Price | Total Proceeds |
| 5/1/2006 | 16,887 | $49.95 | $843,505.65 |
| **Total** | **284,113** | | **$14,562,462.33** |

| AP4'S PURCHASES | | | |
|---|---|---|---|
| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 5/8/2006 | 200,000 | $50.39 | $10,078,000.00 |
| **Total** | **200,000** | | **$10,078,000.00** |

| DEFENDANT DRUSKIN'S SALES | | | |
|---|---|---|---|
| Date | Number of Shares Sold | Share Price | Total Proceeds |
| 1/16/2004 | 11,274 | $49.40 | $556,935.60 |
| 1/21/2004 | 6,000 | $50.28 | $301,680.00 |
| 1/23/2004 | 23,840 | $50.69 | $1,208,449.60 |
| 7/12/2004 | 2,742 | $45.04 | $123,499.68 |

| PKA'S PURCHASES | | | |
|---|---|---|---|
| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 1/22/2004 | 2,000 | $50.70 | $101,396.20 |
| | | | |
| 7/6/2004 | 1,000 | $45.29 | $45,290.00 |

| 1/12/2005 | 2,831 | $47.95 | $135,746.45 |
|---|---|---|---|
| 2/7/2005 | 16,863 | $49.78 | $839,440.14 |
| 2/14/2005 | 16,490 | $49.25 | $812,132.50 |
| 7/19/2005 | 1,000 | $44.47 | $44,470.00 |
| 7/19/2005 | 5,000 | $44.48 | $222,400.00 |
| 2/13/2006 | 19,855 | $45.74 | $908,167.70 |
| 4/24/2006 | 5,744 | $47.87 | $274,965.28 |
| 5/1/2006 | 16,887 | $49.95 | $843,505.65 |
| 10/25/2006 | 15,000 | $50.55 | $758,250.00 |
| 1/22/2007 | 43,639 | $54.55 | $2,380,507.45 |
| 1/29/2007 | 20,000 | $54.02 | $1,080,400.00 |
| 4/18/2007 | 10,000 | $53.07 | $530,700.00 |
| **Total** | **202,165** | | **$10,263,000.05** |

| 1/18/2005 | 1,116 | $47.40 | $52,898.40 |
|---|---|---|---|
| 2/7/2005 | 4,156 | $49.73 | $206,670.81 |
| | | | |
| 7/20/2005 | 1,800 | $44.38 | $79,884.00 |
| | | | |
| 2/21/2006 | 5,700 | $46.12 | $262,861.20 |
| 4/20/2006 | 2,800 | $48.41 | $135,535.68 |
| 5/1/2006 | 17,700 | $49.46 | $875,442.00 |
| 10/26/2006 | 8,500 | $50.83 | $432,035.45 |
| 1/22/2007 | 60,874 | $55.02 | $3,349,250.96 |
| | | | |
| 4/18/2007 | 73,200 | $52.99 | $3,878,868.12 |
| **Total** | **170,346** | | **$8,988,097.37** |

## Defendant Gerspach

| DEFENDANT GERSPACH'S SALES | | | |
|---|---|---|---|
| Date | Number of Shares Sold | Share Price | Total Proceeds |
| 4/28/2005 | 6,074 | $47.05 | $284,511.35 |
| 11/28/2005 | 7,311 | $49.52 | $362,040.72 |
| 5/1/2006 | 22,929 | $49.95 | $1,145,303.55 |
| 12/12/2006 | 9,246 | $52.88 | $488,928.48 |
| 4/17/2007 | 19,128 | $52.93 | $1,012,445.04 |
| **Total** | **64,688** | | **$3,293,229.14** |

| COPERA'S PURCHASES | | | |
|---|---|---|---|
| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 5/5/2005 | 151,700 | $46.97 | $7,125,349 |
| 12/2/2005 | 800 | $48.82 | $39,056 |
| 4/27/2006 | 2,100 | $47.78 | $100,338 |
| 12/5/2006 | 4,300 | $50.40 | $216,720 |
| 4/19/2007 | 43,000 | $53.36 | $2,294,480 |
| **Total** | **201,900** | | **$9,775,943** |

| DEFENDANT GERSPACH'S SALES | | | |
|---|---|---|---|
| Date | Number of Shares Sold | Share Price | Total Proceeds |
| 11/28/2005 | 7,311 | $49.52 | $362,040.72 |
| 2/13/2006 | 1,602 | $45.74 | $73,275.48 |
| 5/1/2006 | 22,929 | $49.95 | $1,145,303.55 |
| 12/12/2006 | 9,246 | $52.88 | $488,928.48 |
| 1/22/2007 | 4,574 | $54.55 | $249,511.70 |
| 4/17/2007 | 19,128 | $52.93 | $1,012,445.04 |
| | | | |
| **Total** | **64,790** | | **$3,331,504.97** |

| TCRS' PURCHASES | | | |
|---|---|---|---|
| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 11/28/2005 | 5,000 | $49.47 | $247,350 |
| 2/13/2006 | 75,000 | $45.72 | $3,429,000 |
| 5/8/2006 | 39,000 | $50.30 | $1,961,700 |
| 12/11/2006 | 10,000 | $52.51 | $525,100 |
| 1/23/2007 | 10,000 | $54.69 | $546,900 |
| 4/16/2007 | 10,000 | $52.84 | $528,400 |
| 4/17/2007 | 5,000 | $52.58 | $262,900 |
| **Total** | **154,000** | | **$7,501,350** |

| DEFENDANT GERSPACH'S SALES | | | |
|---|---|---|---|
| Date | Number of Shares Sold | Share Price | Total Proceeds |
| 1/12/2006 | 129 | $48.99 | $6,919.71 |
| 12/12/2006 | 9,246 | $52.88 | $488,928.48 |
| 4/17/2007 | 19,128 | $52.93 | $1,012,445.04 |
| Total | 28,503 | | $1,508,293.23 |

| AP7'S PURCHASES | | | |
|---|---|---|---|
| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 1/9/2006 | 129,600 | $48.39 | $6,271,344.00 |
| 12/12/2006 | 62,217 | $52.24 | $3,250,216.08 |
| 4/10/2007 | 5,000 | $52.40 | $262,000.00 |
| Total | 196,817 | | $9,783,560.08 |

| DEFENDANT GERSPACH'S SALES | | | |
|---|---|---|---|
| Date | Number of Shares Sold | Share Price | Total Proceeds |
| 5/1/2006 | 22,929 | $49.95 | $1,145,303.55 |
| Total | 64,790 | | $3,331,504.97 |

| AP4'S PURCHASES | | | |
|---|---|---|---|
| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 5/8/2006 | 200,000 | $50.39 | $10,078,000.00 |
| Total | 200,000 | | $10,078,000.00 |

| DEFENDANT GERSPACH'S SALES | | | |
|---|---|---|---|
| Date | Number of Shares Sold | Share Price | Total Proceeds |
| 4/28/2005 | 6,047 | $47.05 | $284,511.35 |
| 11/28/2005 | 7,311 | $49.52 | $362,040.72 |
| 2/13/2006 | 1,602 | $45.74 | $73,275.48 |
| 5/1/2006 | 22,929 | $49.95 | $1,145,303.55 |
| 12/12/2006 | 9,246 | $52.88 | $488,928.48 |
| 1/22/2007 | 4,574 | $54.55 | $249,511.70 |
| | | | |
| 4/17/2007 | 19,128 | $52.93 | $1,012,445.04 |
| Total | 70,837 | | $3,616,016.32 |

| PKA'S PURCHASES | | | |
|---|---|---|---|
| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 5/2/2005 | 10,100 | $46.53 | $469,953.00 |
| 12/1/2005 | 13,300 | $48.85 | $649,701.01 |
| 2/21/2006 | 5,700 | $46.12 | $262,861.20 |
| 5/1/2006 | 17,700 | $49.46 | $875,442.00 |
| 12/14/2006 | 4,000 | $52.79 | $211,169.20 |
| 1/22/2007 | 2,696 | $55.47 | $149,547.12 |
| 1/22/2007 | 60,874 | $55.02 | $3,349,250.96 |
| 4/18/2007 | 73,200 | $52.99 | $3,878,868.12 |
| Total | 187,570 | | $9,846,792.61 |

