**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT ASSOCIATION OF COLORADO, TENNESSEE CONSOLIDATED RETIREMENT SYSTEM, SJUNDE AP-FONDEN, FJÄRDE AP-FONDEN, and PENSIONSKASSERNES ADMINISTRATION A/S, Individually and On Behalf of All Others Similarly Situated, | Electronically Filed |
| Plaintiffs, | No. 1:08-cv-0135 (SHS) |
| v. | ECF CASE |
| CITIGROUP INC., CHARLES O. PRINCE, SALLIE L. KRAWCHECK, GARY L. CRITTENDEN, TODD S. THOMSON, ROBERT DRUSKIN, THOMAS G. MAHERAS, MICHAEL STUART KLEIN, DAVID C. BUSHNELL, JOHN C. GERSPACH, STEPHEN R. VOLK, GEORGE DAVID and KPMG LLP, | |
| Defendants. | |
| TILLIE SALTZMAN, Individually and On Behalf of All Others Similarly Situated, | |
| Plaintiff, | Electronically Filed |
| v. | No. 1:07-cv-9901(SHS) |
| CITIGROUP INC., CHARLES O. PRINCE, ROBERT E. RUBIN, STEPHEN R. VOLK, SALLIE L. KRAWCHECK, GARY L. CRITTENDEN and ROBERT DRUSKIN, | ECF CASE |
| Defendants. | |
| LENNARD HAMMERSCHLAG, Individually, and On Behalf of All Others Similarly Situated, | |
| Plaintiff | Electronically Filed |
| v. | No. 1:07-cv-10258(SHS) |
| CITIGROUP INC., CHARLES PRINCE, SALLIE KRAWCHECK, and GARY CRITTENDEN, | ECF CASE |
| Defendants. | |

JUDY G. FISHER,

                Plaintiff,

   -   against -                           No. 08-cv-0136 (SHS)

CITIGROUP INC., ET AL.,

                Defendants.

**DECLARATION OF ANDREW J. ENTWISTLE**

I, the undersigned, Andrew J. Entwistle, do hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am an attorney licensed to practice law in the United States Supreme Court and the State and Federal courts serving the States of Colorado, Illinois, New Jersey, New York, Texas, and the District of Columbia.  I am the managing partner of the law firm of Entwistle & Cappucci LLP ("Entwistle & Cappucci"), counsel for the Public Employees' Retirement Association of Colorado ("Colorado PERA"), Tennessee Consolidated Retirement System ("TCRS"), Sjunde AP-fonden ("AP7"), Fjärde AP-fonden ("AP4"), and Pensionskassernes Administration A/S ("PKA") (collectively, the "Global Pension Funds").  Entwistle & Cappucci's principal office is located at 280 Park Avenue, 26th Floor, New York, New York 10017.

2.      I submit this Declaration in further support of the Global Pension Funds' Motion for Consolidation, for Appointment as Lead Plaintiffs, and for Selection of Lead Counsel (the "Global Pension Funds' Motion").

3.      Attached hereto as Exhibit 1 is a true and correct copy of a January 11, 2008 letter from Andrew J. Entwistle to Gerald H. Silk, Glen DeValerio, and Merrill Davidoff.

4.      Attached hereto as Exhibit 2 is a true and correct copy of the Declaration of Gregory W. Smith in further support of the Global Pension Funds' Motion.

5.      Attached hereto as Exhibit 3 is a true and correct copy of the Affidavit of Eddie W. Hennessee in further support of the Global Pension Funds' Motion.

6.      Attached hereto as Exhibit 4 is a true and correct copy of the Declaration of AP4's Chief Executive Officer, Mats Andersson and AP4's Administrative Director, Agneta Wilhelmson Kåremar, in further support of the Global Pension Funds' Motion.

7.      Attached hereto as Exhibit 5 is a true and correct copy of the Declaration of AP7's Vice-Executive Director, Richard Gröttheim, in further support of the Global Pension Funds' Motion.

8.      Attached hereto as Exhibit 6 is a true and correct copy of the Declaration of PKA Directors, Annegrete Birck Jakobsen and Michael Nellemann Pedersen, in further support of the Global Pension Funds' Motion.

9.      Attached hereto as Exhibit 7 is a true and correct copy of a posting by Dr. David K. Whitcomb on http://blogs.wsj.com/marketbeat/2007/11/05/erasing-120-billion-in-market-cap with the relevant language highlighted for the Court's convenience.

10.      Attached hereto as Exhibit 8 is a true and correct copy of the January 18, 2008 "Notice of Withdrawal of New Jersey Division of Investment from the U.S. Public Fund Group," filed by the law firm of Berger & Montague, P.C.

11.      Attached hereto as Exhibit 9 is a true and correct copy of an article entitled "*World Rides to Wall Street's Rescue:  Citigroup-Merrill Tap Foreign-Aid Lifelines; Damage Tops $90 Billion*" which appeared in *The Wall Street Journal* on January 16, 2008.

12.      Attached hereto as Exhibit 10 is a true and correct copy of an article entitled "*NJ Invests in Citigroup, Merrill Lynch*" which was released on the Associated Press Newswire on January 15, 2008.

13.     Attached hereto as Exhibit 11 is a true and correct copy of a press release issued by Citigroup Inc. ("Citigroup") on January 15, 2008 entitled "*Citi Reports Fourth Quarter Net Loss of $9.83 Billion, Loss Per Share of $1.99*".

14.     Attached hereto as Exhibit 12 is a true and correct copy of a slip opinion issued in *In re Oca, Inc. Sec. & Deriv. Litig.*, No. 05-2165 (E.D. La. Nov. 18, 2005).

15.     Attached hereto as Exhibit 13 is a true and correct copy of the Form S-3ASR that Citigroup filed with the United States Securities and Exchange Commission (the "SEC") on October 3, 2007.

16.     Attached hereto as Exhibit 14 is a true and correct copy of the Form 8-K that Citigroup filed with the SEC on January 31, 2005.

17.     Attached hereto as Exhibit 15 is a true and correct copy of the Declaration of David Whitcomb, signed on December 31, 2007.

18.     As reflected in the January 17, 2008 letter countersigned by defense counsel at Wachtell, Lipton, Rosen & Katz LLP and attached hereto as Exhibit 16, Citigroup and all of the Individual Defendants named in the complaint that the Global Pension Funds filed on January 7, 2008 (the "Global Pension Funds' Complaint") in the action captioned *Public Employees' Retirement Association of Colorado, et al .v. Citigroup Inc., et al.* (S.D.N.Y.) 08-cv-0135 (SHS) (the "Global Pension Funds' Action"), have either been served with the Global Pension Funds' Complaint or defense counsel has agreed to accept such service.  The Global Pension Funds' are continuing to investigate and develop the claims of the Class.

19.     On behalf of the Global Pension Funds, we have also met and conferred with counsel for KPMG LLP ("KPMG"), which is named as a Defendant only in the

Global Pension Funds' Complaint.  As reflected in the Notices of Appearance attached hereto as Exhibit 17, counsel for KPMG has appeared in the Global Pension Funds' Action and has agreed to accept service.

20.     Service of the Global Pension Funds' Complaint is complete.

21.     The Global Pension Funds have engaged in discussions with counsel for the Defendants concerning the Global Pension Funds' Motion to Require Related Parties to Preserve Documents and Other Evidence (the "Preservation Motion") as well as the Global Pension Funds' Motion for an Order Partially Lifting the Private Securities Litigation Reform Act Discovery Stay (the "Stay Lift Motion").

22.     On January 28, 2008, the Global Pension Funds and all Defendants entered into a Joint Stipulation and [Proposed] Order Regarding Scheduling in connection with the Preservation Motion and the Stay Lift Motion, a copy of which was provided to the Court today and is attached hereto as Exhibit 18.

EXECUTED on the 28th day of January, 2008.


_____/s/_____

Andrew J. Entwistle

# ENTWISTLE & CAPPUCCI LLP

ATTORNEYS AT LAW

280 PARK AVENUE

26TH FLOOR WEST

NEW YORK, NEW YORK 10017

TELEPHONE: (212) 894-7200

TELECOPIER: (212) 894-7272

www.entwistle-law.com

ARMONK, NY

AUSTIN, TX

CHICAGO, IL

FLORHAM PARK, NJ

TALLAHASSEE, FL

WASHINGTON, DC

January 11, 2008

**VIA FACSIMILE**

Gerald H. Silk, Esq.
Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, New York 10019-6028

Merrill Davidoff, Esq.
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103

Glen DeValerio, Esq.
Berman DeValerio Pease Tabacco
  Burt & Pucillo
One Liberty Square
Boston, Massachusetts 02109

Re:    ***Public Employees' Retirement Association of Colorado, et al.***
       ***v. Citigroup Inc., et al. (S.D.N.Y.)***
       **08-cv-00135**

       ***Tillie Saltzman v. Citigroup Inc., et al. (S.D.N.Y.)***
       **No. 1:07-cv-9901(SHS)**

       ***Lennard Hammerschlag v. Citigroup Inc., et al. (S.D.N.Y.)***
       **No. 1:07-cv-10258(SHS)**

Dear Counsel:

On behalf of the Global Pension Funds seeking appointment as Lead Plaintiff in the above captioned litigation, we and our co-counsel at Schiffrin Barroway Topaz & Kessler, LLP write in further response to Mr. Silk's January 8, 2008 letter.

The Global Pension Funds reiterate that they provided the transaction information that the Private Securities Litigation Reform Act of 1995 (the "PSLRA") requires in connection with the



Gerald H. Silk, Esq.
Merrill Davidoff, Esq.
Glen DeValerio, Esq.
January 11, 2008
Page 2

Complaint that they filed in the action captioned *Public Employees' Retirement Association of Colorado, et al. v. Citigroup Inc., et al.* (S.D.N.Y.) 08-cv-00135 and in their motion for appointment as Lead Plaintiff, appointment of Lead Counsel and consolidation of the above referenced actions. *See* 15 U.S.C. §78u-4(a)(2)(A). Nevertheless, attached hereto is a chart depicting the opening balance information and transactions during the period from November 21, 2007 through January 4, 2008 requested in Mr. Silk's January 8, 2008 letter.

On behalf of the Global Pension Funds, we look forward to receiving the information requested in our January 9, 2008 letter.

Very truly yours,

Andrew J. Entwistle

cc:     Andrew L. Barroway, Esq.

| GROUP MEMBER | OPENING BALANCE |
|---|---|
| COPERA | 6,165,332 |
| TCRS | 4,024,004 |
| PKA | 397,433 |
| AP4 | 2,239,200 |
| AP7 | 764,361 |

| TRANSACTIONS | | | | |
|---|---|---|---|---|
| GROUP MEMBER | DATE | TYPE | QUANTITY | PRICE |
| COPERA | 11/27/07 | Buy | 2,000 | 29.9500 |
| COPERA | 11/28/07 | Buy | 17,600 | 31.7728 |
| COPERA | 11/29/07 | Buy | 2,000 | 32.0100 |
| COPERA | 12/3/07 | Sell | 172,500 | 32.9873 |
| COPERA | 12/3/07 | Sell | 500,000 | 32.9950 |
| COPERA | 12/3/07 | Sell | 250,000 | 33.1942 |
| COPERA | 12/5/07 | Buy | 62,300 | 33.1418 |
| COPERA | 12/21/07 | Buy | 31,700 | 30.3780 |
| COPERA | 1/4/08 | Sell | 11,500 | 28.2193 |
| TCRS | 12/27/07 | Sell | 1,800 | 29.7097 |
| AP4 | 12/17/07 | Sell | 545,472 | 30.8999 |
| AP7 | 12/11/07 | Buy | 79,600 | 33.3000 |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT ASSOCIATION OF COLORADO, TENNESSEE CONSOLIDATED RETIREMENT SYSTEM, SJUNDE AP-FONDEN, FJÄRDE AP-FONDEN, and PENSIONSKASSERNES ADMINISTRATION A/S, Individually and On Behalf of All Others Similarly Situated, | Electronically Filed |
| Plaintiffs, | No. 1:08-cv-00135 (SHS) |
| v. | ECF CASE |
| CITIGROUP INC., CHARLES O. PRINCE, SALLIE L. KRAWCHECK, GARY L. CRITTENDEN, TODD S. THOMSON, ROBERT DRUSKIN, THOMAS G. MAHERAS, MICHAEL STUART KLEIN, DAVID C. BUSHNELL, JOHN C. GERSPACH, STEPHEN R. VOLK, GEORGE DAVID and KPMG LLP, | |
| Defendants. | |
| TILLIE SALTZMAN, Individually and On Behalf of All Others Similarly Situated, | Electronically Filed |
| Plaintiff, | No. 1:07-cv-9901(SHS) |
| vs. | ECF CASE |
| CITIGROUP INC., CHARLES O. PRINCE, ROBERT E. RUBIN, STEPHEN R. VOLK, SALLIE L. KRAWCHECK, GARY L. CRITTENDEN and ROBERT DRUSKIN, | |
| Defendants. | |
| LENNARD HAMMERSCHLAG, Individually, and On Behalf of All Others Similarly Situated, | Electronically Filed |
| Plaintiff | No. 1:07-cv-10258(SHS) |
| v. | ECF CASE |
| CITIGROUP INC., CHARLES PRINCE, SALLIE KRAWCHECK, and GARY CRITTENDEN, | |
| Defendants. | |

JUDY G. FISHER,

                    Plaintiff,

-    against -

CITIGROUP INC., ET AL.,

                    Defendants.

Electronically Filed

No. 1:08-civ.-0136 (SHS)

ECF CASE

**DECLARATION OF GREGORY W. SMITH IN FURTHER SUPPORT OF THE
MOTION OF THE GLOBAL PENSION FUNDS FOR CONSOLIDATION, FOR
APPOINTMENT AS LEAD PLAINTIFFS AND FOR THE APPROVAL OF LEAD
PLAINTIFFS' CHOICE OF COUNSEL**

**GREGORY W. SMITH**, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am a member of the Bar of the State of Colorado and I am the General Counsel of the Public Employees' Retirement Association of Colorado ("Colorado PERA").  I respectfully submit this Declaration in support of the Motion of Colorado PERA, Tennessee Consolidated Retirement System ("TCRS"), Sjunde AP-Fonden ("AP7"), Fjärde AP-Fonden ("AP4"), and Pensionskassernes Administration A/S ("PKA") (collectively, the "Global Pension Funds") for consolidation, for appointment as Lead Plaintiffs in the above-captioned actions (the "Actions") against Citigroup Inc. ("Citigroup" or the Company") and related defendants, and for approval of the Global Pension Funds' selection of Entwistle & Cappucci LLP ("Entwistle & Cappucci") and Schiffrin Barroway Topaz & Kessler, LLP ("SBTK") (together, "Proposed Lead Counsel") to serve as Co-Lead Counsel, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").

2.      I am a graduate of the University of Colorado at Boulder and the University of Denver College of Law.  Prior to joining Colorado PERA as General Counsel, I was a litigation partner with a firm in Denver, Colorado, experience that provides me with the ability to supervise and direct complex litigation.

3.      Colorado PERA was established in 1931 and operates by authority of the Colorado General Assembly.  Colorado PERA provides retirement and other benefits to the employees of more than 400 government agencies and public entities in the State of Colorado. Colorado PERA's membership includes employees of the Colorado state government, most teachers in the State of Colorado, many university and college employees, judges, many employees of Colorado cities and towns, Colorado State Troopers, and the employees of a number of other public entities within the State of Colorado.  With approximately $42 billion in

assets and more than 230 employees, Colorado PERA is the 25th largest public pension plan in the United States.

4.     As General Counsel for Colorado PERA, I monitor outside litigation matters for the Association.  In this regard, I supervise outside counsel and I have authority to make decisions regarding legal matters on behalf of Colorado PERA.

5.     I am also active in several organizations designed to promote and enforce corporate transparency, reliable and accurate financial reporting, and sound corporate governance for companies operating in the United States and throughout the world.  I currently serve as a member of the Executive Board of the National Association of Public Pension Attorneys ("NAPPA"), and I am Lead Chair of NAPPA's Insurance Issues Working Group, and Board Liaison to NAPPA's Fiduciary and Plan Governance Section.  I am also actively involved in the Counsel of Institutional Investors ("CII"), where Colorado PERA's Executive Director is a Board member.  Most recently, on October 29, 2007, I was a member of an International Corporate Governance Network ("ICGN") panel discussion on corporate governance at a mid-year meeting held in New York City.  The ICGN is an organization dedicated to promoting sound corporate governance principles around the world.

6.     Entwistle & Cappucci has represented Colorado PERA in other securities matters, and monitors and reports potential securities fraud matters to Colorado PERA as such matters emerge.  Attorneys at Entwistle & Cappucci prepared materials for me to review concerning securities fraud claims against Citigroup Inc. ("Citigroup").  Following this analysis and subsequent analyses of developing facts and the significant losses that Colorado PERA suffered, as well as a review and discussion of the complaints filed in early November 2007 -- all of which are protected by the attorney-client privilege and attorney work product doctrine -- Colorado

PERA retained Entwistle & Cappucci to file a motion for Colorado PERA to be appointed as Lead Plaintiff. Colorado PERA also authorized the firm to retain outside accounting and auditing experts in connection with drafting and filing a complaint detailing the results of their ongoing investigation of the facts. Entwistle & Cappucci advised me that certain other unidentified institutional investors were considering seeking appointment as Lead Plaintiff in the litigation against Citigroup. As Colorado PERA has served as a Co-Lead Plaintiff in securities class actions in the past, I requested that the firm keep me informed as to whether there might be an opportunity to seek Co-Lead Plaintiff appointment with other institutional investors who shared similar litigation and corporate governance objectives.

7.     I understand that after requesting and considering proposals from counsel on its panel of potential securities litigation firms, the Office of the Attorney General of the State of Tennessee (the "Tennessee Attorney General"), on behalf of the Tennessee Consolidated Retirement System ("TCRS"), selected Entwistle & Cappucci to prepare materials for TCRS to seek appointment as a Lead Plaintiff in this litigation. Like Colorado PERA, TCRS incurred substantial losses based upon its purchases of Citigroup securities and was interested in examining whether opportunities existed to seek Co-Lead Plaintiff status with other institutional investors that had also suffered significant losses in this matter.

8.     On behalf of Colorado PERA, I conferred with representatives of the Tennessee Attorney General's Office and TCRS to discuss our respective goals and objectives for the Citigroup litigation and to determine whether and how we could work together in jointly prosecuting this action and supervising our selected counsel. During this discussion, I detailed Colorado PERA's experience as a Lead Plaintiff in *In re Oxford Health Plans, Inc., Securities Litigation*, No. MDL 1222 CLB (S.D.N.Y) ("*Oxford*"), litigated in the United States District

Court for the Southern District of New York, as well as Colorado PERA's experience representing a global class in *In re Royal Ahold Securities & "ERISA" Litigation*, MDL 01539 (D. Md.) ("*Ahold*").

9.     After agreeing that Colorado PERA, the Tennessee Attorney General and TCRS had common goals and objectives in this litigation, we decided to pursue Lead Plaintiff status together with Entwistle & Cappucci as our selected counsel.  The Tennessee Attorney General's Office and TCRS also agreed with Colorado PERA's existing plan to file a detailed complaint and a motion requiring the preservation of documents at Citigroup's variable interest entities ("VIEs") and other related entities, as well as a motion seeking a partial lifting of the PSLRA discovery stay in connection with our Lead Plaintiff application.  We agreed that filing detailed allegations against Citigroup and the Company's Class Period auditor, KPMG LLP ("KPMG"), and seeking interim relief were in the best interests of the Class that we seek to represent.

10.     In particular, we agreed that claims existed based upon Defendants' failure to disclose Citigroup's Class Period issuance of Liquidity Puts, pursuant to which the Company guaranteed a market for Variable Interest Entity ("VIE") debt purchasers by obligating Citigroup to buy back VIE-issued commercial paper at the original purchase price from a holder if the holder could not find a ready market into which to sell such paper.  To date, the Global Pension Funds' Complaint is the only complaint in these securities actions that even mentions the Liquidity Puts, let alone develops the critical facts and accounting provisions related to these guarantees that the Defendants failed to disclose in any way until November 5, 2007.

11.     As Colorado PERA, the Tennessee Attorney General's Office, and representatives from TCRS were preparing each of the submissions referenced above in connection with these proceedings, I learned that AP4, AP7, and PKA had suffered significant losses in connection

with their Class Period purchases of Citigroup securities and had retained SBTK to represent

them in seeking appointment as Lead Plaintiffs in the Citigroup litigation. I further learned that

each of these sophisticated institutional investors was interested in working with other

sophisticated institutional investors to seek appointment as Lead Plaintiffs in this litigation. I am

familiar with AP4, AP7, and PKA based upon my participation in various international corporate

governance organizations. Together with representatives from the Tennessee Attorney General's

Office and TCRS, I decided that we would determine whether AP4, AP7, and PKA shared the

same goals and objectives for directing, supervising and monitoring this important litigation

against Citigroup.

12.     After determining that each of AP4, AP7, and PKA shared similar goals and

objectives for prosecuting this litigation, Colorado PERA, the Tennessee Attorney General's

Office, TCRS, AP4, AP7, and PKA decided to pursue appointment together as a Lead Plaintiff

group. AP4, AP7, and PKA further agreed that filing a detailed Complaint and the motions that

counsel had been preparing under our direction and supervision was in the best interests of the

Class. We also agreed that Entwistle & Cappucci and SBTK would work together as our

proposed Co-Lead Counsel to prosecute this action vigorously and efficiently in the best interest

of the Class.

13.     Colorado PERA, the Tennessee Attorney General's Office and TCRS have

agreed to the terms of a retainer agreement with Entwistle & Cappucci (the "Retainer

Agreement"). The terms of the Retainer Agreement are incorporated into a Joint Prosecution

Agreement that Colorado PERA, the Tennessee Attorney General, TCRS, AP4, AP7, PKA,

Entwistle & Cappucci and SBTK have executed in connection with this litigation.

14.    The Retainer Agreement and Joint Prosecution Agreement provide, among other things, a ceiling on our Proposed Co-Lead Counsel's hourly rates as well as a ceiling on total fees that counsel may request from the Court if we obtain a recovery that the Global Pension Funds believe to be in the best interests of the Class warranting the Court's approval.  I understand and acknowledge that the ultimate award of attorney's fees and expenses is in the Court's discretion.

15.    The Retainer Agreement and Joint Prosecution Agreement also require the Global Pension Funds' consent to non-routine litigation expenses, such as retaining experts, and provide that the Global Pension Funds will review, comment upon, and authorize all filings made with this Court.  In addition, these agreements provide for regular telephone conferences among the Global Pension Funds during which we will discuss and determine litigation strategies and make any decisions that we believe are required to ensure that we and Proposed Lead Counsel continue to represent the best interests of the Class.  The Global Pension Funds have also agreed on how they will work together in this litigation and how they will resolve disputes if they should arise.

16.    The Global Pension Funds treat the Retainer Agreement and Joint Prosecution Agreement as protected by the attorney-client privilege, but are pleased to submit both of these agreements for the Court's *in camera* review if such submission will aid the Court in its consideration of the other Lead Plaintiff applications.

17.    Since deciding to seek appointment as Lead Plaintiffs and authorizing and directing our Proposed Lead Counsel to file the Complaint and motions for interim relief for the Class, as discussed above, the Global Pension Funds have engaged in telephone conferences concerning the other lead plaintiff motions, our responses thereto, and our goals for continuing to

prosecute the claims against Citigroup and the other defendants named in our Complaint in the best interests of the Class that we seek to represent.

18.    Colorado PERA has selected experienced and capable counsel to represent the Class's interests and has engaged counsel to work on terms that are in the Class's best interests. Colorado PERA is dedicated to prosecuting this litigation efficiently.  I respectfully submit that the detailed Complaint and the motions for interim relief that the Global Pension Funds filed together with their motion for appointment as Lead Plaintiffs demonstrate that the Global Pension Funds and Proposed Lead Counsel are adequate representatives of the Class who are capable of working together effectively and efficiently and who are willing to pursue vigorously the Class's claims.

19.    Colorado PERA has been active in the securities litigation arena, fulfilling the Colorado PERA Board of Trustees' commitment to corporate governance reform and enforcement of shareholder rights.  Colorado PERA's prior service as a lead plaintiff demonstrates that Colorado PERA possesses the sophistication, dedication, expertise, and resources required to actively supervise securities class action litigation effectively and in the best interests of the Class.

20.    As noted above, Colorado PERA served as a lead plaintiff in *In re Oxford Health Plans Sec. Litig.*, a case litigated in this Court.  The *Oxford* case settled for $300 million in 2003, at the time one of the largest securities class action settlements in history.  The *Oxford* litigation involved complex business operations, and financial and accounting claims.  Despite the fact that Oxford did not restate any of its financial results, we were able to achieve a settlement on the "courthouse steps" that recovered $225 million from the Company and its officers and directors, and an additional $75 million from Oxford's auditors at KPMG, the same firm that audited

Citigroup during the Class Period at issue here.  Notably, only the Global Pension Funds have named KPMG as a defendant in these proceedings.

21.     In performing its responsibilities as a Lead Plaintiff in the *Oxford* litigation, Colorado PERA helped develop and implement litigation strategies designed to maximize the class's recovery and to minimize expenses to the class.  Based upon its experience in the *Oxford* litigation, Colorado PERA is equipped and prepared to maximize the recovery and to minimize expenses in this litigation.

22.     Colorado PERA also served as Lead Plaintiff in the *Ahold* securities class action, which was first filed in 2003.  Entwistle & Cappucci served as sole Lead Counsel representing the Class.

23.     In June 2006, the Court approved a partial settlement of the *Ahold* litigation for $1.1 billion (the "Ahold Settlement") on behalf of a global class of persons and entities that purchased (or received as a dividend) shares of Ahold common stock and/or American Depository Receipts ("ADRs") during the Class Period.  I understand that at the time it was announced, the Ahold Settlement was the largest securities class action settlement for a worldwide shareholder Class in which all shareholders were treated equally, regardless of where they live or purchased their shares.  The Ahold Settlement also involved the most comprehensive global notice campaign ever undertaken in connection with a securities class action.  The forms that Class Members needed to submit claims to participate in the $1.1 billion Ahold Settlement were translated into 15 different languages and Class Members from 122 different countries submitted claims.  Authorized claimants have already received their initial distributions from the Ahold Net Settlement Fund.

24.    As a Lead Plaintiff in the *Ahold* litigation, I was responsible to ensure that Colorado PERA closely monitored, supervised, and participated in all aspects of the litigation. In carrying out these duties, I among other things:  (i) frequently discussed case strategy with sole Lead Counsel at Entwistle & Cappucci; (ii) reviewed, commented on, and approved the filing of pleadings, motions, briefs and other submissions to the Court; (iii) reviewed and discussed the Defendants' court submissions, including the briefing in connection with Defendants' motions to dismiss the Complaint; (iv) reviewed and discussed the qualifications of, and approved under terms believed to be appropriate, experts and consultants retained by Lead Plaintiffs on behalf of the Class, including experts on accounting and damages; (v) participated in the Mediation that led to the Ahold Settlement; and (vi) approved the retention of the Notice Administrator and Claims Administrator to effectuate and provide notice of the Ahold Settlement to Class Members all over the world.

25.    I respectfully submit that the Global Pension Funds' prosecution of the Citigroup matter to date, as well as Colorado PERA's prior experience as a Lead Plaintiff appointed pursuant to the PSLRA to represent the best interests of classes of investors, demonstrate that the Global Pension Funds are willing and capable of representing the best interests of the Class in the litigation against Citigroup.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Gregory W. Smith, Esq.
General Counsel
Colorado Public Employees'
Retirement Association

Dated: January 23, 2008

9

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT ASSOCIATION OF COLORADO, TENNESSEE CONSOLIDATED RETIREMENT SYSTEM, SJUNDE AP-FONDEN, FJÄRDE AP-FONDEN, and PENSIONSKASSERNES ADMINISTRATION A/S, Individually and On Behalf of All Others Similarly Situated, | |
| | Electronically Filed |
| Plaintiffs, | No. 1:08-cv-00135 (SHS) |
| v. | ECF CASE |
| CITIGROUP INC., CHARLES O. PRINCE, SALLIE L. KRAWCHECK, GARY L. CRITTENDEN, TODD S. THOMSON, ROBERT DRUSKIN, THOMAS G. MAHERAS, MICHAEL STUART KLEIN, DAVID C. BUSHNELL, JOHN C. GERSPACH, STEPHEN R. VOLK, GEORGE DAVID and KPMG LLP, | |
| Defendants. | |
| TILLIE SALTZMAN, Individually and On Behalf of All Others Similarly Situated, | |
| | Electronically Filed |
| Plaintiff, | No. 1:07-cv-9901(SHS) |
| vs. | ECF CASE |
| CITIGROUP INC., CHARLES O. PRINCE, ROBERT E. RUBIN, STEPHEN R. VOLK, SALLIE L. KRAWCHECK, GARY L. CRITTENDEN and ROBERT DRUSKIN, | |
| Defendants. | |
| LENNARD HAMMERSCHLAG, Individually, and On Behalf of All Others Similarly Situated, | |
| | Electronically Filed |
| Plaintiff | No. 1:07-cv-10258(SHS) |
| v. | ECF CASE |
| CITIGROUP INC., CHARLES PRINCE, SALLIE KRAWCHECK, and GARY CRITTENDEN, | |
| Defendants. | |

JUDY G. FISHER,

           Plaintiff,

-   against -

CITIGROUP INC., ET AL.,

           Defendants.

Electronically Filed

No. 1:08-civ.-0136 (SHS)

ECF CASE

**AFFIDAVIT OF EDDIE W. HENNESSEE IN FURTHER SUPPORT OF THE MOTION OF THE GLOBAL PENSION FUNDS FOR CONSOLIDATION, FOR APPOINTMENT AS LEAD PLAINTIFFS AND FOR THE APPROVAL OF LEAD PLAINTIFFS' CHOICE OF COUNSEL**

**EDDIE W. HENNESSEE**, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am Assistant Treasurer for Investments and Benefits of the Tennessee Consolidated Retirement System ("TCRS"). I signed a Certification dated January 4, 2008 on behalf of TCRS expressing TCRS' willingness to represent the class in the securities class actions (the "Actions") pending before this Court against Citigroup Inc. ("Citigroup") and related defendants.

2.      I respectfully submit this Declaration in support of the Motion of TCRS, the Public Employees' Retirement Association of Colorado ("Colorado PERA"), Sjunde AP-Fonden ("AP7"), Fjärde AP-Fonden ("AP4"), and Pensionskassernes Administration A/S ("PKA") (collectively, the "Global Pension Funds") for consolidation, for appointment as Lead Plaintiffs in the above-captioned actions (the "Actions") against Citigroup and related defendants, and for approval of the Global Pension Funds' selection of Entwistle & Cappucci LLP ("Entwistle & Cappucci") and Schiffrin Barroway Topaz & Kessler, LLP ("SBTK") (together, "Proposed Lead Counsel") to serve as Co-Lead Counsel, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").

3.      TCRS was established in 1972 with the consolidation of seven separate retirement systems for state employees, public higher education institution employees, public school teachers, and employees of political subdivisions electing to participate in TCRS. The State of Tennessee is responsible for the pension benefits of state employees and higher education employees, and funds a significant portion of the retirement liability for teachers through the Basic Education Program. Each of the 457 participating political subdivisions is responsible for the pension benefits of its employees. TCRS provides a variety of services to its members including: investing assets; counseling of rights and benefits; publishing newsletters, booklets,

pamphlets, and financial statements; processing deductions for retiree insurance programs and federal income tax; calculating death, disability, and retirement benefits; and processing refund and prior service requests. TCRS currently manages approximately $32 billion in assets.

4.      The State of Tennessee Office of the Attorney General ("Tennessee Attorney General") represents TCRS, which exists to provide retirement income to its members. In its capacity as a fiduciary for its members, TCRS is charged with preserving and recovering assets under appropriate circumstances. In this regard, the Tennessee Attorney General and TCRS recognize that it is prudent for TCRS to monitor securities class actions in which it has an interest. TCRS further recognizes that it may be appropriate for TCRS to participate in a securities class action as a lead plaintiff or a co-lead plaintiff when TCRS determines that such participation may enhance the recovery for TCRS and the Class. The Tennessee Attorney General and TCRS have observed that participation as a lead plaintiff or co-lead plaintiff by large, sophisticated shareholders, particularly institutional shareholders, has often resulted in lower attorneys' fees and significantly larger recoveries for class members.

5.      In conjunction with the Tennessee Attorney General, TCRS adopted a Securities Litigation Policy (the "Policy"), which establishes procedures and guidelines for monitoring and participating in securities actions as appropriate to protect TCRS' interests. Pursuant to the Policy, the Tennessee Attorney General and Tennessee State Treasurer (the "Treasurer") invited firms specializing in securities litigation to submit responses to a request for information. Based upon those submissions, the Tennessee Attorney General and the Treasurer selected a panel of law firms to monitor and report emerging securities litigation matters to the Tennessee Attorney General and TCRS. Entwistle & Cappucci was selected to be on the panel of law firms providing such services to the Tennessee Attorney General and TCRS.

2

6.     Pursuant to the Policy, Entwistle & Cappucci submitted a report to the Tennessee Attorney General's Office and TCRS concerning securities fraud claims against Citigroup. This report, and subsequent analyses and discussions of developing facts and the significant losses that TCRS suffered, are protected by the attorney-client privilege and attorney work product doctrine. During these communications, Entwistle & Cappucci advised the Tennessee Attorney General and TCRS that another unidentified sophisticated institutional investor experienced in securities class action litigation had retained the firm to seek appointment as lead plaintiff in litigation against Citigroup. The firm further advised us that this institution had indicated a willingness to explore opportunities to serve as a Co-Lead Plaintiff with other sophisticated institutions.

7.     Pursuant to the Policy, the Tennessee Attorney General recommended the selection of Entwistle & Cappucci to represent TCRS in filing a motion for TCRS to be appointed as Lead Plaintiff. After the Tennessee Attorney General and Reporter and the Treasurer retained Entwistle & Cappucci in the Citigroup litigation in accordance with Tenn. Code Ann. § 8-34-308, Entwistle & Cappucci provided us with information concerning another sophisticated institution that was interested in discussing the possibility of seeking appointment as a Co-Lead Plaintiff. Entwistle & Cappucci informed the Tennessee Attorney General and TCRS that Colorado PERA was the other institution that has retained the Firm in the Citigroup litigation. Entwistle & Cappucci further informed us that Colorado PERA had indicated that it would explore seeking Co-Lead Plaintiff appointment in the Citigroup litigation with other sophisticated institutional investors who shared similar litigation and corporate governance objectives.

8.      Together with representatives of the Tennessee Attorney General's Office, I

conferred with Gregory Smith, Colorado PERA's General Counsel, to discuss our respective

goals and objectives for the Citigroup litigation and to determine whether and how we could

work together in jointly prosecuting this action and supervising our selected counsel. We

discussed Colorado PERA's experience as a Lead Plaintiff in *In re Oxford Health Plans, Inc.,*

*Securities Litigation*, No. MDL 1222 CLB (S.D.N.Y) ("*Oxford*"), litigated in the United States

District Court for the Southern District of New York, as well as Colorado PERA's experience

representing a global class in *In re Royal Ahold Securities & "ERISA" Litigation*, MDL 01539

(D. Md.) ("*Ahold*"). Together with representatives of the Tennessee Attorney General's Office, I

agreed that TCRS and Colorado PERA had common goals and objectives in this litigation. We

discussed certain strategic issues, including filing a detailed complaint and a motion requiring the

preservation of documents at Citigroup's variable interest entities ("VIEs") and other related

entities as well as a motion seeking a partial lifting of the PSLRA discovery stay in connection

with our Lead Plaintiff application. We agreed that filing detailed allegations against Citigroup

and the Company's Class Period auditor, KPMG LLP ("KPMG"), and seeking interim relief

were in the best interests of the Class that we seek to represent.

