**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT ASSOCIATION OF COLORADO, TENNESSEE CONSOLIDATED RETIREMENT SYSTEM, SJUNDE AP-FONDEN, FJÄRDE AP-FONDEN, and PENSIONSKASSERNES ADMINISTRATION A/S, Individually and On Behalf of All Others Similarly Situated, | Electronically Filed<br><br>No. 1:08-cv-0135 (SHS)<br><br>ECF CASE |
| Plaintiffs,<br>v. | |
| CITIGROUP INC., CHARLES O. PRINCE, SALLIE L. KRAWCHECK, GARY L. CRITTENDEN, TODD S. THOMSON, ROBERT DRUSKIN, THOMAS G. MAHERAS, MICHAEL STUART KLEIN, DAVID C. BUSHNELL, JOHN C. GERSPACH, STEPHEN R. VOLK, GEORGE DAVID and KPMG LLP, | |
| Defendants. | |
| TILLIE SALTZMAN, Individually and On Behalf of All Others Similarly Situated, | Electronically Filed<br><br>No. 1:07-cv-9901 (SHS) |
| Plaintiff,<br>v. | |
| CITIGROUP INC., CHARLES O. PRINCE, ROBERT E. RUBIN, STEPHEN R. VOLK, SALLIE L. KRAWCHECK, GARY L. CRITTENDEN and ROBERT DRUSKIN, | ECF CASE |
| Defendants. | |
| LENNARD HAMMERSCHLAG, Individually, and On Behalf of All Others Similarly Situated, | Electronically Filed<br><br>No. 1:07-cv-10258 (SHS) |
| Plaintiff<br>v. | |
| CITIGROUP INC., CHARLES PRINCE, SALLIE KRAWCHECK, and GARY CRITTENDEN, | ECF CASE |
| Defendants. | |

JUDY G. FISHER,

                Plaintiff,

   -   against -

CITIGROUP INC., ET AL.,

                Defendants.

No. 08-cv-0136 (SHS)

## DECLARATION OF ANDREW J. ENTWISTLE

I, the undersigned, Andrew J. Entwistle, do hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am an attorney licensed to practice law in the United States Supreme Court and the State and Federal courts serving the States of Colorado, Illinois, New Jersey, New York, Texas, and the District of Columbia.  I am the managing partner of the law firm of Entwistle & Cappucci LLP ("Entwistle & Cappucci"), counsel for the Public Employees' Retirement Association of Colorado ("Colorado PERA"), Tennessee Consolidated Retirement System ("TCRS"), Sjunde AP-fonden ("AP7"), Fjärde AP-fonden ("AP4"), and Pensionskassernes Administration A/S ("PKA") (collectively, the "Global Pension Funds").  Entwistle & Cappucci's principal office is located at 280 Park Avenue, 26th Floor, New York, New York 10017.

2.      I submit this Declaration in support of the Global Pension Funds' Reply Memorandum of Law in Further Support of Their Motion For Consolidation, For Appointment As Lead Plaintiffs, and For Selection of Lead Counsel.

3.      Attached hereto as Exhibit 1 is a true and correct copy of a diagram, based upon paragraph 40 of the Global Pension Funds' Complaint in the action captioned *Public Employees' Retirement Association of Colorado, et al. v. Citigroup Inc., et al.* No. 08-cv-0135 (SHS) (S.D.N.Y.), depicting ATD's involvement in the basic organizational structure of Citigroup Inc.

4.      Attached hereto as Exhibit 2 is a true and correct copy of the Declaration of Christina Holmes, Legal Counsel at PKA, dated February 5, 2008.

5.    Attached hereto as Exhibit 3 is a true and correct copy of the Memorandum of Law in Support of the Motion of Ontario Teachers' Pension Plan Board for Appointment as Lead Plaintiff, Approval of Its Selection of Counsel as Lead Counsel for the Class, and Consolidation of All Related Actions, filed on January 4, 2008 in *Koesterer v. Washington Mutual Inc. et al.,* 1:07-CV-9801-CM (S.D.N.Y.).

6.    Attached hereto as Exhibit 4 is a true and correct copy of the Memorandum of Law in Further Support of the Motion of Ontario Teachers' Pension Plan Board for Appointment as Lead Plaintiff, and In Opposition To All Other Motions, filed on January 22, 2008 in Koesterer v. Washington Mutual Inc. et al., 1:07-CV-9801-CM (S.D.N.Y.).

7.    Attached hereto as Exhibit 5 is a true and correct copy of an article published in Global Pensions, July 2007, entitled Class Action Impacts on European Investors by Bernstein Litowitz Berger and Grossman LLP ("BLB&G").

8.    Attached hereto as Exhibit 6 is a true and correct copy of a BLB&G January 2008 newsletter, *advocate: A Newsletter About US Corporate Governance For European Investors.*

9.    Attached hereto as Exhibit 7 is a true and correct copy of a "screenshot" the website of BLB&G with the drop-down box allowing the user to select the language of his/her choice.

10.    Attached hereto as Exhibit 8 is a true and correct copy of a "screenshot" of the website of BLB&G after selecting the Danish language option.

11.    Attached hereto as Exhibit 9 is a true and correct copy of a "screenshot" of the website of BLB&G after selecting the Swedish language option.

12.    Attached hereto as Exhibit 10 is a true and correct copy of the

Memorandum Decision filed on January 8, 2008 in *GPC Biotech,* No. 07 Civ. 6728 (DC)

(S.D.N.Y.).

EXECUTED on the 7th day of February, 2008.

_____/s/_____

Andrew J. Entwistle

Citigroup Inc. ("Citigroup") is organized into three major business groups, as detailed below.  Citigroup acquired Automated Trading Desk ("ATD") in a transaction announced on June 30, 2007, which closed on October 3, 2007.  As depicted below, ATD became part of Citi Markets & Banking which, among other things, arranged many of the collateralized debt obligations ("CDO") that are the subject of these lawsuits.



**DECLARATION OF CHRISTINA HOLMES IN FURTHER SUPPORT OF THE MOTION
OF THE GLOBAL PENSION FUNDS FOR CONSOLIDATION, FOR APPOINTMENT AS
LEAD PLAINTIFFS AND FOR THE APPROVAL OF LEAD PLAINTIFFS' CHOICE OF
COUNSEL**

**CHRISTINA HOLMES** pursuant to 28 U.S.C. § 1746 and under the laws of the United

States of America, declare as follows:

1.      I, Christina Holmes, am Legal Counsel at Pensionskassernes Administration A/S

("PKA"), and I am authorized to speak on behalf of PKA with regard to legal matters.

2.      I respectfully submit this Declaration in reply to certain arguments made by the U.S.

Public Fund Group relating to PKA, and in further support of the Motion of PKA, the Public

Employees' Retirement Association of Colorado ("Colorado PERA"), Tennessee Consolidated

Retirement System ("TCRS"), Sjunde AP-fonden ("AP7") and Fjärde AP-fonden ("AP4")

(collectively, the "Global Pension Funds") to serve as Lead Plaintiffs and for the approval of the

Global Pension Funds' selection of Entwistle & Cappucci LLP and Schiffrin Barroway Topaz &

Kessler, LLP to serve as Co-Lead Counsel ("Lead Plaintiff Motion").

3.      I am aware that lead plaintiff movant, the U.S. Public Fund Group, has argued that

(i) the eight (8) occupational pension funds, which together created PKA, should be the proper

moving parties (and not PKA); and (ii) PKA has failed to establish that it has standing or authority

to represent its eight (8) occupational pension funds.

4.      These arguments are without merit.  First, in further support of the Global Pension

Funds' Lead Plaintiff Motion, PKA offered the Declaration of Annegrete Birck Jakobsen and

Michael Nellemann Pedersen, two Directors of PKA, in which they declared that PKA serves as

sole manager and administrator for each of the identified eight (8) occupational funds ("Funds") and

is authorized to pursue all legal actions on behalf of the Funds, including the instant Lead Plaintiff

Motion.  (Jakobsen and Pedersen Declaration ¶4.)

5.      Furthermore, PKA has a Power of Procuration from each of the Funds (attached hereto as Exhibit "A") which authorizes PKA to act on behalf of each Fund.  A Power of Procuration is the equivalent of a Power of Attorney in the United States and confers legal authority on PKA to initiate legal proceedings on behalf of the investments in question here.

6.      In connection with the prosecution of the Citigroup litigation on behalf of the Class, only PKA will be making decisions on behalf of the Funds with regard to, among other things, legal strategy and settlement proposals.  Thus, the U.S. Public Funds' contention that there are eight (8) decision makers at PKA is completely incorrect.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 5th day of February, 2008.

**Pensionskassernes Administration A/S**

By: _____

Christina Holmes
*Legal Counsel*

# EXHIBIT A

## *Power of procuration*

According to section 17 in the articles of association of **The Pension Funds Administration Ltd.** the board consists of:

> President, Central Denmark Region Bent Hansen
> Chairman of the Technical Commitee Sonny Berthold
> President, Zealand Region Kristian Ebbensgaard
> President of the Danish Nurses Organisation Connie Dyhr Kruckow
> Anaesthetic nurse Lis Lønbro Lehm
> President of the National Federation of Social Educators in Denmark
> Kirsten Nissen
> President of the Association of Danish Physiotherapists
> Johnny Kuhr Mikkelsen
> President of the Union of Commercial and Clerical Employees in Denmark
> Kim Simonsen
> Anne-Marie Rye Jensen, Communications
> Lawyer, Niels Harton Møller

According to section 21 in the articles of association, the board is entitled to give joint power of procuration.

The above-mentioned board of The Pension Funds Administration Ltd., Tuborg Boulevard 3, DK-2900 Hellerup, Denmark, hereby gives:

> Managing Director, Chief Executive Officer Peter Damgaard Jensen
> Executive Director, Peter Melchior
> Executive Director, Investment, Michael Nellemann Pedersen
> Executive Director Annegrete Birck Jakobsen

joint power of procuration so that two of the directors jointly can sign on behalf of the company. Additionally, the power of procuration includes purchases, sales and mortgages of real estate and sales of mortgage deeds.

This power of procuration cancels any previous given power of procuration.