## Defendant Krawcheck

| DEFENDANT KRAWCHECK'S SALES | | | |
|---|---|---|---|
| Date | Number of Shares Sold | Share Price | Total Proceeds |
| 1/22/2007 | 50,339 | $54.55 | $2,745,992.45 |
| Total | 50,339 | | $2,745,992.45 |

| TCRS' PURCHASES | | | |
|---|---|---|---|
| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 1/23/2007 | 10,000 | $54.69 | $546,900.00 |
| Total | 10,000 | | $546,900.00 |

| DEFENDANT KRAWCHECK'S SALES | | | |
|---|---|---|---|
| Date | Number of Shares Sold | Share Price | Total Proceeds |
| 1/22/2007 | 50,339 | $54.55 | $2,745,992.45 |
| | | | |
| Total | 50,339 | | $2,745,992.45 |

| PKA'S PURCHASES | | | |
|---|---|---|---|
| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 1/22/2007 | 2,696 | $55.47 | $149,547.12 |
| 1/22/2007 | 60,874 | $55.02 | $3,349,250.96 |
| Total | 63,570 | | $3,498,798.08 |

## Defendant Prince

| DEFENDANT PRINCE'S SALES | | | |
|---|---|---|---|
| Date | Number of Shares Sold | Share Price | Total Proceeds |
| 1/12/2004 | 3,564 | $49.69 | $177,095.16 |
| 1/16/2004 | 9,023 | $49.40 | $445,736.20 |
| 3/31/2004 | 54,330 | $51.94 | $2.821.900.20 |
| 7/12/2004 | 3,495 | $45.04 | $157,414.80 |
| 11/30/2005 | 68,510 | $49.09 | $3,363,155.90 |
| 4/17/2007 | 13,419 | $52.93 | $710,267.67 |
| Total | 152,341 | | $4,853,669.73 |

| COPERA'S PURCHASES | | | |
|---|---|---|---|
| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 1/13/2004 | 61,100 | $49.72 | $3,037,892 |
| 4/5/2004 | 26,700 | $51.88 | $1,385,196 |
| 7/2/2004 | 1,200 | $45.77 | $54,924 |
| 12/2/2005 | 800 | $48.82 | $39,056 |
| 4/19/2007 | 43,000 | $53.36 | $2,294,480 |
| Total | 132,800 | | $6,811,548 |

| DEFENDANT PRINCE'S SALES | | | |
|---|---|---|---|
| Date | Number of Shares Sold | Share Price | Total Proceeds |
| 3/31/2004 | 54,330 | $51.94 | $2,821,900.20 |
| 2/14/2005 | 13,944 | $49.25 | $686,742.00 |
| 11/30/2005 | 68,510 | $49.09 | $3,363,155.90 |
| 2/13/2006 | 18,145 | $45.74 | $829,952.30 |
| 1/22/2007 | 81,087 | $54.55 | $4,423,295.85 |
| 4/17/2007 | 13,419 | $52.93 | $710,267.67 |
| | | | |
| 5/17/2007 | 13,395 | $54.91 | $735,519.45 |
| | | | |
| Total | 262,830 | | $13,570,833.37 |

| TCRS' PURCHASES | | | |
|---|---|---|---|
| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 4/1/2004 | 50,000 | $52.31 | $2,615,500 |
| 2/17/2005 | 50,000 | $49.01 | $2,450,500 |
| 11/28/2005 | 5,000 | $49.47 | $247,350 |
| 2/13/2006 | 75,000 | $45.72 | $3,429,000 |
| 1/23/2007 | 10,000 | $54.69 | $546,900 |
| 4/16/2007 | 10,000 | $52.84 | $528,400 |
| 4/17/2007 | 5,000 | $52.58 | $262,900 |
| 5/21/2007 | 10,000 | $55.02 | $550,200 |
| 5/24/2007 | 10,000 | $55.38 | $553,800 |
| Total | 225,000 | | $11,184,550 |

| DEFENDANT PRINCE'S SALES | | | |
|---|---|---|---|
| Date | Number of Shares Sold | Share Price | Total Proceeds |
| 1/16/2004 | 9,023 | $49.40 | $445,736.20 |
| 1/22/2004 | 15,172 | $50.36 | $764,061.92 |
| 1/23/2004 | 38,492 | $50.69 | $1,951,159.48 |
| 1/12/2005 | 3,558 | $47.95 | $170,606.10 |
| 1/12/2006 | 3,412 | $48.99 | $167,153.88 |
| 4/17/2007 | 13,419 | $52.93 | $710,267.67 |
| Total | 83,076 | | $4,208,985.25 |

| AP7'S PURCHASES | | | |
|---|---|---|---|
| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 1/26/2004 | 188,500 | $50.92 | $9,598,420 |
| | | | |
| | | | |
| 1/10/2005 | 199,705 | $48.33 | $9,651,742.65 |
| 1/9/2006 | 129,600 | $48.39 | $6,271,344.00 |
| 4/10/2007 | 5,000 | $52.40 | $262,000.00 |
| Total | 522,805 | | $25,783,506.65 |

| DEFENDANT PRINCE'S SALES | | | |
|---|---|---|---|
| Date | Number of Shares Sold | Share Price | Total Proceeds |
| 5/17/2007 | 13,395 | $54.91 | $735,519.45 |
| | | | |
| Total | 262,830 | | $13,570,833.37 |

| AP4'S PURCHASES | | | |
|---|---|---|---|
| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 5/16/2007 | 89,200 | $54.52 | $4,863,184.00 |
| 5/24/2007 | 80,000 | $55.24 | $4,419,200.00 |
| Total | 169,200 | | $9,282,384.00 |

| DEFENDANT PRINCE'S SALES | | | |
|---|---|---|---|
| Date | Number of Shares Sold | Share Price | Total Proceeds |
| 1/16/2004 | 9,023 | $49.40 | $445,736.20 |
| 1/22/2004 | 15,172 | $50.36 | $764,061.92 |
| 1/23/2004 | 38,492 | $50.69 | $1,951,159.48 |
| 7/12/2004 | 3,495 | $45.04 | $157,414.80 |
| 1/12/2005 | 3,558 | $47.95 | $170,606.10 |
| 2/14/2005 | 13,944 | $49.25 | $686,742.00 |
| 11/30/2005 | 68,510 | $49.09 | $3,363,155.90 |
| 2/13/2006 | 18,145 | $45.74 | $829,952.30 |
| 1/22/2007 | 81,087 | $54.55 | $4,423,295.85 |
| | | | |
| 4/17/2007 | 13,419 | $52.93 | $710,267.67 |
| | | | |
| 5/17/2007 | 13,395 | $54.91 | $735,519.45 |
| Total | 278,240 | | $14,237,911.67 |

| PKA'S PURCHASES | | | |
|---|---|---|---|
| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 1/22/2004 | 2,000 | $50.70 | $101,396.20 |
| | | | |
| 7/6/2004 | 1,000 | $45.29 | $45,290.00 |
| 1/18/2005 | 1,116 | $47.40 | $52,898.40 |
| 2/7/2005 | 4,156 | $49.73 | $206,670.81 |
| 12/1/2005 | 13,300 | $48.85 | $649,701.01 |
| 2/21/2006 | 5,700 | $46.12 | $262,861.20 |
| 1/22/2007 | 2,696 | $55.47 | $149,547.12 |
| 1/22/2007 | 60,874 | $55.02 | $3,349,250.96 |
| 4/10/2007 | 3,300 | $52.03 | $171,706.59 |
| 4/18/2007 | 73,200 | $52.99 | $3,878,868.12 |
| 5/10/2007 | 1,300 | $53.48 | $69,524.00 |
| Total | 168,642 | | $8,937,714.41 |