9.      In particular, we agreed that claims existed based upon Defendants' failure to

disclose Citigroup's Class Period issuance of Liquidity Puts, pursuant to which the Company

guaranteed a market for Variable Interest Entity ("VIE") debt purchasers by obligating Citigroup

to buy back VIE-issued commercial paper at the original purchase price from a holder if the

holder could not find a ready market into which to sell such paper. To date, the Global Pension

Funds' Complaint is the only complaint in these securities actions that even mentions the

4

Liquidity Puts, let alone develops the critical facts and accounting provisions related to these guarantees that the Defendants failed to disclose in any way until November 5, 2007.

10.     As representatives of the Tennessee Attorney General's Office, TCRS and Colorado PERA were preparing each of the submissions referenced above in connection with these proceedings, we learned that AP4, AP7, and PKA had suffered significant losses in connection with their Class Period purchases of Citigroup securities and had retained SBTK to represent them in seeking appointment as Lead Plaintiffs in the Citigroup litigation. I further learned that each of these sophisticated institutional investors was interested in working with other sophisticated institutional investors to seek appointment as Lead Plaintiffs in this litigation. Together with Colorado PERA, I and representatives from the Tennessee Attorney General's Office decided that we would determine whether AP4, AP7, and PKA shared the same goals and objectives for directing, supervising and monitoring this important litigation against Citigroup.

11.     After determining that each of AP4, AP7, and PKA shared similar goals and objectives for prosecuting this litigation, the Tennessee Attorney General's Office and TCRS Colorado PERA, AP4, AP7, and PKA decided to pursue appointment together as a Lead Plaintiff group. AP4, AP7, and PKA further agreed that filing a detailed Complaint and the motions that counsel had been preparing under our direction and supervision was in the best interests of the Class. We also agreed that Entwistle & Cappucci and SBTK would work together as our proposed Co-Lead Counsel to prosecute this action vigorously and efficiently in the best interest of the Class.

12.     The Tennessee Attorney General's Office, TCRS, and Colorado PERA have agreed to the terms of a retainer agreement with Entwistle & Cappucci (the "Retainer Agreement"). The terms of the Retainer Agreement are incorporated into a Joint Prosecution

5

Agreement that the Tennessee Attorney General, TCRS, Colorado PERA, AP4, AP7, PKA, Entwistle & Cappucci and SBTK have executed in connection with this litigation.

13.      The Retainer Agreement and Joint Prosecution Agreement provide, among other things, a ceiling on our Proposed Co-Lead Counsel's hourly rates as well as a ceiling on total fees that counsel may request from the Court if we obtain a recovery that the Global Pension Funds believe to be in the best interests of the Class warranting the Court's approval.  I understand and acknowledge that the ultimate award of attorney's fees and expenses is in the Court's discretion.

14.      The Retainer Agreement and Joint Prosecution Agreement also require the Global Pension Funds' consent to non-routine litigation expenses, such as retaining experts, and provide that the Global Pension Funds will review, comment upon, and authorize all filings made with this Court.  In addition, these agreements provide for regular telephone conferences among the Global Pension Funds during which we will discuss and determine litigation strategies and make any decisions that we believe are required to ensure that we and Proposed Lead Counsel continue to represent the best interests of the Class.  The Global Pension Funds have also agreed on how they will work together in this litigation and how they will resolve disputes if they should arise.

15.      The Global Pension Funds treat the Retainer Agreement and Joint Prosecution Agreement as protected by the attorney-client privilege, but are pleased to submit both of these agreements for the Court's *in camera* review if such submission will aid the Court in its consideration of the other Lead Plaintiff applications.

16.      Since deciding to seek appointment as Lead Plaintiffs and authorizing and directing our Proposed Lead Counsel to file the Complaint and motions for interim relief for the Class, as discussed above, the Global Pension Funds have engaged in telephone conferences

concerning the other lead plaintiff motions, our responses thereto, and our goals for continuing to prosecute the claims against Citigroup and the other defendants named in our Complaint in the best interests of the Class that we seek to represent.

17.    The Tennessee Attorney General's Office and TCRS are dedicated to prosecuting this litigation efficiently.  I respectfully submit that the detailed Complaint and the motions for interim relief that the Global Pension Funds filed together with their motion for appointment as Lead Plaintiffs demonstrates that the Global Pension Funds and Proposed Lead Counsel are adequate representatives of the Class who are capable of working together effectively and efficiently and who are willing to pursue vigorously the Class's claims.

18.    I respectfully submit that the Global Pension Funds' prosecution of the Citigroup matter to date demonstrates that the Global Pension Funds are willing and capable of representing the best interests of the Class in the litigation against Citigroup.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_Eddie W. Hennessee_

Eddie W. Hennessee
Assistant Treasurer for Investments and Benefits
Tennessee Consolidated Retirement System

Sworn to before me this
___ day of January, 2008.

_Delcinia C. Costa_
Notary Public



**DECLARATION OF MATS ANDERSSON AND AGNETA WILHELMSON KÅREMAR IN
FURTHER SUPPORT OF THE GLOBAL PENSION FUNDS' MOTION FOR
CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFFS, AND
APPROVAL OF CO-LEAD COUNSEL**

Mats Andersson and Agneta Wilhelmson Kåremar, pursuant to 28 U.S.C. § 1746 and under

the laws of the United States of America, declares as follows:

1.      We, Mats Andersson and Agneta Wilhelmson Kåremar, are CEO and

Administrative Director of Fjärde AP-Fonden ("AP4"), respectively, and are authorized to direct

this litigation on behalf of AP4.

2.      We respectfully submit this Declaration in support of the Motion of AP4, the Public

Employees' Retirement Association of Colorado ("Colorado PERA"), Tennessee Consolidated

Retirement System ("TCRS"), Sjunde AP-Fonden ("AP7"), and Pensionskassernes Administration

A/S ("PKA") (collectively, the "Global Pension Funds") to serve as Lead Plaintiffs in the above-

captioned actions (the "Actions") against Citigroup Inc. ("Citigroup" or the Company") and related

defendants and for the approval of the Global Pension Funds' selection of Entwistle & Cappucci

LLP ("Entwistle & Cappucci") and Schiffrin Barroway Topaz & Kessler, LLP ("SBTK") (together,

"Proposed Lead Counsel") to serve as Co-Lead Counsel, pursuant to the Private Securities

Litigation Reform Act of 1995 ("PSLRA").

3.      AP4 purchased its Citigroup common stock that is the subject of this action on the

New York Stock Exchange.  AP4 understands that by filing a complaint and seeking lead plaintiff

status, AP4 is subject to the jurisdiction of this Court and is bound by all of its rulings.

4.      AP4, the Fourth Swedish National Pension Fund, is based in Stockholm, Sweden

and is part of the Swedish National Pension Fund (AP Fund) system and manages a portion of the

pension assets of Swedish citizens.  With over four million members and approximately $32 billion

in assets under management, AP4 is one of the largest and most prominent pension funds in all of Scandinavia.

5.     AP4 has previously engaged SBTK to serve as its outside securities litigation counsel. SBTK has previously filed a lead plaintiff motion on AP4's behalf jointly with a U.S. public pension fund in *In re Pfizer Inc. Sec. Litig.*, No. 1:05-md-1688-RO (S.D.N.Y.). In its capacity as outside securities litigation counsel, SBTK regularly monitors AP4's securities portfolio and advises AP4 regarding any potential or existing securities claims. Pursuant to this agreement, SBTK advised AP4 that it had suffered a significant financial loss related to its investment in Citigroup. SBTK further advised that a fraud claim existed against the Company and others to recover for these losses. SBTK provided AP4 a detailed memorandum to substantiate these allegations, which is protected by the attorney-client privilege and attorney work product doctrine. Considering the size of AP4's financial loss and the meritorious nature of the claims against the Company, SBTK advised AP4 that it could seek an active role as Lead Plaintiff in this litigation.

6.     During these communications, SBTK advised AP4 that another unidentified sophisticated institutional investor had retained the firm to seek appointment as lead plaintiff in litigation against Citigroup. The Firm further advised AP4 that this institution had indicated a willingness to explore opportunities to serve as a Co-Lead Plaintiff with other sophisticated institutions, particularly U.S. public pension funds.

7.     AP4 subsequently informed SBTK of its intention to seek appointment as Lead Plaintiff in any consolidated action against Citigroup. SBTK then informed AP4 that AP7 was the other institution that had retained the Firm in the Citigroup litigation. AP4 also understood that AP7 had previous experience with the PSLRA lead plaintiff process having previously filed a joint

lead plaintiff motion with PKA in both *In re Dell, Inc., Sec. Litig.*, No. 06-726-SS (W.D. Tex.) and *In re UnitedHealth Group Inc. PSLRA Litig.*, No. 06-1691 (JMR/FLN) (D. Minn.).

8.     AP4 understood that AP7 had previously engaged SBTK as its outside securities litigation counsel. AP4, of course, is very familiar with AP7 as we are both members of the Swedish National Pension Fund system. After determining that AP7 shared similar goals and objectives for prosecuting this litigation, AP4 agreed to work with AP7 as Lead Plaintiffs.

9.     Subsequent to this decision, SBTK informed AP4 that PKA had also decided to take an active role and seek Lead Plaintiff status in this action. AP4 understood that PKA had also previously engaged SBTK as its outside securities litigation counsel. AP4 further understood that, as described above, PKA had previous experience with the PSLRA lead plaintiff process. After determining that PKA shared similar goals and objectives for prosecuting this litigation, AP4 agreed to work with AP7 and PKA jointly as Lead Plaintiffs.

10.     As our lead plaintiff motion and related filings were being prepared, AP4 learned that Colorado PERA and TCRS had suffered significant losses in connection with their Class Period purchases of Citigroup securities and had retained the law firm of Entwistle & Cappucci to represent them in seeking appointment as Lead Plaintiffs in the Citigroup litigation. AP4 further learned that each of these sophisticated institutional investors was interested in working with other sophisticated institutional investors to seek appointment as Lead Plaintiffs in this litigation. Considering our stated preference to work with U.S. public pension funds and after determining that each of Colorado PERA, the Tennessee Attorney General's Office and TCRS shared similar goals and objectives for prosecuting this litigation, AP4 authorized SBTK to seek Lead Plaintiff status as a group with these institutions.

11.     AP4 further agreed to the filing of a detailed complaint and a motion requiring the preservation of documents at Citigroup's Structured Investment Vehicles ("SIVs") and other related entities as well as a motion seeking a partial lifting of the PSLRA discovery stay in connection with our Lead Plaintiff application. AP4 understands that to date, the Global Pension Funds' Complaint is the only complaint in these securities actions that even mentions Citigroup's Class Period issuance of Liquidity Puts, let alone develops the critical facts and accounting provisions related to these guarantees that the Defendants failed to disclose, in any way, until November 5, 2007.

12.     AP4 also agreed that Entwistle & Cappucci and SBTK would work together as our proposed Co-Lead Counsel to prosecute this action vigorously and efficiently in the best interest of the Class. AP4 was familiar with the Entwistle & Cappucci firm from its role in *In re Royal Ahold Securities & "ERISA" Litigation*, MDL 01539 (U.S. Dist. Ct., D. Md.) where it represented a worldwide class of investors and where Colorado PERA served as Lead Plaintiff.

13.     While AP4 had previously entered into a retainer agreement with SBTK, we have subsequently agreed to enter into a Joint Prosecution Agreement that AP4, Colorado PERA, the Tennessee Attorney General, TCRS, AP7, PKA, Entwistle & Cappucci and SBTK have executed in connection with this litigation.

14.     The Joint Prosecution Agreement provides, among other things, a ceiling on our Proposed Co-Lead Counsel's hourly rates as well as a ceiling on total fees that counsel may request from the Court if we obtain a recovery that the Global Pension Funds believe to be in the best interests of the Class warranting the Court's approval. We understand and acknowledge that the ultimate award of attorney's fees and expenses is in the Court's discretion.

15.     The Joint Prosecution Agreement also requires the Global Pension Funds' consent to non-routine litigation expenses, such as retaining experts, and provides that the Global Pension

Funds will review, comment upon, and authorize all filings made with this Court. In addition, the Joint Prosecution Agreement provides for regular telephone conferences among the Global Pension Funds during which we will discuss and determine litigation strategies and make any decisions that we believe are required to ensure that we and Proposed Lead Counsel continue to represent the best interests of the Class. The Global Pension Funds have also agreed on how we will work together in this litigation and how we will resolve disputes if they should arise.

16.     The Global Pension Funds treat their Joint Prosecution Agreement as protected by the attorney-client privilege, but are pleased to submit it for the Court's *in camera* review if such submission will aid the Court in its consideration of the Lead Plaintiff applications.

17.     Since deciding to seek appointment as Lead Plaintiffs and authorizing and directing our Proposed Lead Counsel to file the Complaint and motions for interim relief for the Class, as discussed above, the Global Pension Funds have engaged in several telephone conferences concerning the competing lead plaintiff motions, our responses thereto, and our goals for continuing to prosecute the claims against Citigroup and the other defendants named in our Complaint in the best interests of the Class that we seek to represent.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

January  25, 2008

**Fjärde AP-Fonden**

By: _____
Mats Andersson
*Chief Executive Officer*

_____
Agneta Wilhelmson Kåremar
*Administrative Director*

**DECLARATION OF RICHARD GRÖTTHEIM IN FURTHER SUPPORT OF THE
GLOBAL PENSION FUNDS' MOTION FOR CONSOLIDATION, APPOINTMENT AS
LEAD PLAINTIFFS, AND APPROVAL OF CO-LEAD COUNSEL**

Richard Gröttheim, pursuant to 28 U.S.C. § 1746 and under the laws of the United States of America, declares as follows:

1.     I, Richard Gröttheim, am Vice-Executive Director of Sjunde AP-Fonden ("AP7") and I am authorized to direct this litigation on behalf of AP7.

2.     I respectfully submit this Declaration in support of the Motion of AP7, the Public Employees' Retirement Association of Colorado ("Colorado PERA"), Tennessee Consolidated Retirement System ("TCRS"), Fjärde AP-Fonden ("AP4"), and Pensionskassernes Administration A/S ("PKA") (collectively, the "Global Pension Funds") to serve as Lead Plaintiffs in the above-captioned actions (the "Actions") against Citigroup Inc. ("Citigroup" or the Company") and related defendants and for the approval of the Global Pension Funds' selection of Entwistle & Cappucci LLP ("Entwistle & Cappucci") and Schiffrin Barroway Topaz & Kessler, LLP ("SBTK") (together, "Proposed Lead Counsel") to serve as Co-Lead Counsel, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").

3.     AP7 purchased its Citigroup common stock that is the subject of this action on the New York Stock Exchange. AP7 understands that by filing a complaint and seeking lead plaintiff status, AP7 is subject to the jurisdiction of this Court and is bound by all of its rulings.

4.     AP7, the Seventh National Pension Fund, is based in Stockholm, Sweden and is part of the Swedish National Pension Fund (AP Fund) system and manages a portion of the pension assets of the citizens of Sweden.  With over two million members and approximately $11 billion in assets under management, AP7 is one of the largest and most prominent pension funds in Sweden.

5.      AP7 has previously engaged SBTK to serve as its outside securities litigation counsel. In this capacity, SBTK regularly monitors AP7's securities portfolio and advises AP7 regarding any potential or existing securities claims.

6.      In its capacity as AP7's monitoring counsel, SBTK advised AP7 that it had suffered a significant financial loss related to its investment in Citigroup. SBTK further advised that a fraud claim existed against the Company and others to recover for these losses. SBTK provided AP7 a detailed memorandum to substantiate these allegations, which is protected by the attorney-client privilege and attorney work product doctrine. Considering the size of AP7's financial loss and the meritorious nature of the claims against the Company, SBTK advised AP7 that it could seek an active role as Lead Plaintiff in this litigation.

7.      AP7 then informed SBTK of its intention to seek appointment as Lead Plaintiff in any consolidated action against Citigroup. At this time, attorneys at SBTK advised AP7 that certain other institutional investors represented by SBTK were considering seeking appointment as Lead Plaintiff in the litigation against Citigroup. As AP7 has served as a Co-Lead Plaintiff in securities class actions in the past, AP7 requested that the firm keep it informed as to whether there might be an opportunity to seek Co-Lead Plaintiff appointment with other institutional investors who shared similar litigation and corporate governance objectives. AP7 further advised SBTK that it was particularly interested in securing Co-Lead Plaintiff appointment with U.S. public pension funds.

8.      SBTK informed AP7 that AP4 had agreed to take an active role in the litigation and to seek Lead Plaintiff status. AP7 understands that AP4 has also previously engaged SBTK as its outside securities litigation counsel. AP7, of course, was very familiar with AP4 as we are both members of the Swedish National Pension Fund system. AP7 also understood that AP4 had previous experience with the PSLRA lead plaintiff process having filed a joint lead plaintiff

application with a U.S. public pension fund in *In re Pfizer Inc. Sec. Litig.*, No. 1:05-md-1688-RO

(S.D.N.Y.). After determining that AP4 shared similar goals and objectives for prosecuting this

litigation, AP7 agreed to work with them jointly as Lead Plaintiffs.

      9.     Subsequent to this decision, SBTK informed AP7 that PKA also decided to take an

active role and seek Lead Plaintiff status in this action. AP7 understood that PKA had also

previously engaged SBTK as its outside securities litigation counsel. Having previously filed a

Lead Plaintiff motion with PKA in both *In re Dell, Inc., Sec. Litig.*, No. 06-726-SS (W.D. Tex.) and

*In re UnitedHealth Group Inc. PSLRA Litig.*, No. 06-1691 (JMR/FLN) (D. Minn.), AP7 was

familiar with PKA including its similar goals and objectives for prosecuting securities claims. AP7

agreed to work with PKA as proposed Co-Lead Plaintiffs.

      10.    As our lead plaintiff motion and related filings were being prepared, AP7 learned

that Colorado PERA and TCRS had suffered significant losses in connection with their Class Period

purchases of Citigroup securities and had retained the law firm of Entwistle & Cappucci to

represent them in seeking appointment as Lead Plaintiffs in the Citigroup litigation. AP7 further

learned that each of these sophisticated institutional investors was interested in working with other

sophisticated institutional investors to seek appointment as Lead Plaintiffs in this litigation.

Considering our stated preference to work with U.S. public pension funds and after determining that

each of Colorado PERA, the Tennessee Attorney General's Office and TCRS shared similar goals

and objectives for prosecuting this litigation, AP7 authorized SBTK to seek Lead Plaintiff status as

a group with these U.S. institutions.

      11.    AP7 further agreed to the filing of a detailed complaint and a motion requiring the

preservation of documents at Citigroup's Structured Investment Vehicles ("SIVs") and other related

entities as well as a motion seeking a partial lifting of the PSLRA discovery stay in connection with

our Lead Plaintiff application. AP7 understands that to date, the Global Pension Funds' Complaint is the only complaint in these securities actions that even mentions Citigroup's Class Period issuance of Liquidity Puts, let alone develops the critical facts and accounting provisions related to these guarantees that the Defendants failed to disclose, in any way, until November 5, 2007.

12.    AP7 also agreed that Entwistle & Cappucci and SBTK would work together as our proposed Co-Lead Counsel to prosecute this action vigorously and efficiently in the best interest of the Class. AP7 was familiar with the Entwistle & Cappucci firm from its role in *In re Royal Ahold Securities & "ERISA" Litigation*, MDL 01539 (U.S. Dist. Ct., D. Md.) where it represented a worldwide class of investors and Colorado PERA served as Lead Plaintiff.

13.    While AP7 has previously entered into a retainer agreement with SBTK, we have subsequently agreed to enter into a superseding Joint Prosecution Agreement that AP7, Colorado PERA, the Tennessee Attorney General, TCRS, AP4, PKA, Entwistle & Cappucci and SBTK have executed in connection with this litigation.

14.    The Joint Prosecution Agreement provides, among other things, a ceiling on our Proposed Co-Lead Counsel's hourly rates as well as a ceiling on total fees that counsel may request from the Court if we obtain a recovery that the Global Pension Funds believe to be in the best interests of the Class warranting the Court's approval. I understand and acknowledge that the ultimate award of attorney's fees and expenses is in the Court's discretion.

15.    The Joint Prosecution Agreement also requires the Global Pension Funds' consent to non-routine litigation expenses, such as retaining experts, and provides that the Global Pension Funds will review, comment upon, and authorize all filings made with this Court. In addition, the Joint Prosecution Agreement provides for regular telephone conferences among the Global Pension Funds during which we will discuss and determine litigation strategies and make any decisions that

we believe are required to ensure that we and Proposed Lead Counsel continue to represent the best interests of the Class. The Global Pension Funds have also agreed on how we will work together in this litigation and how we will resolve disputes if they should arise.

16.    The Global Pension Funds treat their Joint Prosecution Agreement as protected by the attorney-client privilege, but are pleased to submit it for the Court's *in camera* review if such submission will aid the Court in its consideration of the Lead Plaintiff applications.

17.    Since deciding to seek appointment as Lead Plaintiffs and authorizing and directing our Proposed Lead Counsel to file the Complaint and motions for interim relief for the Class, as discussed above, the Global Pension Funds have engaged in several telephone conferences concerning the competing lead plaintiff motions, our responses thereto, and our goals for continuing to prosecute the claims against Citigroup and the other defendants named in our Complaint in the best interests of the Class that we seek to represent.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

January _25_, 2008                          **Sjunde AP-Fonden/AP7**

                                            Richard Grötthelm
                                            *Vice-Executive Director*

**DECLARATION OF ANNEGRETE BIRCK JAKOBSEN AND MICHAEL NELLEMANN
PEDERSEN IN FURTHER SUPPORT OF THE MOTION OF THE GLOBAL PENSION
FUNDS FOR CONSOLIDATION, FOR APPOINTMENT AS LEAD PLAINTIFFS AND
FOR THE APPROVAL OF LEAD PLAINTIFFS' CHOICE OF COUNSEL**

**ANNEGRETE BIRCK JAKOBSEN AND MICHAEL NELLEMANN PEDERSEN**

pursuant to 28 U.S.C. § 1746 and under the laws of the United States of America, declare as
follows:

  1. We, Annegrete Birck Jakobsen and Michael Nellemann Pedersen, are Directors of
Pensionskassernes Administration A/S ("PKA"), and are authorized to direct this litigation on
behalf of PKA.

  2. We respectfully submit this Declaration in support of the Motion of PKA, the Public
Employees' Retirement Association of Colorado ("Colorado PERA"), Tennessee Consolidated
Retirement System ("TCRS"), Sjunde AP-Fonden ("AP7") and Fjärde AP-Fonden ("AP4")
(collectively, the "Global Pension Funds") to serve as Lead Plaintiffs in the above-captioned actions
(the "Actions") against Citigroup Inc. ("Citigroup" or the "Company") and related defendants and
for the approval of the Global Pension Funds' selection of Entwistle & Cappucci LLP ("Entwistle &
Cappucci") and Schiffrin Barroway Topaz & Kessler, LLP ("SBTK") (together, "Proposed Lead
Counsel") to serve as Co-Lead Counsel, pursuant to the Private Securities Litigation Reform Act of
1995 ("PSLRA").

  3. PKA purchased its Citigroup common stock that is the subject of this action on the
New York Stock Exchange. PKA understands that by filing a complaint and seeking Lead Plaintiff
status, PKA is subject to the jurisdiction of this Court and is bound by all of its rulings.

  4. PKA is based in Hellerup, Denmark and was created in 1954 by a collective of
occupational pension funds which currently consists of: (1) The Office Staff Pension Fund
(Pensionskassen for Kontorpersonale); (2) The Medical Laboratory Technologists' Pension Fund

(Pensionskassen for Bioanalytikere); (3) The Danish Diet and Nutrition Officers' Pension Fund

(Pensionskassen for Kost- og Ernæringsfaglige); (4) The Medical Secretaries' Pension Fund

(Pensionskassen for Lægesekretærer); (5) The State Registered Nurses' Pension Fund

(Pensionskassen for Sygeplejersker); (6) The Social Workers' and Social Pedagogues' Pension

Fund (Pensionskassen for Socialrådgivere og Socialpædagoger); (7) The Occupational Therapists'

and Physiotherapists' Pension Fund (Pensionskassen for Ergoterapeuter og Fysioterapeuter); and (8)

The Midwives' Pension Fund (Pensionskassen for Jordemødre). PKA serves as the sole manager

and administrator for each of these funds and is permitted to take all legal actions on behalf of each

fund regarding its investments, including filing a motion for lead plaintiff.

5.      PKA has previously engaged SBTK to serve as its outside securities litigation

counsel. In this capacity, SBTK regularly monitors PKA's securities portfolio and advises PKA

regarding any potential or existing securities claims.

6.      In its capacity as PKA's monitoring counsel, SBTK advised PKA that it had

suffered a significant financial loss related to its investment in Citigroup. SBTK further advised

that a fraud claim existed against Citigroup and others to recover for these losses. SBTK provided

PKA a detailed memorandum to substantiate these allegations, which is protected by the attorney-

client privilege and attorney work product doctrine. Considering the size of PKA's financial loss

and the meritorious nature of the claims against Citigroup, SBTK advised PKA that it could seek an

active role as Lead Plaintiff in this litigation.

7.      SBTK also advised PKA that it had been retained by AP7 and AP4 to pursue a Lead

Plaintiff application on their behalf. Having previously filed a Lead Plaintiff motion with AP7 in

both *In re Dell, Inc., Sec. Litig.*, No. 06-726-SS (W.D. Tex.) and *In re UnitedHealth Group Inc.

PSLRA Litig.*, No. 06-1691 (JMR/FLN) (D. Minn.), PKA was familiar with AP7 and its securities

litigation goals and objectives. PKA was also familiar with AP4 and its status as one of Sweden's largest National Pension Funds. PKA also understood that AP4 had previous experience with the PSLRA lead plaintiff process having filed a joint lead plaintiff application with a U.S. public pension fund in *In re Pfizer Inc. Sec. Litig.*, No. 1:05-md-1688-RO (S.D.N.Y.). SBTK further informed us that both AP7 and AP4 had already expressed a desire to work with other institutional investors as Lead Plaintiffs and, in particular, U.S. based public pension funds. To that end, SBTK informed us that AP7 and AP4 had authorized SBTK to explore the possibility of such a global lead plaintiff group.

8.    After determining that AP7 and AP4 shared similar goals and objectives for prosecuting this litigation with PKA, PKA informed SBTK of its intentions to seek appointment as Lead Plaintiff in any consolidated action against Citigroup along with AP7 and AP4. PKA also informed SBTK that like AP7 and AP4, it desired to seek Lead Plaintiff status along with U.S. public pension funds that shared similar goals and objectives, if possible.

9.    As our lead plaintiff motion and related filings were being prepared, PKA learned that Colorado PERA, and TCRS had suffered significant losses in connection with their purchases of Citigroup securities and had retained the law firm of Entwistle & Cappucci to represent them in seeking appointment as Lead Plaintiffs in the Citigroup litigation. PKA further learned that each of these sophisticated institutional investors was interested in working with other sophisticated institutional investors to seek appointment as Lead Plaintiffs in this litigation. After determining that Colorado PERA, the Tennessee Attorney General's Office and TCRS shared similar goals and objectives for prosecuting this litigation, PKA authorized SBTK to seek Lead Plaintiff with AP4, AP7 and the U.S. institutions.

10.     PKA further agreed to the filing of a detailed complaint and a motion requiring the preservation of documents at Citigroup's Structured Investment Vehicles ("SIVs") and other related entities as well as a motion seeking a partial lifting of the PSLRA discovery stay in connection with our Lead Plaintiff application. We understand that to date, the Global Pension Funds' Complaint is the only complaint in these securities actions that even mentions Citigroup's Class Period issuance of Liquidity Puts, let alone develops the critical facts and accounting provisions related to these guarantees that the Defendants failed to disclose, in any way, until November 5, 2007.

11.     PKA also agreed that Entwistle & Cappucci and SBTK would work together as our proposed Co-Lead Counsel to prosecute this action vigorously and efficiently in the best interest of the Class. PKA was familiar with the Entwistle & Cappucci firm from its role in *In re Royal Ahold Securities & "ERISA" Litigation*, MDL 01539 (U.S. Dist. Ct., D. Md.) where it represented a worldwide class of investors and where Colorado PERA served as Lead Plaintiff.

12.     While PKA has previously entered into a retainer agreement with SBTK, we have subsequently agreed to enter into a superseding Joint Prosecution Agreement that PKA, Colorado PERA, the Tennessee Attorney General, TCRS, AP4, AP7, Entwistle & Cappucci and SBTK have executed in connection with this litigation.

13.     The Joint Prosecution Agreement provides, among other things, a ceiling on our Proposed Co-Lead Counsel's hourly rates as well as a ceiling on total fees that counsel may request from the Court if we obtain a recovery that the Global Pension Funds believe to be in the best interests of the Class warranting the Court's approval. We understand and acknowledge that the ultimate award of attorney's fees and expenses is in the Court's discretion.

14.     The Joint Prosecution Agreement also requires the Global Pension Funds' consent to non-routine litigation expenses, such as retaining experts, and provides that the Global Pension

Funds will review, comment upon, and authorize all filings made with this Court. In addition, this Joint Prosecution Agreement provides for regular telephone conferences among the Global Pension Funds during which we will discuss and determine litigation strategies and make any decisions that we believe are required to ensure that we and Proposed Lead Counsel continue to represent the best interests of the Class. The Global Pension Funds have also agreed on how we will work together in this litigation and how we will resolve disputes if they should arise.

15.    The Global Pension Funds treat their Joint Prosecution Agreement as protected by the attorney-client privilege, but are pleased to submit it for the Court's *in camera* review if such submission will aid the Court in its consideration of the Lead Plaintiff applications.

16.    Since deciding to seek appointment as Lead Plaintiffs and authorizing and directing our Proposed Lead Counsel to file the Complaint and motions for interim relief for the Class, as discussed above, the Global Pension Funds have engaged in several telephone conferences concerning the competing lead plaintiff motions, our responses thereto, and our goals for continuing to prosecute the claims against Citigroup and the other defendants named in our Complaint in the best interests of the Class that we seek to represent.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this *25* day of January, 2008.

Pensionskassernes Administration A/S

By: _____
Annegrete Birck Jakobsen
*Director*

By: _____
Michael Nellemann Pedersen
*Director*

ANTAL S.06

# THE WALL STREET JOURNAL.

Set My F

| News | Today's Newspaper | My Online Journal | Multimedia & Online Extras | Markets Data & Too |

**MARKETBEAT**

WSJ.com's inside look at the markets    Blog Search: [        ] ▶

< Midday Tidbits — Tighter Lending -- Previous | SEE ALL POSTS FROM THIS BLOG | Next -- Four at Four:
Meet the New Boss…Sa[...] >

November 5, 2007, 3:26 pm

Visit WSJ.com's Markets page ▶

# Erasing $120 Billion in Market Cap

OTHER BLOGS FROM WSJ.COM

- Law Blog
- Washington Wire
- Real Time Economics
- The Juggle
- Health Blog
- Energy Roundup
- Business Technology

- MarketBeat
- Deal Journal
- Developments
- The Numbers Guy
- The Wealth Report
- The Informed Reader
- Independent Street

More

Posted by David Gaffen



With **Citigroup's** 7% decline in value today, the ongoing battle between it and **Bank of America** over who has the largest market capitalization has been put on hold for a time, as Citi now clearly trails BAC in terms of this typical valuation.

advertisement

The credit-market turmoil of the last several months has taken a large bite out of the market

### Changes in Market Caps

| Company | 9/20 Market Cap (bil) | 11/5 Market Cap (intraday) | Change |
|---|---|---|---|
| Citigroup | **$234.80** | $174.71 | **-$60.09** |
| Bank of America | $225.35 | **$196.46** | -$28.89 |
| Merrill Lynch | $64.41 | $47.49 | -$16.92 |
| JP Morgan Chase | $157.73 | $143.05 | -$14.68 |
| Morgan Stanley | $68.59 | $58.22 | -$10.37 |
| Lehman Brothers | $33.30 | $30.54 | -$2.49 |
| Bear Stearns | $13.31 | $11.55 | -$1.76 |
| Goldman Sachs | $80.94 | $86.10 | +$5.16 |

capitalization of most major banks and securities. But substantial losses have occurred in these names since Bear Stearns and Goldman Sachs **announced earnings on Sept. 20**.

Combining eight of the major banks and brokerages, **$120 billion**

**TODAY'S MARKETS**    5:30 p.m. EST

| STOCKS | | LAST | CHANGE | %CHANGE |
|---|---|---|---|---|
| Dow Jones Industrials * | | 12207.17 | -171.44 | -1.38 |
| S&P 500 * | | 1330.61 | -21.46 | -1.59 |
| Nasdaq Composite * | | 2326.20 | -34.72 | -1.47 |
| Russell 2000 * | | 688.60 | -4.12 | -0.59 |

| COMMODITIES | LAST | CHANGE |
|---|---|---|
| Gold, Feb | 914.10 | 8.30 |
| Crude Oil | 90.75 | 1.34 |

| TREASURYS | YIELD | CHANGE |
|---|---|---|
| 10-Year Note * | 3.5550 | 1 10/32 |

| CURRENCIES | LAST | PRIOR DAY |
|---|---|---|
| Yen (per dollar) | 106.8300 | 106.88 |
| Euro (in dollars) | 1.4672 | 1.4772 |

Source: Reuters and Dow Jones
Note: Closing quotes are preliminary    * At close

**in market cap has been wiped out in less than seven weeks,** encompassing the period of time in which investors were supposedly going to receive greater clarity on just what was going wrong at these various firms.

They now know there's a lot going wrong — **but still don't know when it's over.** That line about markets hating uncertainty may be a cliché, but it's a cliché for a reason, and recent trade in the likes of Citigroup and Merrill Lynch illustrate that. In that period of time, Citigroup itself has seen $50 billion lost in market-cap, while Merrill has lost $17 billion, and the expectation is that this **hasn't been fully accounted for by all of the firms.**

"I feel strongly that more mea culpas are to come," says Todd Harrison, CEO of Minyanville.com, in commentary today. **"How many more? I've been saying $100 billion in writedowns before year-end and that may prove light."**

 **Book mark MarketBeat.** Click **here** for the URL (no subscription needed).

Permalink | Trackback URL:
http://blogs.wsj.com/marketbeat/2007/11/05/erasing-120-billion-in-market-cap/trackback/
Save & Share: Share on Facebook | Del.icio.us | Digg this | Email This | Print
Read more: Credit, Numbers Game, Banks/Brokerages, Stocks, Financials
**More related content**

Comments
Report offensive comments to marketbeat@wsj.com

$120 billion in market cap has been wiped out in less than seven weeks, that's just what's (quote) "in the lighted side of the moon"! Yes I agree… but what's on the dark side of the moon? Another +250 Billion… maybe, lets just say over the next (Year)? The "WHO" knows what's really out there… and they have just ran out of printing suppliers ("IT")(credit) lines of "Green Paper Backs"… now bouncing off .72 futures!
The OZ

Comment by Wake up... "Dorothy...wake up!" - November 5, 2007 at 3:37 pm

These companies would be worth more if they just performed normal functions.
This exotic Bull-sh## cost them way more than it could have been worth.
The additional cost on the US economy they exploit would be ten times more.