Hellerup, May 14.th 2007

Bent Hansen

Connie Dyhr Kruckow

Kristian Ebbensgaard

Sonny Berthold

Lis Lønbro Lehm

Kirsten Nissen

Johnny Kuhr Mikkelsen

Kim Simonsen

Niels Harton Møller

Anne-Marie Rye Jensen

## *Power of procuration*

The board of The State Registered Nurses' Pension Fund, Tuborg Boulevard 3, DK-2900 Hellerup, Denmark, hereby gives:

> Managing Director, Chief Executive Officer Peter Damgaard Jensen
> Executive Director, Actuary, Peter Melchior
> Executive Director, Investment, Michael Nellemann Pedersen
> Executive Director Annegrete Birck Jakobsen

(all PKA A/S) power of procuration so that two of the directors jointly can sign on behalf of The Pension Fund. Additionally, the power of procuration includes purchases, sales and mortgages of real estate and sales of mortgage deeds.

This power of procuration cancels any previous given power of procuration.

Hellerup, October 1.th 2007

Kristian Ebbensgaard

Connie Dyhr Kruckow

Johannes Flensted-Jensen

Sonny Berthold

Lis Lønbro Lehm

Dorte Steenberg

Jette Søgaard Nissen

## *Power of procuration*

The board of The Danish Diet and Nutrition Officers' Pension Fund, Tuborg Boulevard 3, DK-2900 Hellerup, Denmark, hereby gives:

> Managing Director, Chief Executive Officer Peter Damgaard Jensen
> Executive Director, Actuary, Peter Melchior
> Executive Director, Investment, Michael Nellemann Pedersen
> Executive Director Annegrete Birck Jakobsen

(all PKA A/S) power of procuration so that two of the directors jointly can sign on behalf of The Pension Fund. Additionally, the power of procuration includes purchases, sales and mortgages of real estate and sales of mortgage deeds.

This power of procuration cancels any previous given power of procuration.

Hellerup, October 8th 2007

_____
Niels Kr. Kirketerp Nielsen

_____
Ghita Parry

_____
Stig Vestergaard

_____
Mary-Ann Sørensen

_____
Diana Malene Hansen

### *Power of procuration*

The board of The Occupational Therapists' and Physiotherapists' Pension Fund, Tuborg
Boulevard 3, DK-2900 Hellerup, Denmark, hereby gives:

> Managing Director, Chief Executive Officer Peter Damgaard Jensen
> Executive Director, Actuary, Peter Melchior
> Executive Director, Investment, Michael Nellemann Pedersen
> Executive Director Annegrete Birck Jakobsen

(all PKA A/S) power of procuration so that two of the directors jointly can sign on behalf of
The Pension Fund. Additionally, the power of procuration includes purchases, sales and
mortgages of real estate and sales of mortgage deeds.

This power of procuration cancels any previous given power of procuration.

Hellerup, October 3th 2007

_____
Poul-Erik Svendsen

_____
Niels Kr. Kirketerp Nielsen

_____
Gitten Hammerberg

_____
Brian Errebo-Jensen

_____
Anne-Mette Gislev Mersing

_____
Lars Engberg

_____
Lone B. Høhne

_____
Gunner Gamborg

_____
Johnny Kuhr Mikkelsen

## *Power of procuration*

The board of The Medical Laboratory Technologists' Pension Fund, Tuborg Boulevard 3, DK-2900 Hellerup, Denmark, hereby gives:

> Managing Director, Chief Executive Officer Peter Damgaard Jensen
> Executive Director, Actuary, Peter Melchior
> Executive Director, Investment, Michael Nellemann Pedersen
> Executive Director Annegrete Birck Jakobsen

(all PKA A/S) power of procuration so that two of the directors jointly can sign on behalf of The Pension Fund. Additionally, the power of procuration includes purchases, sales and mortgages of real estate and sales of mortgage deeds.

This power of procuration cancels any previous given power of procuration.

Hellerup, October 2th 2007

Johannes Flensted Jensen

Anne Lise Madsen

Aleksander Aagaard

Lis-Lotte Gaardbo

Erik Troels Schütt

## *Power of procuration*

The board of The Midwives Pension Fund, Tuborg Boulevard 3, DK-2900 Hellerup, Denmark, hereby gives:

> Managing Director, Chief Executive Officer Peter Damgaard Jensen
> Executive Director, Jens Kjærsgaard
> Executive Director, Actuary, Peter Melchior
> Executive Director, Investment, Michael Nellemann Pedersen
> Executive Director Annegrete Birck Jakobsen

(All PKA A/S) power of procuration so that two of the directors jointly can sign on behalf of The Pension Fund. Additionally, the power of procuration includes purchases, sales and mortgages of real estate and sales of mortgage deeds.

This power of procuration cancels any previous given power of procuration.

Hellerup, May 1rd 2007

Niels Kr. Kirketerp Nielsen

Lillian Bondo

Kristian Grønbæk Andersen

Kit Brigitta Dynnes Hansen

Annette Boldt Gemynthe-Petersen

# *Power of procuration*

The board of The County Office Workers' Pension Fund, Tuborg Boulevard 3, DK-2900 Hellerup, Denmark, hereby gives:

> Managing Director, Chief Executive Officer Peter Damgaard Jensen
> Executive Director, Actuary, Peter Melchior
> Executive Director, Investment, Michael Nellemann Pedersen
> Executive Director Annegrete Birck Jakobsen

(all PKA A/S) power of procuration so that two of the directors jointly can sign on behalf of The Pension Fund. Additionally, the power of procuration includes purchases, sales and mortgages of real estate and sales of mortgage deeds.

This power of procuration cancels any previous given power of procuration.

Hellerup, October 8th 2007

Lars Engberg

Aleksander Aagaard

Arne Bundgaard

Kim Simonsen

Nils Pedersen

## *Power of procuration*

The board of The Medical Secretaries' Pension Fund, Tuborg Boulevard 3, DK-2900 Hellerup, Denmark, hereby gives:

> Managing Director, Chief Executive Officer Peter Damgaard Jensen
> Executive Director, Actuary, Peter Melchior
> Executive Director, Investment, Michael Nellemann Pedersen
> Executive Director Annegrete Birck Jakobsen

(all PKA A/S) power of procuration so that two of the directors jointly can sign on behalf of The Pension Fund. Additionally, the power of procuration includes purchases, sales and mortgages of real estate and sales of mortgage deeds.

This power of procuration cancels any previous given power of procuration.

Hellerup, October 3st 2007

_____
Carl Holst

_____
Birgitte Ussing Christensen

_____
Poul-Erik Svendsen

_____
Birgitte Wildt-Andersen

_____
Marianne Hasemann

## *Power of procuration*

The board of The Social Workers' and Social Pedagogues' Pension Fund, Tuborg Boulevard 3, DK-2900 Hellerup, Denmark, hereby gives:

> Managing Director, Chief Executive Officer Peter Damgaard Jensen
> Executive Director, Actuary, Peter Melchior
> Executive Director, Investment, Michael Nellemann Pedersen
> Executive Director Annegrete Birck Jakobsen

(all PKA A/S) power of procuration so that two of the directors jointly can sign on behalf of The Pension Fund. Additionally, the power of procuration includes purchases, sales and mortgages of real estate and sales of mortgage deeds.

This power of procuration cancels any previous given power of procuration.

Hellerup, October 5th 2007

Bent Hansen

Aleksander Aagaard

Henning Breinholt

Ella Susanne Grove Andersen

Kirsten Nissen

Ib Terp

Kaj Skov Frederiksen

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DENNIS KOESTERER, on behalf of
himself and all others similarly situated,

Plaintiff,

v.

WASHINGTON MUTUAL, INC.,
KERRY K. KILLINGER, DAVID C.
SCHNEIDER and THOMAS W. CASEY,

Defendants.

Civil Action No. 1:07-CV-9801-CM

ECF FILED

(Captions continued on subsequent page)

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF ONTARIO TEACHERS' PENSION PLAN BOARD FOR APPOINTMENT AS LEAD PLAINTIFF, APPROVAL OF ITS SELECTION OF COUNSEL AS LEAD COUNSEL FOR THE CLASS, AND CONSOLIDATION OF ALL RELATED ACTIONS**

JOEL ABRAMS and BRIAN ROFFE,
individually and on behalf of all others
similarly situated,

        Plaintiff,

v.

WASHINGTON MUTUAL, INC.,
KERRY K. KILLINGER , STEPHEN J.
ROTELLA and THOMAS W. CASEY,

        Defendants.

Civil Action No. 1:07-CV-9806-AKH

ROBERT L. GARBER, individually and
on behalf of all others similarly situated,

        Plaintiff,

v.

WASHINGTON MUTUAL, INC.,
KERRY K. KILLINGER , STEPHEN J.
ROTELLA and THOMAS W. CASEY,

        Defendants.

Civil Action No. 1:07-CV-11422-UA

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ........................................................ 2

ARGUMENT ...................................................................................................... 5

    I.     Ontario Teachers Should Be Appointed Lead Plaintiff ............................... 5

          A.    Ontario Teachers Believes That It Has the Largest
               Financial Interest in the Relief Sought by the Class ...................... 6

          B.    Ontario Teachers Otherwise Satisfies the Requirements of
               Rule 23 .............................................................................. 7

    II.    The Court Should Approve Ontario Teachers' Selection of Lead
         Counsel ..................................................................................... 10

    III.   The Related Actions Should be Consolidated ......................................... 11

CONCLUSION .................................................................................................. 12

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bhojwani v. Pistiolis*,
No. 06-CV-13761(CM), 2007 U.S. Dist. LEXIS 52139 (S.D.N.Y. June 26,
2007) ............................................................................................................................5, 6

*Fishbury, Ltd. v. Connectics Corp.*,
No. 06 Civ. 11496 (SWK), 2006 U.S. Dist. LEXIS 90696 (S.D.N.Y. Dec. 14,
2006) ............................................................................................................................6, 7

*Glauser v. EVCI Career Colleges Holding Corp.*,
236 F.R.D. 184 (S.D.N.Y. 2006) ................................................................................ *passim*

*In re Cendant Corp. Sec. Litig.*,
404 F.3d 173 (3d Cir. 2005)...................................................................................10

*In re eSpeed, Inc. Sec. Litig.*,
232 F.R.D. 95 (S.D.N.Y. 2005) ................................................................5, 6, 7, 8

*In re Initial Pub. Offering Sec. Litig.*,
214 F.R.D. 117 (S.D.N.Y. 2002) ...............................................................................7, 8

*Weltz v. Lee*,
199 F.R.D. 129 (S.D.N.Y. 2001) ...............................................................................11

**STATUTES**

15 U.S.C.  § 78u-4, *et seq.* ................................................................................. *passim*

**OTHER AUTHORITIES**

H.R. Conf. Rep. No. 104-369, 104th Cong. 1st Sess. (1995), *reprinted in*
1995 U.S.C.C.A.N. 679 ............................................................................................9

Ontario Teachers' Pension Plan Board ("Ontario Teachers") respectfully submits this memorandum in support of its motion (i) to be appointed as Lead Plaintiff pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u-4(a)(3)(B), as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), (ii) for approval of its selection of the law firm of Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz") as Lead Counsel for the Class, and (iii) for consolidation of all related securities class actions pursuant to Fed. R. Civ. P. 42(a).