157

## Defendant Thomson

**DEFENDANT THOMSON'S SALES**

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 1/16/2004 | 5,692 | $49.40 | $281,184.80 |
| 1/20/2004 | 17,199 | $49.50 | $851,350.50 |
| 7/28/2004 | 22,662 | $43.90 | $994,861.80 |
| 12/12/2006 | 49,519 | $52.88 | $2,618,564.72 |
| **Total** | **95,072** | | **$4,745,961.82** |

**COPERA'S PURCHASES**

| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
|---|---|---|---|
| 1/13/2004 | 61,100 | $49.72 | $3,037,892 |
| 8/2/2004 | 200 | $43.80 | $8,760 |
| 12/5/2006 | 4,300 | $50.40 | $216,720 |
| **Total** | **65,600** | | **$3,263,372** |

**DEFENDANT THOMSON'S SALES**

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 2/14/2005 | 9,940 | $49.25 | $489,545.00 |
| 2/13/2006 | 14,410 | $45.74 | $659,113.40 |
| 12/12/2006 | 49,519 | $52.88 | $2,618,564.72 |
| 12/15/2006 | 9,698 | $53.11 | $515,060.78 |
| 12/18/2006 | 10,831 | $54.07 | $585,632.17 |
| **Total** | **94,398** | | **$4,867,916.07** |

**TCRS' PURCHASES**

| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
|---|---|---|---|
| 2/17/2005 | 50,000 | $49.01 | $2,450,500 |
| 2/13/2006 | 75,000 | $45.72 | $3,429,000 |
| 12/11/2006 | 10,000 | $52.51 | $525,100 |
| | | | |
| | | | |
| **Total** | **135,000** | | **$6,404,600** |

**DEFENDANT THOMSON'S SALES**

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 1/16/2004 | 5,692 | $49.40 | $281,184.80 |
| 1/20/2004 | 17,199 | $49.50 | $851,350.50 |
| 1/28/2004 | 125,904 | $50.07 | $6,304,013.28 |
| 1/30/2004 | 25,622 | $49.48 | $1,267,776.56 |
| 12/12/2006 | 49,519 | $52.88 | $2,618,564.72 |
| 12/15/2006 | 9,698 | $53.11 | $515,060.78 |
| 12/18/2006 | 10,831 | $54.07 | $585,632.17 |
| 12/19/2006 | 79,734 | $55.44 | $4,420,452.96 |
| **Total** | **324,199** | | **$16,844,035.77** |

**AP7'S PURCHASES**

| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
|---|---|---|---|
| 1/26/2004 | 188,500 | $50.92 | $9,598,420 |
| | | | |
| | | | |
| 12/12/2006 | 62,217 | $52.24 | $3,250,216.08 |
| | | | |
| **Total** | **250,717** | | **$12,848,636.08** |

| DEFENDANT THOMPSON'S SALES | | | |
|---|---|---|---|
| Date | Number of Shares Sold | Share Price | Total Proceeds |
| 1/16/2004 | 5,692 | $49.40 | $281,184.80 |
| 1/20/2004 | 17,199 | $49.50 | $851,350.50 |
| 1/28/2004 | 125,904 | $50.07 | $6,304,013.28 |
| 7/28/2004 | 22,662 | $43.90 | $994,861.80 |
| 2/14/2005 | 9,940 | $49.25 | $489,545.00 |
| 2/13/2006 | 14,410 | $45.74 | $659,113.40 |
| 12/12/2006 | 49,519 | $52.88 | $2,618,564.72 |
| 12/15/2006 | 9,698 | $53.11 | $515,060.78 |
| 12/18/2006 | 10,831 | $54.07 | $585,632.17 |
| 12/19/2006 | 79,734 | $55.44 | $4,420,452.96 |
| Total | 345,589 | | $17,719,779.41 |

| PKA'S PURCHASES | | | |
|---|---|---|---|
| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 1/22/2004 | 2,000 | $50.70 | $101,396.20 |
| | | | |
| | | | |
| 8/2/2004 | 1,000 | $43.88 | $43,880.00 |
| 2/7/2005 | 4,156 | $49.73 | $206,670.81 |
| 2/21/2006 | 5,700 | $46.12 | $262,861.20 |
| 12/14/2006 | 4,000 | $52.79 | $211,169.20 |
| | | | |
| | | | |
| | | | |
| Total | 16,856 | | $825,977.41 |

## Defendant Volk

| DEFENDANT VOLK'S SALES | | | |
|---|---|---|---|
| Date | Number of Shares Sold | Share Price | Total Proceeds |
| 9/20/2005 | 28,342 | $49.89 | $1,413,982.38 |
| 9/20/2006 | 27,396 | $49.89 | $1,366,786.44 |
| 1/22/2007 | 16,347 | $54.55 | $891,728.85 |
| Total | 72,085 | | $3,672,497.67 |

| TCRS' PURCHASES | | | |
|---|---|---|---|
| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 9/21/2005 | 5,000 | $45.14 | $225,700 |
| 9/26/2006 | 41,300 | $50.08 | $2,068,304 |
| 1/23/2007 | 10,000 | $54.69 | $546,900 |
| Total | 56,300 | | $2,840,904 |

| DEFENDANT VOLK'S SALES | | | |
|---|---|---|---|
| Date | Number of Shares Sold | Share Price | Total Proceeds |
| 9/20/2005 | 28,342 | $49.89 | $1,413,982.38 |
| 1/22/2007 | 16,347 | $54.55 | $891,728.85 |
| | | | |
| Total | 44,689 | | $2,305,711.23 |

| PKA'S PURCHASES | | | |
|---|---|---|---|
| Date of Purchase | Number of Shares Purchased | Approx. Share Price | Total Costs |
| 9/27/2005 | 30,500 | $45.09 | $1,375,245.00 |
| 1/22/2007 | 2,696 | $55.47 | $149,547.12 |
| 1/22/2007 | 60,874 | $55.02 | $3,349,250.96 |
| Total | 94,070 | | $4,874,043.08 |

367.    The Section 20A Defendants sold their shares of Citigroup common stock as alleged above, at market prices artificially inflated by the nondisclosure, and/or misrepresentations, of such material facts in the public statements Defendants made or that they caused the Company to make.

368.    Before selling their Citigroup common stock, the Section 20A Defendants were obligated to publicly disclose the material information that they possessed, and they failed to do so.

369.    By reason of the foregoing, the Section 20A Defendants, by use of the means or instrumentalities of interstate commerce, the mails and the facilities of the national securities exchanges, employed devices, schemes and artifices to defraud, and engaged in acts and transactions and a course of conduct which operated as a fraud or deceit upon Plaintiffs and the other Class members, who purchased Citigroup common stock contemporaneously with the sales by the Section 20A Defendants.

370.    Plaintiffs and all other Class members who purchased shares of Citigroup common stock contemporaneously with the sales of Citigroup stock by the Section 20A Defendants:  (i) have suffered substantial damages in that they paid artificially inflated prices for Citigroup common stock as a result of the violations of Section 10(b) and Section 20(a) of the Exchange Act and SEC Rule 10b-5 as alleged herein; and (ii) would not have purchased Citigroup common stock at the artificially inflated prices that they paid, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' materially false and misleading statements and/or omissions of material fact.

371.    As a result of Plaintiffs' and Class members purchases of Citigroup common stock contemporaneously with the Section 20A Defendants' sales of Citigroup common stock, Plaintiff and Class members have suffered recoverable damages.  The Section 20A Defendants are liable to Plaintiffs and the Class as a result of such transactions.

372.    The Section 20A Defendants are required to account for all such stock sales and to disgorge their profits or ill-gotten gains.

## XVII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of itself the Class, pray for relief and judgment including:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.    Awarding Plaintiffs and the Class their costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## XVIII.    JURY DEMAND

Plaintiffs hereby demand a trial by jury on all triable claims.