Comment by Mistakes Hurt - November 5, 2007 at 3:39 pm

==Citi's loss of $50 billion in market cap is a ridiculous over-reaction. While there may be write-downs in excess of what they==

# MARKETS ON THE MOVE

**Track indexes and hot stocks,** with roll-over charting and headlines. Plus, comprehensive coverage of bonds, commodities and forex. Markets Data Center highlights:
• Most Actives
• Gainers
• Losers
• New Highs and Lows
• Money Flows
• Intraday Futures
• Currencies

**MOST POPULAR POSTS** | VIEWED | EMAILED

1.  S.C. Exit Polls: Breakdown by Race, Gender in Obama Win
2.  Judge Holds Lawyer in Contempt for Reading Maxim
3.  Why Wall Street's Top Women Rarely Lose Their Star Power
4.  Did Bill Clinton Go Too Far?
5.  South Carolina -- Latest Polls, Reader Predictions
6.  Who Are You Jerome Kerviel?
7.  Too Much or Not Enough?
8.  Florida's Crist Backs McCain
9.  Ted Kennedy to Endorse Obama
10.  Obama Earns an Endorsement from Camelot

**RELATED ARTICLES AND BLOGS**

Related Articles from the Online Journal
● Analyst Box Score: The Monoline Insurers
● Four at Four: Where Does It End?
● Fed Cuts Key Interest Rate As Recession Fears Well Up
● Ben Bernanke and Market Surprises

Blog Posts About This Topic
● From the Mouth of a god himself. No recession. Whew!
  ronsen.blogspot.com
● Surprise...!! The Fed jumps in first thing Tuesday morning with a .75% rate... takeitpersonally.blogspot.com

**More related content**    *Powered by Sphere*

# ABOUT THIS BLOG

 MarketBeat, led by Wall Street Journal Online writer David Gaffen, looks under

have taken and forecast to date, there is no possible way Citi could lose $50 billion. That would be more than half of their total exposure. The credit instruments in question are just not that bad.

By way of full disclosure, I should note that I am Chairman Emeritus of ATD, which was sold to Citi recently, so I hold a lot of Citi stock and am NOT a disinterested party. However, as a retired professor of finance (Rutgers Univ), I'd say this whether I owned Citi stock or not.

Comment by David K. Whitcomb, PhD - November 5, 2007 at 3:46 pm

Wake up Dorothy wake up. Amen.

Comment by Richard Wilson - November 5, 2007 at 3:52 pm

Financial innovation is trying to justify your salary by concocting all this exotic bull&*%^ and making sure that it does not blow up on your watch.

Comment by Snake oil salemen! - November 5, 2007 at 4:11 pm

Dr. Whitcomb = congrats on your sale of ATD to Citi. But the transparency, liquidity and price discovery available in equity trading is the direct opposite of the conflicted intertwining of credit rating agencies, structured finance underwriters (C) and investors. If these vehicles had transparency and were properly rated you would see some bids. But it appears that Citi intends to play a waiting game and hopes that the rating agencies withhold additional downgrades and that cash flows in the structures hold up. Relatively big gamble here. Nice addon of Win Bischoff to keep the London money center crowd stroked. Don't you find it telling that they couldn't convince anyone to step up to the CEO job right away? Too much out of control mess.

Comment by Equity market microstructures are not structured finance - November 5, 2007 at 4:14 pm

To Mr. Whitcomb - they said the same thing of the WTC - no way those building could fall down.

Now, I realize we're talking physical structures versus financial structures but try and sell $50 billion of properties where there is a supply glut and you'll find out just how fast you can lose money.

BTW - has anyone asked what were the educational pedigrees of the geniuses who bought these worthless pieces of junk? Might be an "educational" learning tool for the next time around.

Comment by anon2 - November 5, 2007 at 4:15 pm

Regarding the comments of David K. Whitcomb, I sincerely appreciate and respect your disclosure.

the hood of Wall Street each day, finding market-moving news and analyzing interesting trends and numbers. The blog is updated several times daily with contributions from reporters at The Wall Street Journal and the Online Journal and includes noteworthy commentary from the best blogs and research notes. Have a comment? Write to marketbeat@wsj.com.

# Subscribe

**RSS** -- subscribe to updated headlines to read from anywhere on the Web. For more about RSS, click here.

MarketBeat Blog

# Save & Share

**Digg** -- submit this item to be shared and voted on by the digg community. For more about digg, click here.
**Del.icio.us** -- mark an item as a favorite to access later or share with the del.icio.us community. For more about del.icio.us, click here.
**Facebook** -- share an item with users of Facebook, a collection of school, company and regional social networks. For more about Facebook, click here.

# PAST POSTS

November 2007

| M | T | W | T | F | S | S |
|---|---|---|---|---|---|---|
|   |   |   | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

« Oct                    Dec »

# Top Markets Stories

MORE

Comment by Mark Gavagan - November 5, 2007 at 4:19 pm

Warren wasn't kidding when he called these things "weapons of mass destruction".

My advice is call up the financial geniuses at SmithBarney and order up a swap - C for BRK.A Problem though, you might have to take an additional haircut above and beyond the current market price. Do it now - the rating agencies will continue to lower the hammer. Especially since they've awaken from their 3 year slumber while the train was barreling down the track with horns and sirens blaring!!

Comment by anon2 - November 5, 2007 at 4:20 pm

Why are these idiots getting hundreds of millions after losing tens of billions for their shareholders? This is nonsense.

Comment by William - November 5, 2007 at 4:29 pm

Would anyone now aht the book value would be after all forcasted writedowns and icluding a bad 4th quarter?

Comment by Analyst - November 5, 2007 at 4:35 pm

To David K. Whitcomb: While you might be correct that Citi will not lose $50 billion, market capitalization is based upon P/E multiples. Earnings might not decline much, but market expectations for future earnings growth has probably moderated since one of Citi's earnings streams has turned into a loss stream. So, the P/E multiple compresses.

Comment by Anonymous - November 5, 2007 at 4:40 pm

Google has a market cap larger than the combined market cap of the brokers cited in this story.

Comment by citishareholder - November 5, 2007 at 5:15 pm

I'm with William: what is itthat these folks are paid millions when they've mismanaged so many more millions?

Comment by Kit - November 5, 2007 at 5:37 pm

*Google has a market cap larger than the combined market cap of the brokers cited in this story.*

A fine observation, but what is one to conclude from it?

Comment by Tocqueville - November 5, 2007 at 5:41 pm

The rating agencies will have to issue new ratings in order to protect their own domain and sustain the impression that they are

arms length in the process...cough cough. The stress test of the models used was not of the levels easily achieved if not already surpassed.

Comment by suvacrew - November 5, 2007 at 5:41 pm

David Whitcomb - You didn't sell your company to Citi, by taking their stock as consideration you merged and became their silent minority partner. Unfortunately for you, your partner did some fairly unethical things (SIV's) and sold some fairly worthless paper (CDO's) so you and your partner are going to take a very big hit. It will be a lot more than $50 billion when all their subprime and CDO's are added up and they have to account for the CDO's they stuffed in their SIV's and their normal portfolio of mortgages declines in value as defaults increase and they are hit with securities lawsuits for underwriting billions of this junk and their investment banking and trading revenues decline because no one with a brain will want to continue working there and few will want to do business with them when they are exposed as selling worthless paper to their best clients around the world.

Comment by John - November 5, 2007 at 5:47 pm

I agree with William and Kit. It is unethical to reward failure so lavishly. Compensation for the top 1% is out of order. The current administration has refused to do anything about it.

Comment by Enough is Enough - November 5, 2007 at 5:50 pm

To Mr. I mean Dr. Whitcomb: Knowing that smart guys like you are rarely wrong, I'm sure your deal will work out. However, did it ever occur to you that the models these guys are using are phony? Maybe they will pay back their bonuses to help you out.

Comment by Cobweb - November 5, 2007 at 5:51 pm

So what's the problem? If you add up all the go away money these guy's that ran thier companies into the ground you will get a larger number than the decline in market cap.

The problem is that we as shareholders don't have any say in what the boss gets to kill the company and then leave.

The boards are not doing anythng but collecting their checks and getting a free lunch.

So , excuse me but I believe until the stakeholders have more to say about these kill and go bonuses it will contunue to happen over and over again.

Unique Insights

Comment by Unique Insights - November 5, 2007 at 5:59 pm

These shares market cap shrinks will follow US mortgage bulble

burst all the
way into next summer, as housing prices plunge to affordable
level.
According to last 20 years
bubble burst experience,
banking, finance shares will
make 30-50 % correction from their peaks ( Mer and Citi make 50
% while others make 30% correction)

correction to

Comment by Warren Huang - November 5, 2007 at 7:06 pm

Running a corporation is much simpler than running a democracy
with all it's obsolete checks and balances. (Are you listening
investment banks and Wall Street? You don't have any internal
checks and balances and far too much secrecy.) I think one of the
most amazing features of decade was the astute little people that
saw the housing train wreck coming. It was discussed ad nauseum
in forums for years, yet the financial sector, all Harvard and Yale
and Wharton graduates (and a few butcher boys) seemingly had on
blinders and like lemmings dove over the cliff (pockets stuffed
with cash and landing on feather beds). There is a strong argument
to triple tax Wall Street and corporate profiteers, to save them
from their addiction. I think we are seeing how high tax rates and a
balanced economy can co-exist. For one thing, the money is
recycled and stays in America. Something the Europeans have
been practicing for a while with their nanny states. Think where
we might be if we embraced Edwards Deming (continuous
improvement) and the Japanese embraced Milton Friedman
(maximize profits) instead.

Comment by Anonymous - November 5, 2007 at 7:09 pm

When bankers say "exposure is limited" assume they really mean
"we will have over 10 billion in write offs"

Comment by Everything is just fine - November 5, 2007 at 7:53
pm

As Warren Buffetmaster has said many times, "want to find out
what your asset is worth? put it on the market and you'll soon find
out." However Citi hasn't wanted to do that. "Credit instruments in
question are just not that bad." I'm sorry Dr., too many fund,
retirement, pensions, and private accounts simply DO NOT
AGREE. With the locomotive ARM's resets hauling ass down the
tracks who wants to be standing in the way??

Comment by Anonymous Johnathan - November 5, 2007 at 8:08
pm

When will the market realize that the budget cuts coming as a
result of these losses are going to hurt the TECH sector darlings
who source a significant part of their revenues from the financial
sector?

Comment by ohenry - November 5, 2007 at 8:39 pm

Like many small shareholders there is a tendency to react in a corporate profit and loss logic structure to these c.d.o and s.i.v. financial debacles of 2007. However we should keep in mind the short position operations and stradle option tradings which perform inversly. It a sad state of affairs, however, the pension funds, investment funds and small investors as it undermines the credibility and productivity of our North American and global civilizations.

Comment by Normand Larocque, Ontario, Canada. - November 6, 2007 at 5:18 am

Has anyone taken in the big question: What amount was off book and not accounted for yet!

Comment by Brenda - November 6, 2007 at 6:29 am

When you get a chance, can you correct the math in the table? C dropped by 60, not 50.

Comment by Naitik - November 6, 2007 at 10:36 am

When does the next shoe fall at B of A??

Comment by Lee - November 6, 2007 at 11:29 am

So why are we blaming the banks who made the loans rather than the deadbeats who took out the loans. When the banks get done foreclosing on these garbage borrows they will own a lot of US Real Estate and hold deficiency judgements against a lot of fraudulent lowlife borrowers. Our entire system is build on trust, if you borrow money you pay it back regardless who you borrowed it from. The banks need aggressively go after these freeloaders for all they are worth or may be worth in the future. They owe the money they need to be held accountable for repayment. Quit blaming the banks and start holding the true culprits accountable. Think where we'd be without the banks to lend the money. Trying renting for life ! Next time these low lifes come crying for a loan the banks should show them how the street feels.

Comment by Bullet Bob - November 6, 2007 at 11:42 am

The reason the credits aren't as bad as some are saying, at this point, is that loans are still being paid off. As long as that happens, the situation will eventually clear out and the banks and markets will recover. Obviously, that doesn't mean that all of these loans will pay off, just that for now, cash flows are still being paid because payments are still being made.

Comment by None - November 6, 2007 at 12:30 pm

I agree with my good friend and ex-colleague David Whitcomb that Citi's loss of $50 billion in market cap is likely an over-

Case 1:08-cv-00135-SHS    Document 17-8    Filed 01/28/2008    Page 8 of 9

reaction. The loss is magnified by a lack of confidence in Citi's management and board. They didn't disclose faithfully in the past, so many people are wondering now whether they uncovered all the skeletons in their closets.
By way of disclosure, I am an original investor in ATD and presently hold Citi stock.

Comment by Ephraim Sudit - November 6, 2007 at 1:10 pm

There is money to be made in financials-differentiate btw the banks -BAC has no SIVs off-book, their CEO is not in danger of losing his job, their losses were largly trading losses not subprime,altho they certainly have some exposure. I think their investmnt in CWF will pay off as well as their investment in China.Dollar-average back-in and enjoy the dividend. Go back and see their 5 year chart ag the Dow and its good. Citibank is more of a risk but also larger reward. One way to play C is go after their preferred which is paying 7.3% as of 11/5 with good equity upside and small issue (60,000,000 shares)-probably will be future ratings downgrade but cant see dividend in any danger or rating falling below investment grade. Both CWF ands WaMu will survive or be bought up at premiums to current price. More risk=more reward.

Comment by Jim - November 6, 2007 at 1:15 pm

One (and often only) thing CEOs of those large financial companies truly excel at is negotiating THEIR OWN compensation package (more or less unrelated to mid- or long-term company results).
It's like sharing in gains but NEVER in losses in casino.
Rotten to the core.

Comment by SomeBody - November 6, 2007 at 2:58 pm

Cash flow is king–I hope the hidden ice-bergs are small.

Comment by Paul Rich - November 6, 2007 at 3:05 pm

it never seems to amaze me how these financial institutions could make such finanial blunders.. all these CEO.s should be Fired. Fired Immediately….

Comment by casper - November 6, 2007 at 4:22 pm

What astounds me is not that Citigroup has lost $60 billion market capitalization, but that JP Morgan & BofA have only lost $28 and $14 billion, respectively. It seems to me that all money center banks were engaged in similar businesses. All are likely to be holding similar subprime/Alt-A mortgage tranches on the books, or in SIVs they are legally responsible for. They have similar exposures, in relation to their size. Citigroup has big exposure to SIVs, but, it might be able to pay less than 100% of the losses on these. JP Morgan & BofA seem to be holding this toxic waste directly on their own books. They simply have not marked much of it down to market value. Citigroup, may be more honest about

its losses than the others, although they were quite dishonest when the losses were first announced. All the big banks have time bombs ticking. These bombs will explode as soon as their accountants force them to finally mark the toxic waste assets down to market value, and the investing public realizes how deep those losses really are. In spite of the super-SIV they want to create, sooner or later, the banks will have to declare the true level of their losses. So far, however, JPM & BAC have been spared much of the type of stock price loss already experienced by Citi. Eventually, however, they will feel the full measure of stock price pain.

Comment by Cybergoodman - November 7, 2007 at 8:45 am

Post a Comment

Name :

Comment:

Submit

Visit WSJ.com's Markets page ▶

Return To Top

---

**WSJ Digital Network:**

MarketWatch  |  Barrons.com  |  RealEstateJournal
AllThingsDigital  |  Dow Jones News Alerts  |  MORE

---

Subscribe   Log In   Take a Tour   Contact Us   Help   Email Setup   Customer Service: Online | Print

Privacy Policy   Subscriber Agreement & Terms of Use   Copyright Policy   Mobile Devices   RSS Feeds

News Licensing   Advertising   About Dow Jones

Copyright © 2008 Dow Jones & Company, Inc. All Rights Reserved

DOWJONES

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TILLIE SALTZMAN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CITIGROUP INC., CHARLES O. PRINCE, ROBERT E. RUBIN, STEPHEN R. VOLK, SALLIE L, KRAWCHECK, GARY L. CRITTENDEN and ROBERT DRUSKIN,<br><br>Defendants. | CIVIL ACTION NO. 07-9901-SHS<br><br>ECF FILED |
| LENNARD HAMMERSCHLAG, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CITIGROUP INC., CHARLES PRINCE, SALLIE L, KRAWCHECK, GARY CRITTENDEN,<br><br>Defendants. | CIVIL ACTION NO. 07-10258-RJS |

|  |  |  |
|---|---|---|
| PUBLIC EMPLOYEES' RETIREMENT ASSOCIATION OF COLORADO; TENNESSEE CONSOLIDATED RETIREMENT SYSTEM; SJUNDE AP-FONDEN; FJÄRDE AP-FONDEN; and PENSIONSKASSERNES ADMINISTRATION A/S, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO. 08-CV-00135 |
| Plaintiffs, | ) ) ) |  |
| vs. | ) ) ) |  |
| CITIGROUP INC., CHARLES O. PRINCE, SALLIE L. KRAWCHECK, GARY L. CRITTENDEN, TODD S. THOMSON, ROBERT DRUSKIN, THOMAS G. MAHERAS, MICHAEL STUART KLEIN, DAVID C. BUSHNELL, JOHN C. GERSPACH, STEPHEN R. VOLK, GEORGE DAVID, and KPMG LLP, | ) ) ) ) ) ) ) ) ) |  |
| Defendants. | ) |  |

## NOTICE OF WITHDRAWAL OF
## NEW JERSEY DIVISION OF INVESTMENT
## FROM THE U.S. PUBLIC FUND GROUP

The New Jersey Division of Investment ("NJ DOI") joined with the State Teachers

Retirement System of Ohio ("Ohio STRS"), and the State Universities Retirement System of

Illinois ("SURS"), as the U.S. Public Fund Group, to move for appointment as Lead Plaintiff in

this litigation. That application was filed on January 7, 2008. After the U.S. Public Fund Group

had filed this motion, NJ DOI agreed to participate in a private placement of Citigroup

convertible preferred securities, which was announced on January 15, 2008. At the time New

Jersey joined with the U.S. Public Fund Group and authorized its motion for appointment as

2

Lead Plaintiff in this litigation, this participation in the private placement had not been offered to or contemplated by NJ DOI.

Without prejudice to any of its rights, NJ DOI has elected to withdraw from the U.S. Pension Fund Group as an active movant for Lead Plantiff status. NJ DOI continues to support the U.S. Public Fund Group's application for Lead Plaintiff because it believes the U.S. Public Fund Group remains the most adequate plaintiff under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4. NJ DOI reserves all of its rights in connection with this litigation.

Accordingly, NJ DOI has respectfully withdrawn from the U.S. Public Fund Group and its transactions should no longer be considered in connection with the competing motions for Lead Plaintiff.

Dated: January 18, 2008

Respectfully submitted,

**BERGER & MONTAGUE, P.C.**
Merrill G. Davidoff (MD-4099)
Lawrence J. Lederer
Arthur Stock
1622 Locust Street
Philadelphia, PA 19103
Telephone: 215-875-3000
Facsimile: 215-875-4604

Malta 434083

## CERTIFICATE OF SERVICE

I, Merrill G. Davidoff, an attorney with Berger & Montague, P.C., 1622 Locust Street, Philadelphia, PA 19103, hereby certify that on this 18th day of January, 2008 I caused to be electronically filed the foregoing Notice of Change in Status of New Jersey Division of Investment using the ECF System which will electronically send notification of such filing to the registered participants, and paper copies will be sent via first-class mail postage prepaid to those indicated as non-registered participants on January 18, 2008.

Merrill G. Davidoff

1 of 2 DOCUMENTS

Copyright 2008 Factiva ®, from Dow Jones
All Rights Reserved



(Copyright (c) 2008, Dow Jones & Company, Inc.)

## THE WALL STREET JOURNAL.

The Wall Street Journal

January 16, 2008 Wednesday

**SECTION:** Pg. A1

**LENGTH:** 2436 words

**HEADLINE:** World Rides to Wall Street's Rescue --- Citigroup, Merrill Tap Foreign-Aid Lifelines;
Damage Tops $90 Billion

**BYLINE:** By David Enrich, Robin Sidel and Susanne Craig

**BODY:**

In the latest sign of America's sinking financial fortunes, investors from as far afield as Japan, Korea, Singapore, Saudi Arabia and Kuwait have come to the rescue of Wall Street.

The list of players that agreed yesterday to pump a combined $19.1 billion of capital into Citigroup Inc. and Merrill Lynch & Co. spotlights a dramatic shift in power. After flooding the world with capital that fed both economic growth and excess, battered U.S. financial institutions now are turning to countries and companies that not so long ago were suffering through their own disasters.

Yesterday's infusions follow earlier investments into wounded American and European titans, including Morgan Stanley and UBS AG. The bailout is another milestone in a long-running trend: the subsidization of the U.S. economy by foreign investors, from Asian governments purchasing U.S. Treasury bonds to finance the national debt to deep-pocketed oil states snapping up stakes in hobbled banks.

"There are quite a few ironies there," says Anthony Sabino, a professor of law and business at St. John's University in New York. "Traditionally, it is the U.S. economy and the wealth of the U.S. that have come to the rescue of nations and businesses across the world."

Merrill's investors, which were announced yesterday, include Mizuho Financial Group Inc., the second-largest Japanese bank, which was nearly swamped by bad loans made in the 1990s. Korean Investment Corp., another Merrill investor, is a government-controlled investment fund of South Korea, a country that was staggered by the Asian financial crisis in the late 1990s.

The reason titans like Merrill and Citigroup have had to go hat-in-hand for money: big losses from bad bets tied to the battered U.S. housing market.

World Rides to Wall Street's Rescue --- Citigroup, Merrill Tap Foreign-Aid Lifelines; Damage Tops $90 Billion The Wall Street Journal January 16, 2008 Wednesday

Citigroup, which yesterday announced a fourth-quarter loss of $9.83 billion, said it would write down the value of certain assets by $18.1 billion. Merrill's fourth-quarter write-downs, to be announced tomorrow, are expected to be nearly $15 billion. That will push the toll on Wall Street from the current credit crisis past $100 billion in losses, equivalent to 0.7% of gross domestic product. By way of comparison, the total losses from savings and loans and related commercial bank loans from 1986 to 1995 were about $189 billion, or 3.2% of average GDP in that period. S&Ls alone were $153 billion.

Despite their problems, neither Citigroup nor Merrill had trouble luring investors, including one U.S. pension fund and firms drawn to appealing terms such as the 9% dividend Merrill promised on $6.6 billion in preferred stock that it will issue. Citigroup will pay a 7% dividend on $12.5 billion in preferred shares.

"There are trophy properties available for what is petty cash," says Claire Gruppo, co-founder of Gruppo Levey & Co., which advises government investment funds.

Former Citigroup Chairman and Chief Executive Sanford Weill, who is adding to his already large stake in the New York financial conglomerate, said a total of about $20 billion raised so far by Citigroup "goes a long way to shore up losses." He added that "many parts of the company are doing very well."

Vikram Pandit, who became Citigroup's chief executive last month, said the moves announced yesterday "allow us to be on our front foot," using a cricket term for being well positioned.

Despite the billions of dollars in fresh capital, it isn't certain that either Merrill or Citigroup are out of the woods. Credit markets are still performing poorly, and consumers continue to tangle with mortgages carrying interest rates that will adjust upward this year. Furthermore, Citigroup faces big exposure to the consumer-credit cycle, which is showing increased signs of weakness. The big bank has a massive credit-card portfolio that includes subprime cardholders who are likely to find it increasingly difficult to pay their bills.

Financial stocks skidded yesterday on deepening fears that credit problems are spreading beyond mortgages and into credit cards, auto loans, commercial loans and other types of credit. Citigroup helped fuel the sell-off with bearish comments and $4 billion in fourth-quarter credit costs in its U.S. consumer business.

So far, the foreign investment in Wall Street firms hasn't provoked a political backlash in the U.S., in contrast to the uproar that followed Dubai Ports World's attempt to acquire the operations of U.S. ports last year. The Dubai Ports World incident raised anxiety about undermining U.S. defenses against terrorism.

The injections of foreign capital into the two Wall Street giants emerged as an issue in last night's debate among the leading Democratic presidential hopefuls. "I'm concerned about this," New York Sen. Hillary Clinton said, invoking the phrase "sovereign wealth funds." "We've got to know more about them, they've got to be more transparent . . .," she said. "I want the United States Congress and the Federal Reserve Board to ask these tough questions."

Politicians may be aware that the alternative to foreign investment in the banking system could be painful. If banks pull back on lending, that would have negative consequences to the economy. The issue of selling chunks of Wall Street to Middle Eastern and Asian investors hasn't figured much in political campaign rhetoric -- perhaps because voters don't care much about who owns shares in Citigroup or Merrill Lynch.

"What we've seen so far has been largely constructive. We need the money," said Massachusetts Democrat Barney Frank, chairman of the House Financial Services Committee. "Given that we had the losses, the infusion of money is helpful. . . . We'd be worse off without it."

But the long-term implications are uncertain. Foreigners, including the investment arms of some governments criticized as autocratic, will end up with a significant chunk of Wall Street. Existing shareholders will see their stakes diluted.

World Rides to Wall Street's Rescue --- Citigroup, Merrill Tap Foreign-Aid Lifelines; Damage Tops $90 Billion The Wall Street Journal January 16, 2008 Wednesday

Merrill's capital-raising efforts began in October, after its devastating third-quarter write-down and just weeks before Merrill Chairman and Chief Executive John A. Thain arrived. At the board's behest, senior management led by Gregory Fleming, an investment banker specializing in financial institutions and now the firm's president, began assembling a list of possible investors, according to people familiar with the matter.

In December, the firm lined up an immediate $4.4 billion injection from Singapore's state-run Temasek Holdings. But Mr. Thain and others figured the firm would need another $5 billion or so. Given the strong response of investors, they decided to raise more, says one person involved in the discussions with investors.

"We didn't make any outbound calls on this," this person says. All investors involved in yesterday's announcement indicated they would have invested more if they could have, and some ended up investing less than offered, this person says.

"We contacted them," says William G. Clark, director of the New Jersey Division of Investment, which agreed to invest $400 million in Citigroup and $300 million in Merrill Lynch. Mr. Clark approached both firms about a week ago, after reading press reports suggesting that they were looking for additional capital.

Most of the Merrill money is coming from overseas. Korean Investment Corp., Kuwait Investment Authority, and Mizuho Financial Group account for about 80% of the $6.6 billion raised, says the person involved in the discussions.

Mizuho's investment of $1.2 billion is the biggest international move by a Japanese bank since 1986, when Sumitomo Bank Ltd., one of the predecessors of Sumitomo Mitsui Financial Group Inc., bought a $500 million stake in Goldman Sachs, then a private partnership that was fighting to compete with better-capitalized rivals. Sumitomo went on to make $1.9 billion on the investment. When Sumitomo found itself short of cash in 2003, Goldman pumped $1.3 billion into the bank, solidifying the relationship between the two institutions.

Until recently, Japanese banks like Mizuho have largely shied away from big overseas investments, focusing on beefing up their domestic businesses. But these banks are now looking to boost their overseas operations. "We'd like to see if the [Merrill deal] could lead to cooperation between the two firms in different business areas," says a Mizuho spokeswoman.

Merrill is hoping to form strategic alliances with each of the big foreign firms, says a person familiar with the matter.

The large reservoirs of capital available to Citigroup and Merrill are a marked contrast to past banking crises. In 1991, it took Citigroup several months of hard searching before Saudi Arabian Prince Alwaleed bin Talal agreed to pump $590 million into what was then known as Citicorp. The investment, in the form of a private placement of convertible preferred stock, gave him an ownership stake of nearly 15% at the time.

This time, the day after Citigroup unveiled in late November a $7.5 billion investment from the Abu Dhabi Investment Authority, known as ADIA, representatives of other investment firms started calling Citigroup.

"A lot of the equity investors were upset after the ADIA investment because they felt they didn't get a bite of the apple," says one person with knowledge of the situation. Capital Research Global Investors, already one of Citigroup's largest institutional investors, was among the most vocal investors, this person says.

Between Christmas and New Year's Day, a small group of senior Citigroup executives started hammering out that second round of fund raising. Citigroup needed fresh cash to keep its capital levels from dipping into dangerously low territory.

The group included Mr. Pandit, Citigroup's new chief executive officer; Chief Financial Officer Gary Crittenden; investment banking co-head Michael Klein; and Zion Shohet, Citigroup's treasurer. They started reaching out to

World Rides to Wall Street's Rescue --- Citigroup, Merrill Tap Foreign-Aid Lifelines; Damage Tops $90 Billion The Wall Street Journal January 16, 2008 Wednesday

investors that hadn't taken part in the ADIA deal.

Their pitch was simple: Investors would have the chance to snap up significant stakes in Citigroup at half the price it would have cost them before the credit crunch hit last summer. Citigroup executives gave detailed briefings on the company's planned fourth-quarter announcements, including the expected dividend cut and the rough magnitude of the write-downs.

Other Citigroup executives, including Hamid Biglari, a senior deal maker responsible for the investment bank's dealings with financial institutions, reached out to the China Development Bank, an institution with ties to the Chinese government. They tentatively reached an agreement last week in which CDB would invest about $2 billion in Citigroup. But last weekend the deal fell through after it encountered resistance from Chinese regulators.

The setback proved fleeting, as the Government of Singapore Investment Corp., known as GIC, kicked in extra funding to compensate for China's withdrawal. GIC ended up as by far the largest investor, pouring in about $6.9 billion, slightly more than half of the total infusion. The next largest contributor, the Kuwait Investment Authority, put in "a fraction" of what GIC invested, says a person familiar with the matter. None of the investors will own more than 4.9% of Citigroup's stock, allowing them to avoid added scrutiny from U.S. bank regulators.

While Citigroup didn't disclose the size of the other investors' stakes, the contributions were relatively small. One person close to the situation described the investments by Mr. Weill and Prince Alwaleed as "tiny little pieces" of the overall $12.5 billion investment.

In recent days, Mr. Pandit reached out to Mr. Weill and asked him if he'd like to participate. Citigroup didn't need his cash. But executives were eager for Mr. Weill to invest because it would send a signal that he endorsed the bank's management and strategy, says a person familiar with the matter.

Mr. Weill had built Citigroup into a financial colossus. His handpicked successor, Charles Prince, had recently stepped down amid mounting losses, and Mr. Weill's strategy of a universal bank has increasingly been called into question. Mr. Pandit was willing to use Mr. Weill as a sounding board about Citigroup's problems. Mr. Weill offered to be an investor, and dealt directly with Mr. Pandit.

As Citigroup executives came to terms with the size of the looming fourth-quarter loss -- the largest quarterly loss in Citigroup's history -- the need for billions of dollars in fresh capital became obvious.

In the third quarter, Citigroup's Tier 1 capital ratio -- a key measure of its ability to withstand losses and continue serving its customers -- had already dwindled below the company's internal target levels, prompting Citigroup to stop repurchasing its own shares.

The investments announced yesterday will go a long way toward mending the tattered capital ratios. With that and other cash in its pocket, Citigroup estimates its Tier 1 ratio will rebound to 8.2%, safely above its internal target and regulatory minimums.

The danger is that further write-downs will continue to chip away at capital. Even after reducing their value by $18 billion, Citigroup still is exposed to $37.3 billion of collateralized debt obligations, or CDOs, complex investment vehicles whose values have cratered as mortgage defaults have soared.

Citigroup continues to assign higher average values than others in the industry to the rarely traded instruments, analysts say. As a result, "more CDO hits could be in store," says David Hendler, an analyst at CreditSights Inc.

The company's U.S. consumer business could be another source of pain. Citigroup surprised Wall Street yesterday by taking a $4.1 billion hit in order to set aside more money to cover possible future defaults on mortgages, home-equity loans, credit cards and auto loans -- areas in which the bank is seeing more borrowers fall behind on

World Rides to Wall Street's Rescue --- Citigroup, Merrill Tap Foreign-Aid Lifelines; Damage Tops $90 Billion The Wall Street Journal January 16, 2008 Wednesday

payments.

Citigroup said those beefed-up reserves should be enough to cover 22 months worth of loan losses -- as long as they stay at current levels. But many industry observers expect a leap in defaults on credit-card and auto loans, where credit quality so far has remained solid. If that happens, Citigroup likely will be forced to bite the bullet and set aside additional reserves.

---

Monica Langley, Craig Karmin, David Wessel and Yuka Hayashi contributed to this article.

(See related article: "Broad Market Still Worried; Dow Falls 2%" -- WSJ Jan. 16, 2008)



License this article from Dow Jones Reprint Service

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** January 16, 2008

NJ Invests in Citigroup, Merrill Lynch: Financial News - Yahoo! Finance                Page 1 of 2

Case 1:08-cv-00135-SHS     Document 17-11     Filed 01/28/2008     Page 1 of 2



Yahoo! My Yahoo! Mail    Make Y! your home page                Search:        Web Searc



**YAHOO!** FINANCE    **Sign In**    Finance Home - Help
New User? Sign Up                                    Associated Pr

[ GET QUOTES ]    **Finance Search**

TD AMERITRADE    Scottrade    E*TRADE



**Related Quotes**

C 15-Jan 4:00pm (C)Yah

| | | |
| --- | --- | --- |
| C | 26.94 | -2.12 | Ne |
| MER | 53.01 | -2.96 | Ne |

**View Detailed Quotes**
Delayed 20 mins
Providers - Disclaimer

AP

# NJ Invests in Citigroup, Merrill Lynch

Tuesday January 15, 4:27 pm ET

By Tom Hester Jr., Associated Press Writer

**New Jersey State Fund Sees Opportunity in Investing in Citigroup, Merrill Lynch**

TRENTON, N.J. (AP) -- Tucked amid the major foreign investment funds and well-known Wall Street investors providing cash to struggling Citigroup and Merrill Lynch was the New Jersey Division of Investment.

ADVERTISEMENT

**The Berkshire Miracle**

Berkshire Hathaway made Warren Buffett the 2nd richest man in the world.

And in Omaha, Nebraska alone, more than 30 families own $100 million worth of Berkshire stock. If you missed out on the Berkshire miracle, a rare second chance awaits you.

In a new free report, The Motley Fool reveals what could be the next Berkshire Hathaway.

Click here to get your FREE report now!

The division invested $400 million in pension funds in Citigroup Inc. preferred stock and $300 million in Merrill Lynch & Co. preferred stock. The investments pay a much higher return than common shares, as the investment banks offer premiums to big investors willing to provide cash to help them weather the global credit problems.

"These investments give the division the opportunity to increase its exposure to two of the strongest franchises in the global financial services marketplace," said William G. Clark, the division's director. "In both cases, the investments provide for a significant current yield and the opportunity to benefit from potential appreciation in the underlying common stock of these firms."

The Citigroup preferred stock that the state fund is getting, for instance, will pay a 7 percent annual dividend and a premium above market price when converted into common stock. Also Tuesday, Citigroup cut its dividend to common shareholders by 41 percent to preserve cash.

Sue Burrows Farber, the division's chief administrative officer, said the division "negotiated terms that we think were lucrative to our pension fund."