## PRELIMINARY STATEMENT

These federal securities class action lawsuits arise from allegations concerning violations of the federal securities laws by Washington Mutual Inc. ("WaMu" or the "Company") and certain of its officers (collectively, "Defendants"). During the period from April 18, 2006 through December 10, 2007 (the "Class Period"), Defendants disseminated materially false and misleading information concerning the Company's operations and financial condition while suppressing or recklessly ignoring information known to them about the Company's business and finances. Defendants' misstatements artificially inflated the price of WaMu securities and caused substantial damage to the Company's investors.

Pursuant to the PSLRA, this Court must appoint the "most adequate plaintiff" to serve as Lead Plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(i). In that regard, the Court is required to determine which movant has the "largest financial interest" in the relief sought by the Class in this litigation and also makes a *prima facie* showing that it is an adequate class representative under Rule 23 of the Federal Rules of Civil Procedure. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

Ontario Teachers believes that it is the "most adequate plaintiff" under the PSLRA to serve as the Lead Plaintiff on behalf of investors in this action. Ontario Teachers believes that it has the largest financial interest in the relief sought in this action by virtue of, among other things, the approximately $24 million loss on its investment in WaMu securities.[1] Ontario Teachers further satisfies the relevant requirements of Rule 23 of the Federal Rules of Civil Procedure as an adequate class representative with claims typical of the other Class members. Ontario Teachers is, moreover, a sophisticated public institutional investor, highly experienced in conducting and supervising counsel in complex securities litigation, and is therefore a paradigmatic Lead Plaintiff under the PSLRA.

## FACTUAL AND PROCEDURAL BACKGROUND

WaMu is the nation's largest savings and loan bank. Headquartered in Seattle, Washington, the Company offers consumer banking, mortgage lending and consumer finance services throughout the United States, with over twenty bank branches and "home loan" centers located in this District. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "WM." It has nearly 860 million shares outstanding and held by public investors.

The complaints filed in this action allege that during the Class Period, Defendants issued materially false and misleading statements and/or concealed material adverse facts regarding the Company's business and financial results. Plaintiffs allege, *inter alia*, that WaMu improperly exerted pressure on a third-party appraisal firm, eAppraiseIT (a

---

[1] A copy of the Certification of Ontario Teachers is attached as Exhibit A to the Declaration of Gerald H. Silk (the "Silk Decl."). As required by the PSLRA, this Certification sets forth the transactions of Ontario Teachers in WaMu stock during the Class Period.

division of the First American Corporation), to inflate the appraised value of homes used as collateral for loans originated by WaMu. The Company failed to disclose this scheme, which violated federal and state laws and regulations requiring an independent appraisal process. The inflated appraisals rendered WaMu's financial results misleading, as its loan assets were overstated while its provision for doubtful accounts and reserves for loan losses were materially understated. Defendants' scheme and other materially misleading statements and omissions regarding the Company's financial performance caused the price of WaMu stock to trade at artificially inflated prices during the Class Period, reaching a high of a $46.29 in December 2006.

On October 17, 2007, after the market closed, WaMu announced that the Company had suffered a 72 percent drop in net income in the third quarter and that it would have to set aside up to $1.3 billion to cover expected loan losses in the fourth quarter. As a result of this announcement, WaMu shares fell $2.55 per share, or over 7.7 percent, to close at $30.52 per share on heavy trading volume on October 18, 2007.

Then, on November 1, 2007, the Attorney General of the State of New York filed a lawsuit against WaMu's principal outside appraiser, First American Corporation ("First American") and its real estate appraisal subsidiary, eAppraiseIT, alleging their complicity in a scheme to provide inflated appraisals to WaMu. After the market learned of the Attorney General's lawsuit, WaMu's stock price dropped from $27.88 to close at $25.75 per share on November 1, 2007, declining 7.76 percent on high-volume trading. On the following day, the Company's shares continued to fall an additional $1.94 per share, or 7.75 percent, to close at $23.81 per share on, a decline of almost 15 percent over the two-day period.

3

On November 7, 2007, the New York Attorney General issued subpoenas to Fannie Mae and Freddie Mac concerning loans they had purchased from WaMu that may have been tainted by WaMu's fraudulent appraisal processes, raising questions concerning those companies' ability to continue purchasing loans from WaMu, an essential source of financing for the Company. As a result of this additional news, WaMu shares plunged further, dropping $4.84, or 20 percent, on extremely high volume trading over the next two days, to close at $19.39 on November 9, 2007.

Then, on December 10, 2007, after the close of the market, WaMu disclosed, *inter alia*, (i) a $1.6 billion write-down of all goodwill associated with the Company's home loan business; (ii) an increase in the Company's fourth quarter loan loss provisions to between $1.5 and $1.6 billion, stating that even greater loan loss provisions for the first quarter of 2008 were expected; and (iii) that the Company would exit the subprime lending business entirely, shutting down half of its home loan centers and sales offices and cutting more than 3000 jobs in the process. As a result of these additional corrective disclosures, WaMu's share price fell an additional $2.46 per share, or 12.3 percent, closing at $17.42 on December 11, 2007 on unusually heavy trading volume.

The first complaint in this action, styled *Koesterer v. Washington Mutual, Inc., et al.*, was filed in the Southern District of New York on Nov. 5, 2007. The first notice of pendency of this action, attached as Exhibit B to the Silk Decl., was published that same day and alerted investors to a class period of July 19, 2006 through October 31, 2007. A subsequently published notice, attached as Exhibit C to the Silk Decl., notified investors that another complaint had been filed expanding the class period to run from April 18, 2006 through December 10, 2007.

The PSLRA permits any member of the class to move for appointment as Lead Plaintiff within 60 days of the publication of notice that the first action asserting substantially the same claims has been filed. *See* 15 U.S.C. § 78u-4(a)(3)(A). Ontario Teachers has satisfied this deadline by making this motion.[2]

## ARGUMENT

**I.      Ontario Teachers Should Be Appointed Lead Plaintiff**

Ontario Teachers respectfully submits that it should be appointed Lead Plaintiff because it is the movant "most capable of adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B). The PSLRA establishes a presumption that the "most adequate plaintiff" is the movant that "has the largest financial interest in the relief sought by the class" and "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B); *see also Bhojwani v. Pistiolis*, No. 06-CV-13761(CM), 2007 U.S. Dist. LEXIS 52139, at *15 (S.D.N.Y. June 26, 2007); *Glauser v. EVCI Career Colleges Holding Corp.*, 236 F.R.D. 184, 187-89 (S.D.N.Y. 2006) (McMahon, J.); *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 97-98 (S.D.N.Y. 2005).

---

[2] There is also a substantially similar securities class action complaint on file in the Western District of Washington. Ontario Teachers is also, concurrently herewith, filing a motion seeking appointment as Lead Plaintiff in that action. In addition, Defendant Washington Mutual has filed a motion before the Judicial Panel on Multidistrict Litigation seeking to transfer the actions currently pending in the Southern District of New York to the Western District of Washington. *See* Motion of Washington Mutual for Transfer of Actions to the Western District of Washington Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings. (Dkt. #3, Attachment #2.) That motion has been opposed by certain of the plaintiffs in these actions.

A.    **Ontario Teachers Believes That It Has the Largest Financial
       Interest in the Relief Sought by the Class**

Ontario Teachers should be appointed Lead Plaintiff because it has the largest

financial interest in the relief sought by the Class.    15 U.S.C. § 78u-4(a)(3)(B)(iii).

Courts generally look to four factors in determining which movant has the largest

financial interest in the litigation.    These factors are (i) the number of gross shares

purchased during the class period; (ii) the number of net shares purchased during the

class period; (iii) the total net funds expended during the class period; and (iv) the

approximate losses suffered.  *See, e.g., Fishbury, Ltd. v. Connectics Corp.*, No. 06 Civ.

11496 (SWK), 2006 U.S. Dist. LEXIS 90696, at *7-8 (S.D.N.Y. Dec. 14, 2006); *Glauser*,

236 F.R.D. at 187; *In re eSpeed*, 232 F.R.D. at 100.    In light of each of these factors,

Ontario Teachers believes that it has the largest financial interest in the outcome of this

lawsuit.

Ontario Teachers purchased 1,788,133 shares of WaMu on a gross basis during

the Class Period.    During the same period, Ontario Teachers had net purchases of

975,283 shares.    In addition, Ontario Teachers had total net expenditures of

$17,011,063.15 during the Class Period.    As a result of the revelation of WaMu's

misconduct, Ontario Teachers suffered over $24 million in losses, whether calculated on

a LIFO or FIFO basis.[3]  Specifically, Ontario Teachers lost $24,055,605.35 on a LIFO

---

[3] Courts in this District and elsewhere rely on two principal methods for calculating
approximate loss for purposes of Lead Plaintiff motions under the PSLRA. These are the
FIFO (first in, first out) and LIFO (last in, first out) methods. Under the FIFO method,
sales are offset against the movant's inventory of stock acquisitions, starting with the
earliest and moving chronologically forward (hence, "first in, first out"). Under the
alternative LIFO method, the sales are offset against the movant's inventory of stock
acquisitions, starting with the latest and moving chronologically backward (hence, "last
in, first out"). *See generally Bhojwani v. Pistiolis*, 2007 U.S. Dist. LEXIS 52139, at *23-
24.

6

basis and $24,380,402.89 on a FIFO basis (charts setting forth Ontario Teachers'

transactions and losses in WaMu securities on LIFO and FIFO bases are attached as

Exhibits D and E, respectively, to the Silk Decl.). The magnitude of Ontario Teachers'

financial interest in this litigation can be summarized as follows:

| Factor | Ontario Teachers' Position |
|---|---|
| **Gross Purchases:** | 1,788,133 shares |
| **Net Purchases:** | 975,283 shares |
| **Net Expenditures:** | $17,011,063.15 |
| **Approximate LIFO Loss:** | $24,055,605.35 |
| **Approximate FIFO Loss:** | $24,380,402.89 |

Accordingly, Ontario Teachers believes that it has the largest financial interest of

any qualified movant seeking appointment as Lead Plaintiff.