Dated:  January 7, 2008

ENTWISTLE & CAPPUCCI LLP

By: _____
     Andrew J. Entwistle, Esq. (AE-6513)
     Johnston de F. Whitman, Jr., Esq. (JW-5781)
     Richard W. Gonnello (RG-7098)
     Jonathan H. Beemer (JB-0458)
     Jordan A. Cortez (JC-4121)
     Laura J. Babcock, Esq. (LB-3198)
     280 Park Avenue, 26th Floor West
     New York, New York 10017
     Telephone:  (212) 894-7200
     Facsimile:  (212) 894-7272

     Andrew L. Barroway, Esq.
     David Kessler, Esq.
     Darren J. Check, Esq.

161

Sean M. Handler, Esq.
SCHIFFRIN BARROWAY TOPAZ
  & KESSLER, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone (610) 667-7706

*Attorneys for Plaintiffs Public Employees'*
*Retirement Association of Colorado, Tennessee*
*Consolidated Retirement System, Sjunde AP-*
*Fonden, Fjärde AP-Fonden, and Pensionskassernes*
*Administration A/S*

## CERTIFICATION OF GREGORY W. SMITH

I, Gregory W. Smith, General Counsel of the Public Employees' Retirement Association of Colorado ("COPERA"), hereby declare that:

1.      I am authorized to make this certification on behalf of COPERA.

2.      I have reviewed the complaints filed in this action alleging violations of the securities laws and affirm that COPERA is willing to serve as a lead plaintiff in this case and all other related cases that may be consolidated with it.

3.      COPERA did not purchase the securities that are the subject of this action at the direction of the plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.      COPERA is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial if necessary.  COPERA fully understands the duties and responsibilities of the Lead Plaintiff under the Private Securities Litigation Reform Act of 1995, specifically concerning its selection and retention of counsel and overseeing and directing the prosecution of the action on behalf of the class.

5.      COPERA's transactions in Citigroup, Inc. common stock during the proposed class period are set forth in Schedule A hereto.

6.      COPERA has sought to serve as a representative party on behalf of a class in the following action brought under the federal securities laws and filed during the 3-year period preceding the date on which this certification is signed:

*Karialla v. Amgen, Inc. et. al.*, No. 2:07-cv-02536-PSG-PLA (C.D. Cal.).

7.      COPERA will not accept any payment for serving as a representative party on behalf of a class beyond its pro-rata share of any recovery, except as ordered or approved by the

court, including any award to a representative plaintiff of reasonable costs and expenses directly related to the representation of the class.

       8.    I declare under penalty of perjury that the foregoing is true and correct, executed on this 27th day of December 2007.

Gregory W. Smith

2

**SCHEDULE A**

| TRADE DATE | TRANSACTION TYPE | QUANTITY (UNITS) | TRANS PRICE |
|---|---|---|---|
| 01/13/04 | Buy | 61,100 | $49.718 |
| 02/19/04 | Buy | 3,400 | $49.860 |
| 04/05/04 | Buy | 26,700 | $51.881 |
| 06/02/04 | Buy | 200 | $46.910 |
| 07/02/04 | Buy | 1,200 | $45.770 |
| 08/02/04 | Buy | 200 | $43.800 |
| 08/16/04 | Buy | 11,700 | $44.840 |
| 10/01/04 | Buy | 900 | $44.670 |
| 11/01/04 | Buy | 200 | $44.550 |
| 12/01/04 | Buy | 800 | $45.660 |
| 12/09/04 | Buy | 45,200 | $45.987 |
| 12/28/04 | Buy | 20,500 | $48.548 |
| 12/28/04 | Buy | 40,000 | $48.642 |
| 02/01/05 | Buy | 1,200 | $49.336 |
| 03/01/05 | Buy | 500 | $48.140 |
| 03/02/05 | Buy | 28,900 | $48.185 |
| 04/05/05 | Buy | 6,800 | $44.735 |
| 04/07/05 | Buy | 25,800 | $45.760 |
| 04/08/05 | Buy | 41,100 | $45.780 |
| 04/11/05 | Buy | 42,500 | $45.674 |
| 05/05/05 | Buy | 78,000 | $46.796 |
| 05/05/05 | Buy | 73,700 | $47.135 |
| 05/23/05 | Buy | 56,900 | $47.829 |
| 05/24/05 | Buy | 58,400 | $47.620 |
| 08/01/05 | Buy | 300 | $43.725 |
| 08/29/05 | Buy | 20,600 | $43.220 |
| 08/31/05 | Buy | 9,000 | $43.499 |
| 08/31/05 | Buy | 2,200 | $43.510 |
| 10/03/05 | Buy | 2,500 | $45.535 |
| 12/02/05 | Buy | 800 | $48.820 |
| 02/01/06 | Buy | 2,100 | $46.419 |
| 04/06/06 | Buy | 5,100 | $48.130 |
| 04/27/06 | Buy | 2,100 | $47.780 |
| 05/23/06 | Buy | 30,000 | $49.130 |
| 05/23/06 | Buy | 30,000 | $49.092 |
| 05/24/06 | Buy | 80,000 | $48.803 |
| 08/14/06 | Buy | 3,500 | $47.540 |
| 08/14/06 | Buy | 3,500 | $47.844 |
| 09/07/06 | Buy | 6,500 | $48.640 |
| 12/05/06 | Buy | 4,300 | $50.403 |
| 03/05/07 | Buy | 23,000 | $50.021 |
| 03/06/07 | Buy | 5,900 | $49.944 |
| 03/09/07 | Buy | 4,000 | $50.135 |
| 03/12/07 | Buy | 6,000 | $50.270 |
| 04/19/07 | Buy | 16,500 | $53.230 |
| 04/19/07 | Buy | 26,500 | $53.484 |
| 06/06/07 | Buy | 5,100 | $53.610 |
| 08/17/07 | Buy | 10,000 | $49.526 |
| 08/20/07 | Buy | 10,000 | $49.044 |
| 10/09/07 | Buy | 100,650 | $47.896 |
| 11/07/07 | Buy | 40,100 | $34.724 |

**SCHEDULE A**

| TRADE DATE | TRANSACTION TYPE | QUANTITY (UNITS) | TRANS PRICE |
|---|---|---|---|
| 02/02/04 | Sell | 25,700 | $49.681 |
| 02/06/04 | Sell | 5,400 | $49.005 |
| 02/06/04 | Sell | 6,800 | $49.045 |
| 02/06/04 | Sell | 12,100 | $49.081 |
| 02/06/04 | Sell | 100 | $49.068 |
| 02/09/04 | Sell | 800 | $49.258 |
| 02/10/04 | Sell | 65,000 | $48.984 |
| 02/20/04 | Sell | 12,500 | $48.987 |
| 02/23/04 | Sell | 200 | $49.088 |
| 02/24/04 | Sell | 300 | $49.488 |
| 02/25/04 | Sell | 4,900 | $49.591 |
| 03/01/04 | Sell | 1,000 | $50.448 |
| 03/02/04 | Sell | 11,900 | $49.850 |
| 03/30/04 | Sell | 62,500 | $51.704 |
| 03/30/04 | Sell | 110,600 | $51.668 |
| 04/02/04 | Sell | 23,500 | $51.787 |
| 04/06/04 | Sell | 187,500 | $52.013 |
| 04/07/04 | Sell | 7,400 | $51.746 |
| 04/13/04 | Sell | 11,800 | $51.241 |
| 04/26/04 | Sell | 12,200 | $48.979 |
| 04/28/04 | Sell | 6,800 | $48.505 |
| 05/03/04 | Sell | 11,600 | $48.464 |
| 05/05/04 | Sell | 2,600 | $48.488 |
| 05/13/04 | Sell | 600 | $46.119 |
| 05/27/04 | Sell | 50,000 | $46.757 |
| 06/14/04 | Sell | 43,032 | $46.727 |
| 06/22/04 | Sell | 12,200 | $47.080 |
| 08/24/04 | Sell | 5,000 | $45.969 |
| 09/01/04 | Sell | 400 | $46.539 |
| 09/27/04 | Sell | 12,700 | $43.613 |
| 10/06/04 | Sell | 6,500 | $44.594 |
| 11/17/04 | Sell | 12,900 | $46.239 |
| 11/17/04 | Sell | 12,900 | $46.298 |
| 11/29/04 | Sell | 13,300 | $44.974 |
| 12/14/04 | Sell | 100,000 | $46.788 |
| 12/14/04 | Sell | 100,000 | $46.840 |
| 12/14/04 | Sell | 100,000 | $46.905 |
| 01/03/05 | Sell | 1,100 | $48.749 |
| 02/01/05 | Sell | 12,100 | $49.289 |
| 02/16/05 | Sell | 24,600 | $49.117 |
| 02/17/05 | Sell | 13,000 | $49.025 |
| 02/18/05 | Sell | 12,300 | $48.473 |
| 02/24/05 | Sell | 12,200 | $48.258 |
| 02/25/05 | Sell | 12,300 | $48.153 |
| 02/25/05 | Sell | 11,100 | $48.103 |
| 03/03/05 | Sell | 13,000 | $48.260 |
| 04/04/05 | Sell | 15,000 | $44.015 |
| 04/21/05 | Sell | 12,200 | $46.073 |
| 04/21/05 | Sell | 12,200 | $46.005 |
| 04/21/05 | Sell | 24,400 | $45.929 |
| 04/22/05 | Sell | 12,400 | $46.466 |