"The timing of these investments coincides with the division's view that opportunities have now emerged within the financial services sector that appear attractive from a

**Related News Stories**

- Merrill Lynch to Get $6.6 Billi - AP (4:41 pm)
- Sovereign funds buying stake in banks - at Reuters (4:37 pm)
- [$$] Investors Back Away Fro Risk - at The Wall Street Journal Onli (4:37 pm)

More



MANSIONS GONE WIL

60 MINUTES
YAHOO! NEWS
Watch Now

**Top Stories**

- Stocks Fall Sharply on Economic Worries - AP (4:26 pm
- Citi Loses Almost $10B, Slashes Dividend - AP (4:15 pm)
- Merrill Lynch to Get $6.6 Billi - AP (4:39 pm)
- Court Rules Against Investor AP (3:54 pm)

More

- More AP

NJ Invests in Citigroup, Merrill Lynch: Financial News - Yahoo! Finance     Page 2 of 2

Case 1:08-cv-00135-SHS    Document 17-11    Filed 01/28/2008    Page 2 of 2

long-term perspective," Clark said.

New Jersey's governor, Jon S. Corzine, is a former chairman of the investment firm Goldman Sachs and has proposed increasing highway tolls to cut state debt, but Burrows Farber said the governor's office had no role in the investment decisions.

In total, Citigroup announced a $12.5 billion capital injection, while Merrill Lynch secured $6.6 billion in investments from other big investors including the Government of Singapore Investment Corp., the Kuwait Investment Authority and Prince Alwaleed bin Talal of Saudi Arabia.

New Jersey's pension fund is worth $81.3 billion and is among the 10 largest public fund managers in the United States. It provides retirement benefits for more than 700,000 current and future retirees in seven public systems.

The pension funds provide retirement benefits to teachers, judges, prosecutors, police, firefighters and state, county and local government workers. The benefits granted to those workers are guaranteed by state law and cannot be reduced.

But as the state largely failed to fund the pension system from 1993 to 2006, lawmakers increased pension benefits, and stock market woes drained the fund, it now has an estimated deficit of about $25 billion.

Given that, the state has been trying to diversify its portfolio to help boost a return on its investment. The state also has contributed more than $2 billion to the fund since 2006.

According to its Web site, the division has 35.5 percent of its investments in domestic stocks and no exposure to securities backed by subprime mortgages, many of which have fallen into default, creating problems for firms like Citigroup and Merrill Lynch and creating global credit woes.

- Most-viewed articles

**Inside Yahoo! Finance**

**Mutual Fund Center**

- Fund Screener
- Top Performers
- Exchange-Traded Funds
- Mutual Funds 101

**RSS Feeds**

Add headlines to your personalized My Yahoo! Page ( About My Yahoo! and RSS )

C Headlines

MER Headlines

MERPO Headlines

Mutual Fund Headlines

More Finance RSS Feeds



✉ Email Story     🔔 Set News Alert     🖨 Print Story

[ Search News ]

Sponsor Results

Countrywide® Home Loans
No Closing Cost Refi. No Points. No Credit Report or Processing Fees.
www.Countrywide.com

Trade Forex Online
Free Forex Software & One-on-One Training. Try GFT risk-free now.
www.GFTforex.com

Try Forex Currency Trading at Forex.com
Free $50,000 practice account with real-time charts, news and research.
www.forex.com

(What's This?)

Copyright © 2008 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright Policy - Send Feedback
Copyright © 2008 The Associated Press. All rights reserved. The information contained in the AP News report may not be published, broadcast, rewritten, or redistributed without the prior written authority of The Associated Press.



**CITI REPORTS FOURTH QUARTER NET LOSS OF $9.83 BILLION, LOSS PER SHARE OF $1.99**

**RESULTS REFLECT WRITE-DOWNS ON SUB-PRIME RELATED DIRECT EXPOSURES IN FIXED INCOME MARKETS AND INCREASED CREDIT COSTS RELATED TO U.S. CONSUMER LOANS**

**RECORD RESULTS IN INTERNATIONAL CONSUMER, TRANSACTION SERVICES AND GLOBAL WEALTH MANAGEMENT**

**STRONG BUSINESS VOLUMES; AVERAGE DEPOSITS UP 21%, AVERAGE LOANS UP 19%**

**FULL YEAR 2007 REVENUES OF $81.7 BILLION, NET INCOME OF $3.62 BILLION**

**FULL YEAR RECORD REVENUES AND NET INCOME IN INTERNATIONAL CONSUMER, TRANSACTION SERVICES AND GLOBAL WEALTH MANAGEMENT**

**FULL YEAR RECORD INTERNATIONAL REVENUES, UP 15%**

New York, NY, January 15, 2008 — Citigroup Inc. (NYSE:C) today reported a net loss for the 2007 fourth quarter of $9.83 billion, or $1.99 per share. Results include $18.1 billion in pre-tax write-downs and credit costs on sub-prime related direct exposures in fixed income markets, and a $4.1 billion increase in credit costs in U.S. consumer primarily related to higher current and estimated losses on consumer loans.

For the full year 2007, net income was $3.62 billion, or $0.72 per share. See Schedule A for full year business segment results.

**Management Comment**

"Our financial results this quarter are clearly unacceptable. Our poor performance was driven primarily by two factors – significant write-downs and losses on our sub-prime direct exposures in fixed income markets, and a large increase in credit costs in our U.S. consumer loan portfolio. Looking beyond these two factors, revenues and volumes continued to grow strongly in a number of our franchises and we generated record results in international consumer, transaction services, wealth management, and advisory," said Vikram Pandit, Chief Executive Officer of Citi.

"We have begun to take actions to ensure that Citi is well positioned to compete and win across our franchises while effectively keeping a tight control over our business risks. We are taking several steps to strengthen our capital base, including today's announcement regarding an investment in Citi by several long-term sophisticated investors, our dividend reset, and our continued focus on divesting non-core assets and businesses. We are taking actions to enhance our risk management processes and to improve expense productivity. We are also in the midst of a thorough review of our businesses, which when complete, will drive our execution priorities," said Pandit.

"Over the past five weeks I have been touring our businesses and listening to many of Citi's important constituents – employees, investors, clients, regulators, and many others. These discussions have only confirmed my deep belief in the power and strength of Citi. We have a unique franchise that is well positioned in growing markets with tremendous capabilities to serve clients around the world. We intend to build on our advantages to deliver superior results for our clients, investors, and employees," said Pandit.

citi

**Citi Segment Results**

| (In Millions of Dollars, except EPS) | Fourth Quarter Revenues | | % | Fourth Quarter Net Income | | % |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | Change | 2007 | 2006 | Change |
| Global Consumer | $16,633 | $12,882 | 21% | $766 | $2,611 | (71)% |
| Markets & Banking | (11,729) | 7,080 | NM | (10,986) | 1,754 | NM |
| Global Wealth Management | 3,462 | 2,716 | 27 | 623 | 411 | 27 |
| Alternative Investments | 384 | 1,308 | (71) | 61 | 549 | (89) |
| Corporate/Other | (434) | (158) | NM | (187) | (196) | 5 |
| Total Citi | $7,216 | $23,828 | (70)% | $(9,833) | $5,129 | NM |
| Earnings per Share | | | | $(1.99) | $1.03 | NM |
| International Results [1] | $8,142 | $9,982 | (18)% | $(677) | $2,036 | NM |

(1) International results are fully reflected in the Total Citi results above, and exclude Alternative Investments, and Corporate/Other.
NM Not meaningful.

## FOURTH QUARTER SUMMARY

- Revenues were $7.2 billion, down 70%, driven by significant write-downs on sub-prime related direct exposures in fixed income markets (discussed below). Revenues across many businesses increased, driven by growth in business volumes.

  – U.S. consumer revenues grew 6%, driven by higher business volumes with average deposits and managed loans, both up 10%.

  – International consumer revenues increased 45%, driven by organic volume growth, the impact of recent acquisitions, a $507 million pre-tax gain on Visa Inc. shares, and a $313 million pre-tax gain on the sale of an ownership interest in Nikko Cordial's Simplex Investment Advisors. Average deposits and loans increased 21% and 30%, respectively, and investment sales were up 24%.

  – In markets & banking, securities and banking revenues were negative due to write-downs and losses related to deterioration in the mortgage-backed and credit markets, including:

    ▪ Write-downs of $17.4 billion on sub-prime related direct exposures. These exposures on September 30, 2007 were comprised of approximately $11.7 billion of gross lending and structuring exposures and approximately $42.9 billion of net ABS CDO super senior exposures (ABS CDO super senior gross exposures of $53.4 billion). On December 31, 2007, sub-prime related direct exposures were comprised of approximately $8.0 billion of gross lending and structuring exposures and approximately $29.3 billion of net ABS CDO super senior exposures (ABS CDO super senior gross exposures of $39.8 billion). See detail in Schedule B on page 12.

    ▪ Lower revenues due to write-downs on non sub-prime securitized products and in fixed income proprietary trading.

    ▪ These results were partially offset by double-digit revenue growth in interest rate and currency trading, commodities, and record advisory revenues.

    Transaction services revenues were a record, up 44%, driven by increased liability balances, up 35%, and higher assets under custody, up 26%.

    Markets and banking international revenues included strong double-digit revenue growth in Asia, Latin America, and Japan.

  – Global wealth management revenues increased 27%, as U.S. revenues grew 7% and international revenues more than doubled due to double-digit organic growth and increased ownership in Nikko Cordial.

  – Alternative investments revenues declined as strong growth in client revenues was offset by lower revenues from private equity and hedge fund activities, and a lower market value on Legg Mason shares.

  – Acquisitions contributed 7% to revenue growth during the quarter.

  – The net interest margin increased 15 basis points versus the third quarter 2007.



- **Operating expenses** increased 18%, primarily driven by the impact of acquisitions, increased business volumes, charges related to approximately 4,200 net headcount reductions, and the impact of foreign exchange. Expenses reflect savings from structural expense initiatives announced in April 2007.

  – Excluding the impact of acquisitions, organic expense growth was 9%.

  – The company opened or acquired 267 new retail bank or consumer finance branches during the quarter, including 188 internationally and 79 in the U.S. During 2007, 712 retail bank and consumer finance branches have been opened or acquired.

- **Credit costs** increased $5.41 billion, primarily driven by an increase in net credit losses of $1.56 billion and a net charge of $3.85 billion to increase loan loss reserves.

  – U.S. consumer credit costs increased $4.1 billion, comprised of $689 million in higher net credit losses and a net charge of $3.31 billion to increase loan loss reserves. The $3.31 billion net charge compares to a net reserve release of $127 million in the prior-year period. The increase in credit costs primarily reflected a weakening of leading credit indicators, including increased delinquencies on 1st and 2nd mortgages, unsecured personal loans, credit cards, and auto loans. Credit costs increased also due to trends in the U.S. macroeconomic environment, including the housing market downturn, and portfolio growth.

  – International consumer credit costs increased $374 million, comprised of $257 million of higher net credit losses and a net charge of $217 million to increase loan loss reserves. The $217 million net charge compares to a net charge of $100 million in the prior-year period. The increase in credit costs primarily reflected portfolio growth, the impact of recent acquisitions, and an increase in net credit loss ratios in consumer finance. The credit environment in international consumer remained generally stable.

  – Markets & banking credit costs increased $905 million, driven by higher net credit losses, including $535 million of net credit losses on loans with sub-prime related direct exposure. Credit costs also include a $284 million net charge to increase loan loss and unfunded lending commitment reserves, reflecting a slight weakening in overall portfolio credit quality, as well as loan loss reserves for specific counterparties. The loan loss reserves for specific counterparties includes $169 million for sub-prime related direct exposures.

- **Taxes** were a net credit of $7.31 billion, reflecting pre-tax losses in the fourth quarter. The effective tax rate was 42.9% vs. 29.8% in the prior-year period due to higher tax rates in the jurisdictions where the losses were incurred.

- **Summary of highlighted items.** During the quarter, the following charges and benefits were recorded. See Schedule B on page 12 for detail on write-downs and losses on sub-prime related direct exposures in securities and banking:

| (In Millions of Dollars) | Pre-tax Impact | After-tax Impact | Business |
| --- | --- | --- | --- |
| Gain on Visa Inc. shares | $534 | $336 | International Cards, International Retail Banking and Transaction Services |
| Gain on sale of ownership in Simplex Investment Advisors | 313 | 106 [2] | International Retail Banking |
| Gain on sale of MasterCard shares | 152 | 99 | U.S. Cards, Transaction Services |
| Reserve for customer settlements in Japan consumer finance | (188) | (122) | International Consumer Finance |
| Visa Inc.-related litigation reserve | (306) | (199) | U.S. Cards, Transaction Services |
| Charge related to headcount reductions | (539) [1] | (337) | Securities and Banking, Transaction Services, Smith Barney, U.S. Consumer, and Private Bank |

(1) Excludes $(53) million of charges related to structural expense initiatives announced in April 2007.
(2) Net of minority interest.

3



## APPENDIX
## GLOBAL CONSUMER GROUP

| (In Millions of Dollars) | Fourth Quarter Revenues | | % | Fourth Quarter Net Income | | % |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | Change | 2007 | 2006 | Change |
| U.S. Cards | $3,557 | $3,571 | -- | $398 | $1,001 | (60)% |
| U.S. Retail Distribution | 2,699 | 2,407 | 12 | 245 | 463 | (47) |
| U.S. Consumer Lending | 1,754 | 1,471 | 19 | (1,199) | 484 | NM |
| U.S. Commercial Business | 401 | 508 | (21) | 124 | 146 | (15) |
| **Total U.S. Consumer** | $8,411 | $7,957 | 6% | $(432) | $2,094 | NM |
| International Cards | 2,624 | $1,650 | 59% | $678 | $231 | NM |
| International Consumer Finance | 667 | 349 | 91 | (207) | (351) | 41 |
| International Retail Banking | 3,864 | 2,946 | 31 | 874 | 748 | 17 |
| **Total International Consumer** | $7,155 | $4,945 | 45% | $1,345 | $628 | NM |
| Other | (33) | (20) | (65) | (157) | (111) | (41) |
| **Global Consumer** | $15,533 | $12,882 | 21% | $756 | $2,611 | (71)% |

NM Not meaningful.

### U.S. Consumer

Revenues grew 6% driven by increased average deposits and managed loans, both up 10%. Expenses increased 13% primarily due to a $292 million pre-tax charge related to Citi's pro-rata share of certain Visa Inc.-related litigation exposure. Excluding the litigation charge, expenses increased 5%. Credit costs increased substantially, driven by a weakening of leading credit indicators, including increased delinquencies on 1st and 2nd mortgages, unsecured personal loans, credit cards, and auto loans. Credit costs increased due to trends in the U.S. macroeconomic environment, including the housing market downturn, and portfolio growth. Higher credit costs and expenses drove a decline in net income.

- **U.S. Cards**
  - Revenues were even with the prior-year period as higher net interest revenues, up 15%, and a $136 million pre-tax gain on sale of MasterCard shares, were offset by lower securitization results. Lower securitization revenues primarily reflected the net impact of higher funding costs and higher credit losses in the securitization trusts. Net interest revenues grew due to higher loans held on balance sheet. On a managed basis, revenues increased 8% as lower net interest margins, due to higher funding costs, were offset by growth in average managed loans and the gain on MasterCard shares.
  - Average managed loans grew 4%, driven by an 8% increase in purchase sales and growth in travel, business, and partner portfolios. Loan growth included a 7% increase in non-promotional balances, reflecting increased new customer originations through Citi proprietary distribution channels, increased card usage by existing customers, and a slight decrease in payment rates.
  - Expenses grew 19% due to a $292 million pre-tax charge related to Citi's pro-rata share of certain Visa Inc.-related litigation exposure. Excluding the litigation charge, expenses were even with the prior-year period.
  - Higher credit costs were driven by a $493 million pre-tax charge to increase loan loss reserves, reflecting a weakening of leading credit indicators in the portfolio and trends in the macro-economic environment. Increased credit costs also reflected higher net credit losses, up 36%, driven by higher bankruptcy filings and increased delinquency flows. The managed net credit loss ratio increased 76 basis points to 5.11%.
  - The net income decline was driven by significantly higher credit costs and increased expenses due to the Visa Inc.-related litigation charge.

- **U.S. Retail Distribution**
  - Revenues grew 12%, driven by higher average loans and deposits, up 23% and 8%, respectively, and gains on asset sales. Volume growth was partially offset by lower net interest margins, reflecting a shift in customer deposits to higher cost Direct Bank and time deposit balances.
  - Expenses increased 6% due to investment in new branches and higher customer activity. During the quarter, 48 new Citibank branches and 31 new consumer finance branches were opened.

citi

- – Credit costs increased substantially, driven by higher net credit losses and a $376 million pre-tax charge to increase loan loss reserves. Higher credit costs reflected a weakening of leading credit indicators, including higher delinquencies in unsecured personal loans and sales finance, trends in the macroeconomic environment, and portfolio growth. The net credit loss ratio increased 45 basis points to 3.33%, reflecting increased bankruptcy filings.
- – The net income decline was driven by significantly higher credit costs.

- **U.S. Consumer Lending**
  - – Revenues increased 19%, primarily driven by higher net servicing revenues, increased gains on sale of loans and securities, and 11% growth in average loans. Higher net servicing revenues were driven by a 68% increase in mortgage servicing assets. Results include the acquisition of ABN AMRO Mortgage Group in March 2007.
  - – Real estate loan originations declined 16%, reflecting modified loan approval criteria and a significant curtailment of activity with third-party loan originators.
  - – Expenses grew 34%, primarily driven by the acquisition of the ABN AMRO business, increased business volumes, and higher staffing costs related to collections.
  - – Credit costs increased substantially, driven by higher net credit losses and a $2.42 billion pre-tax charge to increase loan loss reserves. Higher credit costs were primarily driven by a weakening of leading credit indicators, including higher delinquencies in 1st and 2nd mortgages and auto loans. Credit costs increased also due to trends in the macroeconomic environment, including the housing market downturn.
  - – The net loss reflected higher credit costs and expenses.

- **U.S. Commercial Business**
  - – Revenues declined as increased average loan and deposit balances, up 10% and 18%, respectively, were offset by lower net interest margins. The revenue decline also reflects business divestitures during 2007 and an increase in the mix of tax-advantaged revenues.
  - – Credit costs increased due to higher expected losses on specific loans and trends in the macroeconomic environment.
  - – Net income declined as lower revenues and higher credit costs offset increased tax benefits.

### International Consumer

Revenues increased 45%, driven by organic volume growth and the impact of recent acquisitions. Results also include a $507 million pre-tax gain on Visa Inc. shares, and a $313 million pre-tax gain on the sale of an ownership interest in Nikko Cordial's Simplex Investment Advisors. Average deposits and loans were up 21% and 30%, respectively, and investment sales increased 24%. Expenses increased 18%, primarily due to acquisitions and higher business volumes. Credit costs increased 34%, primarily due to the impact of recent acquisitions, portfolio growth, and an increase in the net credit loss ratio in consumer finance. Net income more than doubled, driven by higher business volumes and the Visa and Simplex gains.

- **International Cards**
  - – Revenues grew 59%, primarily driven by higher purchase sales and average loans, up 37% and 53%, respectively, and a $448 million pre-tax gain on Visa Inc. shares. Excluding the gain, revenues increased 32%. Loan balances grew at a double-digit pace in all regions. Results include the impact of recent acquisitions.
  - – Expenses increased 31%, driven by higher business volumes and the impact of recent acquisitions.
  - – Credit costs increased 9%, as a decline in net credit losses was offset by an increase in loan loss reserves. Net credit losses declined as higher losses in Mexico and portfolio growth were offset by the impact of recent acquisitions. A charge of $149 million pre-tax to increase loan loss reserves primarily reflected portfolio growth.
  - – Net income more than doubled, driven by strong volume growth and the gain on Visa Inc. shares. Excluding the Visa gain, net income increased 68%.



- *International Consumer Finance*
    - In Japan, revenues and net income increased primarily due to the absence of a $755 million pre-tax charge recorded in the prior-year period. The current period results include a $188 million pre-tax charge to increase reserves for estimated losses due to customer settlements. Results also reflect a decline in receivables balances and an increase in the net credit loss ratio. Financial results reflected recent adverse changes in the operating environment and the impact of consumer lending laws passed in the fourth quarter 2006.
    - Outside of Japan, revenues increased 15%, driven by average loan growth of 21%. Net income declined as revenue growth was offset by an increase in net credit losses due to portfolio growth and an increase in the net credit loss ratio in India and Mexico. Higher credit costs also reflected the impact of repositioning the U.K. business. The net credit loss ratio increased 86 basis points to 3.78%.

- *International Retail Banking*
    - Revenues increased 31%, driven by increased deposits and loans, up 21% and 27%, respectively, and increased investment sales, up 24%. Results also reflected a $313 million pre-tax gain on the sale of an ownership interest in Nikko Cordial's Simplex Investment Advisors, and a $59 million pre-tax gain on Visa, Inc. shares. Average loan balances grew at a double-digit pace in EMEA, Asia, Latin America, and Mexico. Results include the impact of recent acquisitions.
    - Expenses grew 22%, reflecting increased business volumes and acquisitions. During the quarter, 152 new branches were opened or acquired.
    - Higher credit costs reflected increased net credit losses primarily due to the impact of recent acquisitions. Excluding the impact of acquisitions, the net credit loss ratio was approximately even with the prior-year period.
    - Net income grew 17%, driven by the Simplex and Visa gains, and higher business volumes. The net income growth rate also reflected the absence of a gain on sale of Avantel in Mexico recorded in the prior-year period, as well as lower APB 23 tax benefits in Mexico.

### MARKETS & BANKING

| (In Millions of Dollars) | Fourth Quarter Revenues | | % | Fourth Quarter Net Income | | % |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | Change | 2007 | 2006 | Change |
| Securities and Banking | $(14,020) | $5,486 | NM | $(11,632) | $1,389 | NM |
| Transaction Services | 2,292 | 1,594 | 44 | 664 | 378 | 76 |
| Other | (1) | -- | NM | (18) | (13) | (38) |
| **Markets & Banking** | **$(11,729)** | **$7,080** | **NM** | **$(10,986)** | **$1,754** | **NM** |
| *International Results* | **$34** | **$4,658** | **(99)%** | **$(2,158)** | **$1,347** | **NM** |

NM Not meaningful.

- *Securities and Banking*
    - Fixed income markets recorded negative revenue of $16.9 billion driven by:
        - Write-downs of $17.4 billion on sub-prime related direct exposures. These exposures on September 30, 2007 were comprised of approximately $11.7 billion of gross lending and structuring exposures and approximately $42.9 billion of net ABS CDO super senior exposures (ABS CDO super senior gross exposures of $53.4 billion). On December 31, 2007, sub-prime related direct exposures were comprised of approximately $8.0 billion of gross lending and structuring exposures and approximately $29.3 billion of net ABS CDO super senior exposures (ABS CDO super senior gross exposures of $39.8 billion). See detail in Schedule B on page 12.
        - Lower revenues due to write-downs on non sub-prime securitized products and in fixed income proprietary trading.
        - These results were partially offset by double-digit revenue growth in interest rate and currency trading, and commodities.



- Equity markets revenues declined 18% to $738 million as record revenues in cash trading and strong growth in equity finance were more than offset by weaker performance in derivatives and convertibles, and write-downs in proprietary trading.
- Lending revenues increased 88% to $989 million, primarily driven by hedging gains related to the corporate loan portfolio.
- Net investment banking revenues were $1.3 billion, down 3%.
  - Record advisory and other fees increased 43% to $547 million. For 2007, Citi ranked #3 in global announced and completed M&A.
  - Equity underwriting revenues were even with the prior-year period. For 2007, Citi ranked #3 in global equity underwriting.
  - Debt underwriting revenues of $414 million declined 38%, reflecting $205 million of write-downs on funded and unfunded highly leveraged finance commitments, and lower industry-wide underwriting volumes. The $205 million write-down on highly leveraged finance commitments was partially offset by $70 million of net recoveries on highly leveraged finance commitments recorded in lending.
- Operating expenses increased 17%, reflecting higher other operating and administrative expenses offset by a decline in incentive compensation costs. Other operating and administrative expenses grew primarily due to acquisitions and higher business development costs, and a $370 million pre-tax charge related to headcount reductions.
- Credit costs increased significantly, primarily driven by $535 million in net credit losses on loans with sub-prime related direct exposure, and a $284 million net charge to increase loan loss and unfunded lending commitment reserves reflecting a slight weakening in overall portfolio credit quality, as well as loan loss reserves for specific counterparties. The loan loss reserves for specific counterparties includes $169 million for sub-prime related direct exposures.
- Results also reflected a significant increase in the effective tax rate, primarily due to higher tax rates in the jurisdictions where the write-downs on sub-prime direct exposures were incurred.

- *Transaction Services*
  - Revenues were a record $2.29 billion, up 44%, driven by higher customer volumes, stable net interest margins, and the acquisition of The Bisys Group, which closed in August 2007. All regions generated strong double-digit revenue and net income growth.
  - Liability balances grew 35% and assets under custody were up 26%.
  - Operating expenses increased 29%, primarily driven by increased business volumes, the impact of acquisitions, and a $67 million pre-tax charge related to headcount reductions.
  - Net income was a record $664 million, up 76%.

### GLOBAL WEALTH MANAGEMENT

| (In Millions of Dollars) | Fourth Quarter Revenues 2007 | 2006 | % Change | Fourth Quarter Net Income 2007 | 2006 | % Change |
|---|---|---|---|---|---|---|
| Smith Barney | **$2,780** | $2,189 | 27% | **$327** | $305 | 7% |
| Private Bank | 682 | 527 | 29 | 196 | 106 | 85 |
| **Global Wealth Management** | **$3,462** | $2,716 | 27% | **$523** | $411 | 27% |
| *International Results* | *$963* | $379 | NM | *$136* | $61 | NM |

NM Not meaningful.

- *Smith Barney*
  - Revenues grew 27%, driven by 18% growth in fee-based and net interest revenues and a 43% increase in transactional revenues. Growth in fee-based revenues was driven by a continued shift toward offering fee-based advisory products and services. Transactional revenue growth primarily reflected the increased ownership of Nikko Cordial in Japan.
  - Assets under fee-based management increased 30% to $446 billion, primarily driven by acquisitions, positive market action, and net client asset flows.
  - Expenses grew 29%, primarily due to increased customer activity, the impact of acquisitions, and a $41 million pre-tax charge related to headcount reductions.
  - Net income increased 7%, as increased business volumes and the impact of acquisitions were offset by the charge related to headcount reductions.



*Private Bank*
– Revenues were a record, driven by a 36% increase in international revenues, reflecting strong growth in capital markets products in Asia and EMEA. U.S. revenues increased 18% driven by increased average deposit and loan balances and higher investment sales.
– Client business volumes increased 17%, including higher client assets under fee-based management, up 9%, and average loans, up 33%.
– Expenses grew 10% and primarily reflected higher compensation costs, driven by increased client activity and an increase in bankers, and a $26 million pre-tax charge related to headcount reductions.
– Credit costs increased due to a $13 million pre-tax charge to increase loan loss reserves, primarily related to new loan volumes.
– International growth drove an 85% increase in net income.

## ALTERNATIVE INVESTMENTS

| (In Millions of Dollars) | Fourth Quarter Revenues | | % | Fourth Quarter Net Income | | % |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | Change | 2007 | 2006 | Change |
| **Alternative Investments** | **$384** | $1,308 | (71)% | $61 | $549 | (89)% |

NM Not meaningful.

- *Alternative Investments*
  – Revenue and net income declined as growth in client revenues, up 16%, was offset by significantly lower proprietary investment revenues. Proprietary investment revenues declined primarily due to a decline in private equity gains, lower results from hedge fund activities, and a lower market value on Legg Mason shares. Client capital under management increased 26%. Client revenues and capital reflected organic growth and the acquisition of Old Lane Partners, L.P. in July 2007.

## CORPORATE/OTHER

Corporate/Other income increased slightly, as higher funding costs were offset by lower taxes held at Corporate.



## INTERNATIONAL OPERATIONS [1]

| (In Millions of Dollars) | Fourth Quarter Revenues 2007 | Fourth Quarter Revenues 2006 | % Change | Fourth Quarter Net Income 2007 | Fourth Quarter Net Income 2006 | % Change |
|---|---|---|---|---|---|---|
| Global Consumer............................... | $1,642 | $1,612 | 2% | $411 | $477 | (14)% |
| Markets & Banking............................. | 157 | 199 | (21) | 62 | 85 | (27) |
| Global Wealth Management................. | 38 | 33 | 15 | 9 | 9 | -- |
| **Mexico** | **$1,837** | **$1,844** | -- | **$482** | **$571** | (16)% |
| | | | | | | |
| Global Consumer............................... | $1,847 | $1,404 | 32% | $215 | $112 | 92% |
| Markets & Banking............................. | (2,983) | 2,252 | NM | (3,374) | 545 | NM |
| Global Wealth Management................. | 159 | 90 | 77 | 20 | 8 | NM |
| **Europe, Middle East and Africa (EMEA)** | **$(977)** | **$3,746** | NM | **$(3,139)** | **$665** | NM |
| | | | | | | |
| Global Consumer............................... | $853 | $91 | NM | $21 | $(326) | NM |
| Markets & Banking............................. | 393 | 310 | 27 | 65 | 77 | (16) |
| Global Wealth Management................. | 411 | -- | NM | 5 | -- | NM |
| **Japan** | **$1,657** | **$401** | NM | **$91** | **$(249)** | NM |
| | | | | | | |
| Global Consumer............................... | $1,910 | $1,291 | 48% | $808 | $332 | 83% |
| Markets & Banking............................. | 1,635 | 1,440 | 14 | 723 | 510 | 42 |
| Global Wealth Management................. | 285 | 206 | 38 | 96 | 40 | NM |
| **Asia (excluding Japan)** | **$3,830** | **$2,937** | 30% | **$1,425** | **$882** | 62% |
| | | | | | | |
| Global Consumer............................... | $903 | $547 | 65% | $92 | $33 | NM |
| Markets & Banking............................. | 832 | 457 | 82 | 366 | 130 | NM |
| Global Wealth Management................. | 60 | 50 | 20 | 6 | 4 | NM |
| **Latin America** | **$1,795** | **$1,054** | 70% | **$464** | **$167** | NM |
| | | | | | | |
| **Total International** | **$8,142** | **$9,982** | (18)% | **$(677)** | **$2,036** | NM |

(1) International results for the quarter are fully reflected in the product disclosures.
NM Not meaningful.

- *Mexico*

  - Consumer revenue growth was driven by an increase in average loans and investment AUMs, up 18% and 16%, respectively, and a $186 million pre-tax gain on Visa Inc. shares. Net income declined as revenue growth was offset by higher credit costs, the absence of a gain on the sale of Avantel in the prior-year period, and lower APB 23 tax benefits. The increase in credit costs was due primarily to portfolio growth and an increase in past due accounts. During the past 12 months, 137 new retail bank and consumer finance branches were opened.

  - Markets & banking revenues and net income decreased as record revenue and net income in transaction services were offset by lower results in securities and banking. Transaction services revenues increased 14%, driven by growth in net interest revenue, fees, and commissions. In securities and banking, revenues declined 34%, driven by lower revenues in equity and fixed income markets, partially due to volatility in foreign exchange rates and a flat yield curve.

- *Europe, Middle East and Africa*

  - Consumer revenues increased 32% and net income almost doubled, driven by growth in average deposits and loans, up 47% and 48%, respectively, and higher investment product sales, up 38%. Results include the acquisition of Egg plc in the U.K.

  - Markets & banking results reflected write-downs on sub-prime related direct exposures and highly leveraged finance commitments in securities and banking, which more than offset record revenues and net income in transaction services. In securities and banking, revenues reflected $4.4 billion of pre-tax write-downs and credit costs on sub-prime related direct exposures. These write-downs and credit costs were partially offset by double-digit revenue growth in equity markets and underwriting, advisory, and lending. Transaction services revenues and net income grew at a double-digit pace, driven by increased customer volumes and average deposit growth.

citi

- **Japan**
  - Consumer revenues and net income increased primarily due to the absence of a $755 million pre-tax charge in consumer finance, recorded in the prior-year period. In the current period, consumer finance results include a $188 million pre-tax charge to increase reserves for estimated losses due to customer settlements, as well as a decline in receivables balances and an increase in the net credit loss ratio. Financial results reflected recent adverse changes in the operating environment and the impact of consumer lending laws passed in the fourth quarter 2006. Results also include a $313 million pre-tax gain on the sale of an ownership interest in Nikko Cordial's Simplex Investment Advisors.
  - Markets & banking revenue growth was driven by increased ownership in Nikko Cordial and strong double-digit growth in transaction services. The net income decline was primarily driven by lower results in fixed income and equity markets.
  - Wealth management results reflected the impact of increased ownership of Nikko Cordial.
- **Asia**
  - Consumer revenues and net income increased 48% and 83%, respectively, driven by growth in average deposits, up 13%, and average loans, up 21%, and an almost doubling of investment product sales. Results also include an estimated $245 million pre-tax gain on Visa, Inc. shares. During the past 12 months, 90 retail and consumer finance branches were open or acquired. Results include the acquisition of Bank of Overseas Chinese.
  - Markets & banking revenues and net income increased, up 14% and 42%, respectively. Securities and banking revenues declined 3%, driven by lower fixed income markets revenues, which reflected lower results in credit markets, offset by increased results in interest rate and currency products and equity markets. Transaction services revenues and net income grew at a strong double-digit pace, reflecting increased business volumes and balances.
  - Wealth management revenue and income growth was driven primarily by continued strong volumes in capital markets products and performance fees.
- **Latin America**
  - Consumer revenue and net income growth was driven by increased average deposits, up 74%, a doubling of average loans, and higher investment AUMs, up 24%. Results also include a $42 million pre-tax gain on Visa Inc. shares and the impact of recent acquisitions. Over the last 12 months, 230 new retail bank and consumer finance branches were opened or acquired.
  - Markets & banking revenues grew 82% and net income more than doubled driven by strong growth in fixed income revenues and record results in equities. Results also reflected record revenues and net income in transaction services, driven by higher customer volumes and increased liability balances.

A reconciliation of non-GAAP financial information contained in this press release is set forth on page 14.

Vikram Pandit, Chief Executive Officer and Gary Crittenden, Chief Financial Officer, will host a conference call today at 8:30 AM (EST). A live webcast of the presentation, as well as financial results and presentation materials, will be available at http://www.citigroup.com/citigroup/fin. A replay of the webcast will be available at http://www.citigroup.com/citigroup/fin/pres.htm.

Citi, the leading global financial services company, has some 200 million customer accounts and does business in more than 100 countries, providing consumers, corporations, governments and institutions with a broad range of financial products and services, including consumer banking and credit, corporate and investment banking, securities brokerage, and wealth management. Citi's major brand names include Citibank, CitiFinancial, Primerica, Smith Barney, and Banamex. Additional information may be found at www.citigroup.com or www.citi.com.

Additional financial, statistical, and business-related information, as well as business and segment trends, is included in a Financial Supplement. Both the earnings release and the Financial Supplement are available on Citi's website at www.citigroup.com or www.citi.comT.

Certain statements in this document are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act. These statements are based on management's current expectations and are subject to uncertainty and changes in circumstances. Actual results may differ materially from those included in these statements due to a variety of factors. More information about these factors is contained in Citigroup's filings with the Securities and Exchange Commission.