**B.    Ontario Teachers Otherwise Satisfies the Requirements of Rule 23**

Ontario Teachers should be appointed Lead Plaintiff because it also satisfies the

requirements of Rule 23 of the Federal Rules of Civil Procedure. On a motion to serve as

Lead Plaintiff, the movant "need only make a preliminary showing that it satisfies the

typicality and adequacy requirements of Rule 23." *Glauser*, 236 F.R.D. at 188 (quoting

*In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 296 (E.D.N.Y. 1998)); *see also*

*Fishbury*, 2006 U.S. Dist. LEXIS 90696, at *7 (same); *In re eSpeed*, 232 F.R.D. at 102

(same). Ontario Teachers unquestionably satisfies both requirements in this case.

Ontario Teachers' claim is typical of the claims of other Class members.

"Typicality is satisfied where the claims arise from the same conduct from which the

other class members' claims and injuries arise." *In re Initial Pub. Offering Sec. Litig.*,

214 F.R.D. 117, 121 (S.D.N.Y. 2002). Ontario Teachers' claims in this action arise from

the very same course of misconduct at WaMu as the claims of the other Class members—

7

*i.e.*, the artificial inflation and consequent market correction of WaMu stock caused by Defendants' fraudulent public statements and omissions. *See, e.g., Glauser,* 236 F.R.D. at 188-89 (finding a Lead Plaintiff movant's claim to be typical where the movant "like all class members, (1) purchased or acquired EVCI securities during the proposed class period, (2) at prices allegedly artificially inflated by Defendants' false and misleading statements and/or omissions, and (3) suffered damages thereby."); *In re eSpeed,* 232 F.R.D. at 102 (finding a Lead Plaintiff movant's claim to be typical where "[m]embers of the class claim to have been injured by a fraudulent inflation of eSpeed's stock price" and the movant "makes the same claim.").

Ontario Teachers likewise satisfies the adequacy requirement of Rule 23. The adequacy requirement is satisfied where "the class members' interests are not antagonistic to one another;" "the class has a sufficient interest in the outcome of the case to ensure vigorous advocacy," and where "class counsel is qualified, experienced, and generally able to conduct the litigation." *In re Initial Public Offering Sec. Litig.,* 214 F.R.D. at 121. Ontario Teachers satisfies each of these elements of the adequacy requirement.

Ontario Teachers is adequate to represent the Class because its interests are perfectly aligned with those of the other Class members and are not antagonistic in any way. Indeed, Ontario Teachers seeks identical relief on identical claims based on identical legal theories. There are, furthermore, no facts suggesting that any actual or potential conflict of interest or other antagonism exists between Ontario Teachers and other Class members.

8

Ontario Teachers has also submitted a Certification affirming its understanding of the duties owed to Class members through its commitment to oversee the prosecution of this Class action. *See* Silk Decl., Exhibit A. Through that Certification, Ontario Teachers accepts the fiduciary obligations it will assume if appointed Lead Plaintiff in this action.

Ontario Teachers also has substantial experience overseeing the prosecution of complex securities class action lawsuits such as this one. For example, Ontario Teachers served as Co-Lead Plaintiff in *In re Nortel Networks Corp. Securities Litigation*, No. 05-MD-1659 (LAP) (S.D.N.Y.), in which a $1.3 billion settlement that included extensive corporate governance reforms was obtained on behalf of investors. Ontario Teachers' well-established record of success seeking redress on behalf of its fellow investors is also reflected in the critical leadership role it played in *In re Williams Securities Litigation*, No. 02-CV-72 (N.D. Okla.), in which Ontario Teachers was specifically selected by the District Court for the Northern District of Oklahoma to replace previously appointed lead plaintiffs that had withdrawn from the case for undisclosed reasons, threatening to leave the Class with no ability to recover its losses. Ontario Teachers' prosecution of the case resulted in a recovery of $311 million for the class following completion of fact discovery. Ontario Teachers also currently serves as a Lead Plaintiff in *In re Biovail Securities Litigation*, No. 03-CV-8917 (RO) (S.D.N.Y.), in which a $138 million settlement is pending approval.

Moreover, Ontario Teachers is a classic example of the sort of Lead Plaintiff envisioned by Congress in its enactment of the PSLRA—a sophisticated institutional investor with a real financial interest in the litigation. *See* H.R. Conf. Rep. No. 104-369,

9

at 34, 104th Cong. 1st Sess. (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 690 (explaining that "increasing the role of institutional investors in class actions will ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions"); *see also In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 180 (3d Cir. 2005) (holding that the PSLRA establishes "a paradigm in which the plaintiff with the largest stake in the case, usually a large and sophisticated institution, is accorded the status of lead plaintiff and assigned the right to appoint and duty to monitor lead counsel for the class"); *Glauser*, 236 F.R.D. at 188.  Finally, Ontario Teachers has demonstrated its adequacy through its selection of Bernstein Litowitz as counsel to represent the Class. As discussed more fully below, Bernstein Litowitz is highly qualified and experienced in the area of securities class action litigation and has repeatedly demonstrated its ability to conduct complex securities class action litigation effectively.

**II.    The Court Should Approve Ontario Teachers' Selection of Lead Counsel**

The Court should approve Ontario Teachers' choice of the law firm of Bernstein Litowitz to serve as Lead Counsel.  Pursuant to Section 21D(a)(3)(B)(v) of the PSLRA, codified at 15 U.S.C. § 78u-4(a)(3)(B)(v), the Lead Plaintiff is to select and retain Lead Counsel to represent the Class, subject to Court approval.  Ontario Teachers has selected and retained the law firm of Bernstein Litowitz.

Bernstein Litowitz is among the preeminent securities class action law firms in the country, having been appointed sole or co-lead counsel in numerous complex securities class actions in this District and around the country.  *See, e.g.*, Bernstein Litowitz's Firm Biography, attached as Exhibit F to the Silk Decl.  Bernstein Litowitz served as co-lead counsel in *In re WorldCom, Inc. Securities Litigation*, No. 02-CV-3288 (DLC) (S.D.N.Y.), in which settlements totaling in excess of $6 billion—one of the

largest recoveries in securities class action history—were obtained for the class. Bernstein Litowitz was also counsel for Ontario Teachers in the successful prosecutions of *In re Nortel Networks Corp. Securities Litigation*, No. 05-MD-1659 (LAP) (S.D.N.Y.) and *In re Biovail Securities Litigation*, No. 03-CV-8917 (RO) (S.D.N.Y.).

Accordingly, the Court should approve Ontario Teachers' selection of Bernstein Litowitz as Lead Counsel for the Class.

### III.    The Related Actions Should be Consolidated

There are at least three securities class action complaints pending in the Southern District of New York on behalf of investors in WaMu securities:

| Case Number | Abbreviated Case Name | Date Filed |
|---|---|---|
| 07-CV-9801 | *Koesterer v. Washington Mutual, Inc., et al.* | November 5, 2007 |
| 07-CV-9806 | *Abrams v. Washington Mutual, Inc., et al.* | November 5, 2007 |
| 07-CV-11422 | *Garber v. Washington Mutual, Inc., et al.* | December 19, 2007 |

These actions present virtually identical factual and legal issues, as they all arise out of the same alleged misstatements regarding the financial condition of WaMu. Accordingly, consolidation is appropriate here. *See, e.g., Glauser*, 236 F.R.D. at 186 ("[T]his Court has recognized that consolidation is particularly appropriate in the context of securities class actions if the complaints are based on the same public statements and reports.") (internal quotation marks omitted); *Weltz v. Lee*, 199 F.R.D. 129, 131 (S.D.N.Y. 2001) ("In securities actions where the complaints are based on the same 'public statements and reports,' consolidation is appropriate if there are common

questions of law and fact and the defendants will not be prejudiced.") (internal citation omitted).

## CONCLUSION

For the foregoing reasons, Ontario Teachers respectfully requests that the Court: (i) appoint Ontario Teachers as Lead Plaintiff pursuant to the PSLRA; (ii) approve Ontario Teachers' selection of Bernstein Litowitz Berger & Grossmann LLP as Lead Counsel for the Class; (iii) consolidate all related actions; and (iv) grant such other and further relief as the Court may deem just and proper.

Dated: January 4, 2008                        Respectfully submitted,

                                              **BERNSTEIN LITOWITZ BERGER &**
                                              **GROSSMANN LLP**


                                              /s/ Gerald H. Silk
                                              Gerald H. Silk (GS-4565)
                                              Noam Mandel (NM-0203)
                                              1285 Avenue of the Americas, 38th Floor
                                              New York, NY 10019
                                              (212) 554-1400

                                              *Counsel for Ontario Teachers' Pension Plan*
                                              *Board and Proposed Lead Counsel for the*
                                              *Class*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DENNIS KOESTERER, on behalf of himself and all others similarly situated,<br><br>       Plaintiff,<br><br>v.<br><br>WASHINGTON MUTUAL, INC., KERRY K. KILLINGER, DAVID C. SCHNEIDER and THOMAS W. CASEY,<br><br>       Defendants. | Civil Action No. 1:07-CV-9801-CM<br><br>ECF FILED |

(Captions continued on subsequent page)

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION OF ONTARIO TEACHERS' PENSION PLAN BOARD FOR APPOINTMENT AS LEAD PLAINTIFF AND IN OPPOSITION TO ALL OTHER MOTIONS**

JOEL ABRAMS and BRIAN ROFFE,
individually and on behalf of all others
similarly situated,

        Plaintiff,

v.

WASHINGTON MUTUAL, INC.,
KERRY K. KILLINGER , STEPHEN J.
ROTELLA and THOMAS W. CASEY,

        Defendants.

Civil Action No. 1:07-CV-9806-AKH

ROBERT L. GARBER, individually and
on behalf of all others similarly situated,

        Plaintiff,

v.

WASHINGTON MUTUAL, INC.,
KERRY K. KILLINGER , STEPHEN J.
ROTELLA and THOMAS W. CASEY,

        Defendants.