**SCHEDULE A**

| TRADE DATE | TRANSACTION TYPE | QUANTITY (UNITS) | TRANS PRICE |
|---|---|---|---|
| 04/22/05 | Sell | 13,200 | $46.283 |
| 05/03/05 | Sell | 600 | $46.658 |
| 05/26/05 | Sell | 12,900 | $47.336 |
| 05/26/05 | Sell | 13,400 | $47.373 |
| 06/08/05 | Sell | 1,000 | $47.868 |
| 06/09/05 | Sell | 12,900 | $47.638 |
| 06/10/05 | Sell | 4,800 | $47.736 |
| 06/28/05 | Sell | 13,200 | $47.017 |
| 06/30/05 | Sell | 13,300 | $46.268 |
| 06/30/05 | Sell | 13,300 | $46.548 |
| 07/05/05 | Sell | 2,600 | $46.398 |
| 07/06/05 | Sell | 13,000 | $46.608 |
| 07/07/05 | Sell | 13,500 | $46.114 |
| 07/07/05 | Sell | 13,500 | $45.901 |
| 07/11/05 | Sell | 35,500 | $46.205 |
| 07/14/05 | Sell | 24,200 | $46.371 |
| 09/01/05 | Sell | 600 | $43.718 |
| 10/14/05 | Sell | 22,500 | $44.648 |
| 10/20/05 | Sell | 52,500 | $44.768 |
| 11/01/05 | Sell | 1,100 | $45.498 |
| 01/03/06 | Sell | 15,000 | $48.215 |
| 01/03/06 | Sell | 6,900 | $48.195 |
| 03/01/06 | Sell | 2,300 | $46.357 |
| 04/03/06 | Sell | 6,000 | $47.379 |
| 06/01/06 | Sell | 1,300 | $49.488 |
| 06/27/06 | Sell | 50,781 | $47.966 |
| 06/27/06 | Sell | 76,171 | $48.073 |
| 06/27/06 | Sell | 54,408 | $48.117 |
| 06/27/06 | Sell | 45,340 | $48.431 |
| 02/26/07 | Sell | 1,400 | $53.915 |
| 11/08/07 | Sell | 16,400 | $32.139 |

## CERTIFICATION OF Eddie W. Hennessee

I, Eddie W. Hennessee, Assistant Treasurer for Investments and Benefits, of the Tennessee Consolidated Retirement System ("TCRS"), hereby declare that:

1.      I am authorized to make a certification on behalf of TCRS.

2.      I have reviewed the complaints filed in this action alleging violations of the securities laws and TCRS is willing to serve as a lead plaintiff in this case and all other related cases that may be consolidated with it. I have also reviewed the Motion for Consolidation, Appointment as Lead Plaintiff, and Approval of Lead Counsel filed herewith.

3.      TCRS did not purchase the securities that are the subject of this action at the direction of the plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.      TCRS is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial if necessary. TCRS fully understands the duties and responsibilities of the Lead Plaintiff under the Private Securities Litigation Reform Act of 1995, specifically concerning its selection and retention of counsel and overseeing and directing the prosecution of the action on behalf of the class.

5.      TCRS' transactions in Citigroup, Inc. common stock during the proposed class period are set forth in Schedule A hereto.

6.      TCRS has not served or sought to serve as a class representative in any action brought under the federal securities laws filed during the 3-year period preceding the date on which this certification is signed.

7.      TCRS will not accept any payment for serving as a representative party on behalf of a class beyond its pro-rata share of any recovery, except as ordered or approved by the court,

including any reward to a representative plaintiff of reasonable costs and expense directly related to the representation of the class.

8.    I declare under penalty of perjury that the foregoing is true and correct, executed on this day 4th day of January 2008.

*Eddie W. Hennessee*

Eddie W. Hennessee

**SCHEDULE A**

| TRADE DATE | TRANSACTION TYPE | QUANTITY (UNITS) | TRANS PRICE |
|---|---|---|---|
| 2/27/2004 | Buy | 150,000 | $50.061 |
| 2/27/2004 | Buy | 150,000 | $50.127 |
| 4/1/2004 | Buy | 50,000 | $52.311 |
| 5/3/2004 | Buy | 23,000 | $48.598 |
| 5/4/2004 | Buy | 150,000 | $48.942 |
| 8/9/2004 | Buy | 23,000 | $43.515 |
| 11/5/2004 | Buy | 115,000 | $46.398 |
| 11/8/2004 | Buy | 32,000 | $46.249 |
| 12/17/2004 | Buy | 150,000 | $46.744 |
| 2/17/2005 | Buy | 50,000 | $49.015 |
| 3/30/2005 | Buy | 80,000 | $44.670 |
| 4/19/2005 | Buy | 70,000 | $46.691 |
| 7/20/2005 | Buy | 150,000 | $44.314 |
| 9/21/2005 | Buy | 5,000 | $45.140 |
| 11/9/2005 | Buy | 5,000 | $46.893 |
| 11/10/2005 | Buy | 5,000 | $47.675 |
| 11/16/2005 | Buy | 10,000 | $47.872 |
| 11/17/2005 | Buy | 5,000 | $47.625 |
| 11/28/2005 | Buy | 5,000 | $49.469 |
| 12/12/2005 | Buy | 95,000 | $48.720 |
| 12/21/2005 | Buy | 60,000 | $49.486 |
| 2/1/2006 | Buy | 150,000 | $46.531 |
| 2/13/2006 | Buy | 75,000 | $45.720 |
| 3/6/2006 | Buy | 162,000 | $45.971 |
| 5/8/2006 | Buy | 10,000 | $50.395 |
| 5/8/2006 | Buy | 29,000 | $50.200 |
| 5/23/2006 | Buy | 150,000 | $49.100 |
| 9/26/2006 | Buy | 41,300 | $50.084 |
| 10/23/2006 | Buy | 20,000 | $50.127 |
| 10/24/2006 | Buy | 40,000 | $50.460 |
| 10/26/2006 | Buy | 10,000 | $50.960 |
| 11/13/2006 | Buy | 10,000 | $50.649 |
| 11/14/2006 | Buy | 20,000 | $50.835 |
| 11/21/2006 | Buy | 10,000 | $50.801 |
| 11/27/2006 | Buy | 411,000 | $49.834 |
| 11/28/2006 | Buy | 36,900 | $49.678 |
| 12/11/2006 | Buy | 10,000 | $52.511 |
| 1/23/2007 | Buy | 10,000 | $54.693 |
| 2/20/2007 | Buy | 140,000 | $54.355 |
| 4/16/2007 | Buy | 10,000 | $52.843 |
| 4/17/2007 | Buy | 5,000 | $52.584 |
| 5/21/2007 | Buy | 10,000 | $55.021 |
| 5/24/2007 | Buy | 10,000 | $55.378 |
| 8/8/2007 | Buy | 6,300 | $49.651 |
| 8/20/2007 | Buy | 26,000 | $48.307 |
| 10/25/2007 | Buy | 20,000 | $40.822 |
| 10/29/2007 | Buy | 71,000 | $42.834 |
| 10/29/2007 | Buy | 40,000 | $42.662 |
| 11/2/2007 | Buy | 100,000 | $38.506 |
| 11/6/2007 | Buy | 50,000 | $35.311 |
| 11/7/2007 | Buy | 50,000 | $34.858 |