Contacts:

| Press: | Christina Pretto | (212) 559-9560 | Equity Investors: | Arthur Tildesley | (212) 559-2718 |
| --- | --- | --- | --- | --- | --- |
| | Shannon Bell | (212) 793-6206 | | Scott Freidenrich | (212) 559-2718 |
| | Michael Hanretta | (212) 559-9466 | Fixed Income Investors: | Maurice Raichelson | (212) 559-5091 |

citi

## SCHEDULE A

### CITI FULL YEAR 2007 SEGMENT RESULTS

| (In Millions of Dollars, except EPS) | Revenues 2007 | Revenues 2006 | % Change | Net Income 2007 | Net Income 2006 | % Change |
|---|---|---|---|---|---|---|
| **Global Consumer:** | | | | | | |
| U.S. Cards | **$13,418** | $13,508 | (1)% | **$2,873** | $3,890 | (26)% |
| U.S. Retail Distribution | **10,209** | 9,584 | 7 | **1,343** | 2,027 | (34) |
| U.S. Consumer Lending | **6,459** | 5,519 | 17 | **(628)** | 1,912 | NM |
| U.S. Commercial Business | **1,649** | 1,983 | (17) | **518** | 561 | (8) |
| **Total U.S. Consumer** | **$31,735** | $30,594 | 4% | **$4,108** | $8,390 | (51)% |
| International Cards | **$9,228** | $5,959 | 55% | **$2,064** | $1,137 | 82% |
| International Consumer Finance | **3,182** | 3,318 | (4) | **(508)** | 40 | NM |
| International Retail Banking | **12,878** | 10,518 | 22 | **2,637** | 2,840 | (7) |
| **Total International Consumer** | **$25,288** | $19,795 | 28% | **$4,193** | $4,017 | 4% |
| Other | **(39)** | (90) | 57 | **(433)** | (351) | (23) |
| **Total Global Consumer** | **$56,984** | $50,299 | 13% | **$7,868** | $12,056 | (35)% |
| **Markets and Banking:** | | | | | | |
| Securities and Banking | **$2,684** | $21,218 | (87)% | **$(7,604)** | $5,763 | NM |
| Transaction Services | **7,840** | 5,971 | 31 | **2,215** | 1,426 | 55 |
| Other | **(2)** | (2) | -- | **136** | (62) | NM |
| **Total Markets and Banking** | **$10,522** | $27,187 | (61)% | **$(5,253)** | $7,127 | NM |
| **Global Wealth Management:** | | | | | | |
| Smith Barney | **$10,529** | $8,160 | 29% | **$1,351** | $1,005 | 34% |
| Private Bank | **2,457** | 2,017 | 22 | **623** | 439 | 42 |
| **Total Global Wealth Management** | **$12,986** | $10,177 | 28% | **$1,974** | $1,444 | 37% |
| **Alternative Investments** | **$2,103** | $2,901 | (28)% | **$672** | $1,276 | (47)% |
| **Corporate/Other** | **$(897)** | $(949) | 5% | **$(1,644)** | $(654) | NM |
| **Income from Continuing Operations before Income Taxes and Minority Interest** | | | | **$1,701** | $29,639 | (94)% |
| **Provision (benefits) for Income Taxes** | | | | **(2,201)** [1] | 8,101 | NM |
| **Minority Interest, Net of Income Taxes** | | | | **285** | 289 | (1) |
| **Income From Continuing Operations** | | | | **$3,617** | $21,249 | (83)% |
| **Discontinued Operations** [2] | | | | **--** | 289 | NM |
| **Total Citi** | **$81,698** | $89,615 | (9)% | **$3,617** | $21,538 | (83)% |

NM Not Meaningful
(1)  The tax credit is due to the effect of permanent differences on the lower level of pre-tax earnings.
(2)  Discontinued operations relates to residual items from the company's sale of Travelers Life & Annuity, which closed during the 2005 third
     quarter and the company's sale of substantially all of its Asset Management business, which closed during the 2005 fourth quarter.



## SCHEDULE B

### Schedule of Sub-prime Related Direct Exposures in Securities and Banking

*The following table sets forth Citi's sub-prime related direct exposures in Securities and Banking, comprised of CDO super senior exposures and Lending and Structuring exposures.*

| ($ billions) | September 30, 2007 Exposures | Fourth Quarter 2007 Write-downs | Fourth Quarter 2007 Sales/Transfers | December 31, 2007 Exposures |
|---|---|---|---|---|
| **CDO Super Senior** | | | | |
| Total Gross Exposures | $53.4 | | | $39.8 |
| Hedged Exposures | 10.5 | | | 10.5 |
| **Net Exposures** | | | | |
| ABCP/CDO (1) | $24.9 | ($4.3) | $0.0 | $20.6 |
| High grade | 9.5 | (4.9) [4] | 0.3 | 4.9 |
| Mezzanine | 8.3 | (5.2) [4] | 0.5 | 3.6 |
| ABS CDO-squared | 0.2 | 0.1 | 0.0 | 0.2 |
| **Total Net Exposures** | $42.9 | ($14.3) | $0.8 | $29.3 |
| Reserve on hedge counterparty exposure (2) | | ($0.9) | | |
| **Lending & Structuring** | | | | |
| **Gross Exposures** | | | | |
| CDO warehousing/unsold tranches of ABS CDOs | $2.7 | ($2.6) | $0.0 | $0.2 |
| Subprime loans purchased for sale or securitization | 4.2 | (0.2) | 0.0 | 4.0 |
| Financing transactions secured by subprime | 4.8 | (0.1) [4] | (0.9) | 3.8 |
| **Total Gross Exposures** | $11.7 | ($2.9) | ($0.9) | $8.0 |
| **Total Exposures (3)** | $54.6 | ($18.1) | ($0.1) | $37.3 |

(1) Primarily backed by high grade ABS CDOs.  During the fourth quarter 2007, the CDOs which collateralized the ABCP were consolidated on Citi's balance sheet.

(2) FAS 157 adjustment related to counterparty credit risk.

(3) Comprised of net CDO Super Senior exposures and gross Lending & Structuring exposures.

(4) Includes an aggregate $704 million recorded in credit costs.

Citi's CDO Super Senior sub-prime direct exposures are not subject to valuation based on observable transactions.  Accordingly, fair value of these exposures is based on estimates.  Citi's estimation process involves use of an intrinsic cash flow methodology.  During the course of the fourth quarter the methodology has been refined, and inputs used for the purposes of estimation have been modified in part to reflect ongoing unfavorable market developments.  The methodology takes into account both macroeconomic factors, including estimated housing price adjustments over the next four years, unemployment rates, interest rates and their volatility, and microeconomic factors, including loan attributes, such as age, credit scores, documentation status, loan-to-value (LTV) ratio, and debt-to-income (DTI) ratio.  In addition, the methodology takes account of estimates of the impact of geographic concentration of mortgages, estimated impact of reported fraud in the origination of sub-prime mortgages and the application of discount rates for each level of exposures, the fair value of which is being estimated.

Estimates of the fair value of the CDO Super Senior exposures depend on market conditions and are subject to further change over time.  In addition, while Citi believes that the methodology used to value these exposures is reasonable, the methodology is subject to continuing refinement, including as a result of market developments.  Further, if observable transactions in respect of some or all of these exposures occur in the future, these observable transactions, rather than estimates, could be used to determine fair value.

Most of the lending and structuring direct sub-prime exposures are fair valued based on observable transactions and other market data.  The majority of such exposures are classified as Level 3 assets.

Securities and banking also has trading positions, both long and short, in U.S. sub-prime residential mortgage-backed securities (RMBS) and related products, including ABS CDOs, that are not included in these figures.  The exposure from these positions is actively managed and hedged, although the effectiveness of the hedging products used may vary with material changes in market conditions.



## SCHEDULE C

## SUMMARY OF PRESS RELEASE DISCLOSED ITEMS - NET INCOME IMPACT ($MM)

*See schedule B for direct sub-prime related exposures in securities and banking*

|  | 4Q'06 | 4Q'07 |
|---|---|---|
| Cards | $ -- | $(103) [3,4] |
| Retail Distribution | -- | -- |
| Consumer Lending | -- | (5) [5] |
| Commercial Business Group | -- | -- |
| **U.S. Consumer** | -- | **$(108)** |
| Cards | -- | 290 [6] |
| Consumer Finance | (489) [1] | (122) [7] |
| Retail Banking | 145 [2] | 133 [6,8] |
| **International Consumer** | **$(344)** | **$301** |
| Other Consumer | -- | (16) [5] |
| **Global Consumer** | **$(344)** | **$177** |
| Securities and Banking | -- | $(232) [5] |
| Transaction Services | -- | (21) [4,5,6] |
| Other | -- | -- |
| **Markets & Banking** | -- | **$(253)** |
| Smith Barney | -- | $(25) [5] |
| Private Bank | -- | (16) [5] |
| **Global Wealth Management** | -- | **$(41)** |
| **Alternative Investments** | -- | -- |
| **Corporate / Other** | -- | -- |
| **Discontinued Operations** | -- | -- |

(1) Establishment of a reserve for customer settlements, higher year-over-year credit costs and refunds, and a repositioning charge of ($755) pre-tax (($489) after-tax) in Japan Consumer Finance.

(2) Gain on sale of Avantel of $234 pre-tax ($145 after-tax) in International Retail Banking.

(3) Gain on sale of MasterCard shares of $136 pre-tax ($87 million after-tax) in U.S. Cards, and $16 pre-tax ($12 after-tax) in Transaction Services.

(4) Charge related to Citi's pro-rata share of certain Visa Inc.-related litigation exposure of ($292) pre-tax (($190) after-tax) in U.S. Cards and ($14) pre-tax (($9) after-tax) in Transaction Services.

(5) Charge related to headcount reductions of ($8) pre-tax (($5) after-tax) in U.S. Consumer Lending, ($27) pre-tax (($16) after-tax) in Consumer Other, ($370) pre-tax (($232) after-tax) in Securities and Banking, ($67) pre-tax (($44) after-tax) in Transaction Services, ($41) pre-tax (($25) after-tax) in Smith Barney, and ($26) pre-tax (($16) after-tax in Private Bank.

(6) Gain on Visa Inc. shares of $448 pre-tax ($290 after-tax) in International Cards, $59 pre-tax ($27 after-tax) in International Retail Banking and $27 pre-tax ($20 after-tax) in Transaction Services.

(7) Charge to increase reserves for customer settlements of ($188) pre-tax (($122) after-tax) in Japan Consumer Finance.

(8) Gain on sale of ownership in Simplex Investment Advisors in Japan of $313 pre-tax ($106 after-tax) in International Retail Banking.

**SCHEDULE D**

**Non-GAAP Financial Measures**

The following are measures considered "non-GAAP financial measures" under SEC guidelines:

1) Citi Operating Expenses excluding the impact of acquisitions.
2) U.S. Consumer Operating Expenses excluding the charge for Visa-related litigation exposure.
3) U.S. Cards Operating Expenses excluding the charge for Visa-related litigation exposure.
4) International Cards Revenues excluding the gain on Visa shares.
5) International Cards Net Income excluding the gain on Visa shares.

The Company believes that these non-GAAP financial measures provide a greater understanding of ongoing operations and enhance comparability of those results in prior periods as well as demonstrating the effects of unusual gains and charges in the quarter. The Company believes that a meaningful analysis of its financial performance requires an understanding of the factors underlying that performance. The Company believes that investors may find it useful to see these non-GAAP financial measures to analyze financial performance without the impact of unusual items that may obscure trends in the Company's underlying performance.

Reconciliation of the GAAP financial measures to the aforementioned non-GAAP measures follows:

| ($ in millions) | 4Q 2007 | 4Q 2006 | 4Q'07 vs. 4Q'06 % Change |
|---|---|---|---|
| GAAP Citi Operating Expenses | $16,501 | $13,958 | 18% |
| Excluding the impact of acquisitions | (1,218) | -- | |
| Non-GAAP Citi Operating Expenses as Adjusted | $15,283 | $13,958 | 9% |
| | | | |
| GAAP U.S. Consumer Operating Expenses | $4,062 | $3,603 | 13% |
| Excluding the Visa-related litigation charge | (292) | -- | |
| Non-GAAP U.S. Consumer Operating Expenses as Adjusted | $3,770 | $3,603 | 5% |
| | | | |
| GAAP U.S. Cards Operating Expenses | $1,822 | $1,535 | 19% |
| Excluding the Visa-related litigation charge | (292) | -- | |
| Non-GAAP U.S. Consumer Cards Expenses as Adjusted | $1,530 | $1,535 | -- |
| | | | |
| GAAP International Cards Revenues | $2,624 | $1,650 | 59% |
| Excluding the gain on Visa shares | (448) | -- | |
| Non-GAAP International Cards Revenues as Adjusted | $2,176 | $1,650 | 32% |
| | | | |
| GAAP International Cards Net Income | $678 | $231 | NM |
| Excluding the net gain Visa shares | (290) | -- | |
| Non-GAAP International Cards Net Income as Adjusted | $388 | $231 | 68% |

NM Not meaningful.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

No. 05-2165

IN RE OCA, INC. SECURITIES
AND DERIVATIVE LITIGATION                    SECTION: R(3)

JUDGE VANCE

**THIS DOCUMENT RELATES
TO: ALL CASES**

<u>**ORDER AND REASONS**</u>

Before the Court are motions for appointment as lead plaintiff in the securities cases and in the derivative cases that have been consolidated in this proceeding. For the reasons stated below, the Court conditionally appoints Samuel Boodman as the lead plaintiff in the securities actions, and it approves his selection of Kaplan Fox & Kilsheimer LLP as lead counsel and Neblett, Beard & Arsenault as liaison counsel. The Court appoints Eric Nagel as lead plaintiff in the derivative actions, and it approves his selection of Federman & Sherwood and Brodsky & Smith, LLC as co-lead counsel and Barasso Usdin Kupperman Freeman & Sarver, L.L.C. as liaison counsel.

I.    **FACTUAL AND PROCEDURAL BACKGROUND**

Defendant OCA, Inc. is a Louisiana-based company that
provides business services to orthodontic and pediatric dental
practices throughout the United States.  Specifically, OCA
provides affiliated practices with information systems and a
range of operational, purchasing, financial, marketing,
administrative and other business services.  It generally
provides its services to affiliated practices under long-term
service, consulting, or management service agreements with terms
that typically range from 20 to 25 years.  As of December 31,
2004, OCA had approximately 565 affiliated centers in the United
States and abroad, and the company had customers in 46 states and
in international locations.

On May 18, 2004, OCA announced that it would adopt Financial
Accounting Standards Board Interpretation No. 46R ("FIN 46R"),
which requires a company to consolidate the financial results of
variable interest entities under certain circumstances when the
company has an interest in the entities.  OCA stated that its
adoption of FIN 46R would require it to make a number of changes
to its financial statements effective January 1, 2004.  Those
changes included changes to the way OCA recorded patient revenue
and patient receivables.  OCA's chief executive officer, Bart F.
Palmisano, Sr., stated in OCA's May 18, 2004 press release that

2

the accounting changes would make OCA's accounting simpler and
more transparent and would lead to financial reporting that was
more consistent with the way OCA managed its business.

Plaintiffs allege that over the remainder of 2004 and the
early part of 2005, defendants made a series of false statements
concerning OCA's quarterly financial results and its future
prospects.  According to plaintiffs, those statements were
materially false or misleading and had the effect of artificially
inflating OCA's stock price.

On March 17, 2005, OCA announced that it would delay the
filing of its Form 10-K for the fiscal year ended December 31,
2004 because it had identified certain accounting errors relating
to 2004 and earlier years.  OCA stated that it would continue to
review its accounting and that it had not made a decision about
whether the errors were material or would require it to restate
earlier financial results.  On June 7, 2005, OCA announced a
further delay the filing of its 2004 Form 10-K and reported that
it had identified material errors in its calculation of patient
receivables reported during the first three quarters of 2004.  It
revealed that its audit committee required it to restate its
financial results for those periods.  OCA also announced that it
had organized a special committee of the board of directors to
review the origins of certain journal entries in the company's

3

general ledger and their impact on OCA's financial statements.
OCA's chief operating officer, Bart. F. Palmisano, Jr., went on
administrative leave pending the outcome of the company's
internal investigation.  On the heels of OCA's June 7
announcement, shares of OCA stock fell $1.55, or 38%, to close at
$2.48 per share.

Shortly after OCA's June 7, 2005 announcement, a number of
plaintiffs filed securities class actions and shareholder
derivative actions in this district against OCA and certain of
its officers and directors.  The complaints allege generally that
defendants engaged in improper accounting practices that
materially overstated OCA's patient receivables reported during
2004.  The complaints further allege that defendants made
improper journal entries in the company's general ledger, altered
information that they provided to OCA's independent accounting
firm, and failed to maintain adequate internal controls to ensure
accurate financial reporting.  The securities plaintiffs assert
claims against defendants under sections 10(b) and 20(a) of the
Securities Exchange Act of 1934.  The derivative plaintiffs
assert claims for breach of fiduciary duty, abuse of control,
mismanagement, waste of corporate assets, unjust enrichment and
disgorgement under the Sarbanes-Oxley Act of 2002.

To date, 14 shareholder class actions and 7 shareholder

4

derivative actions have been filed in this district and
consolidated before this Court.  On August 2, 2005, the Court
held a preliminary conference and determined that separate lead
plaintiffs should be appointed for the consolidated securities
actions and the consolidated derivative actions.  The Court
directed the parties to file motions for appointment as lead
plaintiff in the securities actions and in the derivative actions
no later than August 12, 2005.  Six plaintiffs or groups of
plaintiffs timely moved for appointment as lead plaintiff in the
securities actions, and two candidates timely moved for
appointment as lead plaintiff in the derivative actions.  The
Court gave the plaintiffs the opportunity to respond to the
respective motions by August 19, 2005.  In the meantime,
Hurricane Katrina struck, which delayed the resolution of these
issues.

## II.  THE SECURITIES CASES

### A.  Applicable Law

The appointment of a lead plaintiff in a federal securities
class action is governed by the Private Securities Litigation
Reform Act of 1995.  *See* 15 U.S.C. § 78u-4.  The history and
purposes of the PSLRA have been extensively discussed in the case
law, and the Court will not repeat that discussion here.  *See
generally, e.g., Newby v. Enron Corp. (In re Enron Corp. Sec.*

*Litig.)*, 206 F.R.D. 427, 441-42 (S.D. Tex. 2002); *In re Network Assocs., Inc., Sec. Litig.*, 76 F. Supp. 2d 1017, app. at 1046-50 (N.D. Cal. 1999) (Amicus Brief of Securities and Exchange Commission); *In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 813-15 (N.D. Ohio 1999).  Suffice it to say, the PSLRA was enacted to curb perceived abuses in federal securities class actions and to ensure that securities plaintiffs, not lawyers, exercise control over federal securities class actions.

To that end, the statute sets out a detailed procedure for determining the appropriate lead plaintiff.  Under the PSLRA, the first plaintiff to file a complaint must publish notice in a widely circulated business publication or wire service notifying putative class members that, no later than 60 days after publication of the notice, any putative class member can move to be appointed as the lead plaintiff for the purported class of plaintiffs.  15 U.S.C. § 78u-4(a)(3)(A)(i)(II).  The district court must consider any timely motion for appointment as lead plaintiff, and it must appoint the "most adequate plaintiff" as the lead plaintiff.  The "most adequate plaintiff" is the class member who is most capable of adequately representing the interests of class members.  *Id.* § 78u-4(a)(3)(B)(i).

The PSLRA creates a rebuttable presumption that the most adequate plaintiff is "the person or group of persons" that (i)

6

has moved for appointment as the lead plaintiff in response to the notice described above; (ii) has "the largest financial interest in the relief sought by the class;" and (iii) "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." *Id.* § 78u-4(a)(3)(B)(iii)(I).  Of Rule 23's requirements for the maintenance of a class action, only two, typicality and adequacy of representation, are relevant in the lead plaintiff context. *See Newby*, 206 F.R.D. at 441; *Tarica v. McDermott Int'l, Inc.*, No. Civ.A.99-3831, 2000 WL 377817, at *4 (E.D. La. Apr. 13, 2000).

Once the Court has determined the presumptive most adequate plaintiff, the statutory presumption can be rebutted only by proof that the presumptive plaintiff "will not fairly and adequately protect the interests of the class[,] or . . . is subject to unique defenses that render such plaintiff incapable of adequately representing the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

### B.  The Most Adequate Plaintiff

In this case, six parties timely moved for appointment as lead plaintiff in the securities cases.  These parties and their interests are described below.

(1) Cannell Capital, LLC, an institutional investment advisor, asserts a loss of $2,649,791.25 from its investments in

OCA securities.  Cannell Capital originally asserted a loss of
$3,016,046.  (*See* Cannell Cap. Mem. at 6).  It later submitted a
declaration stating that one of its clients had not given it
permission to pursue this action.  Accordingly, Cannell Capital
revised its purchases and sales to exclude transactions on behalf
of that client, and it now asserts a loss of $2,649,791.25.  (*See*
Cannell Decl. Ex. A, at 7).

(2) The "OCA Investors Group" consists of Louisiana School
Employees' Retirement System; Lawford Overseas Management, Inc.;
B.V. Brooks, acting on behalf of himself, his wife (over whose
account he holds a power of attorney) and a family trust the
activities of which he directs as trustee; Brooks Torrey & Scott,
Inc.; B.V. Brooks & Colin Gunn TTEE; Westbrook, Inc.; and Bryan
Cardinal.  (*See* OCA Inv. Group Mem. at 1 & n.1).  It asserts a
loss of $482,625.68.  The OCA Investors Group initially asserted
a loss of $468,376.18. (*See id.* at 10).  In its responsive
memorandum, however, it states that it has identified additional
class period transactions in OCA securities, resulting in a total
loss of $482,625.68.  (*See* OCA Inv. Group Resp. Mem. at 6 n.3).

(3) Douglas Levine and Samuel Boodman, two individual
investors who seek appointment as co-lead plaintiffs, assert a
loss of $417,134.  (*See* Levine & Boodman Mem. at 1).

(4) Robotti & Company Advisors LLC, an investment management

8

firm, asserts a loss of $318,399.  (*See* Robotti & Co. Mem. at 5-6).  In its responsive memorandum, Robotti & Company asserts a loss of $373,480, a figure that includes the individual losses of Robert E. Robotti.  (*See* Robotti & Co. Resp. Mem. at 11-12).  Because only Robotti & Company, not Robotti personally, timely moved for appointment as lead plaintiff, the Court will not consider Robotti's personal loss in determining Robotti & Company's financial interest in this action.

(5) The "MEL Capital Group," which consists of MEL Capital; Penmont Securities, LP; Richard Feinberg; Scott Goebel; and Greg Konny, asserts a loss of $214,400.  (*See* MEL Cap. Group Mem. at 1, 5).

(6) Dr. Martin DeSomma, an individual investor, asserts as loss of $108,430.  (*See* DeSomma Mem. at 2).

By filing their motions, each of the applicants has complied with the first of the statute's three criteria for becoming the most adequate plaintiff.  The Court must next determine which of the movants has "the largest financial interest in the relief sought by the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

The PSLRA does not define the term "largest financial interest."  *See In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 302 (S.D. Ohio 2005); *In re Goodyear Tire & Rubber Co. Sec. Litig.*, No. 5:03 CV 2166, 2004 WL 3314943, at *3 (N.D.

Ohio May 12, 2004).  A number of courts have held that four factors are relevant to determining which proposed lead plaintiff has the greatest financial interest.  They consider (i) the total number of shares purchased during the class period; (ii) the total net shares purchased during the class period; (iii) the total net funds expended during the class period; and (iv) the approximate amount of loss suffered.  *See, e.g., In re eSpeed, Inc. Sec. Litig.*, No. 05 Civ.2091(SAS), 2005 WL 1653933, at *3 (S.D.N.Y. July 13, 2005); *Cardinal Health*, 226 F.R.D. at 303-04; *Goodyear Tire & Rubber Co.*, 2004 WL 3314943, at *3.  Other courts have eschewed the four-factor inquiry and held that the inquiry should be based solely on each plaintiff's approximate loss.  *See In re Bally Total Fitness Sec. Litig.*, No. 04 C 3530, 2005 U.S. Dist. LEXIS 6243, at *14-15 (N.D. Ill. Mar. 15, 2005) ("We believe that the best yardstick by which to judge 'largest financial interest' is the amount of loss, period.").  Because the parties focus primarily on approximate loss in their submissions, the Court will employ only that measure to determine which plaintiff has the largest financial interest here.

     1.  *Cannell Capital*

On the face of the lead plaintiff motions, Cannell Capital's purported loss of $2,649,791 is almost $2.2 million larger than the next-largest purported loss, which would give it by far the

greatest loss of any proposed lead plaintiff.

Several parties argue that Cannell Capital is an inadequate lead plaintiff regardless of the size of its purported loss because it may not be able to establish that any such loss was caused by the defendants' fraud.  Those parties point out that Cannell Capital sold all of its OCA shares by April 15, 2005, nearly two months before OCA's June 7, 2005 announcement that it would restate its financial results for the first three quarters of 2004.  As a result, they argue, Cannell Capital's claims might be subject to a defense for lack of loss causation.  *See* 15 U.S.C. § 78u-4(b)(4) (plaintiff in section 10(b) action must prove that defendant's misrepresentations "caused the loss for which the plaintiff seeks to recover"); *Dura Pharms., Inc. v. Broudo*, 125 S.Ct. 1627, 1631-34 (2005) (plaintiff must allege and prove a causal connection between defendant's misrepresentations and the alleged loss).  Cannell Capital responds that it will be able to allege and prove loss causation because OCA's March 17, 2005 press release announcing that the company would delay the filing of its 2004 Form 10-K was a partial disclosure of defendants' alleged fraud and led to a decline in the market price of OCA stock.  Cannell Capital asserts that it still held OCA shares at the time of the March 17, 2005 partial disclosure, and that it will therefore be able to establish loss causation.

11

Notwithstanding this argument, the fact remains that Cannell Capital faces issues concerning loss causation that the other lead plaintiff candidates do not.  Those issues are substantial enough to render Cannell Capital inadequate to serve as the lead plaintiff in this action.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) (presumption that party is most adequate plaintiff may be rebutted by showing that plaintiff is "subject to unique defenses that render such plaintiff incapable of adequately representing the class").  It is a safe bet that, if Cannell Capital were appointed lead plaintiff, defendants would challenge its claims on loss causation grounds.  Regardless of whether such a challenge would be successful, Cannell Capital would be required to devote substantial time and resources to establishing that the defendants' alleged fraud caused its loss, an issue that is not relevant to a significant number of class members.  That alone makes Cannell Capital inadequate to serve as lead plaintiff.  *See, e.g., Bally Total Fitness*, 2005 U.S. Dist. LEXIS 6243, at *19 (plaintiff inadequate when "the time and attention [it] would be required to devote to the loss causation issue . . . would distract it from the claims of the rest of the class"); *Goodyear Tire & Rubber Co.*, 2004 WL 3314943, at *4 (lead plaintiff candidates inadequate when they would likely face motion to dismiss for lack of loss causation); *In re Carreker*

12

*Corp. Sec. Litig.*, No. 3:03-CV-0250-M, 2003 U.S. Dist. LEXIS
25988, at *8-9 (N.D. Tex. Aug. 14, 2003) (same).

In addition, Cannell Capital's interests in this litigation
are potentially divergent from the interests of other putative
class members. Because Cannell Capital sold all of its OCA
shares before the June 7, 2005 disclosure that marks the end of
the class period, its overarching interests in this case are to
establish that OCA's March 17, 2005 press release was a
disclosure of the alleged fraud and to maximize the significance
of that disclosure. Cannell Capital's incentive to effectively
front-load the disclosure of the alleged fraud might, however,
cause it to make arguments or take legal positions that are
adverse to the interests of those class members who purchased OCA
shares after March 17, 2005. Indeed, it has already done so on
this motion. In its responsive memorandum, Cannell Capital
argues that plaintiffs who purchased OCA stock after March 17 are
inadequate to serve as lead plaintiff because they purchased OCA
stock "with knowledge of the company's accounting problems."
(Cannell Cap. Resp. Mem. at 8). The existence of this potential
conflict creates significant concerns about whether Cannell
Capital could be a typical or adequate representative of the
entire class, and it is an additional reason for finding that

Cannell Capital is not the most adequate plaintiff in this case.[1]

    2.   *OCA Investors Group*

The OCA Investors Group purports to have the next-greatest financial interest in this case, as its members assert a combined loss of $482,625.68.  The OCA Investors Group cannot be the most adequate plaintiff, however, because the Court finds that it is not an appropriate "group of persons" to serve as a lead plaintiff in this action.

Courts are divided on whether a previous relationship among investors, independent of the lawsuit, is required for a group of investors to be appointed as lead plaintiff.  *Compare, e.g., Bally Total Fitness*, 2005 U.S. Dist. LEXIS 6243, at *8 ("'Where the members of the group do not share business or other relationships independent of the lawsuit . . . appointment of such an artificial group of persons as lead plaintiffs should be rare under the PSLRA.'" (quoting *Sakhrani v. Brightpoint, Inc.*, 78 F. Supp. 2d 845, 847 (S.D. Ind. 1999))), *Goodyear Tire & Rubber Co.*, 2004 WL 3314943, at *5 ("[L]ead plaintiff movants must have a pre-existing relationship and basis for acting as a

---

[1] Levine and Boodman also argue that Cannell Capital is an inadequate lead plaintiff because it is an investment advisor and it has not shown that it has standing to bring this action in its own name on behalf of its clients.  As the Court has found that Cannell Capital is not the most adequate plaintiff, the Court need not address this additional argument.

collective unit to qualify under the PSLRA as a viable lead
plaintiff group."), *and In re Donnkenny Inc. Sec. Litig.*, 171
F.R.D. 156, 157 (S.D.N.Y. 1997) ("To allow an aggregation of
unrelated plaintiffs to serve as lead plaintiffs defeats the
purpose of choosing a lead plaintiff."), *with In re Cendant Corp.
Litig.*, 264 F.3d 201, 266 (3d Cir. 2001) ("We disagree with those
courts that have held that the statute invariably precludes a
group of 'unrelated persons' from serving as a lead plaintiff
under the PSLRA."), *and In re Am. Bus. Fin. Servs., Inc. Sec.
Litig.*, No. 04-0265, 2004 U.S. Dist. LEXIS 10200, at *12 (E.D.
Pa. June 3, 2004) (PSLRA does not mandate that members of a group
have a preexisting relationship).  The PSLRA does not, by its
express terms, prohibit groups of unrelated plaintiffs from
banding together to move for appointment as lead plaintiff, and
this Court has permitted a group of investors to serve as co-lead
plaintiffs in other litigation.  *See Tarica,* 2000 WL 377817, at
*5.  Nevertheless, it is equally apparent that the practice of
aggregating unrelated plaintiffs into groups in order to seek
appointment as lead plaintiff, if permitted without scrutiny,
could undermine the PSLRA's goal of fostering plaintiff-driven
securities class action litigation.  *See, e.g., Sakhrani*, 78 F.
Supp. 2d at 847 ("[I]n most situations the appointment of an
artificial group as lead plaintiffs will tend to undermine the

15

goals of the PSLRA.").

Like a number of other courts, this Court will not take a categorical approach on the issue.  It will permit an unrelated group of investors to serve as lead plaintiff if the group shows that its assemblage "is not a manipulated effort to aggregate larger losses than other proposed Lead Plaintiffs." *Newby*, 206 F.R.D. at 455; *In re Microstrategy, Inc. Sec. Litig.*, 110 F. Supp. 2d 427, 437 (E.D. Va. 2000) (refusing to appoint group of unrelated plaintiffs when evidence suggested that group "was merely a diverse collection of plaintiffs assembled . . . for the purpose of winning the lead plaintiff role").  Thus, to be eligible to serve as lead plaintiff, a group of unrelated investors must show that it is a cohesive group that will operate efficiently and that the group's appointment as lead plaintiff will provide some benefit to the class that would not be achieved by the appointment of a single lead plaintiff.  *See In re Waste Mgmt., Inc. Sec. Litig.*, 128 F. Supp. 2d 401, 413 (S.D. Tex. 1999) ("The burden is on those seeking to aggregate to demonstrate the cohesiveness of their purported 'group' . . . .");  *see also Carreker Corp.*, 2003 U.S. Dist. LEXIS 25988, at *10-11 (stating that court will consider "whether an appointment of previously unrelated persons best serves the interest of the class and whether a sufficient governance structure is in

16

place"). Moreover, any group of plaintiffs must be small enough in size to assure the Court that it can manage the litigation effectively. For that reason, the Securities and Exchange Commission has stated that groups should generally contain no more than three to five members. *See Network Assocs.*, 76 F. Supp. 2d at app. at 1041 (Amicus Brief of Securities and Exchange Commission).

The OCA Investors Group consists of nine different plaintiffs, six of which are related and grouped under the moniker the "Brooks Family."[2] The OCA Investors Group asserts that it is a "small, cohesive and diverse group" that will provide the class "with benefits of joint decision-making and funding" and will allow the class to "wield more control" over counsel. (OCA Inv. Group Resp. Mem. at 7). The members of the OCA Investors Group have also signed a joint declaration stating that they "have agreed to communicate to discuss material developments and strategy and to establish a method of reporting by Lead Counsel" and have "exchanged contact information so that [they] may discuss issues outside the presence of counsel, if

---

[2]The "Brooks Family" consists of B.V. Brooks, his wife (over whose account he holds a power of attorney), a family trust whose activities he directs as trustee, and several companies he controls – Brooks Torrey & Scott, Inc., B.V. Brooks & Colin Gunn TTEE and Westbrook, Inc. (*See* OCA Inv. Group. Mem. at 1 & n.1).

[they] feel it necessary to do so." (*Id.* Ex. C, at 2).

Although the size of the OCA Investors Group exceeds that typically found acceptable, the Brooks Family would effectively function as a single investor by virtue of the relationships among its members. For practical purposes, then, the OCA Investors Group consists of only four members, and its size alone does not prevent it from serving as lead plaintiff.

The Court nevertheless finds that the OCA Investors Group is not an adequate lead plaintiff because it has not met its burden of showing that it is anything but a diverse collection of plaintiffs with no reason for being other than the aggregation of losses. The OCA Investors Group provides little or no information on matters relevant to its cohesiveness and ability to function efficiently. A proposed group should provide the Court with a description of how and why the group was formed, the specific benefits that each group member will bring to the prosecution of the litigation, other than the size of its loss, and the specific manner in which the group proposes to make decisions. *See Network Assocs.*, 76 F. Supp. 2d at 1026 (group should provide "descriptions of its members, including any pre-existing relationships among them; an explanation of how it was formed and how its members would function collectively; and a description of the mechanism that its members and the proposed

18

lead counsel have established to communicate with one another about the litigation." (quoting Amicus Brief of Securities and Exchange Commission at 12, 15, *Parnes v. Digital Lightwave, Inc*., No. 99-11293 (11th Cir. Aug. 2, 1999))); *Newby*, 206 F.R.D. at 455 (denying group's motion for appointment as lead plaintiff when there was "no clear or persuasive reason why FSBA and NYC Funds have joined together to apply for Lead Plaintiff in this litigation other than an effort to amalgamate their losses to be greater than their competitors'").

Here, the OCA Investors Group provides no real explanation as to how or why it was formed, other than its generic statements about the benefits of joint decision-making and generalizations about a group's ability to control counsel more effectively than a single plaintiff.  Even if those statements were accurate, they would apply to virtually any group of investors put together by counsel to move for appointment as lead plaintiff.  Moreover, the OCA Investors Group has failed to provide an adequate description of how the group would function to manage this litigation.  The group's joint declaration merely states that it will "discuss material developments and strategy" and that it intends to "establish a method of reporting." (*See* OCA Inv. Group. Resp. Mem. Ex. C, at 2).  General statements like these are inadequate. *See Carreker Corp*., 2003 U.S. Dist. LEXIS 25988, at *9-11

19

(counsel's declaration that group "'implemented procedures,' [had] a 'regular schedule' and [would] make decisions . . . on a majority vote" insufficient to show that group would effectively manage litigation).