Civil Action No. 1:07-CV-11422-UA

Ontario Teachers Pension Plan Board ("Ontario Teachers") respectfully submits that it should be appointed Lead Plaintiff. The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires the Court to appoint as Lead Plaintiff the movant with the "largest financial interest in the relief sought by the class" that "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." *See* 15 U.S.C. § 78u-4(a)(3)(B); *see also Glauser v. EVCI Career Colleges Holding Corp.*, 236 F.R.D. 184, 187 (S.D.N.Y. 2006). Ontario Teachers clearly satisfies these requirements and should be appointed Lead Plaintiff.

Ontario Teachers suffered approximate losses of $24 million in connection with its investment in the stock of Washington Mutual, Inc. ("WaMu")—a significantly larger financial interest than any other movant herein.[1] Ontario Teachers is, in addition, a sophisticated and experienced institutional investor, and is, therefore, "precisely the type of sophisticated institutional investor that Congress and this Court have recognized as being ideally suited to control this type of securities class action litigation." *EVCI Career Colleges Holding Corp.*, 236 F.R.D. at 188. Ontario Teachers is, therefore, the "most adequate plaintiff" under the PSLRA and respectfully submits that it should be appointed Lead Plaintiff and its motion should otherwise be granted. 15 U.S.C. § 78u-4(a)(3)(B).

Other movants herein recognize that Ontario Teachers financial interest is the largest and that Ontario Teachers satisfies the relevant requirements of Rule 23 as an adequate class representative with typical claims. For example, the NYC Police and Fire Pension Funds have withdrawn their motion, stating that "it appears that the Ontario

---

[1] The other movants and their claimed losses on a first in, first out ("FIFO") basis are: The New York City Police and Fire Pension Funds, asserting losses of $15,173,101; the WaMu Institutional Investor Group, asserting losses of $14,793,906; the Massachusetts Pension Reserves Investment Management Board, asserting losses of $7,035,421; and Mr. Burton Rosenfield, asserting losses of $44,810.

Teachers Pension Plan Board has the largest financial interest in the relief sought by the class, 15. U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb), and otherwise satisfies the criteria for appointment as Lead Plaintiff." Notice of Withdrawal of Motion for Appointment of Lead Plaintiff and Approval of Lead Counsel, at 2 (Dkt. 34.). Similarly, the WaMu Institutional Investor Group and Burton Rosenfield have all withdrawn their motions for appointment as Lead Plaintiff in deference to Ontario Teachers. *See* Notice of Withdrawal of Motion of WaMu Institutional Investor Group, at 1 (Dkt. 29.); Notice of Withdrawal of Burton Rosenfield's Motion for Lead Plaintiff, at 1 (Dkt. 32.).

Accordingly, Ontario Teachers respectfully requests that the Court appoint it as Lead Plaintiff, approve its selection of Bernstein Litowitz Berger & Grossmann LLP as Lead Counsel for the Class, and consolidate all related actions.

Dated: January 22, 2008                    Respectfully submitted,

                                           **BERNSTEIN LITOWITZ BERGER &**
                                           **GROSSMANN LLP**


                                           /s/ Gerald H. Silk
                                           Gerald H. Silk (GS-4565)
                                           Noam Mandel (NM-0203)
                                           1285 Avenue of the Americas, 38th Floor
                                           New York, NY 10019
                                           (212) 554-1400

                                           *Counsel for Ontario Teachers' Pension Plan*
                                           *Board and Proposed Lead Counsel for the*
                                           *Class*

**interview: Tony Gelderman**

# Class action impacts on European investors



**Alex Beveridge** asks Tony Gelderman of law firm BLB&G to explain how class action has crossed over to Europe and how pension funds can take advantage

**ALEX BEVERIDGE:** Class action is now firmly on the agenda for many large pension funds in Europe. But are some pension funds still missing out on settlements?

**TONY GELDERMAN:** More than a few. According to a recent study, only about 30% of those eligible for settlement funds are actually filing the necessary claims forms. The figure is probably below 30% in the UK and Europe.

This is a pretty basic breach of fiduciary duty that is widespread. With US$18bn in class action settlements last year, real money is being left on the table by investors.

**ALEX BEVERIDGE:** Class action has been a part of institutional shareholders' investment tools in the US for many years. Why is it only really coming of age in Europe now?

**TONY GELDERMAN:** It's really evolutionary. Keep in mind that the Private Securities Litigation Reform Act, or the PSLRA, only went into effect in 1996 in the US.

This is the law passed by the US Congress that drew large US pension systems into the role of lead plaintiff in class actions and it was several years after the Act's message that the US pension funds actually got involved in a meaningful way.

It only stands to reason that UK and European investors would wait to see how these new investor led class actions would turn out.

Since the experience has proved fruitful for US investors – who have demonstrated that institutional investors can dramatically increase recoveries and reduce fees when they serve as lead plaintiff in a class action – the practice of getting involved as a lead plaintiff is now spreading to the UK and Europe.

**ALEX BEVERIDGE:** Are there any unique aspects to representing a European or non-US pension fund over US-based pension funds?

**TONY GELDERMAN:** There are certain legal challenges that defendants can raise against non-US investors to try and bar their participation in US class actions.

While addressing these challenges presents an additional hurdle when representing non-US pension funds, it also reinforces the importance of having such funds take an active role in US litigations.

Without the involvement of sophisticated non-US investors to advocate on behalf of all international investors in responding to these legal challenges, it is possible for defendants to preclude non-US investors from participating in US litigations, and from sharing in the recoveries that are obtained for the class.

**ALEX BEVERIDGE:** You speak to pension funds from all around Europe about class actions. Which countries do you see as most advanced in using this legal tool?

**TONY GELDERMAN:** In these formative years, you see the most activity coming out of the Netherlands, Germany, the UK and the Nordic countries.

However, over time I think that the recognition of the benefits of US securities litigation will become commonplace throughout the European Union.

Larger investors generally tend to be more sophisticated about US securities litigation, so you will likely see a clustering of activity among the larger asset pools.

**ALEX BEVERIDGE:** The threat of class actions is sometimes used to explain the growth of listings outside of the US. Is this fair?

**TONY GELDERMAN:** Not at all. The rise of listings outside of the US is an indication of the maturing of emerging markets, the sometimes higher cost of US-based underwriting, and the advantages of listing closer to home.

Geography has especially helped the London Stock Exchange, with listing from former Soviet Bloc countries.

It's also worth noting that many of the new listings on foreign exchanges would not have satisfied the listing requirements of the US exchanges.

The US securities markets remain the deepest and strongest, and the rise of other markets does not signal the decline of markets in the US, but rather the ascension of newer markets.

**ALEX BEVERIDGE:** One persistent concern amongst some pension funds is that they fear devaluing companies they own stock in if they sue them. Why is this not the case?

**TONY GELDERMAN:** For starters, meritorious securities fraud claims almost always involve an action against a company that is already in serious trouble, possibly even on the verge of bankruptcy, as a result of the corporate misconduct that gives rise to the litigation.

The resolutions of these cases, where institutional investors are the lead plaintiff, regularly involve corporate governance reform designed to prevent future incidents of securities fraud.

Moreover, these actions will be litigated regardless of whether institutions take an active leadership role.

But only by taking on the role of a lead plaintiff can a pension fund seek to balance the interests of long term holders of the security in question against the interests of those who have sold their interest in the security in question, and use litigation as a tool to improve corporate governance in addition to making investors whole.

**ALEX BEVERIDGE:** Do you see any possibility of class actions becoming part of the European legal landscape?

**TONY GELDERMAN:** Some aspects may become part of the landscape. As a starting premise, no one likes to be sued. But from a corporate standpoint, having claims aggregated is more appealing than dealing with hundreds of smaller cases, and the ability to settle a claim on a class-wide basis allows companies to buy global peace and move on with their business. It is simply more efficient.

**ALEX BEVERIDGE:** Some pension funds fear that they could be dragged into lengthy and time consuming administration if they become embroiled in a class action. To what extent is this justified?

**TONY GELDERMAN:** To say there is no time commitment to serving as a lead plaintiff is misleading.

However, the time commitment can be limited if you are well represented by highly qualified counsel, who can assist the funds in reviewing documents and answering limited discovery requests, and who will fight to limit the burdens on their clients.

Attending important mediations and potentially participating in depositions should be factored in any decision to become a lead plaintiff in these cases. I would, on balance, describe the average time commitment for a lead plaintiff in these cases as modest.

**ALEX BEVERIDGE:** Please tell our readers about the difference between a passive and active approach to class actions.

**TONY GELDERMAN:** Passive refers to simply staying in a class as a member of the class and filing for your portion of the settlement at the end of the class.

Passive class members can share in any recovery achieved, but have no ability to influence the size of the recovery or to limit fees.

An active approach would mean working with counsel to actively monitor your portfolio for losses in meritorious securities class actions and moving for lead plaintiff in those cases where facts support such a motion.

By taking an active role, it has been shown that institutional investors obtain higher recoveries for the class while reducing fees.

**ALEX BEVERIDGE:** There are a number of firms vying for the attention of European pension funds. What should a pension fund look for when choosing a class action lawyer?

**TONY GELDERMAN:** I'd sum it up in one word: reputation. How is the firm perceived in the US? What is the record the firm has established in past class actions?

A European or UK pension fund should talk to their US counterparts and ask them their views on the various firms. I also suggest that defence firms be questioned by institutional investors looking to hire securities counsel.

The firms that defend the companies that are sued are in a unique position to rate their adversaries and in most cases will do so.

By asking the pension funds and the defence firms active in this area in the US, you will have a pretty good idea of which firms have truly outstanding reputations.

If a pension fund is looking for an objective measure of a law firm's success, I'd say that the best metric is the average size of the recoveries in the cases the firm prosecutes. Not the number of cases a firm is involved with, or the total amount a firm might recover in a given year – both of which might identify a firm that is not carefully screening the cases it advises its clients to bring – but the size of the average recovery achieved.

■ *Tony Gelderman is counsel at Bernstein, Litowitz, Berger & Grossmann*

**BLB&G** Bernstein Litowitz Berger & Grossmann LLP

# *advocate*

Issue No 1 January 2008 | A NEWSLETTER ABOUT US CORPORATE GOVERNANCE FOR EUROPEAN INVESTORS



It is a great pleasure to present to you the first edition of our Advocate for European Institutional Investors. With this publication we will regularly be providing you with updates on current issues related to US corporate governance and securities litigation.