**SCHEDULE A**

| TRADE DATE | TRANSACTION TYPE | QUANTITY (UNITS) | TRANS PRICE |
|---|---|---|---|
| 11/9/2007 | Buy | 10,000 | $32.204 |
| 11/9/2007 | Buy | 10,000 | $33.998 |
| 11/14/2007 | Buy | 5,000 | $36.959 |
| 1/12/2004 | Sell | 300,000 | $49.580 |
| 2/20/2004 | Sell | 60,000 | $48.663 |
| 3/1/2004 | Sell | 71,000 | $50.398 |
| 5/12/2004 | Sell | 60,000 | $45.435 |
| 5/18/2004 | Sell | 30,000 | $45.072 |
| 7/20/2004 | Sell | 15,000 | $43.887 |
| 8/18/2004 | Sell | 260,998 | $45.463 |
| 9/8/2004 | Sell | 450,000 | $46.903 |
| 9/17/2004 | Sell | 20,000 | $46.819 |
| 10/5/2004 | Sell | 15,000 | $44.624 |
| 2/14/2005 | Sell | 226,000 | $49.213 |
| 3/22/2005 | Sell | 10,000 | $45.878 |
| 5/2/2005 | Sell | 89,000 | $46.486 |
| 7/18/2005 | Sell | 50,000 | $45.304 |
| 7/19/2005 | Sell | 10,000 | $44.598 |
| 7/22/2005 | Sell | 10,000 | $44.168 |
| 7/28/2005 | Sell | 10,000 | $44.078 |
| 9/2/2005 | Sell | 300,000 | $43.922 |
| 1/5/2006 | Sell | 10,000 | $48.561 |
| 1/30/2006 | Sell | 5,000 | $46.691 |
| 2/9/2006 | Sell | 5,000 | $45.665 |
| 6/12/2006 | Sell | 105,006 | $49.323 |
| 6/23/2006 | Sell | 200,000 | $47.731 |
| 6/26/2006 | Sell | 100,000 | $47.673 |
| 6/28/2006 | Sell | 100,000 | $47.656 |
| 7/21/2006 | Sell | 40,000 | $47.002 |
| 8/7/2006 | Sell | 41,000 | $48.293 |
| 9/26/2006 | Sell | 60,000 | $49.887 |
| 11/6/2006 | Sell | 77,000 | $50.039 |
| 2/9/2007 | Sell | 50,000 | $54.112 |
| 2/28/2007 | Sell | 25,000 | $50.369 |
| 3/20/2007 | Sell | 36,000 | $50.493 |
| 3/29/2007 | Sell | 58,000 | $51.420 |
| 4/10/2007 | Sell | 2,700 | $52.202 |
| 5/31/2007 | Sell | 260,000 | $54.570 |
| 7/9/2007 | Sell | 40,000 | $51.512 |
| 8/15/2007 | Sell | 20,000 | $45.557 |
| 9/25/2007 | Sell | 30,000 | $46.222 |
| 10/1/2007 | Sell | 10,000 | $46.148 |
| 11/14/2007 | Sell | 90,000 | $36.528 |

**CERTIFICATION OF MATS ANDERSSON AND AGNETA WILHELMSON
KÅREMAR IN SUPPORT OF FJÄRDE AP-FONDEN'S MOTION FOR
CONSOLIDATION, FOR ITS APPOINTMENT AS LEAD PLAINTIFF, AND FOR THE
APPROVAL OF ITS SELECTION OF COUNSEL**

Fjärde AP-Fonden ("AP4" or "Plaintiff"), declares, as to the claims asserted under the federal securities laws, that:

1.     AP4 did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

2.     AP4 is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

3.     Attached in Schedule A are AP4's transactions in Citigroup, Inc. (NYSE: C) securities during the Class Period.

4.     AP4 has full power and authority to bring suit to recover for its investment losses.

5.     AP4 has fully reviewed the facts and allegations of the complaints filed in this action and have authorized the filing of the motion for appointment as lead plaintiff on its behalf in this action.

6.     We, Mats Andersson and Agneta Wilhelmson Kåremar, Chief Executive Officer and Administrative Director respectively, of AP4 are authorized to make legal decisions on behalf of AP4.

7.     AP4 intends to actively monitor and vigorously pursue this action for the benefit of the class, and has retained the law firm of Schiffrin Barroway Topaz & Kessler, LLP, which has extensive experience in securities litigation and in the representation of institutional investors, to represent AP4 in this action.



8.    AP4 will endeavor to provide fair and adequate representation and work directly with the efforts of Class counsel to ensure that the largest recovery for the Class consistent with good faith and meritorious judgment is obtained.

9.    AP4 has, within the three year period preceding the date hereof, sought to serve as a representative party in a federal securities class action against Pfizer, Inc.

10.    AP4 will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 20th day of December, 2007.

Fjärde AP-Fonden

By: _____
Mats Andersson
*Chief Executive Officer*

_____
Agneta Wilhelmson Kåremar
*Administrative Director*

## SCHEDULE A

| Date | Purchase or Sale | Type of Securities | Number of Securities | Price of Securities |
|---|---|---|---|---|
| 11/9/2004 | Purchase | Com Stk | 14,400 | 46.4000 |
| 11/18/2004 | Purchase | Com Stk | 12,500 | 46.2000 |
| 11/19/2004 | Purchase | Com Stk | 14,700 | 45.7500 |
| 11/29/2004 | Purchase | Com Stk | 14,600 | 45.2100 |
| 10/5/2005 | Purchase | Com Stk | 108,000 | 45.4800 |
| 12/14/2005 | Purchase | Com Stk | 754,900 | 49.6400 |
| 5/8/2006 | Purchase | Com Stk | 200,000 | 50.3900 |
| 5/16/2006 | Purchase | Com Stk | 83,000 | 49.4200 |
| 7/25/2006 | Purchase | Com Stk | 345,000 | 47.7000 |
| 7/26/2006 | Purchase | Com Stk | 375,000 | 47.3500 |
| 7/31/2006 | Purchase | Com Stk | 200,000 | 48.4000 |
| 8/1/2006 | Purchase | Com Stk | 155,000 | 48.3100 |
| 8/3/2006 | Purchase | Com Stk | 113,000 | 48.3900 |
| 8/14/2006 | Purchase | Com Stk | 47,000 | 48.0200 |
| 11/24/2006 | Purchase | Com Stk | 98,000 | 50.5600 |
| 5/8/2007 | Purchase | Com Stk | 68,200 | 53.7900 |
| 5/16/2007 | Purchase | Com Stk | 89,200 | 54.5200 |
| 5/24/2007 | Purchase | Com Stk | 80,000 | 55.2400 |
| 8/6/2007 | Purchase | Com Stk | 65,000 | 45.6300 |
| 10/23/2007 | Purchase | Com Stk | 180,000 | 42.6400 |
| 11/13/2007 | Purchase | Com Stk | 95,000 | 35.3367 |
| | | | | |
| 1/15/2004 | Sale | Com Stk | 110,300 | 49.4900 |
| 1/27/2004 | Sale | Com Stk | 13,300 | 50.4300 |
| 2/20/2004 | Sale | Com Stk | 84,600 | 48.8800 |
| 2/23/2004 | Sale | Com Stk | 42,000 | 49.2100 |
| 3/25/2004 | Sale | Com Stk | 26,900 | 50.0900 |
| 4/5/2004 | Sale | Com Stk | 20,700 | 51.9500 |
| 4/23/2004 | Sale | Com Stk | 26,200 | 49.1400 |
| 5/4/2004 | Sale | Com Stk | 926,100 | 48.8400 |
| 5/5/2004 | Sale | Com Stk | 148,400 | 48.6300 |
| 5/10/2004 | Sale | Com Stk | 104,700 | 45.2000 |
| 7/8/2004 | Sale | Com Stk | 14,800 | 45.4500 |
| 8/24/2004 | Sale | Com Stk | 5,800 | 45.9900 |
| 9/23/2004 | Sale | Com Stk | 18,300 | 44.1100 |
| 1/20/2005 | Sale | Com Stk | 45,000 | 47.8300 |
| 12/9/2005 | Sale | Com Stk | 50,200 | 48.8400 |
| 6/21/2006 | Sale | Com Stk | 29,000 | 48.4800 |