The failure to provide any specifics about how the group will function is particularly problematic in a case such as this when the group consists of an unlikely conglomeration of very diverse parties. The OCA Investors Group consists of a public pension fund, an investment advisor based in Mexico, a commercial fisherman, and an individual businessman who invested on behalf of his family and several family-owned companies. With such a motley assortment of members, it is vital that such a group establish communication and decision-making structures to ensure that it is able to operate effectively. Thus, despite the OCA Investors Group's assertion that it is a "cohesive" group, without some detail as to why the group was formed or how it will function, the Court cannot find that it is an appropriate lead plaintiff.[3]

---

[3]Levine and Boodman also challenge the OCA Investors Group on additional grounds, including that Lawford Overseas Management does not have standing to pursue this action on behalf of its clients and that Louisiana School Employees' Retirement System cannot serve as a lead plaintiff in this action because it would violate the PSLRA's restriction on "professional plaintiffs." *See* 15 U.S.C. § 78u-4(a)(3)(B)(vi). As the Court has found that the OCA Investors Group is not an appropriate group of plaintiffs

Although the OCA Investors Group is not itself an appropriate plaintiff, the Court can consider whether any of its individual members is the most adequate plaintiff. *See Bally Total Fitness*, 2005 U.S. Dist. LEXIS 6243, at *12 (considering individual group members as independent lead plaintiff candidates); *Cardinal Health*, 226 F.R.D. at 308 ("A group vying for lead plaintiff does not necessarily rise and fall as a group."). None of the individual members of the OCA Investors Group independently has the largest financial interest of the remaining candidates; thus, none of them can qualify as the most adequate plaintiff. Nor does the "Brooks Family," which itself is an acceptable "group" of investors, have a sufficiently large financial interest to serve as lead plaintiff.

      3.   *Douglas Levine and Samuel Boodman*

Levine and Boodman purport to have the next-largest financial interest in this action, with $417,134 in asserted losses. Like the OCA Investors Group, however, Levine and Boodman are a group of unrelated investors, and they have also failed to provide the Court with sufficient reason to justify their serving as co-lead plaintiffs.

On his own, however, Samuel Boodman asserts a loss of

---

under the PSLRA, it will not consider the additional challenges raised by Levine and Boodman.

$318,501.50, which is greater than the asserted loss of any other single investor.  Moreover, Boodman also satisfies the typicality and adequacy requirements of Rule 23.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  Typicality under Rule 23 requires that the claims or defenses of the representative party be typical of the claims or defenses of the putative class of plaintiffs.  *See* Fed. R. Civ. P. 23(a)(3).  Here, Boodman and the class of plaintiffs both claim that the market price for OCA securities was artificially inflated during the class period as a result of defendants' false or misleading public statements, that they purchased OCA securities during the class period without knowledge of defendants' alleged fraud and in reliance upon the integrity of the market price for OCA securities, and that they suffered damages as a result.  Nor does it appear likely that Boodman will be subject to any unique defenses that would render him an atypical class representative.  Boodman purchased OCA shares between January 3, 2005 and February 3, 2005, while the market for OCA shares was allegedly inflated and before the March 17, 2005 "partial disclosure."  Moreover, Boodman retained those shares through the end of the class period and the disclosure of the alleged fraud.  The Court therefore finds that Boodman's claims are typical of the claims of the putative class members.

To satisfy Rule 23's adequacy requirement, the

22

representative party's interests must not be antagonistic to those of the class members, and the class representative's selected counsel must be qualified, experienced, and able to vigorously prosecute the action on behalf of the class. *See Tarica*, 2000 WL 377817, at *5.  Here, Boodman's interests appear to be fully aligned with the interests of the other putative class members, and as discussed below, Boodman has retained experienced counsel who will prosecute this action vigorously. The Court therefore finds that Boodman satisfies the requirements of Rule 23.

The OCA Investors Group challenges Boodman's application on the ground that his certification of transactions in OCA securities during the class period is limited to his transactions in OCA common stock and does not include options traded during the class period.  The OCA Investors Group asserts that without such information, it is impossible to determine whether Boodman actually has the largest financial interest of any of the proposed lead plaintiffs. (*See* OCA Inv. Group Resp. Mem. at 17).

The Court notes that although the majority of the securities complaints purport to represent only purchasers and sellers of OCA common stock during the class period, several of the complaints define the class more broadly to include purchasers of all "publicly traded securities" of OCA, or OCA "common stock and

23

sold put options." *See Thomas v. OCA Inc.*, No. 05-2220 (E.D. La. filed June 10, 2005); *Klein v. OCA, Inc.*, No. 05-2433 (E.D. La. filed June 15, 2005). The Court further notes that a plaintiff who purchased only OCA common stock can serve as lead plaintiff for purchasers of stock and options, unless or until a conflict arises between stock purchasers and options purchasers. *See Constance Sczesny Trust v. KPMG LLP*, 223 F.R.D. 319, 325 (S.D.N.Y. 2004) (declining to appoint separate lead plaintiff for sub-class of options purchasers); *Waste Mgmt.*, 128 F. Supp. 2d at 432 (same). Thus, that Boodman did not buy or sell any OCA options during the class period would not affect his eligibility to serve as lead plaintiff.

The OCA Investors Group's attack does not go to Boodman's ability to represent the class, however, but to whether he has the largest financial interest in the litigation. The OCA Investors Group asserts that Boodman's failure to state whether or not he bought or sold any OCA options during the class period renders it impossible to determine his financial interest in this litigation because undisclosed options trades could alter Boodman's asserted loss materially. Since Boodman's certification identifies only stock transactions, the Court orders Boodman to file a supplemental certification within five days of the date of this order stating whether he had any

24

transactions in OCA stock options during the class period and revising his estimated loss to reflect any such transactions. In the interim, the Court provisionally finds that Boodman is the most adequate plaintiff for the purposes of this motion.

Aside from this issue, the other lead plaintiff applicants have not come forward with any evidence to rebut the statutory presumption that Boodman is the most adequate plaintiff. Specifically, no party has shown that Boodman would not fairly or adequately represent the interests of the class members or that he is subject to any unique defense that renders him incapable of adequately representing the class. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Accordingly, the Court conditionally appoints Samuel Boodman as the lead plaintiff in the securities actions.

### C.   Approval of Lead Counsel

The PSLRA directs that, subject to the court's approval, the most adequate plaintiff shall select and retain counsel for the class. *See id.* § 78u-4(a)(3)(B)(v). Boodman has selected Kaplan Fox & Kilsheimer LLP as his proposed lead counsel and Neblett, Beard & Arsenault as proposed liaison counsel. The Court has reviewed the firm résumés of Boodman's proposed lead and liaison counsel, and it is satisfied that Boodman has retained competent and experienced counsel to represent the class in this matter.

25

Kaplan Fox & Kilsheimer has extensive experience representing plaintiffs in securities litigation over the past 20 years, and it has played a role in many cases that have generated substantial recoveries for shareholders. (*See* Levine & Boodman Mem. Ex. D, at 1-3).  Mr. Arsenault of Neblett, Beard & Arsenault has many years of experience in complex litigation and has previously served as liaison counsel in complex actions before this Court.  The Court is satisfied that Boodman's chosen counsel will adequately represent the class in this litigation.  The Court therefore conditionally approves Boodman's selection of lead and liaison counsel.

## III. THE DERIVATIVE CASES

Two parties move for appointment as lead derivative plaintiff.  A group titled the "Derivative Plaintiffs," consisting of Eric Nagel, Kevin Koch, Lemon Bay Partners, L.L.P., Daniel Taub and Xiafang Barr (hereinafter "Nagel"), moves for the appointment of Eric Nagel as lead plaintiff.  Plaintiffs Aleksy Shkuratkov and Ryan Bulmer jointly move to appoint themselves as co-lead plaintiffs.

### A.    Appropriate Legal Standard

Although the PSLRA provides a detailed process for appointing a lead plaintiff in securities class actions, no similar statutory scheme governs the appointment of a lead

plaintiff in shareholder derivative actions.  Further, relatively few cases have discussed the appointment process for a lead derivative plaintiff.  In the absence of a clearly defined standard to apply, the Court directed the parties to brief the issue of the criteria the Court should consider in appointing a lead derivative plaintiff in this case.

The parties urge the Court to consider a variety of factors in determining the adequacy of shareholder derivative plaintiffs. Nagel relies primarily on cases that consider factors extrapolated from Federal Rule of Civil Procedure 23.1, which requires, among other things, that a derivative plaintiff fairly and adequately represent the interests of similarly situated shareholders.  *See Larson v. Dumke*, 900 F.2d 1363, 1367 (9th Cir. 1990) (considering eight relevant factors to determine whether plaintiff was adequate under Rule 23.1); *Rothenberg v. Sec. Mgmt. Co.*, 667 F.2d 958, 961 (11th Cir. 1982) (five-factor inquiry into adequacy under Rule 23.1); *Horn v. Raines*, 227 F.R.D. 1, 3 (D.D.C. 2005) (considering three factors to determine whether proposed lead plaintiffs satisfied Rule 23.1).  Nagel additionally cites to cases that consider the size of each plaintiff's relative financial stake as a factor in appointing a lead derivative plaintiff.  *See TCW Tech. Ltd. P'ship v. Intermedia Commc'ns, Inc.*, No. 18336, 2000 WL 1654504, at *4

27

(Del. Ch. Oct. 17, 2000).

Shkuratkov and Bulmer, on the other hand, argue that the appointment of a lead plaintiff and lead counsel should be made based on a consideration of (i) the quality of the pleadings filed by each party; (ii) the vigor with which each plaintiff has prosecuted the suit; and (iii) whether each plaintiff is represented by competent counsel. *See, e.g., Dollens v. Zionts*, No. 01 C 5931, 2001 WL 1543524, at *5-6 (N.D. Ill. Dec. 4, 2001); *see also Horn*, 227 F.R.D. at 3; *Millman v. Brinkley*, No. 1:03-CV-3831-WSD, 2004 WL 2284505, at *3 (N.D. Ga. Oct. 1, 2004). Although Shkuratkov and Bulmer assert that these three factors should be given controlling weight, some of the cases they cite considered additional factors, including the relative size of each plaintiff's economic stake in the outcome of the litigation. *See Dollens*, 2001 WL 1543524, at *5-6.

The key difference between the approach advocated by Nagel and that favored by Shkuratkov and Bulmer is that Nagel focuses on factors that measure the adequacy of the plaintiffs themselves, while Shkuratkov and Bulmer look to a greater degree to the quality of each plaintiff's counsel. Although the Court finds that the factors relied on by both movants are relevant, it concludes that it should accord more weight to factors that reflect the adequacy of the plaintiff than to factors that depend

28

upon the quality of the plaintiff's counsel.  Congress, through the lead plaintiff provisions of the PSLRA, has mandated that private securities litigation should, to the extent possible, be driven and controlled by plaintiffs rather than by their lawyers. Although those provisions apply only to class actions, the policies underlying them are relevant to shareholder derivative actions, and the Court finds it appropriate to take those policies into account when it appoints a lead derivative plaintiff.  *See id.* at *5 (PSLRA factors relevant to appointment of lead derivative plaintiff); *In re Conseco, Inc. Sec. Litig.*, 120 F. Supp. 2d 729, 734 (N.D. Ind. 2000) (applying PSLRA factors, though noting "unique circumstances" of case). Accordingly, to determine which movant to appoint as lead plaintiff, the Court will consider (i) which plaintiff best satisfies the requirements of Rule 23.1; (ii) each movant's relative economic stake in the outcome of the litigation; (iii) the quality of the pleadings filed by each party; (iv) the vigor with which each plaintiff has prosecuted this litigation; and (v) whether each movant is represented by competent counsel.  The Court will give more weight to the first two factors than the last three.

B.    **Analysis**

1.    *Federal Rule of Civil Procedure 23.1*

Rule 23.1 provides a number of requirements for the maintenance of a shareholder derivative action in federal court. Under Rule 23.1, a shareholder derivative complaint filed in federal court must be verified and must allege both that the plaintiff was a shareholder at the time of the actions complained of and that the suit is not a collusive attempt to confer jurisdiction upon a federal court that it would not otherwise have. Fed. R. Civ. P. 23.1. The complaint must also allege with particularity the plaintiff's efforts, if any, to obtain the desired action through the board of directors, or the reasons why no such efforts were made. *Id.* Finally, Rule 23.1 provides that a derivative action "may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders . . . similarly situated in enforcing the right of the corporation." *Id.*

Each proposed lead plaintiff filed a derivative complaint in this litigation,[4] and each of those complaints facially complies with the requirements of Rule 23.1. Each of the complaints is

---

[4]*See Bulmer v. Palmisano*, No. 05-2421 (E.D. La. filed June 15, 2005); *Shkuratkov v. Palmisano*, No. 05-2223 (E.D. La. filed June 10, 2005); *Nagel v. Palmisano*, No. 05-2222 (E.D. La. filed June 10, 2005).

verified, each plaintiff alleges that he held OCA shares during the relevant time period, each alleges that there has been no collusion to create federal jurisdiction, and each alleges that it would be futile to demand action by OCA's board of directors.[5]

Nagel challenges the sufficiency of Shkuratkov's verification on the ground that the verification that he initially submitted with his complaint was signed by Shkuratkov's attorney, rather than by Shkuratkov himself.  The Court need not decide this issue, however, because even were Shkuratkov's initial verification defective, such a defect is curable, and Shkuratkov has since filed a verification that he personally executed.  *See Halsted Video, Inc. v. Guttillo*, 115 F.R.D. 177, 180 (N.D. Ill. 1987).

Each of the lead plaintiff candidates also at least preliminarily satisfies Rule 23.1's requirement that a derivative plaintiff fairly and adequately represent the interests of similarly situated shareholders in enforcing the rights of the corporation.  Whether a party is adequate under Rule 23.1 is an issue that is firmly committed to the discretion of the district

---

[5]The Court emphasizes that its findings concerning compliance with the requirements of Rule 23.1 are merely preliminary findings of facial compliance with Rule 23.1 and are made only for purposes of this motion.  The Court does not consider whether, for example, plaintiffs' allegations of demand futility are legally sufficient.

court.  *See Smith v. Ayres*, 977 F.2d 946, 948 (5th Cir. 1992).
Courts that have considered Rule 23.1's adequacy requirement have
established a laundry list of factors that can bear on this
inquiry.  In *Larson*, for example, the court found it appropriate
to consider (i) whether the plaintiff is the real party in
interest; (ii) the plaintiff's familiarity with the litigation;
(iii) the degree of control exercised by the plaintiff's
attorneys; (iv) the degree of support the plaintiff received from
other shareholders; (v) the plaintiff's personal commitment to
the litigation; (vi) the remedy sought in the derivative action;
(vii) the relative magnitude of the plaintiff's personal
interests as compared to his interest in the action itself; and
(viii) whether the plaintiff is vindictive toward the
defendants.[6]  *Larson*, 900 F.2d at 1367.  The Court will consider
these factors to the extent they are relevant here.

Nagel argues that Shkuratkov and Bulmer are inadequate under
Rule 23.1 because they are phantom plaintiffs who are unwilling
to participate in this litigation.  Nagel charges that Shkuratkov
and Bulmer are plaintiffs in name only and that their counsel is

---

[6]*See also Rothenberg*, 667 F.2d at 961 (considering (i)
indications that plaintiff is not real party in interest; (ii)
plaintiff's unfamiliarity with the action; (iii) degree of
control exercised by counsel; (iv) degree of support received by
other shareholders; and (v) plaintiff's lack of personal
commitment to the action).

actually driving the litigation.  Disqualification on this ground requires a substantial showing that the plaintiff lacks knowledge of, or interest in, the pursuit of the claims and that the litigation is completely controlled by the plaintiff's attorney. In *Rothenberg*, upon which Nagel relies, for example, the Court found the plaintiff inadequate because she had "an almost total lack of knowledge about the facts of the case," was essentially unable to comprehend the nature of the derivative action, and sought primarily to recover her personal losses, not losses to the corporation.  *Rothenberg*, 667 F.2d at 963.  The plaintiff in that case also admitted at a deposition that she did not believe that she could fairly and adequately represent the interests of the corporation.  *Id.* at 962 n.11; *Mills v. Esmark, Inc.*, 573 F. Supp. 169, 176 (N.D. Ill. 1983) (deposition showed that plaintiff had "little, if any comprehension of the litigation" and that lawyers had "total control" of litigation).

Nagel has not shown that Shkuratkov and Bulmer completely lack knowledge about this action or that their counsel exercises total control over the case.  Nagel points out that Shkuratkov's initial verification of his complaint was executed by counsel. He also notes that when Shkuratkov gave his personal verification later, he incorrectly referred to his complaint as an amended complaint, and he based it "on discussions with and reliance

33

upon" counsel.  This showing falls short of establishing the kind of ignorance that courts have found sufficient to render a plaintiff inadequate.  Moreover, Nagel fails even to point to any similar flaws that would disqualify Bulmer.  The Court therefore finds that Shkuratkov and Bulmer preliminarily satisfy the requirements of Rule 23.1 for purposes of this motion.

Shkuratkov and Bulmer do not argue that Nagel fails to satisfy Rule 23.1's adequacy requirement, and the Court finds nothing in the record before it that would call his adequacy into question.  Moreover, on the record before the Court, Nagel appears to be a more adequate derivative plaintiff than Shkuratkov and Bulmer.  First, Nagel's educational and professional background suggests that he would be a more adequate lead plaintiff than Shkuratkov and Bulmer.  Nagel has a degree in accounting, he worked at a major accounting firm for a year, he has worked on Wall Street since 1997, and he is currently an institutional bond broker.  This background is relevant in this case because the allegations of the complaints center on accounting and financial reporting errors at a publicly traded company.  Nagel's experience with accounting and securities makes it likely that he will understand the facts and issues in the case and be able to take an active role in this litigation. Shkuratkov and Bulmer have not provided the Court with any

similar background information.

It is also relevant that the verification Nagel submitted with his complaint is based on his own knowledge, information and belief, while Shkuratkov's verification expressly relies upon counsel.  Although, as stated *supra*, that Shkuratkov's verification was made in reliance upon counsel does not render him an inadequate plaintiff, it does indicate that he has less personal knowledge of the case than Nagel and that his personal involvement in the case may be more limited.

The Court further notes that five of the seven plaintiffs who filed derivative complaints support Nagel's appointment as lead plaintiff. As OCA shareholders, those plaintiffs have an economic interest in seeing this litigation prosecuted successfully on behalf of OCA.  That those plaintiffs agree that Nagel should be the lead derivative plaintiff suggests that they also believe that Nagel will most adequately represent OCA's interests in this action.

On the basis of these considerations, the Court concludes that Nagel appears to be most able to represent the interests of similarly situated shareholders adequately in enforcing the rights of OCA.  Accordingly, this factor weighs in favor of Nagel.

35

2.    *Relative Economic Stake*

The movants do not dispute that Nagel has a greater economic stake in the outcome of this litigation than Shkuratkov and Bulmer combined.  Nagel has been an OCA shareholder since 2001, and he currently holds 16,000 shares of OCA stock.  (*See* Nagel Mem. at 1).  Shkuratkov and Bulmer hold a combined total of 350 OCA shares.  (*See* Shkuratkov & Bulmer Resp. Mem. at 13 n.11).  The parties' dispute instead focuses on the weight that this factor should be given in this case.  Shkuratkov and Bulmer argue that when, as here, neither movant holds a significant portion of the corporation's outstanding shares, the economic stake of the plaintiffs should be given little weight.  *See Wiehl v. Eon Labs*, No. Civ.A. 1116-N, 2005 WL 696764, at *3 (Del. Ch. Mar. 22, 2005) (economic stakes of competing plaintiffs not given great weight when largest stake represented only 0.065 percent of corporation's outstanding shares).

It is true that, since any recovery in the shareholder derivative actions would go to the corporation, the plaintiffs' economic interests in the outcome of this action are only indirect interests in any event.  Nevertheless, the Court is not convinced by Shkuratkov's and Bulmer's argument that economic interest should be given little weight in this case.  First, the analogous provision of the PSLRA, which creates a presumption

36

that the plaintiff with the largest financial interest is the most adequate plaintiff, applies even when no party's asserted loss is significant in relation to the size of the company or its total number of outstanding shares.  Moreover, the size of the competing plaintiffs' stake in the company relative to each another provides a measure of their relative incentives to litigate vigorously, particularly when there is a large disparity in the size of their holdings.  Shkuratkov's and Bulmer's approach would rob this consideration of significance in cases like this one.

Although economic interest alone is not dispositive, the Court finds that it should be given substantial weight.  Here, for example, Nagel's 16,000 shares is over 45 times greater than the combined holdings of Shkuratkov and Bulmer.  Nagel thus has a substantially greater incentive to make every effort to secure an outcome favorable to OCA.  This factor therefore weighs in favor of Nagel.

         3.   *Quality of the Pleadings*

Shkuratkov and Bulmer assert that the quality of their complaints compared to Nagel's strongly favors appointing them as lead plaintiffs.  Shkuratkov and Bulmer argue that Nagel's complaint is inferior because Nagel failed to invoke this Court's jurisdiction properly and failed to include certain causes of

action.  The Court considers each of these contentions in turn.

Nagel identifies two possible bases for this Court's subject-matter jurisdiction.  He first alleges that jurisdiction exists on the basis of diversity of citizenship.  He then asserts that the Court has federal question jurisdiction over his claim for contribution under the Securities Exchange Act of 1934, which allows the Court to exercise supplemental jurisdiction over his state law claims.  Shkuratkov and Bulmer argue that Nagel's jurisdictional allegations are deficient because he has failed to plead the citizenship of each of the parties and because his contribution claim is not yet ripe.

Shkuratkov and Bulmer are correct that Nagel's complaint does not properly plead jurisdiction on the basis of diversity of citizenship.  Because the burden of establishing diversity of citizenship rests with the plaintiff, the plaintiff must affirmatively plead the citizenship of the parties.  *See Stafford v. Mobil Oil Corp.*, 945 F.2d 803, 804-05 (5th Cir. 1991).  Nagel's complaint alleges generally that Nagel is diverse from each of the defendants, but it fails to allege the citizenship of any of the individual defendants.  Such a pleading defect is curable, *see Strain v. Harrelson Rubber Co.*, 742 F.2d 888, 889-90 (5th Cir. 1984), and there are no facts before the Court to suggest that Nagel cannot establish that he is diverse from each

of the defendants.  Nevertheless, this defect negatively impacts

Nagel's application.

Shkuratkov and Bulmer are also correct that a contribution

claim under federal law is not yet ripe and, accordingly, cannot

provide the basis for the Court's jurisdiction.  *See Vulcan*

*Materials Co. v. City of Tehuacana*, 238 F.3d 382, 385 (5th Cir.

2001) (noting that federal court cannot exercise supplemental

jurisdiction over state law claims when plaintiff's sole federal

claim is unripe (citing *Samaad v. City of Dallas*, 940 F.2d 925,

934 (5th Cir. 1991))).  The right to contribution under the

Securities Exchange Act arises only once a defendant has incurred

an obligation to pay a judgment.  *See* 15 U.S.C. § 78u-4(f)(8)

(providing right of contribution to one who "becomes jointly and

severally liable for damages in any private action"); *id.* § 78u-

4(f)(9) (statute of limitations for contribution claim calculated

from date of final, nonappealable judgment); *see also In re*

*Cendant Corp. Derivative Action Litig.*, 96 F. Supp. 2d 394, 397

(D.N.J. 2000) (contribution claim under section 11 of Securities

Act of 1933 not ripe when settlement had not been approved by

court).  Thus, if diversity jurisdiction does not exist, the

Court could not at this point exercise supplemental jurisdiction

over Nagel's state law claims.

Of less significance is Shkuratkov's and Bulmer's assertion

that their complaints are superior because they include a cause of action for disgorgement under section 304 of the Sarbanes-Oxley Act of 2002. *See* 15 U.S.C. § 7243. Whether derivative plaintiffs can maintain claims under section 304 may be an open one, but one court has squarely held that they cannot. *See Neer v. Pelino*, No. Civ.A. 04-4791, 2005 WL 2434685, at *3-8 (E.D. Pa. Sept. 27, 2005) (holding that section 304 does not provide a private right of action). Thus, the Court does not find that the inclusion of such a claim makes Shkuratkov's and Bulmer's complaints superior to Nagel's complaint in any significant way.

Shkuratkov and Bulmer also point to their claim for breach of fiduciary duty for insider selling, which is based on an OCA director's sale of 4,800 shares of OCA stock while he was allegedly in possession of material, non-public information. Nagel's complaint also refers to insider stock sales in its claim for breach of fiduciary duty, but it makes only a passing, unspecific reference to such sales, and it does not include specific facts concerning any particular defendant or any particular sale of stock. In this respect, Shkuratkov's and Bulmer's complaints are at least moderately more detailed than Nagel's complaint.

On the whole, each plaintiff has filed a detailed and professional complaint. For the reasons stated above, however,

the Court finds that Shkuratkov's and Bulmer's complaints are somewhat more thorough and carefully drafted.  Accordingly, this factor weighs in favor of Shkuratkov and Bulmer.

### 4.  *Vigorous Prosecution*

Each movant and his counsel has been active in the prosecution of the early stages of this litigation, and the Court is confident that each movant would continue to prosecute this action vigorously if selected as lead plaintiff.  Although the movants argue over which party has been more vigorous to date, the Court finds that this factor favors neither Nagel nor Shkuratkov and Bulmer.

### 5.  *Competence of Counsel*

Likewise, each movant is represented in this action by able lawyers who are experienced in the field of shareholder derivative litigation.  The Court has reviewed the parties' submissions on this issue and the attached firm résumés, and it is comfortable that each party's proposed leadership structure would capably prosecute this action.

Nagel's proposed leadership structure consists of Federman & Sherwood and Brodsky & Smith, LLC as proposed co-lead counsel, with Barasso Usdin Kupperman Freeman & Sarver, L.L.C. as proposed liaison counsel.  Nagel's co-lead counsel have served and currently serve as lead counsel in a large number of shareholder

41

derivative actions in state and federal courts around the United States. (*See* Nagel Mem. at 6-9 & Exs. E-F; Nagel Resp. Mem. at 2-4). Federman & Sherwood has successfully represented the interests of derivative plaintiffs in a number of actions. (*See* Nagel Mem. at 8-9). Nagel's proposed liaison counsel, Barasso Usdin Kupperman Freeman & Sarver, L.L.C., are reputable attorneys with a great deal of experience in complex litigation, including shareholder derivative litigation, and Mr. Kupperman of that firm has served as liaison counsel in complex litigation in this district. (*See id.* at 9-10).

Shkuratkov and Bulmer propose the appointment of Barrett, Johnston & Parsley and Robbins Umeda & Fink, LLP as co-lead counsel, with Smith & Fawer, LLC as liaison counsel. Barrett, Johnston & Parsley have successfully represented plaintiffs in a number of complex securities litigations, and currently serve as co-lead counsel in at least two shareholder derivative actions pending in federal courts. (*See* Shkuratkov & Bulmer Mem. at 12-13). Robbins Umeda & Fink has also successfully represented plaintiffs in a number of securities class actions and shareholder derivative actions. (*See id.* at 14-15). Moreover, Smith & Fawer are also well qualified to serve as liaison counsel. Mr. Smith of that firm has long practiced before the courts of this district and has ample experience in complex

42

litigation.  (*See id.* at 16).

Shkuratkov and Bulmer, however, seek to break the tie on this issue by asserting that Nagel's lawyers have committed ethics violations or have a disabling conflict of interest.  They rely on June 8, 2005 press releases issued by Brodsky & Smith and Federman & Sherwood that announce the filing of a class action lawsuit against OCA.  The press releases in question are generally similar and state that a securities class action was filed against OCA in this Court on June 7, 2005, that members of the putative class might have certain rights and that putative class members could contact the firms if they have questions about their legal rights.  (*See* Shkuratkov & Bulmer Resp. Mem. Ex. A).  Shkuratkov and Bulmer argue that, since neither Brodsky & Smith nor Federman & Sherwood filed securities actions in this Court, the press releases violate Louisiana Rule of Professional Conduct 7.1(a), which prohibits a lawyer from, *inter alia*, making false, misleading or deceptive communications about his services. They argue alternatively that if either of those firms does, in fact, represent clients suing OCA for securities fraud, then the firm has a conflict of interest that prevents it from serving as counsel to plaintiffs suing derivatively on behalf of OCA.

This Court is not persuaded by these arguments.  First, neither Brodsky & Smith nor Federman & Sherwood filed a complaint

43

or has otherwise appeared before this Court as attorneys for any securities plaintiff.  Nor is there any evidence that they ever formed an attorney-client relationship with, or received confidential information from, any securities plaintiff.  There is therefore no basis to find that they have a conflict of interest in representing plaintiffs in the derivative actions. Second, the press releases themselves do not actually assert that either of those firms filed a class action complaint.  They state only that a class action had been filed in this Court, which, of course, is true.  There is nothing inherently false, misleading or deceptive about the press releases that would lead this Court to conclude that counsel violated Louisiana Rule of Professional Conduct 7.1(a).

Thus, each plaintiff's proposed leadership structure for counsel is competent and adequate to pursue this action, and the Court finds that this factor does not favor either Nagel or Shkuratkov and Bulmer.

### C.    Lead Derivative Plaintiff

Based on the foregoing analysis, the Court appoints Nagel as the lead derivative plaintiff.  The Court bases this decision on its findings that Nagel is the most adequate of the proposed lead derivative plaintiffs under Rule 23.1 and that he has by far the largest economic stake in the outcome of the litigation.  The

Court is also satisfied that Nagel has vigorously prosecuted this action and that he is represented by competent and experienced counsel.  Although Shkuratkov and Bulmer have filed somewhat better pleadings to date, as stated *supra*, the Court finds that the lead plaintiff inquiry should give primary consideration to the relative adequacy of the plaintiffs themselves.  Here, that factor favors Nagel.  Accordingly, the court appoints Eric Nagel as lead derivative plaintiff.  The Court also approves his selection of Brodsky & Smith and Federman & Sherwood as co-lead counsel and Barasso Usdin Kupperman Freeman & Sarver as liaison counsel.

**IV.   CONCLUSION**

For the reasons stated above, the Court conditionally appoints Samuel Boodman as lead plaintiff in the securities actions.  The Court conditionally approves his selection of Kaplan Fox & Kilsheimer as lead counsel and Neblett, Beard & Arsenault as liaison counsel.  The Court appoints Eric Nagel as lead derivative plaintiff and approves his selection of Brodsky &

Smith and Federman & Sherwood as co-lead counsel and Barasso
Usdin Kupperman Freeman & Sarver as liaison counsel.


New Orleans, Louisiana, this __18th__ day of November, 2005.


_____
                 SARAH S. VANCE
         UNITED STATES DISTRICT JUDGE

# CITIGROUP INC

# FORM S-3ASR

(Automatic shelf registration statement of securities of well-known seasoned issuers)

## Filed 10/03/07

| | |
|---|---|
| Address | 399 PARK AVENUE |
| | NEW YORK, NY 10043 |
| Telephone | 2125591000 |
| CIK | 0000831001 |
| Symbol | C |
| SIC Code | 6021 - National Commercial Banks |
| Industry | Money Center Banks |
| Sector | Technology |
| Fiscal Year | 12/31 |

http://access.edgar-online.com
© Copyright 2008, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

As filed with the Securities and Exchange Commission on October 3, 2007

**Registration No. 333-**

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

---

# Form S-3
## REGISTRATION STATEMENT UNDER
## THE SECURITIES ACT OF 1933

---

| **Citigroup Inc.** | **Delaware** | **52-1568099** |
|---|---|---|
| *(Exact name of registrant as specified in its charter)* | *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification Numbers)* |

**399 Park Avenue**
**New York, NY 10043**
**(212) 559-1000**
*(Address, including zip code, and telephone number,*
*including area code, of registrant's principal executive offices)*

---

**Michael S. Zuckert, Esq.**
**General Counsel, Finance and Capital Markets**
**Citigroup Inc.**
**425 Park Avenue**
**New York, NY 10043**
**(212) 559-1000**
*(Name, address, including zip code, and telephone number,*
*including area code, of agent for service)*

---

*Copies to:*

**Gregory A. Fernicola, Esq.**
**Skadden, Arps, Slate, Meagher & Flom LLP**
**Four Times Square**
**New York, New York 10036**
**(212) 735-3000**

---

**Approximate date of commencement of proposed sale of the securities to the public:** At such time (from time to time) as agreed upon by Citigroup Inc. and the Underwriters in light of market conditions.

If the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans, please check the following box. ☐

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, other than securities offered only in connection with dividend or interest reinvestment plans, check the following box. ☑

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a registration statement pursuant to General Instruction I.D. or a post-effective amendment thereto that shall become effective upon filing with the Commission pursuant to Rule 462(e) under the Securities Act, check the following box. ☑

If this Form is a post-effective amendment to a registration statement filed pursuant to General Instruction I.D. filed to register additional securities or additional classes of securities pursuant to Rule 413(b) under the Securities Act, check the following box. ☐

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered | Amount to be Registered | Proposed Maximum Offering Price(1) | Amount of Registration Fee |
|---|---|---|---|
| Common Stock of Citigroup Inc. to be offered by the selling stockholders named herein | 11,171,938 shares | $523,293,576 | $16,065.11 |

(1)   Estimated for the sole purpose of computing the registration fee.

(2)   Pursuant to Rules 457(r) and 457(c) under the Securities Act of 1933, the proposed maximum aggregate offering price and registration fee for up to 11,171,938 shares of common stock of Citigroup Inc. to be offered by the selling stockholders from time to time at indeterminate prices are computed on the basis of the average high and low prices of Citigroup's common stock, as reported on the New York Stock Exchange, on September 28, 2007.

RESALE PROSPECTUS



## 11,171,938 Shares of Common Stock

———————————

**Who is offering the common stock and receiving proceeds from any sales** . The shares of common stock described in this prospectus are being offered for sale from time to time by the selling stockholders named herein who acquired the shares in connection with Citigroup's acquisition of Automated Trading Desk, Inc. The selling stockholders will receive all of the proceeds from any sales. Citigroup will not receive any of the proceeds.

**How sales will be made; price of shares** . The selling stockholders may sell the shares of common stock at various times and in various types of transactions, including sales in the open market, sales in negotiated transactions and sales by a combination of these methods. Shares may be sold at the market price of the common stock at the time of a sale, at prices relating to the market price over a period of time, or at prices negotiated with the buyers of shares.

**Fees and expenses** . The selling stockholders will pay all brokerage fees and commissions and similar sale-related expenses. Citigroup is paying expenses relating to the registration of the shares with the Securities and Exchange Commission.