*Tony Gelderman, Counsel*
*Responsible for Institutional Investor Outreach*

**Contact details: e-mail: tony@blbglaw.com**
**Phone: +1-504-899-2339**

# Claims Administration:
## European Investors Are Leaving Money Behind

### The Facts:

- During 2007, securities class actions resulted in a total of USD 9.4 billion in settlements.
- Less than 30% of institutional investors with provable losses secure their claims.
- There is currently an estimated USD 15.7 billion (as of 1 Jan 2008) available to potential claimants.
- International investors are expected to claim only 5% of this total, despite owning about 30% of the US equity market by market cap.

### Why do so many international institutions fail to file claims?

We don't have the data yet to be sure exactly why so few non-US investors claim the funds they are owed. We do know, however, that international institutions are not alone as the majority of institutional investors in the US also fail to file claims. It seems that many institutions, both within and outside the US, have not put into place sufficient mechanisms and organizational systems to know when these funds are available. The claims process is quite demanding and time consuming and we suspect that institutions will work more closely with their custodial banks in the future to ensure that they can track the monies recovered in these litigations and can participate in the claims process in a timely manner.

### Do European investors have the same right to claim as US investors?

Yes, they have exactly the same rights.

### What happens to the claims that my institution does not file?

If you do not file a claim, you are not entitled to any funds. The first step in the claims process is for all potential class members to submit claims within a defined time period. Once the deadline for filing claims has passed, the total settlement fund is divided pro-rata among all class members that have filed claims.

### What is the best solution for claims administration for international investors?

This is an issue that I know that many European institutional investors are struggling with. My answer is that this is best done by your custodian. They are experts on securities data processing and have full access to your fund's trading records. All major global custodians have started to include claims administration services in their standard custodial service platform, although in some cases this information does not seem to have reached all of their European clients. If you have a European-based custodian, they will typically have a relationship with a US subcustodian to manage your fund's US holdings. Claims administration should be a part of the service provided.

### Some law firms offer claims administration services. BLB&G does not – why?

Why replicate a service that your custodian will already do for you, can probably do well and is based on data that the custodian already has the systems to process? There is no value added in having your legal counsel do the custodian's job. Additionally, your custodian will generally handle these processes for no extra charge to the fund.

### Can I really trust my custodian to secure all claims?

In most cases, we believe yes. We have done studies for our clients regarding their custodians' completeness and efficiency in performing claims administration. Each time, we have been able to conclude that the custodian was doing a creditable job of filing all claims to which the investor was entitled and was doing so accurately and in a timely manner. As part of the portfolio monitoring and legal counseling service we provide, we frequently do this kind of analysis for our clients. I highly recommend that funds ask their counsel to perform such "audits" on their custodial bank's performance – our clients have found it to be of great value.

### How much money could claims filing amount to for a typical institution?

That's hard to answer, as the amount is based on many variables – including size of portfolio, market cap profile of the equity investments and exposure to US versus non-US names. But, as an example, the State of Wisconsin Investment Board – with USD 93 billion in assets under management – reports that it has recovered USD 7 million per year as a result of filing claims. Since the funds can generally be recovered through the custodian at little cost, it really is the fund's fiduciary duty to pursue these recoveries.

# Case Briefing:
# UnitedHealth Group, Inc.

Pension funds successfully challenge executive compensation abuse with a record recovery in a case related to stock options back-dating. The recovered assets are the largest ever in a case against individual directors and company officials, a so-called derivative action.

On December 6, 2007, on behalf of six large pension fund clients, BLB&G announced a record breaking recovery in excess of USD 920 million from executives of UnitedHealth Group Inc, one of the largest health insurers in the US. This recovery is subject to shareholder comment and Court approval.

It includes a USD 615 million settlement by Dr. William W. McGuire, UnitedHealth's former CEO, to resolve the claims against him. This payment is more than 46 times the total combined amounts recovered from individual defendants in the Enron case.

Similar recoveries are being obtained from UnitedHealth's former COO and current CEO Stephen Hemsley, who will pay some USD 240 million, and former General Counsel David Lubben, who will pay USD 30 million.

A shareholder derivative lawsuit allows investors to launch legal action on behalf of a Company, in the absence of action by its Board of Directors, against individual officers or directors who are deemed to have harmed the Company through some form of fiduciary malfeasance. Derivative lawsuits are difficult to bring and the successful UnitedHealth Group case has set important corporate governance standards for Directors everywhere:

- In response to the lawsuits, UnitedHealth's Board of Directors established a special litigation committee to determine its fiduciary responsibility in the matter. This committee has been widely recognized for its effectiveness, particularly in seeking shareholder views on the problems at UnitedHealth, and has set the bar higher for other companies facing similar litigation.

- BLB&G's successful recovery should encourage company Boards to institute repayment provisions, or "clawbacks," in all employment agreements with senior executives and to enforce them.

- Following the initiation of this lawsuit, UnitedHealth agreed to set up a committee representing long-term institutional investors to advise on the candidates and qualifications for its Board of Directors.

For more information about the *UnitedHealth* case, please contact
**BLB&G Partner Chad Johnson (+1-212-554-1400; chad@blbglaw.com).**

## Who we are

Founded in 1983, BLB&G is widely recognized as the leading US law firm specializing in securities and other complex class litigation. We represent institutional shareholders worldwide in US securities fraud class actions, helping our clients recover losses and achieve governance reform. We are over fifty highly experienced lawyers practicing out of offices in New York, California, Louisiana and New Jersey.

**For more information see our website www.blbglaw.com**

## International shareholders in protest against the SEC

In reaction to the limited nature of shareholder rights in the US, a group of international investors have started to lobby the US Securities and Exchange Commission. The current issue concerns the right of shareholders to nominate board candidates by including them on the proxy ballot. In October, the International Corporate Governance Network (ICGN) wrote a letter to the SEC criticizing a current proposal that would limit shareholders' ability to influence the resolutions put forward to the Annual General Meeting. "International experience of shareholder access to the proxy suggests that such rights are used responsibly and constructively", says the ICGN.

## New Pay Disclosure Rules adopted by the SEC

Amid growing disquiet about executive pay and the options-backdating scandal, the US Securities and Exchange Commission (SEC) has introduced new rules that require US listed companies to disclose more details of executive compensation in the proxy statement to shareholders. The new rules have resulted in lengthy reports. For example, IBM's statement covered 47 pages. The SEC is now criticizing companies for being too vague, especially about individual performance goals and targets. The Commission has sent letters to nearly 300 companies critiquing disclosures and demanding more information. The letters are expected to lead to enhanced executive-pay revelations in the 2008 proxy statements.

## Shareholders demand say on executive pay

Last spring the US House of Representatives approved a bill by a vote of 269 to 134 to give shareholders the right to cast nonbinding votes on the pay of top company executives. "An expression of widespread shareholder dissatisfaction would provide a valuable signal to the board," Lucian Bebchuk, director of the corporate governance program at Harvard Law School, said in prepared testimony to Congress. "The fact that the outcome of the vote would be publicly known would apply some pressure on the board to take the shareholders' preferences into account."

The White House opposes the bill and the prospects for the bill in the Senate are uncertain. Investors are hoping that even if the bill fails to become law, it will prompt companies to voluntarily introduce advisory votes.

**Disclaimer:** Advocate for Institutional Investors is published by Bernstein Litowitz Berger & Grossmann LLP, 1285 Avenue of the Americas, New York, NY 10019, +1-212-554-1400 or +1-800-380-8496. The materials in this newsletter have been prepared for information purposes only and are not intended to be, and should not be taken as, legal advice.
© 2008. ALL RIGHTS RESERVED. Quotation with attribution permitted.



Home | Cases | Institutional Investor Services | News & Events | Publications | FAQs | Offices | Careers | Contact Us | Search

 **BLB&G**

Our firm  **I**  Our attorneys  **I**  Our practice areas  **I**  Our results

## Contact Us



Bernstein Litowitz Berger & Grossmann LLP

People, Resources, Excellence… *Results*

## Our Offices

**NEW YORK**
1285 Avenue of the Americas
New York, New York 10019
Telephone: 212-554-1400
Fax: 212-554-1444

**CALIFORNIA**
12481 High Bluff Drive
Suite 300
San Diego, CA 92130
Telephone: 858-793-0070
Fax: 858-793-0323

**LOUISIANA**
2727 Prytania Street
Suite 14
New Orleans, LA 70130
Telephone: 504-899-2339
Fax: 504-899-2342

**NEW JERSEY**
220 St. Paul Street
Westfield, New Jersey 07090
Telephone: 908-928-1700
Fax: 908-301-9008

## Anmode om oplysninger eller indberette svindel

Bernstein Litowitz Berger & Grossmann LLP, "BLB&G," retsforfølger private sager og gruppesøgsm
og institutionelle kunders vegne. Vores specialer er gruppesøgsmål mht. værdipapirer og sagsanla
virksomhedsledelse, retsforfølgelse mht. krænkelse af borgerrettigheder samt forbrugerkrav. I sa
med vores kunder har vi opnået nogle af de mest vigtige erstatninger for svindel og
borgerrettighedskrænkelser nogen sinde.

BLB&G repræsenterer investorer, forbrugere og medarbejdere i gruppesøgsmål, ofte på betinget g
hvor vi påtager os alle omkostninger og udgifter.

Hvis du ønsker flere oplysninger om vores advokatfirma, har brug for juridisk rådgivning eller øns
indberette virksomheds- eller regeringssvindel, bedes du kontakte os via nedenstående formular.
obligatoriske felter og klik på knappen "Send formular". Alle oplysninger vil blive behandlet fortro

* Angiver obligatorisk felt

Fornavn: *        Efternavn: *        E-mail: *

Postadresse:                              Telefon:

By:        Stat:        Postnummer:

Meddelelse: *

ønsker du at blive tilføjet til vores adresseliste?
ja ● nej ○

[ Send formular ]

Home | Cases | Institutional Investor Services | News & Events | Publications | FAQs | Offices | Careers | Contact Us | Search

Site Map - Disclaimer - Attorney
Advertising

For additional information please email your request to blbg@blbglaw.com or call us at 800-380-8496
©2008 Bernstein Litowitz Berger & Grossmann LLP. All rights reserved. February 6, 2008
This Web site contains Attorney Advertising. Prior results do not guarantee a similar outcome.