| 10/11/2006 | Sale | Com Stk | 213,000 | 50.3000 |
| 10/26/2006 | Sale | Com Stk | 54,000 | 50.7700 |
| 12/12/2006 | Sale | Com Stk | 252,000 | 52.0400 |
| 12/19/2006 | Sale | Com Stk | 53,900 | 54.9100 |
| 12/19/2006 | Sale | Com Stk | 78,100 | 54.9100 |
| 12/28/2006 | Sale | Com Stk | 155,000 | 55.8800 |
| 12/29/2006 | Sale | Com Stk | 157,000 | 55.8200 |
| 5/24/2007 | Sale | Com Stk | 80,000 | 55.2900 |
| 5/25/2007 | Sale | Com Stk | 160,000 | 54.7900 |

**CERTIFICATION OF PETER NORMAN IN SUPPORT OF THE SJUNDE AP-FONDEN MOTION FOR CONSOLIDATION, FOR ITS APPOINTMENT AS LEAD PLAINTIFF, AND FOR THE APPROVAL OF ITS SELECTION OF COUNSEL**

Sjunde AP-Fonden ("AP7" or "Plaintiff"), declares, as to the claims asserted under the federal securities laws, that:

      1.    AP7 did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

      2.    AP7 is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

      3.    Attached in Schedule A are AP7's transactions in Citigroup, Inc. (NYSE: C) securities during the Class Period.

      4.    AP7 has full power and authority to bring suit to recover for its investment losses.

      5.    AP7 has fully reviewed the facts and allegations of the complaints filed in this action and have authorized the filing of the motion for appointment as lead plaintiff on its behalf in this action.

      6.    I, Peter Norman, , Executive Director of AP7 am authorized to make legal decisions on behalf of AP7.

      7.    AP7 intends to actively monitor and vigorously pursue this action for the benefit of the class, and has retained the law firm of Schiffrin Barroway Topaz & Kessler, LLP, which has extensive experience in securities litigation and in the representation of institutional investors, to represent AP7 in this action.

8.    AP7 will endeavor to provide fair and adequate representation and work directly with the efforts of Class counsel to ensure that the largest recovery for the Class consistent with good faith and meritorious judgment is obtained.

9.    AP7 has, within the three year period preceding the date hereof, sought to serve as a representative party in a federal securities class action against UnitedHealth Group and Dell, Inc.

10.    AP7 will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ___11___ day of December, 2007.

Sjunde AP-Fonden

By: _____

Peter Norman
*Executive Director*

## SCHEDULE A

| Date | Purchase or Sale | Type of Securities | Number of Securities | Price of Securities |
|---|---|---|---|---|
| 1/26/2004 | Purchase | Com Stk | 188,500 | 50.924 |
| 1/10/2005 | Purchase | Com Stk | 199,705 | 48.3294 |
| 1/31/2005 | Purchase | Com Stk | 42,300 | 49.0479 |
| 3/8/2005 | Purchase | Com Stk | 16,300 | 48.4697 |
| 10/6/2005 | Purchase | Com Stk | 3,100 | 45.4191 |
| 1/9/2006 | Purchase | Com Stk | 129,600 | 48.39 |
| 1/31/2006 | Purchase | Com Stk | 12,600 | 46.5781 |
| 12/12/2006 | Purchase | Com Stk | 62,217 | 52.2419 |
| 2/26/2007 | Purchase | Com Stk | 13,000 | 52.68 |
| 4/10/2007 | Purchase | Com Stk | 5,000 | 52.4 |
| 6/13/2007 | Purchase | Com Stk | 5,300 | 53.6745 |
| 10/17/2007 | Purchase | Com Stk | 4,700 | 47.9 |
| 3/19/2004 | Sale | Com Stk | 2,300 | 50.3465 |
| 6/18/2004 | Sale | Com Stk | 200 | 47.51 |
| 11/30/2004 | Sale | Com Stk | 65,800 | 44.7526 |
| 12/17/2004 | Sale | Com Stk | 27,765 | 46.6235 |
| 6/27/2005 | Sale | Com Stk | 8,500 | 46.7708 |
| 7/22/2005 | Sale | Com Stk | 6,000 | 44.42 |
| 7/29/2005 | Sale | Com Stk | 4,900 | 43.5025 |
| 8/4/2005 | Sale | Com Stk | 12,400 | 43.9203 |
| 10/26/2005 | Sale | Com Stk | 4,900 | 45.6519 |
| 11/25/2005 | Sale | Com Stk | 27,400 | 49.5202 |
| 3/7/2006 | Sale | Com Stk | 54,300 | 46.1264 |
| 3/22/2006 | Sale | Com Stk | 18,900 | 47.67 |
| 5/15/2007 | Sale | Com Stk | 131,900 | 52.7902 |
| 8/20/2007 | Sale | Com Stk | 12,800 | 48.3906 |

**CERTIFICATION OF PETER DAMGAARD JENSEN AND MICHAEL NELLEMANN PEDERSEN IN SUPPORT OF THE PENSIONSKASSERNES ADMINISTRATION A/S MOTION FOR CONSOLIDATION, FOR ITS APPOINTMENT AS LEAD PLAINTIFF, AND FOR THE APPROVAL OF ITS SELECTION OF COUNSEL**

Pensionskassernes Administration A/S ("PKA" or "Plaintiff") as Manager and Administrator for (i.) The Office Staff Pension Fund (Pensionskassen for Kontorpersonale); (ii.) The Medical Laboratory Technologists' Pension Fund (Pensionskassen for Bioanalytikere); (iii.) The Danish Diet and Nutrition Officers' Pension Fund (Pensionskassen for Kost- og Ernæringsfaglige); (iv.) The Medical Secretaries' Pension Fund (Pensionskassen for Lægesekretærer); (v.) The State Registered Nurses' Pension Fund (Pensionskassen for Sygeplejersker); (vi.) The Social Workers' and Social Pedagogues' Pension Fund (Pensionskassen for Socialrådgivere og Socialpædagoger); (vii.) The Occupational Therapists' and Physiotherapists' Pension Fund (Pensionskassen for Ergoterapeuter og Fysioterapeuter); and, (vii.) The Midwives' Pension Fund (Pensionskassen for Jordemødre), declares, as to the claims asserted under the federal securities laws, that:

1.  PKA did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

2.  PKA is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

3.  Attached in Schedule "A" are the PKA's transactions in Citigroup, Inc. (NYSE: C) securities during the Class Period.

4.  PKA has full power and authority to bring suit to recover for investment losses on behalf of itself and the pension funds it manages and administers.

5.      PKA has fully reviewed the facts and allegations of the complaints filed in this action and have authorized the filing of the motion for appointment as lead plaintiff on its behalf in this action.

6.      We, Peter Damgaard Jensen and Michael Nellemann Pedersen, Chief Executive Officer and Director at PKA respectively, are authorized to make legal decisions on behalf of PKA.

7.      PKA intends to actively monitor and vigorously pursue this action for the benefit of the class, and has retained the law firm of Schiffrin Barroway Topaz & Kessler, LLP, which has extensive experience in securities litigation and in the representation of institutional investors, to represent PKA in this action.