Citigroup's common stock is listed on the New York Stock Exchange under the symbol "C". On October 2, 2007, the last reported sale price for Citigroup's common stock on the New York Stock Exchange was $47.86 per share.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

———————————

The date of this prospectus is October 3, 2007

## TABLE OF CONTENTS

| | Page |
|---|---|
| FORWARD-LOOKING STATEMENTS | 1 |
| CITIGROUP INC. | 1 |
| RISK FACTORS | 1 |
| USE OF PROCEEDS | 2 |
| SELLING STOCKHOLDERS | 2 |
| PLAN OF DISTRIBUTION | 3 |
| LEGAL MATTERS | 3 |
| EXPERTS | 3 |
| WHERE YOU CAN FIND MORE INFORMATION | 4 |
| EX-5.01: OPINION OF MICHAEL S. ZUCKERT, ESQ. | |
| EX-23.01: CONSENT OF KPMG LLP | |
| EX-24.01: POWERS OF ATTORNEY | |

i

## FORWARD-LOOKING STATEMENTS

This prospectus and the information incorporated by reference in this prospectus include forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. These forward-looking statements are based on Citigroup's management's beliefs and assumptions and on information currently available to Citigroup's management. Forward-looking statements include information concerning Citigroup's possible or assumed future results of operations and statements preceded by, followed by or that include the words "believes," "expects," "anticipates," "intends," "plans," "estimates" or similar expressions.

Forward-looking statements involve risks, uncertainties and assumptions. Actual results may differ materially from those expressed in these forward-looking statements. Factors that could cause actual results to differ materially from these forward-looking statements include, but are not limited to, those discussed elsewhere in this prospectus and the documents incorporated by reference in this prospectus. You should not put undue reliance on any forward-looking statements. Citigroup does not have any intention or obligation to update forward-looking statements after it distributes this prospectus.

## CITIGROUP INC.

Citigroup is a diversified global financial services holding company whose businesses provide a broad range of financial services to consumer and corporate customers. Citigroup has more than 200 million customer accounts and does business in more than 100 countries. Citigroup's activities are conducted through the Global Consumer, Markets & Banking, Global Wealth Management and Alternative Investments business segments. Citigroup's principal subsidiaries are Citibank, N.A., Citigroup Global Markets Inc. and Grupo Financiero Banamex, S.A. de C.V., each of which is a wholly-owned, indirect subsidiary of Citigroup. Citigroup was incorporated in 1988 under the laws of the State of Delaware as a corporation with perpetual duration.

Citigroup is a holding company and services its obligations primarily with dividends and advances that it receives from subsidiaries. Citigroup's subsidiaries that operate in the banking and securities business can only pay dividends if they are in compliance with the applicable regulatory requirements imposed on them by federal and state bank regulatory authorities and securities regulators. Citigroup's subsidiaries may be party to credit agreements that also may restrict their ability to pay dividends. Citigroup currently believes that none of these regulatory or contractual restrictions on the ability of its subsidiaries to pay dividends will affect Citigroup's ability to service its own debt. Citigroup must also maintain the required capital levels of a bank holding company before it may pay dividends on its stock. Each of Citigroup's major operating subsidiaries finances its operations on a stand-alone basis consistent with its capitalization and ratings.

Under the regulations of the Federal Reserve, a bank holding company is expected to act as a source of financial strength for its subsidiary banks. As a result of this regulatory policy, the Federal Reserve might require Citigroup to commit resources to its subsidiary banks when doing so is not otherwise in the interests of Citigroup or its shareholders or creditors.

Citigroup's principal office is located at 399 Park Avenue, New York, NY 10043, and its telephone number is (212) 559-1000.

## RISK FACTORS

Investing in Citigroup's common stock involves risk. See the risk factors described in Citigroup's Annual Report on Form 10-K for Citigroup's most recent fiscal year, which is incorporated by reference in this prospectus. Before making an investment decision, you should carefully consider these risks as well as other information Citigroup includes or incorporates by reference in this

Table of Contents

prospectus. These risks could materially affect Citigroup's business, results of operations or financial condition and cause the value of Citigroup's common stock to decline. You could lose all or part of your investment.

## USE OF PROCEEDS

All shares of common stock sold pursuant to this prospectus will be sold by the selling stockholders and Citigroup will not receive any of the proceeds from such sales.

## SELLING STOCKHOLDERS

The selling stockholders acquired the shares of common stock offered by this prospectus from Citigroup in connection with the acquisition of Automated Trading Desk, Inc. by Citigroup in October 2007.

The registration of these shares does not necessarily mean that the selling stockholders will sell all or any of the shares.

The following table provides information regarding the beneficial ownership of Citigroup's common stock by the selling stockholders, as of October 1, 2007. The number of shares set forth in the table below represents all shares of Citigroup's common stock owned by the selling stockholders.

The information provided in the table below with respect to the selling stockholders has been obtained from the selling stockholders and Citigroup has not sought to verify this information.

| Selling Stockholders | Number of Shares Beneficially Owned Prior to the Offering | Number of Shares Being Offered (1) |
|---|---|---|
| Selling stockholders (including their permitted transferees under the registration rights agreement) that acquired shares of Citigroup common stock in connection with the acquisition of Automated Trading Desk, Inc. by Citigroup | 11,175,503 | 11,171,938 |

(1)     Represents less than 1% of Citigroup's outstanding common stock.

2

## PLAN OF DISTRIBUTION

Citigroup is registering the shares of common stock covered by this prospectus for the selling stockholders. Pursuant to a merger agreement, dated as of June 30, 2007, Citigroup agreed to register the resale of the common stock owned by the selling stockholders and to indemnify the selling stockholders against certain liabilities related to the selling of the common stock, including liabilities arising under the Securities Act. Under the merger agreement, Citigroup also agreed to pay the costs and fees of registering the shares of common stock; however, the selling stockholders will pay any brokerage commissions relating to the sale of the shares of common stock.

The selling stockholders may sell the common stock being offered hereby in one or more of the following ways at various times:

•     directly to institutional investors; or

•     through agents to the public or to institutional investors.

The selling stockholders may offer their shares of common stock in one or more offerings pursuant to one or more prospectus supplements, if required by applicable law, and any such prospectus supplement will set forth the terms of the relevant offering to the extent required.

Each selling stockholder will act independently of Citigroup in making decisions with respect to the timing, manner and size of each sale. The selling stockholders may sell the common stock on the New York Stock Exchange or otherwise, at market prices prevailing at the time of sale, at prices related to the prevailing market prices, or at negotiated prices.

The selling stockholders may negotiate and pay broker-dealers' commissions, discounts or concessions for their services. Broker-dealers engaged by the selling stockholders may allow other broker-dealers to participate in resales. The selling stockholders and any broker-dealers involved in the sale or resale of the common stock may qualify as "underwriters" within the meaning of Section 2(a)(11) of the Securities Act. In addition, the broker-dealers' commissions, discounts or concessions may qualify as underwriters' compensation under the Securities Act. If a selling stockholder qualifies as an "underwriter," it will be subject to the prospectus delivery requirements of Section 5(b)(2) of the Securities Act.

## LEGAL MATTERS

The validity of the shares of common stock offered pursuant to this prospectus will be passed upon by Michael S. Zuckert, General Counsel, Finance and Capital Markets of Citigroup, 425 Park Avenue, New York, New York 10043. Mr. Zuckert beneficially owns, or has rights to acquire under Citigroup's employee benefit plans, an aggregate of less than 1% of Citigroup's common stock.

## EXPERTS

The consolidated financial statements of Citigroup Inc. as of December 31, 2006 and 2005, and for each of the years in the three-year period ended December 31, 2006, and management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2006 have been incorporated by reference in this prospectus in reliance upon the reports of KPMG LLP, independent registered public accounting firm, incorporated by reference herein, and upon the authority of said firm as experts in accounting and auditing. The report of KPMG LLP on the consolidated financial statements refers to changes in 2006, in Citigroup's methods of accounting for defined benefit pensions and other postretirement benefits, stock-based compensation, certain hybrid financial instruments and servicing of financial assets, and in 2005, in Citigroup's method of accounting for conditional asset retirement obligations associated with operating leases.

3

**WHERE YOU CAN FIND MORE INFORMATION**

As required by the Securities Act, Citigroup filed a registration statement relating to the securities offered by this prospectus with the Securities and Exchange Commission. This prospectus is a part of that registration statement, which includes additional information. Citigroup has filed the exhibits discussed in this prospectus with the registration statement, and you should read the exhibits carefully for provisions that may be important to you.

Citigroup files annual, quarterly and current reports, proxy statements and other information with the SEC. You may read and copy any document Citigroup files at the SEC's public reference room in Washington, D.C. You can also request copies of these documents, upon payment of a duplicating fee, by writing to the Public Reference Section of the SEC. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. These SEC filings are also available to the public from the SEC's web site at http://www.sec.gov.

The SEC allows Citigroup to "incorporate by reference" the information it files with the SEC, which means that it can disclose important information to you by referring you to those documents. The information incorporated by reference is considered to be part of this prospectus. Information that Citigroup files with the SEC will automatically update the information in this prospectus. In all cases, you should rely on the later information over different information included in this prospectus. Citigroup incorporates by reference the documents listed below and any future filings made with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Exchange Act (File No. 1-09924):

(a) Annual Report on Form 10-K for the year ended December 31, 2006;

(b) Quarterly Reports on Form 10-Q for the quarters ended March 31, 2007 and June 30, 2007;

(c) Current Reports on Form 8-K filed on January 9, 2007, January 19, 2007 (excluding the Item 2.02 Current Report on Form 8-K filed on that date), February 2, 2007, February 7, 2007, February 12, 2007, February 16, 2007, February 27, 2007, March 1, 2007, March 6, 2007, March 7, 2007, March 8, 2007, March 15, 2007, March 19, 2007, April 17, 2007, April 27, 2007, May 25, 2007, May 29, 2007, May 31, 2007, June 29, 2007, July 2, 2007, July 24, 2007, July 27, 2007, August 8, 2007, August 13, 2007, August 15, 2007, August 16, 2007, August 17, 2007, August 27, 2007, September 18, 2007, October 1, 2007 and October 2, 2007; and

(d) Registration Statement on Form 8-B, dated May 10, 1988, describing Citigroup's common stock, including any amendments or reports filed for the purpose of updating such description.

All documents Citigroup files pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of this prospectus and before the later of (1) the completion of the offering of the securities described in this prospectus and (2) the date the broker-dealer subsidiaries of Citigroup stop offering securities pursuant to this prospectus shall be incorporated by reference in this prospectus from the date of filing of such documents.

You may request a copy of these filings, at no cost, by writing or telephoning Citigroup at the following address:

4

Citigroup Document Services
140 58th Street, Suite 8G
Brooklyn, NY 11220
(877) 936-2737 (toll free)
(718) 765-6514 (outside the U.S.)

———————————————

   You should only rely on the information provided in this prospectus, as well as the information incorporated by reference. Citigroup is not making an offer to sell these securities in any jurisdiction where the offer or sale is not permitted. You should not assume that the information in this prospectus or any documents incorporated by reference is accurate as of any date other than the date of the applicable document. Citigroup's business, financial condition, results of operations and prospects may have changed since that date.

5

# PART II

## INFORMATION NOT REQUIRED IN PROSPECTUS

**Item 14.  *Other Expenses of Issuance and Distribution.***

The following table sets forth the various expenses payable by the Registrant in connection with the Securities being registered hereby. All of the fees set forth below, except for the Commission Registration Fee, are estimates.

| | |
|---|---:|
| Commission Registration Fee | $ 16,065 |
| Accounting Fees | 6,300 |
| Printing and Engraving Fees | 4,000 |
| Legal Fees and Expenses | 7,500 |
| Stock Exchange Listing Fees | 0 |
| Total | $ 33,865 |

Item 15.  Indemnification of Directors and Officers.

Subsection (a) of Section 145 of the General Corporation Law of the State of Delaware, or DGCL, empowers a corporation to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation) by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with such action, suit or proceeding if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which the person reasonably believed to be in or not opposed to the best interest of the corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that the person's conduct was unlawful.

Subsection (b) of Section 145 of the DGCL empowers a corporation to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in right of the corporation to procure a judgment in its favor by reason of the fact that such person acted in any of the capacities set forth above, against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation and except that no indemnification may be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

Subsection (d) of Section 145 of the DGCL provides that any indemnification under subsections (a) and (b) of Section 145 (unless ordered by a court) shall be made by the corporation only as authorized in the specific case upon a determination that indemnification of the present or former director, officer, employee or agent is proper in the circumstances because the person has met the applicable standard of conduct set forth in subsections (a) and (b) of Section 145. Such determination shall be made, with respect to a person who is a director or officer at the time of such determination, (1) by a majority vote of the directors who are not parties to such action, suit or proceeding, even though less than a quorum, or (2) by a committee of such directors designated by the majority vote of such directors, even though less than a quorum, or (3) if there are no such directors, or if such directors so direct, by independent legal counsel in a written opinion, or (4) by the stockholders.

Section 145 of the DGCL further provides that to the extent a present or former director or officer of a corporation has been successful on the merits or otherwise in the defense of any action, suit or proceeding referred to in subsections (a) and (b) of Section 145, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith and that such expenses may be paid by the corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the corporation as authorized in Section 145 of the DGCL; that any indemnification and advancement of expenses provided by, or granted pursuant to, Section 145 shall not be deemed exclusive of any other rights to which the indemnified party may be entitled; that indemnification provided by, or granted pursuant to, Section 145 shall, unless otherwise provided when authorized and ratified, continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of such person's heirs, executors and administrators; and empowers the corporation to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the corporation would have the power to indemnify such person against such liabilities under Section 145. Section Four of Article IV of Citigroup's By-Laws provides that Citigroup shall indemnify its directors and officers to the fullest extent permitted by the DGCL.

Citigroup also provides liability insurance for its directors and officers which provides for coverage against loss from claims made against directors and officers in their capacity as such, including, subject to certain exceptions, liabilities under the federal securities laws.

Section 102(b)(7) of the DGCL provides that a certificate of incorporation may contain a provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director (i) for any breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL, or (iv) for any transaction from which the director derived an improper personal benefit. Article Tenth of Citigroup's Restated Certificate of Incorporation limits the liability of directors to the fullest extent permitted by Section 102(b)(7).

The directors and officers of Citigroup are covered by insurance policies indemnifying them against certain liabilities, including certain liabilities arising under the Securities Act, which might be incurred by them in such capacities and against which they cannot be indemnified by Citigroup. Any agents, dealers or underwriters who execute any underwriting or distribution agreement relating to securities offered pursuant to this Registration Statement will agree to indemnify Citigroup's directors and their officers who signed the Registration Statement against certain liabilities that may arise under the Securities Act with respect to information furnished to Citigroup by or on behalf of such indemnifying party.

Pursuant to the merger agreement entered into by Citigroup and the selling stockholders, under certain circumstances, Citigroup has agreed to indemnify the selling stockholders and their respective directors and officers for certain liabilities, including liabilities incurred under the Securities Act, in connection with the registration of the shares of common stock being offered by the selling stockholders.

For the undertaking with respect to indemnification, see Item 17 herein.

II-2

**Item 16.** *Exhibits* .

| Exhibit Number | | Description |
|---|---|---|
| 5.01 | — | Opinion of Michael S. Zuckert, Esq. |
| 23.01 | — | Consent of KPMG LLP, Independent Registered Public Accounting Firm. |
| 23.02 | — | Consent of Michael S. Zuckert, Esq. (included in Exhibit 5.01). |
| 24.01 | — | Powers of Attorney. |

**Item 17.** *Undertakings* .

The undersigned registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i) to include any prospectus required by Section 10(a)(3) of the Securities Act of 1933, as amended;

(ii) to reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in this registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement; and

(iii) to include any material information with respect to the plan of distribution not previously disclosed in this registration statement or any material change to such information in this registration statement.

(2) That, for the purpose of determining any liability under the Securities Act of 1933, as amended, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(4) That, for the purpose of determining liability under the Securities Act of 1933, as amended, to any purchaser:

(i) Each prospectus filed by the Registrant pursuant to Rule 424(b)(3) shall be deemed to be part of the registration statement as of the date the filed prospectus was deemed part of and included in the registration statement; and

(ii) Each prospectus required to be filed pursuant to Rule 424(b)(2), (b)(5) or (b)(7) as part of a registration statement in reliance on Rule 430B relating to an offering made pursuant to Rule 415(a)(1)(i), (vii) or (x) for the purpose of providing the information required by Section 10(a) of the Securities Act of 1933 shall be deemed to be part of and included in the registration statement as of the earlier of the date such form of prospectus is first used after effectiveness or the date of the first contract of sale of securities in the offering described in the prospectus. As provided in Rule 430B, for liability purposes of the issuer and any person that is at that date an underwriter, such date shall be deemed to be a new effective date of the registration statement relating to the securities in the registration statement to which the prospectus relates, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof. Provided, however, that no statement made in a registration statement or prospectus that is part of the registration statement or made in a document

II-3

Table of Contents

incorporated or deemed incorporated by reference into the registration statement or prospectus that is part of the registration statement will, as to a purchaser with a time of contract of sale prior to such effective date, supersede or modify any statement that was made in the registration statement or prospectus that was part of the registration statement or made in any such document immediately prior to such effective date.

(5) That, for the purpose of determining liability of the Registrant under the Securities Act of 1933, as amended, to any purchaser in the initial distribution of the securities, the undersigned Registrant undertakes that in a primary offering of securities of the undersigned Registrant pursuant to this registration statement, regardless of the underwriting method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of any of the following communications, the undersigned Registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser:

(i) Any preliminary prospectus or prospectus of the undersigned Registrant relating to the offering required to be filed pursuant to Rule 424;

(ii) Any free writing prospectus relating to the offering prepared by or on behalf of the undersigned Registrant or used or referred to by the undersigned Registrant;

(iii) The portion of any other free writing prospectus relating to the offering containing material information about the undersigned Registrant or its securities provided by or on behalf of the undersigned Registrant; and

(iv) Any other communication that is an offer in the offering made by the undersigned Registrant to the purchaser.

(6) That, for purposes of determining any liability under the Securities Act of 1933, as amended, each filing of Citigroup Inc.'s annual report pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934, as amended, (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the Securities Exchange Act of 1934, as amended) that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(7) To file an application for the purpose of determining the eligibility of the trustee to act under subsection (a) of Section 310 of the Trust Indenture Act in accordance with the rules and regulations prescribed by the Commission under Section 305(6)(2) of the Trust Indenture Act.

Insofar as indemnification for liabilities arising under the Securities Act of 1933, as amended may be permitted to directors, officers and controlling persons of each Registrant pursuant to the provisions described in Item 15 above, or otherwise, the Registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act of 1933 and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act of 1933 and will be governed by the final adjudication of such issue.

II-4

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, Citigroup Inc. certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form S-3 and has duly caused this Registration Statement or Amendment thereto to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on October 3, 2007.

CITIGROUP INC.

By:    /s/ Gary Crittenden
Name: Gary Crittenden
Title:   Chief Financial Officer

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement or Amendment thereto has been signed below by the following persons in the capacities indicated on October 3, 2007.

| Signatures | |
|---|---|
| /s/ Charles Prince | Chairman and Chief Executive Officer |
| Charles Prince | (Principal Executive Officer) |
| /s/ Gary Crittenden | Chief Financial Officer |
| Gary Crittenden | (Principal Financial Officer) |
| /s/ John C. Gerspach | Controller and Chief Accounting Officer |
| John C. Gerspach | (Principal Accounting Officer) |
| * | Director |
| C. Michael Armstrong | |
| * | Director |
| Alain J.P. Belda | |
| * | Director |
| George David | |
| * | Director |
| Kenneth T. Derr | |
| * | Director |
| John M. Deutch | |
| * | Director |
| Roberto Hernández Ramirez | |
| * | Director |
| Andrew N. Liveris | |
| * | Director |
| Anne M. Mulcahy | |
| * | Director |
| Richard D. Parsons | |
| * | Director |
| Judith Rodin | |
| * | Director |
| Robert E. Rubin | |
| * | Director |
| Franklin A. Thomas | |

*By:  /s/ Michael S. Helfer

**EXHIBIT INDEX**

| Exhibit Number | | Description |
| --- | --- | --- |
| 5.01 | — | Opinion of Michael S. Zuckert, Esq. |
| 23.01 | — | Consent of KPMG LLP, Independent Registered Public Accounting Firm. |
| 23.02 | — | Consent of Michael S. Zuckert, Esq. (included in Exhibit 5.01). |
| 24.01 | — | Powers of Attorney. |

Exhibit-1

[CITIGROUP LETTERHEAD]

**Exhibit 5.01**

October 3, 2007

Citigroup Inc.
399 Park Avenue
New York, New York 10043

Ladies and Gentlemen:

I am General Counsel, Finance and Capital Markets of Citigroup Inc., a Delaware corporation (the "Company"). I refer to the filing by the Company under the Securities Act of 1933, as amended (the "Securities Act"), with the Securities and Exchange Commission (the "Commission") of a Registration Statement on Form S-3 (the "Registration Statement") relating to shares of Common Stock, $.01 par value per share, of the Company (the "Securities").

I, or attorneys under my supervision, have examined and am familiar with originals, or copies certified or otherwise identified to my satisfaction, of such corporate records of the Company, certificates or documents as I have deemed appropriate as a basis for the opinion expressed below. In such examination, I (or such persons) have assumed the legal capacity of all natural persons, the genuineness of all signatures, the authenticity of all documents submitted to me (or such persons) as originals, the conformity to original documents of all documents submitted to me (or such persons) as certified or photostatic copies and the authenticity of the originals of such copies.

Based upon and subject to the foregoing, I am of the opinion that the Securities are legally issued, fully paid and non-assessable.

My opinion is limited to matters governed by the General Corporation Law of the State of Delaware (including the applicable provisions of the Delaware Constitution and the reported judicial decisions interpreting the General Corporation Law of the State of Delaware and such applicable provisions of the Delaware Constitution). I am not admitted to the practice of law in the State of Delaware.

I consent to the use of this opinion in the Registration Statement and to the reference to my name in the Prospectus constituting a part of such Registration Statement under the heading "Legal Matters". In giving such consent, I do not thereby admit that I come within the category of persons whose consent is required under Section 7 of the Securities Act, or the rules and regulations of the Commission thereunder.

Very truly yours,

/s/ Michael S. Zuckert
Michael S. Zuckert
General Counsel, Finance and Capital Markets

Exhibit 23.01

Consent of Independent Registered Public Accounting Firm

The Board of Directors and Stockholders of
Citigroup Inc.:

We consent to the incorporation by reference in the Prospectus included as part of the Registration Statement on Form S-3, relating to the issuance of Citigroup Inc. common stock, of our reports dated February 23, 2007, with respect to the consolidated balance sheets of Citigroup Inc. and subsidiaries ("Citigroup") as of December 31, 2006 and 2005, the related consolidated statements of income, changes in stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 2006, the related consolidated balance sheets of Citibank, N.A. and subsidiaries as of December 31, 2006 and 2005, and management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2006 and the effectiveness of internal control over financial reporting as of December 31, 2006, and to the reference to our firm under the heading "Experts" in the Prospectus. The aforementioned report with respect to the consolidated financial statements of Citigroup refers to changes in 2006, in Citigroup's methods of accounting for defined benefit pensions and other postretirement benefits, stock-based compensation, certain hybrid financial instruments and servicing of financial assets, and in 2005, Citigroup changed its method of accounting for conditional asset retirement obligations associated with operating leases.

/s/ KPMG LLP

New York, New York
October 2, 2007

**Exhibit 24.01**

## POWER OF ATTORNEY

(Form S-3)

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, a director of CITIGROUP INC., a Delaware corporation (the "Company"), does hereby constitute and appoint Charles Prince, Gary Crittenden and Michael S. Helfer, and each of them, the true and lawful attorneys-in-fact and agents of the undersigned, to do or cause to be done any and all acts and things and to execute any and all instruments and documents which said attorneys-in-fact and agents, or any of them, may deem advisable or necessary to enable the Company to comply with the Securities Act of 1933, as amended, and any rules, regulations and requirements of the Securities and Exchange Commission in respect thereof, in connection with the registration of the securities of the Company being registered on the Registration Statement on Form S-3 to which this power of attorney is filed as an exhibit (the "Securities"), including specifically, but without limiting the generality of the foregoing, power and authority to sign, in the name and on behalf of the undersigned as a director of the Company, the Registration Statement on Form S-3 to which this power of attorney is filed as an exhibit, or another appropriate form in respect of the registration of the Securities, and any and all amendments thereto, including post-effective amendments, and any instruments, contracts, documents or other writings of which the originals or copies thereof are to be filed as a part of, or in connection with, the Registration Statement, any other appropriate form or any amendments thereto, and to file or cause to be filed the same with the Securities and Exchange Commission, and to effect any and all applications and other instruments in the name and on behalf of the undersigned which said attorneys-in-fact and agents, or any of them, deem advisable in order to qualify or register the Securities under the securities laws of any of the several States; and the undersigned does hereby ratify all that said attorneys-in-fact or agents, or any of them, shall do or cause to be done by virtue thereof.

IN WITNESS WHEREOF, the undersigned has signed these presents this 16 th day of July, 2007.

/s/ C. Michael Armstrong

POWER OF ATTORNEY

(Form S-3)

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, a director of CITIGROUP INC., a Delaware corporation (the "Company"), does hereby constitute and appoint Charles Prince, Gary Crittenden and Michael S. Helfer, and each of them, the true and lawful attorneys-in-fact and agents of the undersigned, to do or cause to be done any and all acts and things and to execute any and all instruments and documents which said attorneys-in-fact and agents, or any of them, may deem advisable or necessary to enable the Company to comply with the Securities Act of 1933, as amended, and any rules, regulations and requirements of the Securities and Exchange Commission in respect thereof, in connection with the registration of the securities of the Company being registered on the Registration Statement on Form S-3 to which this power of attorney is filed as an exhibit (the "Securities"), including specifically, but without limiting the generality of the foregoing, power and authority to sign, in the name and on behalf of the undersigned as a director of the Company, the Registration Statement on Form S-3 to which this power of attorney is filed as an exhibit, or another appropriate form in respect of the registration of the Securities, and any and all amendments thereto, including post-effective amendments, and any instruments, contracts, documents or other writings of which the originals or copies thereof are to be filed as a part of, or in connection with, the Registration Statement, any other appropriate form or any amendments thereto, and to file or cause to be filed the same with the Securities and Exchange Commission, and to effect any and all applications and other instruments in the name and on behalf of the undersigned which said attorneys-in-fact and agents, or any of them, deem advisable in order to qualify or register the Securities under the securities laws of any of the several States; and the undersigned does hereby ratify all that said attorneys-in-fact or agents, or any of them, shall do or cause to be done by virtue thereof.

IN WITNESS WHEREOF, the undersigned has signed these presents this 16 th day of July, 2007.

/s/ Alain J.P. Belda _____

## POWER OF ATTORNEY

(Form S-3)

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, a director of CITIGROUP INC., a Delaware corporation (the "Company"), does hereby constitute and appoint Charles Prince, Gary Crittenden and Michael S. Helfer, and each of them, the true and lawful attorneys-in-fact and agents of the undersigned, to do or cause to be done any and all acts and things and to execute any and all instruments and documents which said attorneys-in-fact and agents, or any of them, may deem advisable or necessary to enable the Company to comply with the Securities Act of 1933, as amended, and any rules, regulations and requirements of the Securities and Exchange Commission in respect thereof, in connection with the registration of the securities of the Company being registered on the Registration Statement on Form S-3 to which this power of attorney is filed as an exhibit (the "Securities"), including specifically, but without limiting the generality of the foregoing, power and authority to sign, in the name and on behalf of the undersigned as a director of the Company, the Registration Statement on Form S-3 to which this power of attorney is filed as an exhibit, or another appropriate form in respect of the registration of the Securities, and any and all amendments thereto, including post-effective amendments, and any instruments, contracts, documents or other writings of which the originals or copies thereof are to be filed as a part of, or in connection with, the Registration Statement, any other appropriate form or any amendments thereto, and to file or cause to be filed the same with the Securities and Exchange Commission, and to effect any and all applications and other instruments in the name and on behalf of the undersigned which said attorneys-in-fact and agents, or any of them, deem advisable in order to qualify or register the Securities under the securities laws of any of the several States; and the undersigned does hereby ratify all that said attorneys-in-fact or agents, or any of them, shall do or cause to be done by virtue thereof.

IN WITNESS WHEREOF, the undersigned has signed these presents this 16 th day of July, 2007.

/s/ George David

## POWER OF ATTORNEY

(Form S-3)

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, a director of CITIGROUP INC., a Delaware corporation (the "Company"), does hereby constitute and appoint Charles Prince, Gary Crittenden and Michael S. Helfer, and each of them, the true and lawful attorneys-in-fact and agents of the undersigned, to do or cause to be done any and all acts and things and to execute any and all instruments and documents which said attorneys-in-fact and agents, or any of them, may deem advisable or necessary to enable the Company to comply with the Securities Act of 1933, as amended, and any rules, regulations and requirements of the Securities and Exchange Commission in respect thereof, in connection with the registration of the securities of the Company being registered on the Registration Statement on Form S-3 to which this power of attorney is filed as an exhibit (the "Securities"), including specifically, but without limiting the generality of the foregoing, power and authority to sign, in the name and on behalf of the undersigned as a director of the Company, the Registration Statement on Form S-3 to which this power of attorney is filed as an exhibit, or another appropriate form in respect of the registration of the Securities, and any and all amendments thereto, including post-effective amendments, and any instruments, contracts, documents or other writings of which the originals or copies thereof are to be filed as a part of, or in connection with, the Registration Statement, any other appropriate form or any amendments thereto, and to file or cause to be filed the same with the Securities and Exchange Commission, and to effect any and all applications and other instruments in the name and on behalf of the undersigned which said attorneys-in-fact and agents, or any of them, deem advisable in order to qualify or register the Securities under the securities laws of any of the several States; and the undersigned does hereby ratify all that said attorneys-in-fact or agents, or any of them, shall do or cause to be done by virtue thereof.

IN WITNESS WHEREOF, the undersigned has signed these presents this 16th day of July, 2007.

/s/ Kenneth T. Derr

## POWER OF ATTORNEY

### (Form S-3)

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, a director of CITIGROUP INC., a Delaware corporation (the "Company"), does hereby constitute and appoint Charles Prince, Gary Crittenden and Michael S. Helfer, and each of them, the true and lawful attorneys-in-fact and agents of the undersigned, to do or cause to be done any and all acts and things and to execute any and all instruments and documents which said attorneys-in-fact and agents, or any of them, may deem advisable or necessary to enable the Company to comply with the Securities Act of 1933, as amended, and any rules, regulations and requirements of the Securities and Exchange Commission in respect thereof, in connection with the registration of the securities of the Company being registered on the Registration Statement on Form S-3 to which this power of attorney is filed as an exhibit (the "Securities"), including specifically, but without limiting the generality of the foregoing, power and authority to sign, in the name and on behalf of the undersigned as a director of the Company, the Registration Statement on Form S-3 to which this power of attorney is filed as an exhibit, or another appropriate form in respect of the registration of the Securities, and any and all amendments thereto, including post-effective amendments, and any instruments, contracts, documents or other writings of which the originals or copies thereof are to be filed as a part of, or in connection with, the Registration Statement, any other appropriate form or any amendments thereto, and to file or cause to be filed the same with the Securities and Exchange Commission, and to effect any and all applications and other instruments in the name and on behalf of the undersigned which said attorneys-in-fact and agents, or any of them, deem advisable in order to qualify or register the Securities under the securities laws of any of the several States; and the undersigned does hereby ratify all that said attorneys-in-fact or agents, or any of them, shall do or cause to be done by virtue thereof.

IN WITNESS WHEREOF, the undersigned has signed these presents this 16 th day of July, 2007.

/s/ John M. Deutch

## POWER OF ATTORNEY

(Form S-3)

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, a director of CITIGROUP INC., a Delaware corporation (the "Company"), does hereby constitute and appoint Charles Prince, Gary Crittenden and Michael S. Helfer, and each of them, the true and lawful attorneys-in-fact and agents of the undersigned, to do or cause to be done any and all acts and things and to execute any and all instruments and documents which said attorneys-in-fact and agents, or any of them, may deem advisable or necessary to enable the Company to comply with the Securities Act of 1933, as amended, and any rules, regulations and requirements of the Securities and Exchange Commission in respect thereof, in connection with the registration of the securities of the Company being registered on the Registration Statement on Form S-3 to which this power of attorney is filed as an exhibit (the "Securities"), including specifically, but without limiting the generality of the foregoing, power and authority to sign, in the name and on behalf of the undersigned as a director of the Company, the Registration Statement on Form S-3 to which this power of attorney is filed as an exhibit, or another appropriate form in respect of the registration of the Securities, and any and all amendments thereto, including post-effective amendments, and any instruments, contracts, documents or other writings of which the originals or copies thereof are to be filed as a part of, or in connection with, the Registration Statement, any other appropriate form or any amendments thereto, and to file or cause to be filed the same with the Securities and Exchange Commission, and to effect any and all applications and other instruments in the name and on behalf of the undersigned which said attorneys-in-fact and agents, or any of them, deem advisable in order to qualify or register the Securities under the securities laws of any of the several States; and the undersigned does hereby ratify all that said attorneys-in-fact or agents, or any of them, shall do or cause to be done by virtue thereof.

IN WITNESS WHEREOF, the undersigned has signed these presents this 16th day of July, 2007.

/s/ Roberto Hernandez

POWER OF ATTORNEY

(Form S-3)

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, a director of CITIGROUP INC., a Delaware corporation (the "Company"), does hereby constitute and appoint Charles Prince, Gary Crittenden and Michael S. Helfer, and each of them, the true and lawful attorneys-in-fact and agents of the undersigned, to do or cause to be done any and all acts and things and to execute any and all instruments and documents which said attorneys-in-fact and agents, or any of them, may deem advisable or necessary to enable the Company to comply with the Securities Act of 1933, as amended, and any rules, regulations and requirements of the Securities and Exchange Commission in respect thereof, in connection with the registration of the securities of the Company being registered on the Registration Statement on Form S-3 to which this power of attorney is filed as an exhibit (the "Securities"), including specifically, but without limiting the generality of the foregoing, power and authority to sign, in the name and on behalf of the undersigned as a director of the Company, the Registration Statement on Form S-3 to which this power of attorney is filed as an exhibit, or another appropriate form in respect of the registration of the Securities, and any and all amendments thereto, including post-effective amendments, and any instruments, contracts, documents or other writings of which the originals or copies thereof are to be filed as a part of, or in connection with, the Registration Statement, any other appropriate form or any amendments thereto, and to file or cause to be filed the same with the Securities and Exchange Commission, and to effect any and all applications and other instruments in the name and on behalf of the undersigned which said attorneys-in-fact and agents, or any of them, deem advisable in order to qualify or register the Securities under the securities laws of any of the several States; and the undersigned does hereby ratify all that said attorneys-in-fact or agents, or any of them, shall do or cause to be done by virtue thereof.

IN WITNESS WHEREOF, the undersigned has signed these presents this 16 th day of July, 2007.

/s/ Andrew N. Liveris

POWER OF ATTORNEY

(Form S-3)

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, a director of CITIGROUP INC., a Delaware corporation (the "Company"), does hereby constitute and appoint Charles Prince, Gary Crittenden and Michael S. Helfer, and each of them, the true and lawful attorneys-in-fact and agents of the undersigned, to do or cause to be done any and all acts and things and to execute any and all instruments and documents which said attorneys-in-fact and agents, or any of them, may deem advisable or necessary to enable the Company to comply with the Securities Act of 1933, as amended, and any rules, regulations and requirements of the Securities and Exchange Commission in respect thereof, in connection with the registration of the securities of the Company being registered on the Registration Statement on Form S-3 to which this power of attorney is filed as an exhibit (the "Securities"), including specifically, but without limiting the generality of the foregoing, power and authority to sign, in the name and on behalf of the undersigned as a director of the Company, the Registration Statement on Form S-3 to which this power of attorney is filed as an exhibit, or another appropriate form in respect of the registration of the Securities, and any and all amendments thereto, including post-effective amendments, and any instruments, contracts, documents or other writings of which the originals or copies thereof are to be filed as a part of, or in connection with, the Registration Statement, any other appropriate form or any amendments thereto, and to file or cause to be filed the same with the Securities and Exchange Commission, and to effect any and all applications and other instruments in the name and on behalf of the undersigned which said attorneys-in-fact and agents, or any of them, deem advisable in order to qualify or register the Securities under the securities laws of any of the several States; and the undersigned does hereby ratify all that said attorneys-in-fact or agents, or any of them, shall do or cause to be done by virtue thereof.