Home | Cases | Institutional Investor Services | News & Events | Publications | FAQs | Offices | Careers | Contact Us | Search



**BLB&G**

Our firm | Our attorneys | Our practice areas | Our results

Contact Us



Bernstein Litowitz Berger
& Grossmann LLP

People, Resources, Excellence…*Results*

## Our Offices

**NEW YORK**
1285 Avenue of the Americas
New York, New York 10019
Telephone: 212-554-1400
Fax: 212-554-1444

**CALIFORNIA**
12481 High Bluff Drive
Suite 300
San Diego, CA 92130
Telephone: 858-793-0070
Fax: 858-793-0323

**LOUISIANA**
2727 Prytania Street
Suite 14
New Orleans, LA 70130
Telephone: 504-899-2339
Fax: 504-899-2342

**NEW JERSEY**
220 St. Paul Street
Westfield, New Jersey 07090
Telephone: 908-928-1700
Fax: 908-301-9008

## Begär information eller rapportera bedrägeri

Bernstein Litowitz Berger & Grossmann LLP (BLB&G) tar sig an privatmål och grupptalan åt enskil institutioner. Vi är specialister på processer med grupptalan och värdepapper, processer med företagsledningar, brott mot medborgerliga rättigheter och konsumentmål. I samarbete med klier vunnit skadestånd vilka återfinns bland de historiskt mest betydande vad gäller bedrägeri och me rättigheter.

BLB&G representerar investerare, konsumenter och anställda i grupptalan, där arvoden ofta enda skadestånd utdöms; vi står då för samtliga kostnader och utgifter.

Kontakta oss genom att fylla i formuläret nedan och inhämta ytterligare information om firman, b rådgivning eller rapportera bedrägeri i företag eller på regeringsnivå. Fyll i de obligatoriska fälten Skicka in formulär. All information är sekretessbelagd.

* Obligatoriskt fält

Förnamn: *          Efternamn: *          E-post: *

Postadress:                          Telefon:

Ort                    Kommun:              Postnummer:

Meddelande: *

Vill du vara med i vår adresslista?
ja ⦿  nej ◯

[ Skicka ]

Home | Cases | Institutional Investor Services | News & Events | Publications | FAQs | Offices | Careers | Contact Us | Search

Site Map - Disclaimer - Attorney
Advertising

For additional information please email your request to blbg@blbglaw.com or call us at 800-380-8496
©2008 Bernstein Litowitz Berger & Grossmann LLP. All rights reserved. February 6, 2008
This Web site contains Attorney Advertising. Prior results do not guarantee a similar outcome.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

ROBERT CORWIN, on behalf of          :
himself and all others similarly
situated,                            :

                   Plaintiff,        :        07 Civ. 6728 (DC)

          - against -                :

BERND R. SEIZINGER et al.,           :

                   Defendants.       :

- - - - - - - - - - - - - - - - - -x

ISTVAN TEMESFOI, on behalf of        :
himself and all others similarly
situated,                            :

                   Plaintiff,        :        **MEMORANDUM DECISION**

          - against -                :        07 Civ. 7016 (DC)

GPC BIOTECH AG et al.,               :

                   Defendants.       :

- - - - - - - - - - - - - - - - - -x

AUDREY DANG, individually and on     :
behalf of all others similarly
situated,                            :

                   Plaintiff,        :        07 Civ. 7476 (DC)

          - against -                :

GPC BIOTECH AG et al.,               :

                   Defendants.       :

- - - - - - - - - - - - - - - - - -x

**APPEARANCES:**    (See last page)

**CHIN, D.J.**

          In these three securities cases, plaintiffs allege that

defendants violated §§ 10(b) and 20(a) of the Securities Exchange

Act of 1934 and Rule 10b-5 promulgated thereunder.  Plaintiffs

contend that defendants made material misrepresentations that

artificially inflated the price of the stock of GPC Biotech AG

("GPC"), a publicly traded biopharmaceutical company that

specializes in the development of anti-cancer drugs.  Plaintiffs

sue, in all three cases, on behalf of a class of all persons who

purchased or otherwise acquired GPC securities during the period

from December 5, 2005 through July 24, 2007 (the "Class Period")

and who suffered damages as a result.  (Corwin Compl. ¶ 1;

Temesfoi Compl. ¶ 51; Dang Compl. ¶¶ 1, 52).

Before the Court are three competing applications from

shareholders seeking appointment as lead plaintiff and the

appointment of their attorneys as lead counsel.  All three sets

of shareholders also seek consolidation of the three actions, as

well as any subsequently-filed related actions.

## DISCUSSION

### A.   Consolidation

The requests for consolidation are granted.  All three

cases involve securities claims brought on behalf of purchasers

of GPC securities during the Class Period.  The cases assert

similar claims based on the same legal theories and the same

underlying facts.  No opposition to consolidation has been filed.

Hence, the three cases are hereby consolidated for all purposes.

See, e.g., Constance Sczesny Trust v. KPMG LLP, 223 F.R.D. 319,

322 (S.D.N.Y. 2004) (consolidating nine related securities class

actions).

- 2 -

**B.    <u>Appointment of Lead Plaintiff</u>**

   **1.    <u>Applicable Law</u>**

   The Private Securities Litigation Reform Act of 1995
(the "PSLRA") requires the court to appoint a "lead plaintiff" in
private securities class actions.  15 U.S.C. § 78u-4(3)(B)(i).
The "lead plaintiff" is "the member or members of the purported
plaintiff class that the court determines to be most capable of
adequately representing the interests of class members."  <u>Id.</u>
This provision of the PSLRA was intended to ensure that parties
with "significant financial interests in the litigation" would
oversee securities class actions and control the management of
such suits, including the selection of counsel.  <u>See Pirelli
Armstrong Tire Corp. Retiree Medical Benefits Trust v. LaBrance &
Co.,</u> 229 F.R.D. 395, 402 (S.D.N.Y. 2004) (quoting <u>In re Oxford
Health Plans, Inc. Sec. Litig.,</u> 182 F.R.D. 42, 43-44 (S.D.N.Y.
1998) (quoting H.R. Rep. No. 104-369, at 32 (1995) (Conf. Rep.).,
reprinted in 1996 U.S.C.C.A.N. at 731)).

   The PSLRA sets forth detailed procedures for the filing
of securities class actions and the selection of a lead
plaintiff.

   First, each plaintiff seeking to serve as a
representative party on behalf of a class must file, with the
complaint, a sworn certification that makes certain
representations and disclosures, including that the plaintiff has
reviewed the complaint and authorized its filing, the plaintiff
did not purchase the securities at the direction of counsel or to

participate in a lawsuit, and setting forth all transactions of the plaintiff in the securities during the class period.  15 U.S.C. § 78u-4(a)(2).

Second, the plaintiff who files the first action must publish, within twenty days after the complaint is filed, a notice informing class members of the pendency of the action and their right to move, within sixty days after publication of the notice, for appointment as lead plaintiff.  15 U.S.C. § 78u-4(a)(3)(A).  Motions to be appointed lead plaintiff may be made by any purported class member, including one not individually named as a plaintiff in any complaint.  15 U.S.C. § 78u-4(a)(3)(B)(i).

Third, within ninety days after publication of the notice or, where multiple actions are filed, as soon as practicable after the consolidation of multiple related cases (if consolidation occurs after the ninety-day period), the court "shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members."  15 U.S.C. § 78u-4(a)(3)(B).

The determination of the "most capable" class representative entails a two-step process.

First, the PSLRA sets forth a rebuttable presumption that "the most adequate plaintiff" is "the person or group of persons" that (a) filed the initial complaint or moved for appointment as lead plaintiff, (b) has "the largest financial

interest in the relief sought by the class," and (c) "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  Hence, the court must first determine which member (or group of members) of the class is entitled to this statutory presumption.  See, e.g., Constance Sczesny Trust, 223 F.R.D. at 323.  In deciding which proposed lead plaintiff has "the largest financial interest in the relief sought by the class," courts consider four factors: "(i) the gross number of shares purchased; (ii) the net number of shares purchased; (iii) the net funds spent; and (iv) the net loss."  In re Initial Pub. Offering Sec. Litig., 214 F.R.D. 117, 121 (S.D.N.Y. 2002) (citing In re Crayfish Co. Sec. Litig, No. 00 Civ. 6766, 2002 WL 1268013, at *4 (S.D.N.Y. June 6, 2002)); accord Constance Sczesny Trust, 223 F.R.D. at 323 (quoting Ferrari v. Impath, Inc., 03 Civ. 5667, 2004 WL 1637053, at *4 (S.D.N.Y. July 20, 2004) (citing In re Olsten Corp. Sec. Litig., 3 F. Supp. 2d 286, 296 (E.D.N.Y. 1998))).  As for the requirements of Rule 23, at this stage a proposed lead plaintiff need only make a "preliminary showing" that it will satisfy the typicality and adequacy requirements of Rule 23.  In re Initial Pub. Offering Sec. Litig., 214 F.R.D. at 121 (quoting In re Crayfish Co. Sec. Litig, 2002 WL 1268013, at *4); see also Constance Sczesny Trust. 223 F.R.D. at 323-24.

     Second, once the court determines which class member (or group of members) is entitled to the presumption, other members of the purported class may try to rebut the presumption

by showing that the presumptive lead plaintiff will not fairly and adequately protect the interests of the class or is, because of "unique defenses," incapable of adequately representing the class.  Id.; see 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

The Court has the discretion to appoint more than one lead plaintiff and can aggregate the losses suffered by the members of a group of investors.  Constance Sczesny Trust. 223 F.R.D. at 323.

**2.    Application**

The first of the three cases, Corwin, was filed on July 26, 2007.  Attached to the Corwin complaint was the certification of plaintiff Robert Corwin declaring that he had purchased 200 shares of GPC stock and otherwise making the representations required by the PSLRA, 15 U.S.C. § 78u-4(a)(2).  (See Corwin Compl. ¶ 14 & Att.).

The same day (and well within twenty days of the filing of the complaint), Corwin published a notice informing class members of the pendency of the action and their right to move, within sixty days after publication of the notice, for appointment as lead plaintiff, as required by the PSLRA, 15 U.S.C. § 78u-4(a)(3)(A).  (See Kaboolian Decl. ¶ 2 & Ex. A).

Within sixty days after publication of the notice of the Corwin action, the three instant applications for appointment as lead plaintiff (or plaintiffs) were filed:

    --    Axxion S.A. Luxemburg ("Axxion"), through its
          Akrobat Fund-Value, purchased 150,000 shares of

GPC stock and sold none during the Class Period.
(Ellman Decl. Ex. A).[1]  It spent some $3,963,658
to purchase these shares.  (Id.).  It claims
losses of $1,832,888.35.  (Id. at Ex. B).  Axxion
is represented by Labaton Sucharow LLP.