8.      PKA will endeavor to provide fair and adequate representation and work directly with the efforts of Class counsel to ensure that the largest recovery for the Class consistent with good faith and meritorious judgment is obtained.

9.      PKA has, within the three year period preceding the date hereof, sought to serve as lead plaintiff in federal securities class actions against UnitedHealth Group and Dell, Inc.

10.     PKA will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

We declare under penalty of perjury under the laws of the United States of America that

the foregoing is true and correct.

Executed this __7th__ day of January, 2008.

Pensionskassernes Administration A/S

By: _____
Peter Damgaard Jensen
Chief Executive Officer

By: _____
Michael Nellemann Pedersen
*Director*

## SCHEDULE A

| Date | Purchase or Sale | Type of Securities | Number of Securities | Price of Securities |
|---|---|---|---|---|
| 1/22/2004 | Purchase | Com Stk | 2,000 | 50.6981 |
| 3/11/2004 | Purchase | Com Stk | 23,300 | 49.2500 |
| 5/21/2004 | Purchase | Com Stk | 11,300 | 45.6200 |
| 6/8/2004 | Purchase | Com Stk | 6,300 | 47.4300 |
| 6/24/2004 | Purchase | Com Stk | 600 | 47.4400 |
| 7/6/2004 | Purchase | Com Stk | 1,000 | 45.2900 |
| 8/2/2004 | Purchase | Com Stk | 1,000 | 43.8800 |
| 8/10/2004 | Purchase | Com Stk | 2,400 | 43.9223 |
| 9/7/2004 | Purchase | Com Stk | 37,000 | 47.1999 |
| 9/17/2004 | Purchase | Com Stk | 3,500 | 46.9312 |
| 10/12/2004 | Purchase | Com Stk | 2,400 | 44.7727 |
| 11/12/2004 | Purchase | Com Stk | 15,800 | 46.3282 |
| 11/12/2004 | Purchase | Com Stk | 26,086 | 47.0700 |
| 11/24/2004 | Purchase | Com Stk | 49,000 | 45.5200 |
| 12/17/2004 | Purchase | Com Stk | 49,480 | 46.6165 |
| 12/21/2004 | Purchase | Com Stk | 988 | 46.8500 |
| 1/18/2005 | Purchase | Com Stk | 1,116 | 47.4000 |
| 2/7/2005 | Purchase | Com Stk | 4,156 | 49.7283 |
| 3/1/2005 | Purchase | Com Stk | 16,400 | 47.8800 |
| 3/28/2005 | Purchase | Com Stk | 25,300 | 45.0900 |
| 3/29/2005 | Purchase | Com Stk | 4,234 | 44.7391 |
| 3/30/2005 | Purchase | Com Stk | 6,800 | 44.6574 |
| 4/8/2005 | Purchase | Com Stk | 2,700 | 45.4300 |
| 5/2/2005 | Purchase | Com Stk | 10,100 | 46.5300 |
| 6/29/2005 | Purchase | Com Stk | 6,400 | 46.8616 |
| 6/30/2005 | Purchase | Com Stk | 14,000 | 46.2276 |
| 7/20/2005 | Purchase | Com Stk | 1,800 | 44.3800 |
| 9/27/2005 | Purchase | Com Stk | 30,500 | 45.0900 |
| 9/30/2005 | Purchase | Com Stk | 15,200 | 45.6640 |
| 12/1/2005 | Purchase | Com Stk | 13,300 | 48.8497 |
| 2/2/2006 | Purchase | Com Stk | 700 | 45.2600 |
| 2/21/2006 | Purchase | Com Stk | 5,700 | 46.1160 |
| 4/20/2006 | Purchase | Com Stk | 2,800 | 48.4056 |
| 5/1/2006 | Purchase | Com Stk | 17,700 | 49.4600 |
| 7/12/2006 | Purchase | Com Stk | 900 | 49.5848 |
| 7/31/2006 | Purchase | Com Stk | 30,100 | 48.3100 |
| 10/26/2006 | Purchase | Com Stk | 8,500 | 50.8277 |
| 12/14/2006 | Purchase | Com Stk | 4,000 | 52.7923 |

| | | | | |
|---|---|---|---|---|
| 1/22/2007 | Purchase | Com Stk | 2,696 | 55.4700 |
| 1/22/2007 | Purchase | Com Stk | 60,874 | 55.0194 |
| 2/21/2007 | Purchase | Com Stk | 5,270 | 53.8240 |
| 3/2/2007 | Purchase | Com Stk | 5,600 | 49.9825 |
| 3/22/2007 | Purchase | Com Stk | 400 | 52.0150 |
| 4/10/2007 | Purchase | Com Stk | 3,300 | 52.0323 |
| 4/18/2007 | Purchase | Com Stk | 1,300 | 52.9900 |
| 4/18/2007 | Purchase | Com Stk | 71,900 | 52.9900 |
| 5/10/2007 | Purchase | Com Stk | 1,300 | 53.4800 |
| 6/27/2007 | Purchase | Com Stk | 37,700 | 51.6900 |
| 6/29/2007 | Purchase | Com Stk | 6,900 | 51.2900 |
| 7/25/2007 | Purchase | Com Stk | 6,400 | 49.7073 |
| 7/30/2007 | Purchase | Com Stk | 19,300 | 47.2418 |
| 8/2/2007 | Purchase | Com Stk | 17,900 | 46.7719 |
| 8/14/2007 | Purchase | Com Stk | 37,200 | 45.8691 |
| 9/11/2007 | Purchase | Com Stk | 4,400 | 45.9668 |
| 9/24/2007 | Purchase | Com Stk | 13,800 | 46.8514 |
| 10/26/2007 | Purchase | Com Stk | 39,900 | 42.0396 |
| 11/5/2007 | Purchase | Com Stk | 42,000 | 35.9907 |
| 11/7/2007 | Purchase | Com Stk | 133,000 | 33.4100 |
| | | | | |
| 2/4/2004 | Sale | Com Stk | 5,300 | 48.7481 |
| 2/26/2004 | Sale | Com Stk | 11,000 | 49.9686 |
| 5/14/2004 | Sale | Com Stk | 15,100 | 45.6883 |
| 6/4/2004 | Sale | Com Stk | 6,700 | 46.6962 |
| 6/4/2004 | Sale | Com Stk | 200 | 46.8834 |
| 10/13/2004 | Sale | Com Stk | 51,333 | 44.4466 |
| 10/13/2004 | Sale | Com Stk | 1,900 | 44.1100 |
| 10/13/2004 | Sale | Com Stk | 800 | 44.1100 |
| 1/12/2005 | Sale | Com Stk | 35,100 | 47.9800 |
| 1/26/2005 | Sale | Com Stk | 11,000 | 48.2600 |
| 11/14/2005 | Sale | Com Stk | 2,500 | 48.0684 |
| 3/22/2006 | Sale | Com Stk | 2,400 | 47.5245 |
| 3/31/2006 | Sale | Com Stk | 8,100 | 47.2346 |
| 4/7/2006 | Sale | Com Stk | 2,200 | 48.1600 |
| 6/6/2006 | Sale | Com Stk | 1,800 | 49.4003 |
| 1/25/2007 | Sale | Com Stk | 13,400 | 54.3500 |
| 5/23/2007 | Sale | Com Stk | 7,900 | 55.2646 |
| 6/20/2007 | Sale | Com Stk | 13,100 | 54.3900 |
| 6/20/2007 | Sale | Com Stk | 3,900 | 53.9490 |
| 6/20/2007 | Sale | Com Stk | 16,700 | 54.3900 |
| 6/20/2007 | Sale | Com Stk | 5,100 | 53.9143 |

| 8/20/2007 | Sale | Com Stk | 4,000 | 48.2724 |
| 8/31/2007 | Sale | Com Stk | 19,500 | 46.8052 |
| 9/20/2007 | Sale | Com Stk | 700 | 47.3900 |
| 10/17/2007 | Sale | Com Stk | 108,700 | 44.3934 |
| 10/17/2007 | Sale | Com Stk | 15,600 | 44.3934 |