IN WITNESS WHEREOF, the undersigned has signed these presents this 16 th day of July, 2007.

/s/ Anne M. Mulcahy

POWER OF ATTORNEY

(Form S-3)

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, a director of CITIGROUP INC., a Delaware corporation (the "Company"), does hereby constitute and appoint Charles Prince, Gary Crittenden and Michael S. Helfer, and each of them, the true and lawful attorneys-in-fact and agents of the undersigned, to do or cause to be done any and all acts and things and to execute any and all instruments and documents which said attorneys-in-fact and agents, or any of them, may deem advisable or necessary to enable the Company to comply with the Securities Act of 1933, as amended, and any rules, regulations and requirements of the Securities and Exchange Commission in respect thereof, in connection with the registration of the securities of the Company being registered on the Registration Statement on Form S-3 to which this power of attorney is filed as an exhibit (the "Securities"), including specifically, but without limiting the generality of the foregoing, power and authority to sign, in the name and on behalf of the undersigned as a director of the Company, the Registration Statement on Form S-3 to which this power of attorney is filed as an exhibit, or another appropriate form in respect of the registration of the Securities, and any and all amendments thereto, including post-effective amendments, and any instruments, contracts, documents or other writings of which the originals or copies thereof are to be filed as a part of, or in connection with, the Registration Statement, any other appropriate form or any amendments thereto, and to file or cause to be filed the same with the Securities and Exchange Commission, and to effect any and all applications and other instruments in the name and on behalf of the undersigned which said attorneys-in-fact and agents, or any of them, deem advisable in order to qualify or register the Securities under the securities laws of any of the several States; and the undersigned does hereby ratify all that said attorneys-in-fact or agents, or any of them, shall do or cause to be done by virtue thereof.

IN WITNESS WHEREOF, the undersigned has signed these presents this 16 th day of July, 2007.

/s/ Richard D. Parsons

POWER OF ATTORNEY

(Form S-3)

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, a director of CITIGROUP INC., a Delaware corporation (the "Company"), does hereby constitute and appoint Charles Prince, Gary Crittenden and Michael S. Helfer, and each of them, the true and lawful attorneys-in-fact and agents of the undersigned, to do or cause to be done any and all acts and things and to execute any and all instruments and documents which said attorneys-in-fact and agents, or any of them, may deem advisable or necessary to enable the Company to comply with the Securities Act of 1933, as amended, and any rules, regulations and requirements of the Securities and Exchange Commission in respect thereof, in connection with the registration of the securities of the Company being registered on the Registration Statement on Form S-3 to which this power of attorney is filed as an exhibit (the "Securities"), including specifically, but without limiting the generality of the foregoing, power and authority to sign, in the name and on behalf of the undersigned as a director of the Company, the Registration Statement on Form S-3 to which this power of attorney is filed as an exhibit, or another appropriate form in respect of the registration of the Securities, and any and all amendments thereto, including post-effective amendments, and any instruments, contracts, documents or other writings of which the originals or copies thereof are to be filed as a part of, or in connection with, the Registration Statement, any other appropriate form or any amendments thereto, and to file or cause to be filed the same with the Securities and Exchange Commission, and to effect any and all applications and other instruments in the name and on behalf of the undersigned which said attorneys-in-fact and agents, or any of them, deem advisable in order to qualify or register the Securities under the securities laws of any of the several States; and the undersigned does hereby ratify all that said attorneys-in-fact or agents, or any of them, shall do or cause to be done by virtue thereof.

IN WITNESS WHEREOF, the undersigned has signed these presents this 16 th day of July, 2007.

/s/ Judith Rodin

POWER OF ATTORNEY

(Form S-3)

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, a director of CITIGROUP INC., a Delaware corporation (the "Company"), does hereby constitute and appoint Charles Prince, Gary Crittenden and Michael S. Helfer, and each of them, the true and lawful attorneys-in-fact and agents of the undersigned, to do or cause to be done any and all acts and things and to execute any and all instruments and documents which said attorneys-in-fact and agents, or any of them, may deem advisable or necessary to enable the Company to comply with the Securities Act of 1933, as amended, and any rules, regulations and requirements of the Securities and Exchange Commission in respect thereof, in connection with the registration of the securities of the Company being registered on the Registration Statement on Form S-3 to which this power of attorney is filed as an exhibit (the "Securities"), including specifically, but without limiting the generality of the foregoing, power and authority to sign, in the name and on behalf of the undersigned as a director of the Company, the Registration Statement on Form S-3 to which this power of attorney is filed as an exhibit, or another appropriate form in respect of the registration of the Securities, and any and all amendments thereto, including post-effective amendments, and any instruments, contracts, documents or other writings of which the originals or copies thereof are to be filed as a part of, or in connection with, the Registration Statement, any other appropriate form or any amendments thereto, and to file or cause to be filed the same with the Securities and Exchange Commission, and to effect any and all applications and other instruments in the name and on behalf of the undersigned which said attorneys-in-fact and agents, or any of them, deem advisable in order to qualify or register the Securities under the securities laws of any of the several States; and the undersigned does hereby ratify all that said attorneys-in-fact or agents, or any of them, shall do or cause to be done by virtue thereof.

IN WITNESS WHEREOF, the undersigned has signed these presents this 16 th day of July, 2007.

/s/ Robert E. Rubin

POWER OF ATTORNEY

(Form S-3)

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, a director of CITIGROUP INC., a Delaware corporation (the "Company"), does hereby constitute and appoint Charles Prince, Gary Crittenden and Michael S. Helfer, and each of them, the true and lawful attorneys-in-fact and agents of the undersigned, to do or cause to be done any and all acts and things and to execute any and all instruments and documents which said attorneys-in-fact and agents, or any of them, may deem advisable or necessary to enable the Company to comply with the Securities Act of 1933, as amended, and any rules, regulations and requirements of the Securities and Exchange Commission in respect thereof, in connection with the registration of the securities of the Company being registered on the Registration Statement on Form S-3 to which this power of attorney is filed as an exhibit (the "Securities"), including specifically, but without limiting the generality of the foregoing, power and authority to sign, in the name and on behalf of the undersigned as a director of the Company, the Registration Statement on Form S-3 to which this power of attorney is filed as an exhibit, or another appropriate form in respect of the registration of the Securities, and any and all amendments thereto, including post-effective amendments, and any instruments, contracts, documents or other writings of which the originals or copies thereof are to be filed as a part of, or in connection with, the Registration Statement, any other appropriate form or any amendments thereto, and to file or cause to be filed the same with the Securities and Exchange Commission, and to effect any and all applications and other instruments in the name and on behalf of the undersigned which said attorneys-in-fact and agents, or any of them, deem advisable in order to qualify or register the Securities under the securities laws of any of the several States; and the undersigned does hereby ratify all that said attorneys-in-fact or agents, or any of them, shall do or cause to be done by virtue thereof.

IN WITNESS WHEREOF, the undersigned has signed these presents this 16 th day of July, 2007.

/s/ Franklin A. Thomas

EDGARpro
by EDGAR Online®

# CITIGROUP INC

# FORM 8-K
### (Current report filing)

## Filed 01/31/05 for the Period Ending 01/31/05

| | |
|---|---|
| Address | 399 PARK AVENUE |
| | NEW YORK, NY 10043 |
| Telephone | 2125591000 |
| CIK | 0000831001 |
| Symbol | C |
| SIC Code | 6021 - National Commercial Banks |
| Industry | Money Center Banks |
| Sector | Technology |
| Fiscal Year | 12/31 |

http://access.edgar-online.com
© Copyright 2008, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 8-K

### CURRENT REPORT

Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported) January 31, 2005**

# Citigroup Inc.

(Exact name of registrant as specified in its charter)

| Delaware | 1-9924 | 52-1568099 |
|----------|--------|------------|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

399 Park Avenue, New York, New York 10043

(Address of principal executive offices) (Zip Code)

(212) 559-1000

(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 7.01 Regulation FD Disclosure.**

On January 31, 2005, Citigroup Inc. and MetLife, Inc. released a press release announcing an agreement for the sale of Citigroup's Travelers Life & Annuity, and substantially all of Citigroup's international insurance business, to MetLife for $11.5 billion, subject to closing adjustments.

A copy of the above-referenced press release is attached hereto as Exhibit 99.1 to this Form 8-K. The press release is being furnished pursuant to Item 7.01 of this Current Report on Form 8-K, and the information contained in Exhibit 99.1 shall not be deemed to be "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities under Section 18. Furthermore, the information contained in Exhibit 99.1 shall not be deemed to be incorporated by reference into the filings of Citigroup Inc. under the Securities Act of 1933, as amended.

**Item 9.01 Financial Statements and Exhibits.**

(c) Exhibits

<u>**Exhibit Number**</u>

99.1 Press Release, dated January 31, 2005, issued by Citigroup Inc. and MetLife, Inc.

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

```
        Dated: January 31, 2005        CITIGROUP INC.


                                       By: /s/  Michael S. Helfer
                                          ------------------------
                                       Name:   Michael S. Helfer
                                       Title:  General Counsel and Corporate Secretary
```

**EXHIBIT INDEX**

Exhibit Number
--------------

99.1          Press Release, dated January 31, 2005, issued by Citigroup
              Inc. and MetLife, Inc.

Exhibit 99.5

## METLIFE TO ACQUIRE TRAVELERS LIFE & ANNUITY
## FROM CITIGROUP FOR $11.5 BILLION

NEW YORK, January 31, 2005 - MetLife, Inc. (NYSE: MET) and Citigroup Inc. (NYSE: C) today announced an agreement for the sale of Citigroup's Travelers Life & Annuity, and substantially all of Citigroup's international insurance businesses, to MetLife for $11.5 billion, subject to closing adjustments.

Combining Travelers Life & Annuity with MetLife will make MetLife the largest individual life insurer in North America based on sales and increases MetLife's Retirement and Savings general account assets by almost 60 percent.

In connection with the transaction, Citigroup and MetLife have entered into ten-year agreements under which MetLife will greatly expand its distribution by making products available through certain Citigroup distribution channels, subject to appropriate suitability and other standards. These channels include Smith Barney, Citibank branches, and Primerica in the U.S., as well as a number of international businesses.

The businesses being acquired by MetLife generated total revenues of $5.2 billion and net income of $901 million for the twelve months ended December 31, 2004. The businesses had total assets of $96 billion at December 31, 2004. In the first nine months of 2004, MetLife had total revenues of $29 billion, operating income of $2 billion and net income of $2.2 billion. MetLife's assets under management as of September 30, 2004 were $373.5 billion.

The transaction has been approved by the Boards of Directors of both companies. Under the terms of the transaction, Citigroup will receive $1.0 to $3.0 billion in MetLife equity securities and the balance in cash, which will result in an after-tax gain of approximately $2 billion, subject to closing adjustments. MetLife may finance the cash portion of the transaction through a combination of cash on hand, debt, mandatory convertible securities and selected asset sales. MetLife's financing plan will depend on market conditions, timing and valuation considerations and the relative attractiveness of funding alternatives. The transaction is expected to close this summer.

Robert H. Benmosche, Chairman and Chief Executive Officer of MetLife, said, "This transaction increases MetLife's size and scale in our core products and markets. It also allows us to fully leverage the substantial investments we have made in our infrastructure over the past few years to improve operating effectiveness, enhance our IT platforms and build our high performance culture. Travelers Life & Annuity is a leading underwriter in the U.S. for variable annuities, structured settlements, universal life and variable universal life products, and has attractive international franchises. The transaction solidifies our leadership position in the industry, will be immediately accretive to earnings and will enable us to enhance our return on equity going forward."

"Combining Travelers Life & Annuity's strengths with MetLife's will enable us to take full advantage of market opportunities and favorable demographic trends," continued Mr. Benmosche. "Primerica, Smith Barney and Citibank branches are outstanding organizations that perfectly complement MetLife's existing channels. The distribution agreements will provide us with the broadest distribution network in the industry."

Charles Prince, Chief Executive Officer of Citigroup, said, "Travelers Life & Annuity has a long and successful history of providing world-class products and services to its global customer base. This transaction joins Travelers Life & Annuity with one of the world's leading insurance companies and sharpens our focus on Citigroup's long-term growth franchises. We will redeploy the sale proceeds to higher return and higher growth opportunities and to maximize returns to our shareholders."

The transaction encompasses Travelers Life & Annuity's U.S. businesses and its international operations other than Citigroup's life business in Mexico. International operations include wholly owned insurance companies in the United Kingdom, Belgium, Australia, Brazil, Argentina, and Poland; joint ventures in Japan and Hong Kong; and offices in China.

MetLife estimates that the transaction will be immediately accretive and will increase its earnings per share by approximately 4 to 6 percent in 2006.

MetLife said that as a result of the transaction, it expects its international operations to grow significantly in terms of revenue and earnings, types of products offered, and in the number of countries in which it operates.

The transaction is subject to certain domestic and international regulatory approvals, as well as other customary conditions to closing.

MetLife was advised by Banc of America Securities LLC and Goldman Sachs, and Citigroup was advised by Citigroup Global Markets.

**MetLife Conference Call**
MetLife will hold a conference call and audio Webcast to discuss the transaction on Monday, January 31, 2005, from 10:00 to 11:00 a.m. (ET). MetLife's presentation materials will be available at 9:30 a.m. (ET) on the Investor Relations page at www.metlife.com. The conference call will be available live via telephone and the Internet. To listen over the telephone, dial (706) 758-9690 (domestic and international callers). To listen to the conference call over the Internet, visit www.metlife.com (through a link on the Investor Relations page). Those who want to listen to the call on the telephone or via the Internet should dial in or go to the Web site at least fifteen minutes prior to the call to register, and/or download and install any necessary audio software.

The conference call will be available for replay via telephone and the Internet beginning at 12:15 p.m. (ET) on Monday, January 31, 2005, until Monday, February 7, 2005, at 11:59 p.m. (ET). To listen to a replay of the conference call over the telephone, dial (706) 645-9291 (domestic and international callers). To access the replay of the conference call over the Internet, visit www.metlife.com.

**Citigroup Conference Call**
Citigroup will hold a conference call and audio Webcast to discuss the transaction on Monday, January 31, 2005 from 11:00 a.m. (ET) to 12:00 p.m. (ET). To participate on the Question and Answer line, please call 888-455-9655 (for U.S. callers) or 773-756-4621 (for international callers) by 10:45 a.m. (ET) on Monday, January 31. You will need to give the answering coordinator your name, the firm you represent, and passcode: Announcement. To participate on the Listen-Only line, please call 800-369-2154 (for U.S. callers), or 773-756-4622 (for international callers) by 10:45 a.m. (ET) on Monday, January 31. Please use passcode: 2598.

WEBCAST INSTRUCTIONS: To participate in the Citigroup Webcast (which will be listen-only), go to http://www.citigroup.com/citigroup/fin and click on the link for the Travelers/MetLife announcement. You will need to download Windows Media Player prior to the event in order to view the slides and hear the audio. A replay of the Webcast will be made available. A copy of the presentation and press release will be available at: www.citigroup.com/citigroup/fin.

TELECONFERENCE REPLAY INSTRUCTIONS: A continuous telephone replay will be available beginning Monday, January 31, 2005 at approximately 1:00 p.m. (ET) and continuing through 5:00 p.m. (ET), Monday, February 14, 2005. To listen to the replay, please dial 866-507-3580. Callers from outside the U.S. may listen to the replay by dialing 203-369-1888. No passcode is required.

**About Citigroup**
Citigroup (NYSE: C), the leading global financial services company, has some 200 million customer accounts and does business in more than 100 countries, providing consumers, corporations, governments and institutions with a broad range of financial products and services, including consumer banking and credit, corporate and investment banking, insurance, securities brokerage, and asset management. Major

brand names under the Citigroup trademark red umbrella include Citibank, CitiFinancial, Primerica, Smith Barney, Banamex, and Travelers Life & Annuity. Additional information may be found at www.citigroup.com.

**About MetLife**

MetLife, Inc., through its subsidiaries and affiliates, is a leading provider of insurance and other financial services to individual and institutional customers. The MetLife companies serve individuals in approximately 13 million households in the U.S. and provide benefits to 37 million employees and family members through their plan sponsors. Outside the U.S., the MetLife companies serve approximately 8 million customers through direct insurance operations in Argentina, Brazil, Chile, China, Hong Kong, India, Indonesia, Mexico, South Korea, Taiwan and Uruguay. For more information about MetLife, please visit the company's Web site at www.metlife.com.

This release contains statements which constitute forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, including statements relating to trends in the company's operations and financial results and the business and the products of the company and its subsidiaries, as well as other statements including words such as "anticipate," "believe," "plan," "estimate," "expect," "intend" and other similar expressions. Forward-looking statements are made based upon management's current expectations and beliefs concerning future developments and their potential effects on the company. Such forward-looking statements are not guarantees of future performance.

Actual results may differ materially from those included in the forward-looking statements as a result of risks and uncertainties including, but not limited to the following: (i) changes in general economic conditions, including the performance of financial markets and interest rates; (ii) heightened competition, including with respect to pricing, entry of new competitors and the development of new products by new and existing competitors; (iii) unanticipated changes in industry trends; (iv) each company's primary reliance, as a holding company, on dividends from its subsidiaries to meet debt payment obligations and the applicable regulatory restrictions on the ability of the subsidiaries to pay such dividends; (v) deterioration in the experience of the "closed block" established in connection with the reorganization of Metropolitan Life Insurance Company; (vi) catastrophe losses; (vii) adverse results or other consequences from litigation, arbitration or regulatory investigations; (viii) regulatory, accounting or tax changes that may affect the cost of, or demand for, each company's products or services; (ix) downgrades in each company's and its affiliates' claims paying ability, financial strength or credit ratings; (x) changes in rating agency policies or practices; (xi) discrepancies between actual claims experience and assumptions used in setting prices for each company's products and establishing the liabilities for each company's obligations for future policy benefits and claims; (xii) discrepancies between actual experience and assumptions used in establishing liabilities related to other contingencies or obligations; (xiii) the effects of business disruption or economic contraction due to terrorism or other hostilities; (xiv) each company's ability to identify and consummate on successful terms any future acquisitions, and to successfully integrate acquired businesses with minimal disruption; and
(xv) other risks and uncertainties described from time to time in the company's filings with the Securities and Exchange Commission. The companies specifically disclaim any obligation to update or revise any forward-looking statement, whether as a result of new information, future developments or otherwise.

```
             For MetLife:                          For Citigroup:
             ------------                          --------------

   Media:        David Monfried             Leah Johnson
                 (212) 578-4132             (212) 559-9446

                 John Calagna               Shannon Bell
                 (212) 578-6252             (212) 793-6206

   Investors:    Tracey Dedrick             Arthur Tildesley
                 (212) 578-5140             (212) 559-2718

                                            John Randel
                                            (Fixed income)
                                            (212) 559-5091
```

## DECLARATION OF DAVID WHITCOMB

I am a member of the ATD Group, defined below, and I make this declaration in support of the motion by the ATD Group for appointment as lead plaintiff in the Citigroup securities class action litigation.   I was a co-founder of ATD. As non-executive Chairman of ATD's Board and a member of the Board's "Special Committee" on policy regarding the negotiations, I was personally aware of all of the negotiations.  In that capacity, I am aware of any representations that Citigroup made and information that Citigroup provided to the ATD Group in connection with our decision to acquire Citigroup shares in exchange for our interest in ATD.

**The ATD Group**

The ATD Group comprises former employees and/or directors of Automated Trading Desk, Inc. (AATD@) who received Citigroup stock as part of the consideration of our agreement on June 30, 2007, to sell ATD to Citigroup.  We jointly seek representation for our claims against Citigroup, having jointly decided how to proceed with those claims.   I know the other members of the ATD Group and have known them for years.  The ATD Group is not an artificial group of unrelated investors that was joined by lawyers for the purpose of this lawsuit.

**Our Acquisition of Citigroup Stock**

When we negotiated the sale of ATD to Citigroup, a large portion of the consideration was in the form of Citigroup common stock,  priced  at $52.0421 per share, the price at which the stock was trading publicly on the New York Stock Exchange..  The documents that were executed in connection with the ATD acquisition and receipt of Citigroup shares specifically referred us to Citigroup=s SEC filings and Citigroup=s internet website for information concerning Citigroup. Similarly, the acquisition documents stated that for information concerning the risks associated with

the business of Citigroup and with owning Citigroup common stock, we should look at Citigroup=s annual report on Form 10-K for the fiscal year ended December 31, 2006 that Citigroup filed with the SEC on February 23, 2007.    I can affirm that these publicly available materials represented the sole sources of information that the ATD Group had respecting the financial condition of Citigroup.

To put a sharp point on it, neither I, nor any of the other members of the ATD Group, was provided with access to any non-public information concerning Citigroup=s finances, assets, business or value. Nor did we receive any non-public representations concerning Citigroup's financial condition or prospects.    In determining whether to agree to acquire Citigroup stock in consideration for our sale of ATD we relied on:  a) our general belief that Citigroup=s publicly traded stock price was an accurate reflection of all material publicly-known information about Citigroup; and b) the accuracy of the information in Citigroup=s annual and quarterly reports and other SEC filings.

I declare under penalty of perjury that the foregoing is true and accurate.

Dated: _December 31, 2007_

_David Whitcomb_
David Whitcomb

# ENTWISTLE & CAPPUCCI LLP

### ATTORNEYS AT LAW
### 280 PARK AVENUE
### 26TH FLOOR WEST
### NEW YORK, NEW YORK 10017
### TELEPHONE: (212) 894-7200
### TELECOPIER: (212) 894-7272
www.entwistle-law.com

ARMONK, NY
AUSTIN, TX
CHICAGO, IL

FLORHAM PARK, NJ
TALLAHASSEE, FL
WASHINGTON, DC

January 17, 2008

**VIA HAND DELIVERY**

John F. Lynch, Esq.
Wachtell, Lipton, Rosen & Katz
51 W. 52nd Street
New York, New York 10019

> Re:  *Public Employees' Retirement Association of Colorado, et al. v.*
> *Citigroup Inc., et al. 08-cv-00135 (S.D.N.Y.)*

Dear John:

     This letter follows our conversation earlier today in which you informed me that your firm would accept service of the complaint and other materials on behalf of each of the defendant parties, other than Todd S. Thomson ("Thomson") and KPMG LLP ("KPMG"), in the above-referenced action (the "Action").  As to Mr. Thomson, you are investigating whether your firm is authorized to accept service, and will advise us accordingly.  With regard to the complaint in the Action, I am informed that Mr. Thomson was personally served on January 12, 2008 in Rowayton, Connecticut.

     For the purposes of further service, I have enclosed a copy of each the following documents filed in the Action:

    1.    The Complaint and corresponding Summonses;

    2.    The Global Pension Funds' Notice of Motion and Motion for Consolidation, Appointment as Lead Plaintiffs, and Approval of Co-Lead Counsel;

    3.    Memorandum of Law In Support of the Global Pension Funds' Motion for Consolidation, Appointment as Lead Plaintiffs, and Approval of Co-Lead Counsel;

    4.    Declaration of Andrew J. Entwistle In Support of the Global Pension Funds' Motion for Consolidation, Appointment as Lead Plaintiffs, and Approval of Co-Lead Counsel;



5.    Proposed Order Granting the Global Pension Funds' Motion for Consolidation, Appointment as Lead Plaintiffs, and Approval of Co-Lead Counsel;

6.    The Global Pension Funds' Notice of Motion and Motion for an Order Partially Lifting the Private Securities Litigation Reform Act Discovery Stay;

7.    The Global Pension Funds' Memorandum of Law In Support of Their Motion for an Order Partially Lifting the Private Securities Litigation Reform Act Discovery Stay;

8.    Declaration of Andrew J. Entwistle In Support of the Global Pension Funds' Motion for an Order Partially Lifting the Private Securities Litigation Reform Act Discovery Stay;

9.    [Proposed] Order Partially Lifting the Private Securities Litigation Reform Act Discovery Stay;

10.   Notice of Motion and Motion of the Global Pension Funds to Require Related Parties to Preserve Documents and Other Evidence;

11.   The Global Pension Funds' Memorandum of Law In Support of Their Motion to Require Related Parties to Preserve Documents and Other Evidence; and

12.   [Proposed] Order Requiring Related Entities to Preserve Documents and Other Evidence.

I ask that you confirm that you are accepting service on behalf of the defendant parties in the Action, other than Mr. Thomson and KPMG, by signing this letter where indicated and returning a copy to me promptly. As we discussed, we will await your advice as to whether your firm is authorized to accept service on Mr. Thomson's behalf.

I look forward to further discussing these matters with you next week.

Very truly yours,

Andrew J. Entwistle

John F. Lynch

cc:    Brad S. Karp, Esq. (via Federal Express)

Peter N. Wang (PW 9216)
Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Tel: (212) 682-7474
Fax: (212) 687-2329
*Attorneys for Defendant KMPG LLP*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - -- - - - - - - - - - - - - - - - - - - X
PUBLIC EMPLOYEES' RETIREMENT           :
ASSOCIATION OF COLORADO;               :
TENNESSEE CONSOLIDATED                 :
RETIREMENT SYSTEM; SJUNDE              :
AP-FONDEN; FJÄRDE AP-FONDEN;           :      08-CV-0135
And PENSIONSKASSERNES                  :
ADMINISTRATION A/S, Individually and   :      **NOTICE OF APPEARANCE**
Behalf of All Others Similarly Situated, :
                                       :
               Plaintiffs,             :
                                       :
        v.                             :
                                       :
CITIGROUP INC., CHARLES O. PRINCE, :
SALLIE L. KRAWCHECK, GARY L.           :
CRITTENDEN, TODD S. THOMSON,           :
ROBERT DRUSKIN, THOMAS G.              :
MAHERAS, MICHAEL STUART KLEIN, :
DAVID C. BUSHNELL, JOHN C.             :
GERSPACH, STEPHEN R. VOLK,             :
GEORGE DAVID, and KPMG LLP,            :
                                       :
               Defendants.             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

        PLEASE TAKE NOTICE that the undersigned hereby appears as counsel for

Defendant KPMG LLP in the above-captioned action.

        Please adjust your records accordingly and serve additional copies of all future

pleadings, court papers and correspondence to the address listed below:

Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Tel: (212) 682-7474
Fax: (212) 687-2329
Email: rscher@foley.com

Dated: January 23, 2008
New York, New York

/s/ Robert A. Scher
Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Tel: (212) 682-7474
Fax: (212) 687-2329

*Attorney for Defendant KMPG LLP*

## CERTIFICATION OF SERVICE

I, Robert A. Scher, an attorney with Foley & Lardner LLP, hereby certify that on this January 23, 2008, I caused the foregoing **Notice of Appearance for Robert A. Scher** to be electronically filed with the United States District Court for the Southern District of New York.

All documents were served electronically to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

/s/ Robert A. Scher
Robert A. Scher
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Tel: (212) 682-7474
Fax: (212) 687-2329

Peter N. Wang (PW 9216)
Robert A. Scher (RS 2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Tel: (212) 682-7474
Fax: (212) 687-2329
*Attorneys for Defendant KMPG LLP*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT : <br> ASSOCIATION OF COLORADO; : <br> TENNESSEE CONSOLIDATED : <br> RETIREMENT SYSTEM; SJUNDE : <br> AP-FONDEN; FJÄRDE AP-FONDEN; : <br> And PENSIONSKASSERNES : <br> ADMINISTRATION A/S, Individually and : <br> Behalf of All Others Similarly Situated, : <br>              : <br>       Plaintiffs, : <br>              : <br>   v. : <br>              : <br> CITIGROUP INC., CHARLES O. PRINCE, : <br> SALLIE L. KRAWCHECK, GARY L. : <br> CRITTENDEN, TODD S. THOMSON, : <br> ROBERT DRUSKIN, THOMAS G. : <br> MAHERAS, MICHAEL STUART KLEIN, : <br> DAVID C. BUSHNELL, JOHN C. : <br> GERSPACH, STEPHEN R. VOLK, : <br> GEORGE DAVID, and KPMG LLP, : <br>              : <br>       Defendants. : | 08-CV-0135 <br><br> **NOTICE OF APPEARANCE** |

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

PLEASE TAKE NOTICE that the undersigned hereby appears as counsel for Defendant KPMG LLP in the above-captioned action.

Please adjust your records accordingly and serve additional copies of all future pleadings, court papers and correspondence to the address listed below:

NYC_69354.1

Peter N. Wang (PW 9216)
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Tel: (212) 682-7474
Fax: (212) 687-2329
Email: pwang@foley.com

Dated: January 23, 2008
New York, New York

/s/ Peter N. Wang
Peter N. Wang (PW 9216)
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Tel: (212) 682-7474
Fax: (212) 687-2329

*Attorney for Defendant KMPG LLP*

## CERTIFICATION OF SERVICE

I, Peter N. Wang, an attorney with Foley & Lardner LLP, hereby certify that on this January 23, 2008, I caused the foregoing **Notice of Appearance for Peter N. Wang** to be electronically filed with the United States District Court for the Southern District of New York.

All documents were served electronically to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

/s/Peter N. Wang
Peter N. Wang
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Tel: (212) 682-7474
Fax: (212) 687-2329

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT ASSOCIATION OF COLORADO, TENNESSEE CONSOLIDATED RETIREMENT SYSTEM, SJUNDE AP-FONDEN, FJÄRDE AP-FONDEN, PENSIONSKASSERNES ADMINISTRATION A/S, Individually and On Behalf of All Others Similarly Situated,<br><br>      Plaintiffs,<br><br>  v.<br><br>CITIGROUP INC., CHARLES O. PRINCE, SALLIE L. KRAWCHECK, GARY L. CRITTENDEN, TODD S. THOMSON, ROBERT DRUSKIN, THOMAS G. MAHERAS, MICHAEL STUART KLEIN, DAVID C. BUSHNELL, JOHN C. GERSPACH, STEPHEN R. VOLK, GEORGE DAVID and KPMG LLP,<br><br>      Defendants. | ECF Case<br><br>No. 08-CV-0135 (SHS)<br><br><br>**JOINT STIPULATION AND [PROPOSED] ORDER REGARDING SCHEDULING** |

Plaintiffs, Public Employees' Retirement Association of Colorado, Tennessee

Consolidated Retirement System, Sjunde AP-Fonden, Fjärde AP-Fonden, and Pensionskassernes

Administration A/S ("Plaintiffs") and Defendants, Citigroup Inc., Charles O. Prince, Sallie L.

Krawcheck, Gary L. Crittenden, Todd S. Thomson, Robert Druskin, Thomas G. Maheras,

Michael Stuart Klein, David C. Bushnell, John C. Gerspach, Stephen R. Volk, George David,

and KPMG LLP ("Defendants") jointly submit the following Stipulation and [Proposed] Order

Regarding Scheduling, in support of which they state as follows:

   WHEREAS, Plaintiffs filed their Class Action Complaint for Violations of the Federal

Securities Laws ("Complaint") and Motion for Consolidation, Appointment as Lead Plaintiffs

and Approval of Co-Lead Counsel on January 7, 2008;

   WHEREAS, Plaintiffs filed a Motion to Require Related Parties to Preserve Documents

and Other Evidence ("Document Preservation Motion"), and a Motion for an Order Partially

Lifting the Private Securities Litigation Reform Act Discovery Stay ("Discovery Stay Motion")

on January 7, 2008;

WHEREAS, the Court ordered on January 22, 2008 that all movants for the consolidation

of the related securities class actions, appointment as lead plaintiffs, and approval of selection of

lead counsel, including Plaintiffs (collectively, the "Lead Plaintiff Motions"), file any

oppositions to the Lead Plaintiff Motions by January 28, 2008;

WHEREAS, the Court has scheduled oral argument on the Lead Plaintiff Motions for

February 8, 2008;

WHEREAS, counsel for Defendants have represented that Defendants are endeavoring to

meet their document preservation obligations, including those under the Federal Rules of Civil

Procedure and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-

4(b)(3)(C)(i); and

WHEREAS, Plaintiff and Defendants agree that good cause exists to extend the date by

which Defendants shall file any responsive pleading to the Complaint, and any opposition to the

Document Preservation Motion and Discovery Stay Motion;

NOW, THEREFORE, IT IS HEREBY STIPULATED, by and between Plaintiff and

Defendants, through their counsel of record, that:

1.     Service of the Complaint, Document Preservation Motion, and Discovery Stay

Motion was effectuated on Defendants on January 17, 2008.

2.     Defendants need not answer or otherwise move against the Complaint or any

consolidated complaint until either a date for such answer or motion is established by a Case

Management Order, or a date is agreed to by Plaintiffs and Defendants and approved by the

Court following the Court's appointment of Lead Plaintiffs.

3.     Defendants shall file any opposition to the Document Preservation Motion and the

Discovery Stay Motion on or before February 25, 2008.

4.    Plaintiffs shall file any reply in further support of the Document Preservation Motion and the Discovery Stay Motion on or before March 11, 2008.

IT IS SO STIPULATED.

Dated:  New York, New York
          January 28, 2008

By:    _____

Andrew J. Entwistle (AE-6513)
Johnston de F. Whitman, Jr. (JW-5781)
Richard W. Gonnello (RG-7098)
Jonathan H. Beemer (JB-0458)
ENTWISTLE & CAPPUCCI LLP
280 Park Avenue
26th Floor West
New York, New York 10017
Telephone:  (212) 894-7200

Andrew L. Barroway, Esq.
David Kessler, Esq.
Darren J. Check, Esq.
Sean M. Handler, Esq.
SCHIFFRIN BARROWAY TOPAZ
& KESSLER LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706

Attorneys for Plaintiffs Public Employees'
Retirement Association of Colorado,
Tennessee Consolidated Retirement System,
Sjunde AP-Fonden, Fjärde AP-Fonden, and
Pensionskassernes Administration A/S

3

By:  *Lawrence B. Pedowitz* /jmw

Lawrence B. Pedowitz (LP-9718)
George T. Conway III (GC 3181)
Jonathan M. Moses (JM-9049)
John F. Lynch (JL-6661)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
Telephone:   (212) 403-1000

Attorneys for Defendants Citigroup Inc.
and George David

By: _____

Brad S. Karp (BK-3702)
Susanna M. Buergel (SB-5394)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019
Telephone:  (212) 373-3000

Attorneys for Defendants Citigroup Inc.,
Charles O. Prince, Sallie L. Krawcheck,
Gary L. Crittenden, Todd S. Thomson,
Robert Druskin, Thomas G. Maheras,
Michael Stuart Klein, David C. Bushnell,
John C. Gerspach, and Stephen R. Volk

5

By: _____

Peter N. Wang (PW-9216)
Robert A. Scher (RS-2910)
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York  10016
Telephone:  (212) 687-7474

Attorneys for Defendant KPMG LLP

SO ORDERED:

_____

Hon. Sidney H. Stein, U.S.D.J.

6