--   Agamemnon Chua, Dhruvajyoti Biswas, Koernig Kron,
     and Frank Von Tempelhoff (collectively, the "Chua
     Group") purchased a total of 59,410 shares of GPC
     stock and sold 47,910 of those shares during the
     Class Period.  (Chua Group Mem. 1; Kaboolian Decl.
     Ex. F).[2]  The Chua Group spent net funds of
     approximately $278,999.  (See Kaboolian Decl. Ex.
     F).[3]  All told, the Chua Group claims losses of

_____

[1]     Axxion is an investment firm established under
Luxemburgian law.  It manages assets totaling approximately 1.7
billion euros.  It establishes and manages investment funds, such
as the Akrobat Fund, which are separate legal entities from
Axxion and other funds managed by Axxion, and has authority to
sue on behalf of its funds.  The Akrobat Fund-Value and the
Akrobat Fund-Europa are "special assets/partial funds in the
umbrella Akrobat Fund," and are "legally independent entities."
Axxion is proceeding in this case only on behalf of its Akrobat
Fund-Value, but the Akrobat Fund-Europa also had certain
purchases and sales in GPC stock during the Class Period and
claims losses of some $650,335.96.  (Mertes 10/13/07 Decl. ¶¶ 2-6
& Ex. A).

        The Akrobat Fund-Value sold 104,000 shares of its GPC
stock after the Class Period.  (Ellman Decl. Ex. A).

[2]     The Chua Group sold another 9,400 shares of its GPC
stock after the Class Period.  (Kaboolian Decl. Ex. F)

[3]     Exhibit F to the Kaboolian Declaration does not provide
a total for net sums spent, and some amounts are given in dollars
and some in euros.  The Court converted the euros to dollars
using, for simplicity, an exchange rate of 1.3.  The Court then
added up the net amounts spent by each member of the group

approximately $174,351. The Chua Group is represented by Abbey Spanier Rodd & Abrams LLP.

-- Istvan Temesfoi, Stefan Ganswindt, Tobias Wenk, Elmar Rempel, and Matthias Lenardt (collectively, the "Temesfoi Group") purchased (for themselves or on behalf of relatives) a total of 67,518 shares of GPC stock and sold 31,088 of those shares during the Class Period. (Stone Affirmation Ex. 2).[4] The Temesfoi Group spent net funds of approximately $1,280,108. (Id.).[5] The Temesfoi Group also bought and sold certain options in GPC stock. (Id.). All told, the Temesfoi Group claims losses of approximately $928,150.40. (Id.). The Temesfoi Group is represented by Shalov Stone Bonner & Rocco LLP.

I consider which of the three candidates for lead plaintiff is entitled to the statutory presumption that it is "the most adequate plaintiff."

Based on the available information, I conclude that Axxion has "the largest financial interest in the relief sought

(amounts spent on purchases minus amounts received from sales during the Class Period) to obtain a total net amount in dollars.

[4] The Temesfoi Group sold an additional 17,000 shares of the GPC stock after the Class Period. (Stone Affirmation Ex. 2).

[5] Exhibit 2 to the Stone Affirmation does not provide a total for net funds expended, and most of the figures are in euros. The Court has calculated net funds expended during the Class Period following the same methodology used for the Chua Group.

by the class." Of the three competing groups, it purchased the most shares, both on a gross basis and on a net basis, during the Class Period. It spent, by far, the most net funds of the three -- $3.9 million as compared to $1.28 million for the Temesfoi Group and only $278,999 for the Chua Group. It claims, again by far, the greatest net loss of the three -- almost double the loss claimed by the Temesfoi Group and more than ten times the amount claimed by the Chua Group. I also conclude, preliminarily, that Axxion meets the typicality and adequacy requirements of Rule 23. Axxion appears to have a claim typical of other members of the proposed class -- it purchased or acquired GPC securities during the Class Period at prices allegedly artificially inflated by defendants' purported materially false and misleading statements and/or omissions, and suffered damages when the truth was disclosed to the market. Axxion's interests are aligned with the interests of other shareholders and there appear to be no conflicts. Axxion is a sophisticated institutional investor with the resources necessary to litigate a securities class action, and it is represented by able and experienced counsel. Accordingly, Axxion is entitled to the statutory presumption.

Finally, I consider whether any other class members have rebutted the presumption by showing that Axxion will not adequately and fairly protect the interests of the proposed class. I conclude they have not.

The Temesfoi Group argues that Axxion is an inadequate and atypical plaintiff, based largely on what it contends is a

"problematic and inconsistent" certification.  Although Axxion's
initial certification did not completely track the language of
the PSLRA and it did not adequately explain the relationship
between Axxion and the Akrobat Fund-Value, the Temefoi Group's
concerns are largely speculative.  In any event, the concerns
have been adequately addressed in Axxion's follow-up declaration,
which explains the relationship between Axxion and the Akrobat
Fund-Value and confirms that Axxion has the authority to sue on
behalf of its funds.  See Kaplan v. Gelfond, 240 F.R.D. 88, 95
(S.D.N.Y. 2007) (investment manager has standing to sue on behalf
of fund investors as long as it has attorney-in-fact authority
and unrestricted decision-making authority).  Although Axxion did
not initially disclose its GPC holdings in its Akrobat Fund-
Europa, the Akrobat Fund-Value and the Akrobat Fund-Europa are
legally independent entities and Axxion was not required to
include the Europa holdings in its application.  If they were
included, Axxion's alleged losses would be even larger.

     The Chua Group argues that it is the most adequate
plaintiff because it includes both United States and foreign
investors,[6] while Axxion and the Temesfoi Group are foreign
investors that purchased securities of a foreign company on the
German exchange.  It contends that both Axxion and the Temesfoi

---

     [6]     Apparently, Chua and Biswas are U.S. investors.  (Chua
Reply Mem. 2).  Chua, however, purchased only 200 shares during
the Class Period (selling none), for a total net expenditure of
$5,314.  (Kaboolian Decl. Ex. B).  Biswas purchased a total of
5,000 shares during the Class Period, selling 2,000 of those
share during the Class Period, for a net amount expended of some
$102,830.  (Id. at Ex. F).

Group are potentially subject to a defense of lack of subject
matter jurisdiction.  Alternatively, the Chua Group argues that
Chua and Biswas should be appointed co-lead plaintiffs with one
of the other proposed lead plaintiffs.

The Chua Group's arguments are rejected.  Other courts
in this District have appointed foreign investors as class
representatives in securities class actions that included both
foreign and U.S. purchasers of a foreign company's shares.  See,
e.g., In re Nortel Networks Corp. Sec. Litig., No. 01 Civ. 1855
(RMB), 2003 WL 22077464 (S.D.N.Y. Sept. 8, 2003) (certifying
class action brought by Canadian union pension trust fund
alleging fraud in connection with securities of Canadian
company).  While defendants may raise a subject matter
jurisdiction defense, such a defense would not be "unique" to
Axxion, as it appears that many (if not most) of the class
members would be foreign investors.  Axxion elected to file suit
here, and there is no reason to doubt its ability to respond to a
motion to dismiss for lack of subject matter jurisdiction, should
such a motion be made.

Moreover, without prejudging the issue, the Court notes
that plaintiffs have alleged substantial acts in the United
States in furtherance of the alleged fraud.  For example, the
Corwin complaint alleges that GPC maintains clinical facilities
in the United States, its lead product (Satraplatin) was and is
under review by the United States Federal Drug Administration
(the "FDA"), GPC makes filings with the United States Securities

- 11 -

and Exchange Commission (the "SEC"), and certain GPC securities
are traded on an American exchange, the NASDAQ. (<u>Corwin</u> Compl.
¶¶ 3, 15, 22). Plaintiffs further allege that defendants had
been trying to bring Satraplatin to market for several years and
faced financial and other pressures, and that, during the Class
Period, they made public statements falsely suggesting that FDA
approval of the marketing of Satraplatin was coming soon when
they purportedly knew, from facts and developments in the FDA
approval process that they failed to disclose, that FDA approval
would not be coming any time soon. (<u>Dang</u> Compl. ¶ 3; <u>Corwin</u>
Compl. ¶¶ 2-5). The alleged misstatements and omissions involved
the FDA approval process, and thus necessarily had a substantial
connection to the United States.

    As for the Chua Group's alternative suggestion that I
appoint two of its members -- Chua and Biswas -- co-lead
plaintiffs, I decline to do so. Chua's interest is miniscule, as
he purchased only 200 shares. While Biswas's interest is
somewhat more substantial (he purchased 5,000 and sold 2,000
shares during the Class Period), it still is relatively minor.
It would defeat the goals of the PSLRA to take two members of one
proposed group with minor or relatively minor holdings and simply
tack them on as co-lead plaintiffs when I am not otherwise
satisfied that they indeed qualify as the "most capable of
adequately representing the interests of class members." 15
U.S.C. § 78u-4(a)(3)(B).

    Accordingly, the statutory presumption has not been

overcome, and I will appoint Axxion as the lead plaintiff in these securities class actions. Axxion's choice of counsel is approved.

## CONCLUSION

For the reasons set forth above, these three actions are consolidated, Axxion is appointed lead plaintiff, and its choice of counsel is approved.

The Court will enter the proposed order previously submitted by Axxion.

SO ORDERED.

Dated:    New York, New York
          January 8, 2008

DENNY CHIN
United States District Judge

## **APPEARANCES**

For Plaintiff Axxion:

        LABATON SUCHAROW LLP
            By:  Christopher J. Keller, Esq.
                Ira A. Schochet, Esq.
        140 Broadway
        New York, NY  10005


For Plaintiff The Chua Group:

        ABBEY SPANIER RODD & ABRAMS LLP
            By:  Nancy Kaboolian, Esq.
        212 East 39th Street
        New York, NY  10016


For Plaintiff The Temesfoi Group:

        SHALOV STONE BONNER & ROCCO LLP
            By:  Amanda Claire Scuder, Esq.
                Ralph M. Stone, Esq.
                Thomas George Ciarlone, Jr., Esq.
        485 Seventh Avenue, Suite 1000
        New York, NY  10018


For Defendants GPC Biotech AG, Bernd Seizinger, Martine George,
and Marcel Rozencweig:

        MORGAN LEWIS & BOCKIUS LLP
            By:  Bernard J. Garbutt III, Esq.
        101 Park Avenue
        New York, NY  10178